UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
    VS.                             ) No. 4:14-CR-246(AGF)
                                    )
THOMAS G. ANDERSON, JR.,            )
                                    )
                Defendant.          )
_____)


DETENTION HEARING
BEFORE THE HONORABLE SHIRLEY A. PADMORE MENSAH
AUGUST 27, 2014
ST. LOUIS, MISSOURI

FOR THE PLAINTIFF:

    JOHN T. DAVIS
    OFFICE OF U.S. ATTORNEY
    111 South Tenth Street, Suite 2000
    St. Louis, MO  63102
    (314) 539-2200

FOR THE DEFENDANT:

    N. SCOTT ROSENBLUM
    ROSENBLUM AND SCHWARTZ
    120 S. Central Avenue, Suite 130
    St. Louis, MO  63105
    (314) 862-4332


    Proceedings transcribed from courtroom recording.

_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
111 South Tenth Street, Third Floor
St. Louis, MO  63102
(314) 244-7449

<u>I N D E X</u>

August 27, 2014; VOLUME I

| Plaintiff's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| DEA AGENT | | | | |
| ALEXANDER JENNY | 4 | 19 | 33 | |

1          (PROCEEDINGS BEGAN AT 11:30 AM.)

2          THE COURT:  Good morning, Mr. Anderson.

3          THE DEFENDANT:  Good morning, ma'am.

4          THE COURT:  Counsel, are you ready to proceed in

5    Thomas Anderson?

6          MR. ROSENBLUM:  We are, Your Honor.

7          THE COURT:  Okay.  This is *United States versus*

8    *Thomas Anderson*.  The Case Number is 4:14-CR-246(AGF).  We are

9    here for a detention hearing.

10          Will counsel, please, announce your presence?

11          MR. ROSENBLUM:  Scott Rosenblum, Your Honor, on

12    behalf of Mr. Anderson.

13          THE COURT:  Okay.

14          MR. DAVIS:  John Davis on behalf of the

15    United States, Your Honor.

16          THE COURT:  Okay.  Good morning to you, all.  We are

17    here on the Government's Motion for Pretrial Detention.

18          Have both parties had an opportunity to review the

19    Report and Recommendation of the Pretrial Services Office?

20          MR. ROSENBLUM:  I have, Your Honor.

21          MR. DAVIS:  We have.

22          THE COURT:  And, Mr. Rosenblum, have you had a chance

23    to talk to Mr. Anderson about the Report and Recommendation of

24    Pretrial Services?

25          MR. ROSENBLUM:  Generally speaking, Your Honor, yes.

1          THE COURT:  Okay.  I take it there's not a waiver of

2    detention -- of the detention hearing this morning.

3          MR. ROSENBLUM:  There is not, Your Honor.

4          THE COURT:  Okay.  Well, Mr. Davis, this is your

5    motion.

6          MR. DAVIS:  Yes.

7          THE COURT:  The Government has the burden, so please

8    proceed.

9          MR. DAVIS:  I'd like to call DEA Agent Jenny to the

10   stand, please.

11      (The Witness Is Sworn.)

12                        DIRECT EXAMINATION

13   QUESTIONS BY MR. DAVIS:

14   Q    Agent, can you state your full name for the record,

15   please?

16   A    Alexander Jenny.

17   Q    How are you employed?

18   A    As a Task Force Officer with the Drug Enforcement

19   Administration.

20   Q    Detached from?

21   A    St. Louis County Police Department.

22   Q    How long have you been a St. Louis County officer?

23   A    Six-and-a-half years.

24   Q    And how long have you been detached to the TFO?

25   A    Two years.

1  Q    In your employ as a Task Force Officer with the DEA, are

2  you familiar with and have you participated in an

3  investigation of a drug trafficking organization which we've

4  identified as being run by Thomas Anderson?

5  A    That's correct.

6  Q    Are you aware that there was an indictment recently

7  charging illegal weapons including (inaudible) conspiracy to

8  distribute marijuana?

9  A    I am.

10 Q    You participated in that investigation?

11 A    That's correct.

12 Q    Does that participation include developing and talking to

13 sources of information from confidential informants?

14 A    It does.

15 Q    Have they expressed to you concerns about safety issues

16 regarding Mr. Anderson?

17 A    Yes, they have.

18 Q    Specifically have you talked to a man named Mitchell --

19 Well, let me back that up before that.  Who is the primary

20 case agent on the Anderson investigation?

21 A    Brandon Moles.

22 Q    And he's a  (inaudible), correct?

23 A    That's correct.

24 Q    Where is Brandon Moles right now?

25 A    Currently attending language school for an upcoming

1    assignment at the beginning of next year.

2    Q    He's to be transferred outside of the country?

3    A    That's correct.

4    Q    It's an emergent school that he has to attend every day

5    all day till next year, correct?

6    A    Yes, it is.

7    Q    Okay.  In his absence at the emergent school, you've

8    taken on the role for Mr. Moles.  Is that true?

9    A    That's correct.

10   Q    You've reviewed reports written by Moles and other agents

11   and other Task Force Officers?

12   A    Correct.

13   Q    In addition to your personal participation in the

14   investigation?

15   A    Correct.

16   Q    Are you familiar with agents, which may have included

17   you, speaking to a man named "Mitchell Hughes" that goes by

18   the nickname "Big"?

19   A    I am.

20   Q    Can you summarize for the Court how Mr. Hughes said he

21   was familiar with Mr. Anderson?

22   A    Mr. Hughes told investigators that he met Mr. Anderson

23   through the bar scene, basically frequenting bars that

24   Mr. Hughes worked at over the ---

25   Q    Do you know what -- Sorry.  Do you know what -- in what

1    capacity he was employed at various bars around town?

2    A    He was employed as a bouncer.

3    Q    Okay.  Mr. Hughes, is he a physically impressive man?

4    A    Yes, he is.

5    Q    Okay.  And his nickname is, in fact, "Big," correct?

6    A    Correct.

7    Q    Do you know around 2010 that Mr. Anderson employed

8    Mr. Hughes?

9    A    Yes, he did.

10   Q    What did Mr. Hughes tell you that employment consisted

11   of?

12   A    Accompanying Mr. Anderson and associates when they would

13   go out, whether it'd be a Friday or Saturday evening, at bars,

14   at clubs.  Mr. Hughes' role was, more or less, to keep an eye

15   on Mr. Anderson and his associates, make sure there was no

16   altercations with Mr. Anderson by other customers at the bars,

17   and then also to make sure that, more or less, he got his

18   service at the bar.

19   Q    Did Hughes -- In Hughes' own words, did he characterize

20   it as a "bodyguard"?

21   A    Yes, he did, from my understanding, correct.

22   Q    Did he tell you that he was paid for his services?

23   A    Yes.

24   Q    Do you recall roughly how much?

25   A    From what Mr. Hughes told investigators, approximately

1    250 to 300 dollars an evening for his services.

2    Q     Did he indicate to you that he was aware how Mr. Anderson

3    earned his income?

4    A     He explained that Mr. Anderson was responsible for the

5    sales of Kush marijuana and more specifically high-grade

6    marijuana.

7    Q     As a side note, are you aware that there was an ex parte

8    order for Mr. Anderson's tax returns for the years that would

9    be available from the day it was requested?

10   A     I am, aware.

11   Q     2008, 2009, 2010, 2011 were reportable to us.  Is that

12   true?  '12 and '13 were not yet available?

13   A     From my understanding, yes.

14   Q     Do you recall what the report was for those years?

15   A     No tax information had been filed on Mr. Anderson's

16   behalf for those years.

17   Q     For any of those years?

18   A     Correct.

19   Q     Do you recall a particular instance that Mr. Hughes --

20   that Big talked about where Anderson telephoned him and asked

21   him to come to a bar in U. City?

22   A     Yes, I do.

23   Q     What did Mr. Anderson or what did Mr. Hughes relate to

24   DEA about that incident?

25   A     He said that he was contacted by Mr. Anderson to respond

1    to a bar in the University City area and that upon arriving

2    there, the other individual or party that Mr. Anderson

3    apparently had a confrontation with had already left the area.

4    In turn, Mr. Hughes' services were no longer needed, and

5    Mr. Hughes was paid approximately a thousand dollars for

6    responding to assist Mr. Anderson.

7    Q    Did Hughes explain to you about a time he traveled to

8    San Jose, California via Southwest Airlines at the request of

9    Mr. Anderson?

10   A    Yes, he did.

11   Q    Can you summarize for the Court what you recall from that

12   conversation with Mr. Hughes?

13   A    Well, Mr. Hughes explained to investigators that he was

14   contacted by Mr. Anderson in reference to basically a dispute

15   that he had had with another associate over a marijuana

16   transaction.

17   Q    Do you know that associate's name?

18   A    Kyle Kienstra.

19   Q    In your investigation of the Anderson matter, are you

20   familiar with the name "Kyle Kienstra"?

21   A    Yes, sir.

22   Q    Are you aware that there were two conspiracies that were

23   indicted on the same day?  The Anderson one did not include

24   Mr. Kienstra but the other one did?

25   A    I am aware.

1   Q    And did you participate in that investigation as well?

2   A    I did.

3   Q    Was that a joint investigation with Postal Service and

4   the FBI?

5   A    Yes, sir.

6   Q    Kyle Kienstra is under indictment for very similar

7   offenses right now, correct?

8   A    Correct.

9   Q    Okay.  Going back to what Mr. Hughes told you, what --

10  what did he say about Anderson?  What did he say Anderson

11  related to him regarding Kyle Kienstra in San Jose,

12  California?

13  A    That there was a dispute over a marijuana transaction;

14  that Mr. Anderson was owed money from Kyle Kienstra and wanted

15  Mr. Hughes to travel to California to confront -- confront

16  Mr. Kienstra and, in turn, get Mr. Anderson's money back.

17  Q    Did Mr. Hughes employ the assistance of someone else in

18  that trip to San Jose?

19  A    Yes, he did.

20  Q    Do you know who that was?

21  A    The individual's name was Brian Lambert.

22  Q    Was he an associate of Mr. Anderson's or simply a friend

23  of Mr. Hughes?

24  A    I believe it was a friend of Mr. Hughes.

25  Q    Did Hughes tell you what happened when he got to

1  San Jose?

2  A     He said that when he arrived in San Jose, they were

3  picked up by an individual, driven to a hotel, put up in a

4  hotel room there, and explained that shortly after,

5  Mr. Anderson contacted them by telephone.  Mr. Anderson met

6  them at the hotel and informed them that the other individual,

7  which, in fact, was Kyle Kienstra, would be showing up at the

8  hotel.  He told Mr. Hughes and the other individual to wait in

9  the room until he returned with Kyle Kienstra.

10 Q     Did he tell you that Thomas Anderson did return to the

11 room with Kyle Kienstra?

12 A     Yes, correct.

13 Q     Is it your understanding from the Hughes discussion that

14 Kienstra had no idea there would be two other individuals,

15 especially Mr. Big, in that hotel room?

16 A     That's correct.

17 Q     What did you say happened when Kienstra and Anderson

18 walked into the room?

19 A     Mr. Hughes said that when the two individuals walked in

20 the room, Mr. Kienstra was drinking a milk shake at which time

21 Mr. Hughes punched Mr. Kienstra in the face.  Mr. Kienstra

22 fell to the ground at which time Mr. Anderson proceeded to

23 yell threats to Kyle Kienstra while he was on the ground and

24 basically threatened him that if anybody found out about this

25 incident, that Mr. Anderson would make sure that Kyle was

1  killed.

2  Q    Did Hughes explain to you what happened after the assault

3  and the threat by Mr. Anderson?

4  A    Yeah.  He said that Mr. Anderson -- Mr. Anderson

5  instructed Kyle to leave the room after telling him,

6  threatening that if he were to mention anything about the

7  incident, what would happen in the future.  Mr. Kienstra left

8  the room.  Shortly after, Mr. Anderson and Mr. Hughes and

9  Mr. Lambert also left the room.  Mr. Anderson reportedly was

10  carrying a piece of luggage that contained a large amount of

11  U.S. currency inside of it.

12  Q    In excess of $200,000; is that your understanding?

13  A    That is correct.

14  Q    Did Anderson relate to Hughes whose money that was?

15  A    It was money from Kyle Kienstra that was owed --

16  apparently owed to Mr. Anderson.

17  Q    Upon arriving back in St. Louis eventually from that

18  San Jose trip, did Hughes tell you that he was paid for his

19  services?

20  A    He did, and he informed the investigators there that he

21  was paid approximately $3000, $3,500 for his services.  And

22  additionally, Mr. Lambert was paid approximately $1,500 for

23  his services.

24  Q    Are you aware that subpoenas were served on Southwest

25  Airlines and, in fact, confirmed flights to San Jose for

1   Mr. Lambert and Mr. Hughes from St. Louis to San Jose and

2   back?

3   A    I am aware.

4   Q    Are you aware of a federal search warrant executed at

5   4749 East Concord in greater St. Louis on November 12th?

6   A    Yes, I am.

7   Q    Were you there at that particular search warrant?

8   A    I was not present at that location.  I was present at a

9   location of another search warrant executed at the same time.

10  Q    In relation to this same investigation?

11  A    Correct.

12  Q    Was that the residence of Mr. Anderson's sister, Rachel,

13  and her fiance' Brian Hounsom?

14  A    Correct.

15  Q    Brian Hounsom has subsequently been indicted along with

16  Mr. Anderson in this case.  Is that true?

17  A    Correct.

18  Q    But, again, did you speak to agents who were present at

19  the Concord address while you were at the other address and

20  review the reports and photographs?

21  A    I did.

22  Q    Is it true that Mr. Anderson's -- Mr. Anderson's father

23  is Thomas Anderson, Sr., correct?

24  A    Correct.

25  Q    And this is Thomas Anderson, Jr., correct?

1   A     Correct.

2   Q     Was Thomas Anderson, Sr. and Jr. present at the house at

3   the time?

4   A     That is correct.

5   Q     Okay.  And Mr. Anderson -- Anderson, Jr.'s vehicle, a

6   Nissan SUV, was parked at the residence?  Is that true?

7   A     Yes, it was.

8   Q     As the search warrant was executed, can you relate to the

9   Court how much of any money was seized?

10  A     It's my understanding that there was approximately

11  $68,000 seized from the residence.

12  Q     Do you recall where that was located?

13  A     From my review of the case, it appears there was a hidden

14  compartment within one of the bathrooms near a bathtub.

15  Q     Okay.

16        MR. DAVIS:  Your Honor, I have an exhibit that

17  contains, I think -- give me just a moment -- nine

18  photographs.  I provided a copy to Mr. Rosenblum.

19  Q     (By Mr. Davis)  Agent, do you have a copy in front of

20  you?

21  A     I do.

22  Q     On Page 2 of that exhibit, can you describe for the Court

23  what you're looking at there?

24  A     It's a large pile of money, multiple electronic devices.

25  There's also a picture of Mr. Anderson, Jr., and -- alongside

1  a female.

2  Q    And if I told you that that was approximately $4000

3  laying on that table, would you have any dispute with that?

4  A    No, I would not.

5  Q    On the next page, the third page, do you see a planter on

6  top of an encasement around a bathtub?

7  A    Correct.

8  Q    And on the next page, the planter has been removed and

9  that door on which it was sitting is lifted up, correct?

10  A    Yes.

11  Q    Inside that, on the next page, can you describe what you

12  -- what that photograph depicts?

13  A    From my understanding, that is the compartment where a

14  portion of the U.S. currency was concealed inside the

15  residence.

16  Q    And does that picture depict the money that was seized

17  from that compartment?  In fact, it's sitting on top of the

18  tub encasement.

19  A    Yeah.  On the next page, yes, correct.

20  Q    Okay.  In addition to the money that was seized at the

21  residence pursuant to that search warrant, are you aware of

22  the seizure of firearms from the house?

23  A    Yes, I am.

24  Q    Is it true from your review and knowledge of the case

25  that two loaded Glock Model 17 handguns were sitting on top of

1    the bar stools in the kitchen?

2    A    Yes.

3    Q    A Glock Model 17 is a nine-millimeter semi-automatic

4    handgun.  Is that correct?

5    A    I believe so.

6    Q    Is it true there was a Sig Sauer assault rifle located in

7    a case next to the television in the lower level?

8    A    Correct.

9    Q    A Tapco USA AK-47 assault rifle next to the couch in the

10   lower level; is that true?

11   A    Correct.

12   Q    And in relation to those guns, there were five loaded mag

13   -- in relation to the rifles, there were five loaded magazines

14   that are actually ammo clips that -- that service those

15   weapons.  Is that true?

16   A    That's correct.

17   Q    A Glock Model 23, a 40-caliber, not a 9-caliber handgun,

18   located in the driver's side door compartment of the Nissan

19   Armada belonging to Anderson, Jr. was parked at the residence.

20   Is that true?

21   A    That's correct.

22   Q    That handgun was loaded and had a round in the chamber.

23   Is that true?

24   A    That is true.

25   Q    The other handgun, while loaded, was not chambered.  Is

1  that correct?

2  A    From my understanding, yes.

3  Q    If you would continue on to the photographs, there is a

4  picture of a duffle bag.  Can you describe for the Court what

5  that duffle bag contains?

6  A    The duffle bag contains multiple magazine clips

7  ultimately utilized to contain rounds for -- utilized by the

8  assault rifles.

9  Q    And if you switch to the next page, flip to the next

10  page, that appears to be a compilation of several items that

11  were seized.  Does it, in fact, depict the two rifles, the Sig

12  Sauer assault rifle and the AK-47?

13  A    That it does.

14  Q    There is money in a shoebox laying there.  Is that what

15  was retrieved from the tub?

16  A    From my understanding, yes.

17  Q    And then the money behind the -- the AK, is that -- that

18  was pictured previously on the -- on the night stand?  Is that

19  true?

20  A    Correct.

21  Q    On the next page, can you make that picture out?

22  A    The next picture depicts -- appears to be the driver door

23  console on Mr. Anderson, Jr.'s vehicle with the handgun that

24  was found inside.  It was loaded with a round in the chamber.

25  Q    And the next page as well, it's the same photograph

1   basically?

2   A    That's correct; a close-up of the previous picture.

3   Q    Is it true, Agent, there are several cooperating

4   co-defendants in this matter, several sources of information

5   and several confidential sources that have been used by DEA

6   and FBI in this investigation that have voiced some serious

7   concerns for their safety from Mr. Anderson?

8   A    Correct.

9   Q    Have they also voiced to you the fact that Mr. Anderson

10  has resided worldwide during this time period?

11  A    That is correct, also.

12  Q    In fact, the Pretrial Services report indicates that

13  Mr. Anderson himself says he moved to Boston.  He has lived in

14  Cancun.  He has lived in Dubai.  He has lived in Cancun again.

15  He has lived in Medellin, Columbia; South Hollow, Brazil and

16  St. Louis, Missouri and Los Angeles.  Does that comport with

17  most, if not all, of what these individuals have related to

18  DEA?

19  A    It would.

20  Q    And Photograph No. 1 at the very front is a picture of

21  the passport that was seized at the Concord search warrant.

22  Is that correct?

23  A    That is correct.

24      MR. DAVIS:  Your Honor, if there's no objection, I

25  would move for the admission of what I will mark as

1   Plaintiff's Exhibit No. 1 on the back of these nine pages.

2          MR. ROSENBLUM:  No objection.

3          THE COURT:  It will be admitted.  And these nine

4   pages depict photographs ---

5          MR. DAVIS:  They are photographs.

6          THE COURT:  They are photographs of items seized when

7   the search warrant was executed at 4749 East Concord?

8          MR. DAVIS:  Correct.

9          THE COURT:  And what did you say the date was of that

10  seizure?

11         MR. DAVIS:  11-14 of '12.

12         THE COURT:  Okay.  Thank you.

13         MR. DAVIS:  Thank you.  I don't have anything

14  further.

15         THE COURT:  Cross Examination?

16         MR. ROSENBLUM:  Thank you, Your Honor.

17                      CROSS EXAMINATION

18  BY MR. ROSENBLUM:

19  Q    Agent, you said that you came to this investigation

20  approximately two years ago?

21  A    That's correct.

22  Q    You certainly were aware this investigation predated you?

23  A    I'm sorry.  Say that again?

24  Q    This investigation predated you?

25  A    Correct.

1  Q     And it predated you for some period of time; probably at

2  least three to four years, going back to 2008, correct?

3  A     From my understanding, the case was opened towards the

4  beginning of 2012, approximately March of 2012.   Information

5  in the case dated back as far as 2008.

6  Q     So certainly the information related back as far as 2008,

7  but the case was opened in 2012?

8  A     From my understanding, yes, sir.

9  Q     And during the course of your investigation, would it be

10 fair to say that your investigation of Mr. Anderson and others

11 was not necessarily a well-kept secret in the St. Louis

12 community?

13 A     I'm not sure what you mean by that.

14 Q     Well, it was fairly open that you -- that your agency as

15 well as other agencies were investigating Mr. Anderson and

16 others by way of search warrant and things of that nature.

17 A     I mean to an extent there was, you know -- I'm sure that

18 when individual search warrants are executed, arrest warrant

19 enforcement operations are executed, I'm sure individuals

20 start to get leery and start to talk about it, but, obviously,

21 it's not the Federal Government, the DEA or any of the

22 assisting agencies' intention to reveal any of that

23 information.

24 Q     I understand it's not your intention, but you were

25 talking to a lot of people in this case, right?

1   A    There's multiple people that were talked to, correct.

2   Q    And as you were talking to a lot of people, it was your

3   understanding that there was a lot of conversation going

4   around with respect to the individuals that were targeted in

5   this case, some -- at least 23 that wound up indicted and a

6   number of unindicted co-conspirators.  Would that be fair?

7   A    Communication among all of them?

8   Q    Yes.

9   A    To an extent, yes.

10  Q    Now -- And you were aware or were made aware that at some

11  point, that early on in the investigation, at least as early

12  as 2012, Mr. Anderson had retained my services, correct?

13  A    That, I'm not aware of, no, sir.

14  Q    That was not brought to your attention?

15  A    No.  I -- Unless there's some kind of interview

16  enforcement operation where it comes to actually talking to an

17  individual specifically, you know, I mean it's not necessarily

18  one of those things that is made public to everybody.  If need

19  be, it would be.

20  Q    Now if you -- You were -- You mentioned that Mr. Anderson

21  had traveled to these various locations, correct?

22  A    Correct.

23  Q    Were you aware of any time that Mr. Anderson's presence

24  was sought by law enforcement where he did not show up?

25  A    No, not that I'm -- not that I'm aware of.

1  Q    In fact, were you aware that when Mr. Anderson was

2  indicted, that he was out of the country?

3  A    We had reason to believe he was elsewhere, not

4  necessarily out of the country.

5  Q    Were you made aware by this Assistant United States

6  Attorney that once he was indicted, I had communications with

7  him and assured him that he will be in the Eastern District of

8  Missouri to surrender himself voluntarily, from out of the

9  country to this Marshals Office, on a date certain and that he

10 did arrive on that date certain, being this last Monday which

11 would be August 25th, 2014?

12 A    I was aware that there was communication between yourself

13 and the Assistant U.S. Attorney and, in fact, Mr. Anderson

14 did, as you mentioned, self-surrender.

15 Q    He self-surrendered.  So that, obviously, obviated the

16 necessity for your agency or any other agency involved in this

17 investigation to take any action to arrest him, correct?

18 A    At that point, correct.  But prior to that there were

19 efforts made by the agency in efforts to locate him and, in

20 effect, arrest him because of the unsurety of him, in fact,

21 turning himself in.

22 Q    Well, the uncertainty until I was -- until early -- As

23 soon as he was indicted, I communicated with Mr. Davis that

24 he'd be here on this particular date, and he was, right?

25 A    He eventually was, yes, correct.

1   Q    Well, when you say "eventually," was -- was he late,

2   given the representation I made?

3          MR. DAVIS:  Your Honor, I'll stipulate to the fact

4   that Mr. Anderson turned himself in.  As to the exact date and

5   exact place and exact time, Mr. Rosenblum and I discussed it.

6          MR. ROSENBLUM:  Thank you.

7          MR. DAVIS:  (Inaudible).

8   Q    (By Mr. Rosenblum)  Now you talked rather extensively

9   about a fellow by the name of "Biggs" or Mitchell Hughes,

10  correct?

11  A    Yes, sir.

12  Q    And I would -- And Mr. Mitchell Hughes or Biggs was a

13  cooperating informant?

14  A    He was a source of information, yes.

15  Q    He was not a target in any way?

16  A    A target in the case?

17  Q    Yes.

18  A    Not from my understanding, no.

19  Q    Well, was he -- did he -- was he prosecuted for any of

20  the information that he revealed that he was involved in?

21  A    I'm not completely aware of the extent of that.

22  Q    I'm not sure what your answer means.  You're not aware of

23  whether he was prosecuted?

24  A    Whether he was prosecuted for what?  For his role in the

25  -- in assisting Mr. Anderson or his role in other criminal

1   activity?  I'm not sure what you're  ---

2   Q    You're not sure what I'm asking?

3   A    That's correct.

4   Q    Okay.  Well, let's take it -- You said -- First of all,

5   with respect to Mr. Biggs, it's my understanding that your

6   information is four years old.  What he was revealing to you,

7   what he was telling you, this happened in 2010?

8   A    Dating back to 2010, correct.

9   Q    Well, when you say, "dating back," I mean was it ongoing

10  from 2010 forward or was it specifically in the year of 2010?

11  A    For a period of time from 2010.  I don't know the

12  specific date that the services stopped or his association

13  with Mr. Anderson stopped.  I'm not aware of the date itself.

14  Q    Can you tell the Court whether there was any contact

15  between Mr. Anderson and Biggs in 2011?

16  A    I'm not ---

17  Q    Do you know?

18  A    I'm not specifically aware, no.

19  Q    Do you have any information that they were in contact in

20  2011?

21  A    I personally do not.

22  Q    How about '12?

23  A    I -- Once again, I do not.  Moving forward, I do not.

24  Q    Okay.  So what you're talking -- What you're sharing with

25  the Court is information given to you by a cooperating

1   informant back from 2010, right?

2   A    Correct.

3   Q    And this information essentially consists of that he was

4   given money to walk around, to hang out with him in a club,

5   right?

6   A    To accompany him in the club and intervene in any

7   altercations.

8   Q    Did he report that there were any altercations in any of

9   these clubs?

10  A    Not to my knowledge.

11  Q    Did he report that he was called upon to rough up anybody

12  in any of these clubs?

13  A    Other than the incident with Mr. Kienstra, no, not that

14  I'm aware of.

15  Q    Well, I haven't spoke about that incident yet.  I'm

16  talking about this $250 to $300 in the evening to hang out in

17  a club.  Did he report that Mr. Anderson ever said, "Hey, you

18  got to go jack this guy or rough up this guy," or anything of

19  that nature?

20  A    As I mentioned, no, not that I'm aware of.

21  Q    So he was just a big guy hanging out and getting free

22  drinks, right?

23  A    Getting free drinks?  As far as Mr. Hughes?

24  Q    Yeah.  Was he getting free drinks to hang out with these

25  guys?

1    A    Well, the way that Mr. Hughes put it was getting paid

2    to -- to accompany Mr. Anderson.  I don't know about drinks.

3    What I said before about drinks was to make -- Mr. Hughes

4    making sure that Mr. Anderson had good service at the bar.

5    Q    And how did he do that?

6    A    I'm not aware of the extent of those details.

7    Q    So you didn't actually talk to Mr. Hughes yourself, did

8    you?

9    A    No.  As mentioned before, it was members of the

10   investigative team that did.  I did not.

11   Q    So you don't have any -- You had no personal contact with

12   him to evaluate his credibility yourself, right?

13   A    I did not meet him, that's correct.

14   Q    And you didn't -- You don't know the extent of the

15   interview that any of these guys had with Mr. Hughes to

16   determine whether or not essentially he was just a big guy

17   that liked to hang out next to these guys to get drinks and

18   girls?

19   A    Just what I've read from the report and heard from other

20   investigators.

21   Q    And as you said, this is back from 2010, right?

22   A    That's correct.

23   Q    Do you have -- In the entire extent of your

24   investigation, do you have any specific information of

25   Mr. Anderson harming any individual?

1    A    Mr. Anderson personally --

2    Q    Yes.

3    A    -- harming any individual?

4    Q    Mr. Anderson personally.

5    A    No, I do not.

6    Q    Do you have any information that Mr. Anderson would carry

7    a weapon on his person?

8    A    Physically on his person?

9    Q    Yes.

10   A    No.  In his vehicle, yes.

11   Q    And certainly you were aware that Mr. Anderson was --

12   that the weapon in his vehicle was not illegal since it was

13   registered, correct?

14   A    Correct.

15   Q    And with respect to the other weapons you found at the

16   house, each and every one of those weapons were registered in

17   his name, correct?

18   A    That I'm not aware of.

19   Q    Would that be something that you would look at in the

20   course of your investigation?

21   A    Again, I was not present at the house during the search

22   warrant that was executed.

23   Q    Do you have any information that any of those weapons

24   were not registered?

25   A    I do not.

1  Q    Do you have any information that Mr. Anderson was a

2  prohibited person from possessing those weapons?

3  A    I do not.

4  Q    Do you have any information that by possessing those

5  weapons at that time, irrespective of this investigation,

6  whether he was engaged in anything illegal?

7  A    I do not.

8  Q    So that takes us -- And with respect to the picture that

9  you showed in the house contained in the group of Government's

10 exhibits and it appeared to be what you referred to as a

11 compartment next to a tub, correct?

12 A    Correct.

13 Q    Well, inside that compartment next to the tub is a sump

14 pump, correct?

15 A    I'm not -- I'm not aware of that.

16 Q    Well, can you look at the picture and tell me what it

17 appears to be?

18 A    Again, from the picture, I can't positively make out what

19 that is.

20 Q    Does it appear ---

21 A    Is there a possibility that it's a piece of equipment

22 that's associated with a tub, absolutely.

23 Q    So if it's a piece of equipment associated with the tub,

24 then it just appears -- then it's just a compartment that's

25 there for the tub.  And to refer to it as some sort of secret

1  compartment may be a bit of hyperbole, huh?

2  A    Well, I was referring to a compartment where there was

3  money concealed inside.

4  Q    Okay.  So you found money next to a compartment that

5  could be a sump pump, right?

6  A    Correct.

7  Q    And, again, you didn't find that that was in a report,

8  right?

9  A    Correct.

10 Q    Okay.  Let's talk about this incident where Hughes tells

11 you he comes out -- he goes out to -- flies out Southwestern

12 Airlines to -- Did you say San Jose?

13 A    Yes, sir.

14 Q    And this was in what year?  2010 again?

15 A    Looking at the flight records, it appears to be the end

16 of 2011.

17 Q    2011?

18 A    Correct.

19 Q    Did you have any -- Was this reported by Mr. Kienstra?

20 A    The altercation in San Jose?

21 Q    Yes.

22 A    Not to my knowledge.

23 Q    Did Mr. Hughes tells you that the two of those

24 individuals were friends at the time?

25 A    No, I didn't -- I'm not aware of that.

1    Q    Do you know one way or the other?

2    A    Do I know if they were friends at one time?  Yes, I do.

3    Q    With respect to the incident that Hughes told you about,

4    did you -- do you know one way or the other whether or not

5    alcohol was involved in that --

6    A    I do not.

7    Q    -- ruckus?

8    A    I'm not aware of that, no.

9    Q    Do you know whether or not Mr. Kienstra was ever treated

10   for this alleged punch to the face?

11   A    I'm not aware of that either.

12   Q    Do you know whether or not Mr. Kienstra ever -- the

13   extent of any alleged injuries he received?

14   A    I am not.

15   Q    Can you say to the Court whether or not it was a black

16   eye or even a red mark left on him?

17   A    I cannot.

18   Q    You certainly can tell the Court that even given Hughes'

19   version of this altercation, that no weapon was used.  You can

20   tell the Court that, right?

21   A    From my understanding, correct.

22   Q    From your hearsay information.  So that there's no pistol

23   whipping or anything of that nature, correct?

24   A    Correct.

25   Q    And all these -- all these sources that you're saying

1   have some fear of Mr. Anderson, have any of these sources told

2   you that Mr. Anderson has actually threatened them personally?

3   A    No, not that I'm -- not that I'm aware of.

4   Q    Have any of these sources that, obviously, are unnamed

5   and I can't specifically question you about, indicated to you

6   that Mr. Anderson has threatened them indirectly?

7        Do you have any information, specific information to

8   that effect, that you can share with this Court?

9   A    No, not one hundred percent that I'm aware of.

10  Q    So it's just sort of loading hearsay scuttlebutt;

11  generally, "Hey, I'm afraid of this guy."

12  A    I'll say that combined with -- combined with other

13  things.

14  Q    Excuse me.  I'm specifically asking you about one of the

15  last things you said to the Court, these unnamed sources --

16  A    Correct.

17  Q    -- that said they had some concern for their safety.

18  You've told me that there was never a direct threat, right?

19  A    To my knowledge, correct.

20  Q    You told me there was never an indirect threat, right?

21  A    To my knowledge, correct.

22  Q    And you can't give the Court anything concrete as to why

23  they voiced their concerns other than some general concern.

24  Fair to say?

25  A    I would say that it's based off of the fact of his

1  actions in the past in employing individuals like Mr. Hughes.

2  That's what it's based off of.

3  Q    Based on the fact that in 2010, a big fat guy walked

4  around and hung out with him at a club?  That's what it's

5  based off of?

6           MR. DAVIS:  "Fat guy"?  Is that your

7  characterization?

8           MR. ROSENBLUM:  I've never seen him.

9           THE COURT:  Are you objecting on behalf of Mr. Big?

10           MR. DAVIS:  Mischaracterization of the evidence.

11           MR. ROSENBLUM:  Just for the record, if I insulted

12  Mr. Biggs, I'm sorry.

13           MR. DAVIS:  It's "Big," not "Biggs."

14           MR. ROSENBLUM:  Okay.  I get it.

15  Q    (By Mr. Rosenblum)  Big guy, right?

16  A    Right.

17  Q    That's what you're basing your information on?  "Yes"?

18  A    Correct; correct, and his history with Mr. Anderson, yes.

19  Q    And -- And it's fair to say when you guys are debriefing

20  these guys, all of these unnamed sources that are coming

21  forward, typically they're coming forward by way of some sort

22  of proffer agreement?  Fair to say?  Where their words aren't

23  going to be used against them?  You know what that is, right?

24  A    Correct.  There's times -- Yes, there's a majority -- a

25  portion of the time when that is the case, correct.

1  Q    And do you even know whether these guys were even -- all

2  of these unnamed sources were even asked a question by you or

3  any of the agents conducting these interviews as to why

4  they're claiming they have some concerns?  Were they even

5  asked?

6  A    I'm not -- I don't have any direct knowledge of that.

7        MR. ROSENBLUM:  Okay.  Thank you, Your Honor.

8        THE COURT:  Okay.  Thank you.

9        Mr. Davis, do you have any Redirect?

10                  REDIRECT EXAMINATION

11  QUESTIONS BY MR. DAVIS:

12  Q    Agent, Mr. Rosenblum started by asking you if it was your

13  understanding that he related to me, Mr. Rosenblum related to

14  me, that his client was out of the country at the time the

15  warrants were issued and he would surrender himself.  I, in

16  fact, related that to DEA.  Is that correct?

17  A    Yes.

18  Q    Is it true that at that same time we had information that

19  he was not out of the country.  Is that correct?

20  A    Correct.

21  Q    In fact, he had been spotted in Monterey, California and

22  in Humble County, California at the time Mr. Rosenblum was

23  relating he was out of the country.

24  A    That's correct.

25  Q    In fact, there was no customs check, although they were

1  put on alert that if he were to cross into the United States,

2  that he would be detained, and that never happened, correct?

3  A    Correct.

4  Q    Whether it's a big fat guy hanging around for women and

5  free drinks, is it true that Hughes described his relationship

6  with Anderson as being employed as his bodyguard?

7  A    Correct.

8  Q    The other sources of information have related to us, you

9  directly included, that they knew Mr. Anderson employed a

10  bodyguard and his name was "Big."  Is that correct?

11  A    Correct.

12  Q    And they asserted their fear of that man, correct?

13  A    Correct.

14  Q    You were asked if when he possessed these weapons, if

15  they were legally owned or not and at one point if he was

16  doing anything illegal at the time of the possession.  In

17  addition to the things seized from that house, was there

18  marijuana seized?

19  A    That I'm aware of.

20  Q    Are you aware that a drug dog hit on the money that was

21  contained in the bathtub?

22  A    I'm aware of that, yes.

23  Q    And, in fact, he is now charged in an indictment over

24  that time period that he allegedly was involved in a drug

25  conspiracy at the time he possessed all those weapons,

1   correct?

2   A     Correct.

3   Q     You were asked if Hughes was friends with Kyle Kienstra.

4   Do you remember that?

5   A     I was under the impression that it was Mr. Anderson being

6   friends with Mr. Kienstra.

7   Q     Let's talk about at the time of the alleged assault in

8   the hotel room.

9   A     Okay.

10  Q     Hughes -- Are you aware if Hughes knew Kienstra at that

11  time or not?

12  A     I don't believe he did know him.

13  Q     Are you aware of a subsequent relationship between Hughes

14  and Kienstra?

15  A     That I am.

16  Q     To the best of your ability, can you relate to the Court

17  how that evolved?

18  A     From my understanding through the interviews of

19  Mr. Hughes, that once Mr. Kienstra returned to St. Louis, a

20  period of time afterwards an individual on behalf of

21  Mr. Kienstra reached out to Mr. Hughes and, in fact, set up a

22  meeting between Mr. Kienstra and Mr. Hughes in which

23  Mr. Kienstra ultimately tried to secure the services of

24  Mr. Hughes, more or less, to pay -- for Mr. Kienstra to pay

25  Mr. Hughes not to do any enforcement activity towards

1    Mr. Kienstra on Mr. Anderson's behalf.

2    Q    Are you aware from your own interviews and those of other

3    agents that confidential informants, cooperating

4    co-defendants, sources of information were aware of the hotel

5    incident between Anderson and Kienstra and Hughes?

6    A    Correct; multiple.

7    Q    Are you also aware that Anderson himself related what

8    happened in that hotel to several of those individuals but,

9    compared to Hughes' story, embellished it by saying he was

10   duct taped and dangled over a balcony?

11   A    That I'm not aware of.

12   Q    "No"?

13        MR. DAVIS:  I have nothing further of this agent,

14   Your Honor.  Thank you.

15        THE COURT:  Okay.  Do you have any other evidence you

16   wish to present --

17        MR. DAVIS:  No.  No, Your Honor.

18        THE COURT:  -- other than this witness?

19        MR. DAVIS:  I moved for the admission of 1, right?

20        THE COURT:  You did, and I admitted it.

21        Agent Penny, you may step down.

22        THE WITNESS:  Thank you.

23        THE COURT:  Thank you.

24        So, Mr. Davis, if you would make any concluding

25   arguments you wish.  I think I know where you're going, based

1  on the evidence I've heard, but I'd like to hear it from you.

2       MR. DAVIS:  Your Honor, obviously, the three major

3  concerns here are the risk of flight.  I don't think that's as

4  pressing because the man's passport can be revoked or

5  voluntarily surrendered.  I don't know that it would prevent

6  travel but it would certainly hinder it.

7       But this is a man who, at a relatively young age, has

8  no discernable legal income; yet, has lived across the world.

9  Obviously, has connections in Dubai; Barcelona; Columbia,

10 South America and Mexico.  So there is a flight risk there.

11      But in addition to that, there's the danger.  On the

12 date of that search warrant, there were two assault rifles

13 and, I think, three handguns, all of which Mr. Anderson

14 claimed were his, along with approximately $68,000, and it's

15 indicative of the fact that he was involved in the drug trade

16 at the time and most telling is the loaded 40-caliber Glock in

17 the door side compartment -- driver's side door compartment of

18 his vehicle.  That coupled with the incident involving Big in

19 San Jose where Big himself tells the DEA he heard Anderson

20 tell him, "If anyone finds out about this assault, I'll kill

21 you."

22      And then probably most pressing is the fact that

23 there's a presumption of detention at this point because

24 Mr. Anderson is charged with over a thousand-kilogram

25 conspiracy of marijuana that carries a mandatory minimum of a

1   ten-year sentence.  So based on those facts, I would ask that

2   the Court order Mr. Anderson detained.

3              THE COURT:  Okay.

4              MR. DAVIS:  Thank you.

5              THE COURT:  Thank you, Mr. Davis.

6              Mr. Rosenblum?

7              MR. ROSENBLUM:  Your Honor, thank you.

8              By way of proffer, Mr. Anderson, to my knowledge, was

9   in Monterey, California, I believe, three days prior to

10  leaving that location and traveling to Tijuana.  Once Mister

11  -- Tijuana, Mexico.  So there would be no customs information

12  as to crossing over the border unless he was stopped at the

13  border, and I don't believe he was.

14             I was in contact with Mr. Anderson as soon as I

15  learned that there was an indictment unsealed in this case and

16  immediately talked to Mr. Davis and told Mr. Davis when and

17  where Mr. Anderson will arrive.  And he did, in fact, arrive

18  at that date and time.

19             This investigation was not a very well-kept secret in

20  this town.  A lot of these individuals, for lack of a better

21  word, were in sort of the same scene and partied together and

22  hung out at the same clubs and things of that nature.  And I

23  was involved in this case for some period of time.  I believe

24  it was even more than two years but certainly at least by the

25  time that there was a search warrant.  I have been in

1   communications with Mr. Davis and Mr. Casey, depending upon

2   who was leading the investigation, specifically --

3   specifically with respect to Mr. Anderson sporadically since

4   that time.  Mr. Anderson was aware of an investigation.

5   Mr. Anderson was aware that I certainly assured him that even

6   despite the time that was elapsing, that it was the

7   Government's intention to indict him and that he was the

8   target of this investigation and that consistently, he said,

9   "Look, as soon as that happens, I will be in that district to

10  defend myself," and he was.

11       So I think the risk of flight is a nonissue in this

12  case, given the fact that if history is any prediction of the

13  future, he certainly was out of the country at the time of the

14  indictment.  He certainly had the ability to leave from that

15  location to any of the locations that Mr. Davis claims that he

16  could have gone to with these particular -- with these alleged

17  contacts.  He didn't.  What Mr. Anderson did is upon learning

18  of the indictment through me, his lawyer, he returned to this

19  jurisdiction voluntarily without the necessity of being

20  arrested.

21       He came with his passport, which I have in my hand,

22  and which I'm ready to deposit with the registry of the Court,

23  and he intends to defend himself.  So I think if history is

24  any prediction of the future, Mr. Anderson has certainly

25  been -- in good faith satisfied that he's not a risk to flee

1   and that he intends to, certainly, defend himself.

2          And certainly with Pretrial in making this

3   recommendation of $100,000 collateral and with the various

4   conditions that Pretrial is recommending, and we're certainly

5   not opposed to any of those conditions, I think that would

6   assure and insulate the Government of any concerns that he

7   would especially -- I mean electronic monitoring is -- would

8   inform the Government if he strayed from that location at any

9   time.

10          With respect to the danger component, I think the

11   danger component as presented by the Government is fairly

12   weak.  We have an incident.  We have a guy named "Biggs" who

13   hung out with him and never saw any violence in the year 2010.

14   That's four years ago that the Government was really concerned

15   that people were in danger.  I can't imagine that they would

16   not have taken some action before that.

17          With respect to this incident in San Jose, it sounds

18   like two friends getting into a ruckus and Mr. Kienstra, if it

19   happened, was so offended, he hired Mr. Biggs.  That doesn't

20   really speak to somebody that was too concerned about the

21   circumstance.  And with respect to all of these sort of

22   unnamed sources floating around, I can't give that very much

23   credibility since this Agent did not give the Court any

24   particular detail of a direct or indirect threat attributed by

25   or to or from Mr. Anderson.

1          With respect -- There is a presumption of detention;

2    I get it.  There's also a presumption of innocence.  There's

3    been a number of individuals in this indictment that have been

4    released on -- despite their presumption; some of these

5    individuals, I understand, even with a criminal record.

6    Mr. Anderson doesn't have a criminal record.  In fact,

7    Mr. Anderson's -- to speak of, I should say.  He has a --

8    essentially, I believe, which would be a misdemeanor offense.

9    He's got a guideline calculation of 1 for purposes of his

10   criminal history.  And he has no -- The only thing that would

11   come close to an arrest of any violence was an assault second,

12   and I can proffer to the Court -- Obviously, that case was

13   dismissed, but I can proffer to the Court that was a high

14   school incident involving his sister getting beat up and

15   Mr. Anderson came to her defense, and the case never went

16   anywhere.  So looking at his past, there's no discernable

17   indication of any history of violence that the Court can look

18   to.

19         I think it's also important in this case that the --

20   that the bond that's being recommended is $100,000 bond, and

21   how Mr. Anderson is intending to satisfy that bond is his

22   parents are -- came here today with the appropriate paperwork.

23   In the event that the Court would admit Mr. Anderson to bail,

24   they would secure that by their -- by their home, and that's

25   essentially the only asset that these people have.  So --

1    They're not particularly wealthy people.  They were middle

2    class people that worked to secure a home, and they're in a

3    position to pledge that home to assure that Mr. Anderson will

4    appear and defend himself on these charges.  Certainly, I can

5    assure you that Mr. Anderson's close -- very close to his

6    family and to his parents, and he would not do anything, in my

7    opinion, to jeopardize his parents losing their home.  I think

8    that's quite an incentive to make sure that he not only abides

9    by all the conditions that the Court would impose, and even if

10   the Court would choose to impose additional conditions than

11   those recommended by Pretrial, that that should assure the

12   Court that he would not be a threat to the community, nor that

13   he would be a threat to flee the community.

14          And I would ask the Court to consider admitting

15   Mr. Anderson to bail along the lines of the recommendation of

16   the Pretrial Services report.  Thank you.

17          THE COURT:  Thank you.

18          Are you or is Mr. Anderson -- Are you in a position

19   to proffer any evidence about the relationship, the current

20   relationship with Mr. Hughes?

21          MR. ROSENBLUM:  Zero.

22          THE COURT:  Okay.

23          MR. ROSENBLUM:  My information essentially and,

24   obviously, you know, it's hard to examine ghosts, but my

25   information is that Mr. Hughes was essentially a guy that was

1 sort of a follower and liked to hang around in the clubs and

2 get free drinks, and I guess they were surrounded by pretty

3 girls.

4 　　　　MR. DAVIS:  Your Honor, if you'd like, we can put

5 Mr. Hughes on the stand.

6 　　　　THE COURT:  Yeah.  I think I may want to do that.

7 Let me -- Let me tell you why I'm saying that.  I am

8 concerned.  I -- I agree with you, Mr. Rosenblum.  I think

9 that, especially if Mr. Anderson is willing to abide by all of

10 the conditions recommended by the Pretrial Services, in my

11 view, that takes care of any concern of risk of flight, at

12 least from my perspective.

13 　　　　Pretrial Services is, obviously, not aware of this

14 other evidence of Mr. Big or this concern, albeit a little

15 vague, by other sources about their safety because of the

16 relationship between Mr. Anderson and Mr. Hughes, and that

17 concerns me with respect to the danger element, particularly

18 in light of the fact that this is a case where the rebuttable

19 presumption of detention applies.

20 　　　　So with that offer, Mister -- Mr. Davis, I will take

21 you up on that.  I will continue the hearing so that we can

22 hear from Mr. Hughes and I can better assess whether I think

23 we've got a real danger problem here or not.

24 　　　　MR. ROSENBLUM:  That's fine.  Could the Court --

25 Obviously, Mr. Anderson's detained, and we'd like to do this

VOLUME I     44

1  as quickly as possible.

2          THE COURT:  Right.

3          MR. ROSENBLUM:  I have another federal matter I have

4  in Topeka, Kansas.  I'm leaving after this hearing.  I'll be

5  back tomorrow evening.  Could we arrange a Friday date?

6          THE COURT:  I could do it Friday afternoon, if you

7  can have Mr. Hughes here, Mr. Davis.

8          MR. DAVIS:  Your Honor, I wish I could relate to the

9  Court right here and now that I can.

10          THE COURT:  You can't.

11          MR. DAVIS:  But I will do my level best --

12          THE COURT:  Okay.

13          MR. DAVIS:  -- and advise all parties concerned ASAP.

14  Time Friday?

15          MR. ROSENBLUM:  Well, now that I'm going to meet

16  Mr. Biggs, can we all agree not to tell him I called him

17  "fat"?

18          MR. DAVIS:  No.  It's "Big."

19          MR. ROSENBLUM:  All right, "Big."

20          THE COURT:  Not "Biggs," okay.  We will -- It will

21  have to be late in the day on Friday which maybe that will

22  help.  So Friday at 3:30.  We'll continue the hearing till

23  Friday at 3:30.

24          MR. ROSENBLUM:  Do you wish me just to maintain

25  possession of his passport --

1          THE COURT:  Yes.

2          MR. ROSENBLUM:  -- until then?

3          THE COURT:  Please do.

4          MR. ROSENBLUM:  Okay, very good.  Thank you.

5          THE COURT:  All right.  So we'll continue the hearing

6    until Friday at 3:30.  Thank you, all.

7          (Hearing adjourned at 12:20 PM.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL REPORTER

      I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

      Dated this 15th day of September, 2014.


      /s/ Deborah A. Kriegshauser
      _____
      DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
      FEDERAL OFFICIAL COURT REPORTER