UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
     VS.                           ) No. 4:14-CR-246(AGF)
                                   )
THOMAS G. ANDERSON, JR.,           )
                                   )
                    Defendant.     )
_____)


DETENTION HEARING -- VOLUME II
BEFORE THE HONORABLE SHIRLEY A. PADMORE MENSAH
AUGUST 29, 2014
ST. LOUIS, MISSOURI

FOR THE PLAINTIFF:

    JOHN T. DAVIS
    OFFICE OF U.S. ATTORNEY
    111 South Tenth Street, Suite 2000
    St. Louis, MO  63102
    (314) 539-2200

FOR THE DEFENDANT:

    N. SCOTT ROSENBLUM
    ROSENBLUM AND SCHWARTZ
    120 S. Central Avenue, Suite 130
    St. Louis, MO  63105
    (314) 862-4332



    Proceedings transcribed from courtroom recording.

_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
111 South Tenth Street, Third Floor
St. Louis, MO  63102
(314) 244-7449

# I N D E X

August 29, 2014; VOLUME II

| Plaintiff's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MITCHELL HUGHES | 6 | 18 | 60 | |
| COREY NUSPL | 63 | 67 | | |

1              (PROCEEDINGS BEGAN AT 3:54 PM.)

2         THE COURT:  Okay.  This is the continuation of the

3    detention hearing in *United States versus Thomas Anderson*.

4    The case number is 4:14-C-R246-A-G-F.  Will counsel please

5    announce your presence?

6         MR. DAVIS:  John Davis on behalf of the

7    United States, Your Honor.

8         MR. ROSENBLUM:  Scott Rosenblum on behalf of

9    Mr. Anderson, Your Honor.  To my left is Marc Johnson from our

10   office.

11        THE COURT:  Good afternoon.  Well, we continued the

12   detention hearing to give Mr. Davis an opportunity to present

13   additional evidence to the Court.

14        Mr. Davis, please call your first witness.

15        MR. DAVIS:  Mitchell Hughes, Your Honor.  Co-counsel,

16   Mr. Casey, has stepped out to retrieve him from the witness

17   room.

18        THE COURT:  Okay.

19        (Pause)

20        THE COURT:  Would you come forward and be sworn?

21      (The Witness Is Sworn.)

22        MR. DAVIS:  Your Honor, the matter we discussed

23   preliminarily at sidebar, would you like to address it now or

24   would you like to address it when we get to that point?

25        THE COURT:  Let me go ahead and inquire of Mr. Hughes

1    now.

2              MR. DAVIS:  May I make a preliminary --

3              THE COURT:  Yes.

4              MR. DAVIS:  -- explanation to Mr. Hughes?

5              THE COURT:  Yes.

6              MR. DAVIS:  Mr. Hughes, you and I have discussed the

7    purpose of your testimony here today and what it is you're

8    going to say.  Is that correct?

9              THE WITNESS:  Yes, sir.

10             MR. DAVIS:  All right.  The Judge is concerned that

11   part of that involves an assault, and you're aware that it

12   involves an assault that allegedly happened in California,

13   correct?

14             THE WITNESS:  Yes, sir.

15             MR. DAVIS:  She has some legal matters she'd like to

16   discuss with you concerning that.  Okay?

17             THE COURT:  Okay.  Sir, could you state your full

18   name for me, please?

19             THE WITNESS:  Mitchell Hughes.

20             THE COURT:  No middle name?

21             THE WITNESS:  Mitchell Kennedy Hughes.

22             THE COURT:  Say that again.

23             THE WITNESS:  Kennedy.

24             THE COURT:  Kennedy, okay.  Thank you.  And what is

25   your date of birth, Mr. Hughes?

1            THE WITNESS:  10-16-68.

2            THE COURT:  How old does that make you today?

3            THE WITNESS: 45.

4            THE COURT:  All right.  How far did you go in school?

5            THE WITNESS:  Till the 11th grade.

6            THE COURT:  All right.  And I want to make sure.

7   You're here to give testimony today at the request of

8   Assistant United States Attorney John Davis.  Is that correct?

9            THE WITNESS:  Yes, ma'am.

10           THE COURT:  All right.  Did he subpoena you or issue

11  any papers on you to force you to appear today?

12           THE WITNESS:  No, ma'am.

13           THE COURT:  All right.  I want to make sure you

14  understand that you have the right to not incriminate yourself

15  and you can refuse to testify if you feel that doing so might

16  lead to charges being brought against you by the Government.

17  Do you understand that?

18           THE WITNESS:  Yes, ma'am.

19           THE COURT:  All right.  You also have the right to

20  consult with a lawyer regarding your testimony.  Do you

21  understand that?

22           THE WITNESS:  Yes, ma'am.

23           THE COURT:  And if you can't afford a lawyer, you can

24  ask the Court to appoint a lawyer so that you can consult with

25  one.  Do you understand that?

1            THE WITNESS:  Yes, ma'am.

2            THE COURT:  Is that something that you wish to do?

3    Do you have any concerns about incriminating yourself or would

4    you like to talk to a lawyer or are you asking the Court to

5    appoint a lawyer for you to consult with?

6            THE WITNESS:  No, ma'am.  I'm fine.  Mr. Davis has

7    explained it to me.

8            THE COURT:  Okay.  So you're willing to waive or give

9    up your right to consult with a lawyer prior to giving this

10   testimony today?

11           THE WITNESS:  Yes, ma'am.

12           THE COURT:  Although you understand that there might

13   be some possibility that something that you might say could

14   lead to charges being brought against you?

15           THE WITNESS:  Yes, ma'am.  I'm fine.

16           THE COURT:  Okay, very good.  Please proceed,

17   Mr. Davis.

18                      DIRECT EXAMINATION

19   QUESTIONS BY MR. DAVIS:

20   Q    Mr. Hughes, continuing on that topic, you are an

21   informant for the FBI.  Is that true?

22   A    Yes, sir.

23   Q    And the agent with whom you worked the most, correct me

24   if I'm wrong, is Owen Cunningham.  Is that true?

25   A    Yes, sir.

1   Q    The information you have provided the FBI concerns a drug

2   trafficking organization involvement -- involving

3   Tommy Anderson and others.  Is that true?

4   A    Yes, sir.

5   Q    You've been paid for information that you have provided

6   the FBI.  Is that true?

7   A    Yes, sir.

8   Q    Prior to being paid and providing information or in

9   conjunction with it, did Agent Cunningham explain to you

10  certain rules, such as being honest and complete?

11  A    Yes, sir.

12  Q    Do you understand those rules?

13  A    Yes, sir.

14  Q    How much have you been paid to date by the FBI?

15  A    A thousand dollars.

16  Q    One thousand dollars?

17  A    Yes.

18  Q    Okay.  How do you know -- Do you know Thomas Anderson,

19  Jr.?

20  A    Yes, sir, I do.

21  Q    Do you see him in the courtroom today?

22  A    Yes, sir, I do.

23  Q    Is he sitting at defense counsel to my right?

24  A    Yes, sir.

25  Q    Or counsel table I mean.  How did you meet

1   Thomas Anderson, Jr.?

2   A     I was working in Lucas Park as a bouncer, and I was in

3   the club.  We introduced each other or whatever.  He was going

4   to give me some money, you know what I'm saying, to look out

5   for him, whatever.  I'm not for sure if we agreed to ask him

6   or him to ask me, but he asked me about personal security.  So

7   we used to go out periodically here and there.  He would pay

8   me for personal security.

9   Q     Did he ever introduce you to other people as his

10  bodyguard?

11  A     Yes, he always did.

12  Q     You heard him use the term "bodyguard"?

13  A     Yes, sir.

14  Q     How much would you be paid for these services?

15  A     It depends.  It depends on how long we be out or

16  whatever.

17  Q     So if you were out for two hours, it would be a different

18  amount of money than if you were out for two days?

19  A     Yes, pretty much, yeah.

20  Q     Okay.  Was there a set amount or was it just handled at

21  the end?

22  A     No.  It was just handled at the end.

23  Q     You say you met while you were working as a bouncer at

24  Lucas Park.  Do you mean the Lucas Park Grille that's on

25  Washington Avenue right around Tucker?

1    A     Yes, sir.

2    Q     Okay.  Do you recall how many times you acted as

3    Mr. Anderson's bodyguard in the capacity you're talking about

4    right now?

5    A     Somewhere in the range -- Somewhere in the range of 20 to

6    30 times.

7    Q     Okay.  Roughly, how much were you being paid?

8    A     Like 150 to 200.

9    Q     On -- Per time?

10   A     Yes, sir.

11   Q     Okay.  In any of those incidents, was there a case where

12   there had to be some physical altercation involved?

13   A     No, sir.  The only time was when I went to California.

14   Q     Okay.  Prior to that time, do you recall receiving a

15   phone call from Mr. Anderson where you weren't next to him as

16   a bodyguard and he asked you to come somewhere?

17   A     Yes.

18   Q     Where did he ask you to come?

19   A     He asked me to come down to Lucas Park one time.  He said

20   they had been jumped by somebody or whatever.  I was way out

21   on the Loop.  I was trying to get down there, but I really

22   didn't get down there in time.  When I finally got down there,

23   he gave me some money.

24   Q     How much?

25   A     A thousand dollars.

1  Q     For doing what?

2  A     For coming down there to check on him, (inaudible) I

3  guess, because I was trying to get down there to see what was

4  happening because he said he was going to be -- that he was

5  being jumped on or whatever.

6  Q     When you got down there, what did you determine the

7  situation to be by the time you got there?

8  A     There was no situation when I got there.

9  Q     And, yet, he gave you a thousand dollars?

10 A     Yeah.

11 Q     You spoke a moment ago about "except for the time you

12 went to California."  Can you explain to the Court, please,

13 how it -- how you ended up going to California with

14 Thomas Anderson?

15 A     He called me and asked me; told me he need -- he'd take

16 me out on the West Coast to do some business for him.  And I'm

17 like, "What?"  He said he needed -- he needed this dude worked

18 over a little bit, and he said he didn't want him fucked up

19 too much.  He just wanted to get his attention.  You know what

20 I'm saying?

21       So -- He said but I might need somebody else, so I

22 went and got my partner -- my partner named "Conflict," and we

23 flew to San Jose.  We got picked up by this guy in a Jeep.  I

24 don't even remember his name, but he took us down to a hotel.

25 And so we later on went to Monterey Bay.

1  Q    Wait, wait, wait.  The gentleman that picked you up in

2  the Jeep, you don't know his name.  He picked you up from the

3  San Jose Airport and took you to a hotel?

4  A    Yes, sir.

5  Q    And you said you were with another person who goes by the

6  name "Conflict"?

7  A    Yes, sir.

8  Q    Would people on the street, from talking to you, think

9  that Conflict might be your brother?

10 A    Yeah.

11 Q    Do you refer to him as your brother?

12 A    Yes.

13 Q    Is he, in fact, your real brother?

14 A    No.

15 Q    Okay.  Did you spend the night at that hotel?

16 A    Yes, sir, till the next morning.

17 Q    The next morning did you see Thomas Anderson?

18 A    Yes, sir.

19 Q    Can you explain to the Court what happened from the next

20 morning on, please?

21 A    He picked us up, told us the scoop, told us that we --

22 when we get this guy, to rough him up a little bit.  You know

23 what I'm saying?  And then that's going to be it; don't hurt

24 him or nothing like that; don't -- don't -- don't mess with

25 him, too much, you know.

1   Q    Where did you go from that hotel?

2   A    To some resort called the Monterey Bay Season Resort

3   Hotel.

4   Q    Nice place?

5   A    Yeah.

6   Q    Did you go inside a room there?

7   A    Yes, sir.

8   Q    Who took you to the room?

9   A    Thomas Anderson.

10  Q    And can you explain from there what happened as he took

11  you into the room?  Was Conflict with you?

12  A    Yes, sir.

13  Q    Now can you explain when the three of you went to that

14  room, what happened?

15  A    Well, we talked a little bit.  Then later on he called me

16  and told me that ---

17  Q    I need to know who "he" is.

18  A    I said later on Thomas Anderson called and asked -- and

19  told us that he was on his way.  When we got there, he told

20  us, "The dude -- The dude's about to come."  And when the

21  dude's about to come, ---

22  Q    Let me call timeout.  You're using the term "dude."  At

23  this point do you know who the dude is?

24  A    No.

25  Q    Okay.  So you got a phone call from Thomas Anderson.  He

1   said, "It's about to happen."  What happens from there?

2   A    We like turn off the lights and wait for the dude and

3   Tom Anderson to come in.  When they come in, the dude come in

4   and the lights was out.  I swung and hit him, like punched him

5   through a milk shake, and I think Conflict might have punched

6   him.  I don't really remember.  The things were going fast.

7   And then he was like, "No, No, No!  Don't kill me!  Don't kill

8   me," or whatever like.

9   Q    What position was that man in when he said, "Please don't

10  kill me"?

11  A    He was on the floor looking up.

12  Q    Is that because of at least your strike to the face?

13  A    Excuse me?

14  Q    Is that because you struck him in the face?

15  A    Yes, sir, more than likely.

16  Q    And maybe Conflict did, too?  You don't recall?

17  A    I don't recall.

18  Q    You said through a milk shake.  What do you mean by that?

19  A    A malt shake.

20  Q    What, he was holding one?

21  A    Yes.

22  Q    Oh, okay.  Okay.  As the gentleman is laying on the floor

23  saying, "Please don't kill me," do you recall Thomas Anderson

24  saying anything?

25  A    Thomas Anderson said, "Yeah, that's what the fuck's going

1    to happen.  They're going kill your fucking ass if I hear

2    about this shit again.  I better not fucking hear shit about

3    this."

4    Q    What tone of voice was Thomas Anderson using?

5    A    I would call it abrasive.

6            MR. ROSENBLUM:  What was that word?

7            MR. DAVIS:  "Abrasive."

8    Q    (By Mr. Davis)  Did you say "abrasive"?

9    A    Abrasive.

10   Q    When Thomas Anderson -- Before the other gentleman came

11   in with Thomas Anderson, did you see anything in Tom's hands?

12   A    The first time when he came in and said dude -- that the

13   dude's coming in, he didn't have nothing in his hands, but

14   when he got back with dude, he had a little briefcase.

15   Q    Did you later find out what was in that briefcase?

16           MR. DAVIS:  Well, strike that, please, Your Honor.

17   Q    (By Mr. Davis)  After Thomas Anderson said to him,

18   "That's exactly what these guys are going to do if I find out

19   about this, they're going to kill you," what happened?

20   A    He said, "Okay, okay, okay; just please don't hurt me or

21   whatever."  And then he said, "Well, get the fuck out of

22   here," and the dude got up out of there and left.

23   Q    How long before you, Conflict and Tom left?

24   A    Immediately.

25   Q    So this whole incident, Mr. Hughes, from the point where

1  you turn the lights out and waited until you immediately left,

2  how much time are we talking?

3  A    Ten minutes tops.

4  Q    Okay.  When you left, where did you go?

5  A    We went to some hotel.

6  Q    No.  I mean immediately when you left, did you leave on

7  foot?

8  A    Oh, yeah.  We ran up a hill to like a residential area

9  and hopped in the truck.

10  Q    What truck?

11  A    The same one that picked me up at the -- at the airport.

12  Q    Was it the gentleman -- the same gentleman driving the

13  truck?

14  A    Yes, sir.

15  Q    Was the truck waiting there for you?

16  A    Yes, sir.

17  Q    And was Thomas Anderson accompanying you through that?

18  A    Yes, sir.

19  Q    Did he have the briefcase with him?

20  A    Yes, sir.

21  Q    Now did you later find out what was in that briefcase?

22  A    Yes, sir.  About, I guess, two weeks later or a week

23  later I was contacted by this guy I know by the name of "T" or

24  "TJ."  He does bouncer work in clubs, and he was like -- he

25  was like, "A dude named Steve Ballard want to talk to you."

1          I'm like, "Who is that?"

2          He's like, "He's a -- He's a big dude.  He got money;

3    said he wants you to do some work for him."

4          I'm like, "What?"

5          He says, "Some bodyguard work."

6          I'm like, "Who?"

7          So when I got down there, I was meeting TJ, and TJ,

8    we was talking.  Like three or four white guys walked up, you

9    know what I'm saying, I believe, with Steve Ballard and

10   Charlie or somebody else.  And they -- they -- they walked up

11   on me, and I didn't like the situation, you know.  And I told

12   dude like, "What the fuck is this?  Who the fuck is they?

13   They just walking up on me like this?"  Because I didn't know

14   none of them at the time.  So he said, "They wanted -- They

15   wanted to talk to you about some stuff."

16   Q    Did they explain to you what was in the briefcase?

17   A    Yeah, they did.

18   Q    What did they say was in the briefcase?

19   A    Steve Ballard said it was $275,000, and he said that he

20   wanted it.

21          MR. DAVIS:  Can I have one second, Your Honor?

22          (Pause)

23   Q    (By Mr. Davis)  When you went to California at

24   Mr. Anderson's request to rough some dude up, did you know

25   anything about money?

1   A    No.  No, sir, I did not.  I didn't know he was going

2   there to rob dude or take no money from him or whatever.  I

3   just thought it was -- like I was going out there just to put

4   that little work in.

5   Q    Did you ask, when he said we need somebody roughed up,

6   "Hey, why do you want somebody roughed up?"

7   A    No.  No, sir, I didn't.  I usually don't ask no

8   questions.

9   Q    Were you paid for your services of you and Conflict

10  flying to San Jose and doing what you just said?

11  A    Yes, sir.

12  Q    By Thomas Anderson?

13  A    Yes, sir.

14  Q    How much?

15  A    Five thousand dollars.

16  Q    Does that include the airplane ticket and meals and all

17  that?

18  A    No.  He paid for everything.

19  Q    So it's a $5000 payment plus all your expenses.

20  A    Yes.

21  Q    The person who was assaulted in the hotel room, did you

22  later find out what that man's name was?

23  A    Yeah.  I later found out that it was Kyle Kienstra

24  because he said -- like he sent Steve Ballard to find me, and

25  TJ and this dude was supposed to find me or had found me.  He

1  tricked me into coming down to the Social House into the

2  meeting with Steve Ballard and them.  So ---

3  Q    Did you eventually speak to Kyle Kienstra himself?

4  A    Yes, sir.

5  Q    Okay.

6  A    They called me on the phone.

7  Q    Okay.  That's all.  That's all.

8         MR. DAVIS:  That's all I have, Your Honor.  Thanks.

9         THE COURT:  Cross Examination, Mr. Rosenblum?

10                    CROSS EXAMINATION

11  QUESTIONS BY MR. ROSENBLUM:

12  Q    Good afternoon, Mr. Hughes.

13  A    How are you doing, sir?

14  Q    Mr. Hughes, when you first met the FBI, you were at the

15  St. Louis Justice Center?

16  A    Yes, sir.

17  Q    And how did that meeting take place?  Who reached out to

18  whom?

19  A    There was -- They reached out to me.

20  Q    Okay.  They found you there, right?

21  A    Yes, sir.

22  Q    And I would assume you didn't invite them there, right?

23  A    No, sir.

24  Q    It's pretty alarming when the FBI shows up, especially

25  when you're locked up.

1    A    Yes, sir.

2    Q    You're pretty scared?

3    A    No, I wouldn't say scared.

4    Q    How about concerned?

5    A    Yes, of course, I was concerned.

6    Q    And I assume you weren't at the Justice Center on a

7    vacation.

8    A    No, sir.

9    Q    What were you there for?

10   A    I was there for felon in possession of a firearm.

11   Q    So you were there on a federal charge?

12   A    No, sir.

13   Q    State charge?

14   A    Yes, sir.

15   Q    And you were there on a $30,000 bond?

16   A    Yes, sir.

17   Q    A bond that you couldn't make, right?

18   A    Right.

19   Q    And was that a bond that you tried to reach out to

20   Kyle Kienstra to help you make at some point?

21   A    No; not necessarily, no.  He called -- He called

22   allegedly concerned for my welfare or whatever because I guess

23   he had heard something, you know, but nothing that would

24   (inaudible).

25   Q    So this was in 2014, right?

1  A    Yes, sir.

2  Q    And ---

3  A    No, sir.  Well, yes, sir.

4  Q    Well, the report I have said that you met with the FBI on

5  February 14th and February 21st of 2014.

6  A    That's correct.

7  Q    Does that sound about right?

8  A    Yes, sir.

9  Q    So during that period of time, you were in the Justice

10  Center, locked up on a $30,000 bond, and they come to visit

11  you, correct?

12  A    Yes, sir.

13  Q    Now you said that the charge was felon in possession, so

14  that presupposes that you were already a felon, right?

15  A    Yes, sir.

16  Q    And what were your prior felonies, if you could share

17  that with the Court?

18  A    Like back when I was 17, if I'm not mistaken it was a

19  breaking and entering.  And if it wasn't breaking and

20  entering, it was theft from a person; one of the two.

21  Q    Okay.  So you have a ---

22  A    I don't -- I'm not -- I'm not recalling which one came

23  first, but they was right around the same period.  And after

24  that, I had delivery of simulated controlled substance,

25  two-way cocaine which is baking soda; sold to undercover.  And

1    then later on I ended up getting in trouble and getting 40

2    years for possession of cocaine and delivery of cocaine.

3    Q    You got 40 years?

4    A    Yes, sir.

5    Q    Okay.  Well, let's take that one by one.  So as a younger

6    man, you were charged with breaking and entering and theft

7    crimes, correct?

8    A    Yeah.  I got six years for that.  Then I got five years

9    and then I got forty.

10   Q    Okay.  Well, with respect to your first charge, the

11   breaking and entering and the theft charges, and then you

12   followed that up with selling fake dope, right?  Essentially.

13   A    Yes, sir.

14   Q    So you would agree with me that those are crimes of --

15   not only are they crimes but they're crimes showing your

16   dishonest character, correct?

17   A    I disagree.

18   Q    Well, do you think theft -- a theft crime speaks of your

19   honesty or your dishonesty?

20   A    It depends on who's looking at it and what the situation

21   is.

22   Q    Well, I'm looking at it now.

23   A    In my opinion -- In my opinion, yeah, I stole and I broke

24   into someone's house, but I mean it's wrong, and I know it's

25   wrong, but did that make me a bad person?

1    Q    I'm not asking you if you're a bad person.  I'm asking if

2    you would agree with me that your prior crimes show that they

3    were crimes of not only crimes but crimes of dishonesty.

4    A    Yes, sir.

5    Q    Okay.  So we have a theft crime, and then we have you

6    selling fake dope, right?

7    A    Yes, sir.

8    Q    So we have those crimes of dishonesty, and then you

9    follow that up with another crime where you got 40 years,

10   correct?

11   A    Yes, sir.

12   Q    I would assume at some point you got paroled because

13   you're here.

14   A    Yes, sir.

15   Q    And now you have -- So you had three prior offenses,

16   facing a $30,000 bond in the city -- charged in the state

17   court, correct, as of last year?

18   A    Right.  But what you don't know is that when the FBI

19   reached out to me, I had already been in court, been tried and

20   sentenced.

21   Q    When the FBI reached out to you, you're saying you had

22   already been to court and you received a sentence?

23   A    Yes, sir.

24   Q    And what was your sentence?

25   A    Six months.

1  Q    So after all that, you went to trial and you got six

2  months?

3  A    No, sir, I didn't go to trial.  I pleaded out.

4  Q    Okay.  Now before you pled out, did the FBI get involved

5  in any plea negotiations?

6  A    No, sir, they didn't.

7  Q    Did they -- Did the FBI contact the Assistant Circuit

8  Attorney that was on your case, to your knowledge?

9  A    No, not to my knowledge.

10  Q    Is it possible that they did?

11  A    No, sir, it's not possible.

12  Q    When you -- When the FBI showed up, one of the things

13  they told you is that you were a target in this investigation.

14  In fact, you're listed as one of the primary targets in a

15  search warrant.  They told you that, didn't they?

16  A    No, sir.

17  Q    You had no idea that when the FBI showed up, your name

18  was among the names listed in a federal search warrant in this

19  case?

20  A    No.  Well, I don't -- I'm not -- I don't know about that,

21  but what I do know is that they told me that somebody had --

22  Thomas -- Tommy Anderson's organization had said that I was --

23  I worked for Tommy and I was his like -- What term was used?

24  Like I was his go-to guy to handle things.

25  Q    Well, Mr. Hughes, some of the others things -- I'm

1   speculating, and you can correct me if I'm wrong -- that the

2   FBI told you in that meeting after they *Mirandized* you, and

3   you've been in the system long enough to know what that means,

4   right?

5   A    Yes, sir.

6   Q    Okay.  And they did *Mirandize* you, correct?

7   A    Yes, sir.

8   Q    And after they *Mirandized* you, they told you that you

9   were facing federal narcotics charges, didn't they?

10  A    Well, ---

11  Q    You were there.  They told you you were facing federal

12  narcotics charges, did they not?

13  A    Yes, sir, I think they did.

14  Q    Okay.  Well, that's something you'd probably remember.

15  It was only last year; about eight months ago, nine months

16  ago.

17       MR. DAVIS:  Your Honor, (inaudible).

18       MR. ROSENBLUM:  I'll withdraw it.

19       THE COURT:  Okay.

20  Q    (By Mr. Rosenblum)  So as of February, they told you you

21  were -- February of 2014, which is approximately eight months

22  ago, they told you you were a target in a federal narcotics

23  investigation, did they not?

24  A    I answered the question, sir.  I said:  Yes, sir.

25  Q    And they also told you that you have an opportunity to

1  help yourself, correct?

2  A    Yes, sir.

3  Q    And they told you one of the ways that you can help

4  yourself (a) by possibly not being charged in this case is by

5  cooperating with them, correct?

6  A    Yes, sir.

7  Q    That was something that you were very much interested in,

8  correct?

9  A    Yes, sir.

10  Q    And you knew that if you cooperated with the FBI and got

11  on their good side and gave them information that they wanted,

12  then you could prevent these charges which you knew, based on

13  your record, would carry potentially the rest of your life,

14  right?

15  A    Yes, sir.

16  Q    They, in fact, told you that you were facing basically

17  the rest of your life, correct?

18  A    Yes, sir.

19  Q    That gave you some substantial motivation to not only

20  work with them but to get on their good side to prevent that,

21  correct?

22  A    Yes, sir, but not -- not for real.  See, really,

23  honestly, it's not even about me.  It's not even about me

24  doing no time or me being locked up or whatever.  It's

25  about -- It's about being real.  It's about being honest with

1  keeping your word.  It's about ---

2  Q    I appreciate that, and I appreciate the fact that you're

3  here just trying to be real based on your record.  And I would

4  ask that you just answer my questions.  Mr. Davis can ask you

5  questions on Redirect.

6        But in addition to wanting to be real, you certainly

7  didn't want to spend the rest of your life in prison, right?

8  A    No, sir.

9  Q    No matter how real you wanted to be, that was something

10 you wanted to avoid, correct?

11 A    Yes, sir.

12 Q    Okay.  I just wanted to get sort of the lay of the land

13 about where you were at that time, right?  Okay?

14 A    Yes, sir.

15 Q    Now what else the FBI told you -- They met with you for

16 substantial -- a substantial number of hours not only on the

17 14th but on the 21st, correct?

18 A    Yes, sir.

19 Q    How many hours did they meet with you, DEA Agent Moles,

20 as well as Mr. Cunningham, the FBI agent, on the 14th do you

21 think?

22 A    About two hours, I believe.

23 Q    And then they followed that up on the 21st with another

24 meeting, correct?

25 A    Yes, sir.

1    Q    Now how many times did they have to correct you and tell

2    you that they didn't think that you were being honest with

3    them?

4    A    I don't recall.

5    Q    Well, you're not saying that didn't happen, are you?

6    A    I'm saying I don't recall them telling me that.

7    Q    Okay.  Do you recall being corrected by the FBI and they

8    having to remind you that you better -- that you have to be

9    honest?

10   A    No.

11         MR. DAVIS:  Asked and answered, Your Honor.

12   A    No, sir, I didn't.  I never -- never -- No.

13   Q    (By Mr. Davis)  Now you wanted to know ---

14   A    They never did -- They never say nothing about me being

15   dishonest because ---

16   Q    You wanted to know what was going to happen in this case,

17   did you not?

18   A    I didn't know.  I didn't ask.

19   Q    You never asked?

20   A    No.

21   Q    You just took it on face value that you weren't going to

22   be charged and facing life in the penitentiary?

23   A    No, sir, I didn't take nothing at face value.

24   Q    Did you question -- Did you ever obtain a lawyer for this

25   particular cause?

1    A    No, sir.

2    Q    And after you met with the FBI and the DEA on those two

3    particular dates, you had a number of meetings with them

4    afterwards, right?

5    A    Could you repeat that?

6    Q    After the meeting, the initial meetings you had in the

7    beginning and middle of February, the 14th and the 21st, you

8    had a number of meetings with agents for the Federal

9    Government after that occasion -- those occasions, correct?

10   A    Yes, sir.

11   Q    How many total meetings do you think you had?

12   A    Somewhere between five and ten.

13   Q    Okay.  Now is it fair to say that at some point in those

14   meetings with the FBI the question of leniency and potential

15   prosecution in this case came up?

16   A    Attorney sir, I don't remember.

17   Q    You don't remember?

18   A    No, sir.

19   Q    You don't remember ever ---

20   A    That's my honest answer.

21   Q    You don't remember having any discussions about how you

22   can prevent spending the rest of your life in the

23   penitentiary?

24   A    No, sir.

25   Q    Now when you were talking to the FBI about what you say

1  your involvement was in this case, you indicated to them that

2  your initial meeting with Mr. Anderson was in 2009 when you

3  were working at Lucas Park as a bouncer, correct?

4  A    Yes, sir.

5  Q    And I think what you said is that the initial meeting was

6  that he wanted to say -- he asked you to take care of him,

7  right?

8  A    Yes, sir.

9  Q    Well, in fairness, that's not that unusual in the club

10 scene, is it, that somebody comes in and wants to be treated

11 like a VIP guy?  Right?

12 A    No.  It happens all the time.

13 Q    And it happened all the time to you, right?

14 A    Yes, sir.

15 Q    And that's how you made extra money by capitalizing on

16 the guys that wanted to throw a few dollars around just to be

17 taken care of a little specially, the VIP treatment, right?

18 A    Yes, sir.

19 Q    And, in fact, you said to the Court that you didn't know

20 who engaged who subsequently about a bodyguard.  Your -- Fair

21 to say you're -- what word do I want to use -- a bit of an

22 opportunist when it came to making money back then, right?

23 A    Yes, sir.

24 Q    I mean you liked to capitalize on whatever opportunity is

25 presented, correct?

1  A     That's what the world is based on.

2  Q     I understand.  And that's what you were basing it on,

3  right?

4  A     Yes, sir.

5  Q     Because you weren't getting paid all that much as the

6  bouncer at Lucas Park.  So what you wanted to do is sort of

7  expand your role and sort of be like a VIP concierge, right?

8  A     No, sir.

9  Q     But you certainly wanted to take advantage of your

10  position there and those that were willing to pay you by

11  giving them a little extra attention to make them feel

12  special, right?

13  A     No, sir, not everybody.  Depends on -- Just depends on if

14  I like or want to deal with that person.

15  Q     Right.  But, again, Tommy Anderson wasn't the only person

16  that put you in that situation, right?

17  A     No, sir.

18  Q     And what Tommy was asking is just essentially, because

19  you are on Washington Avenue, late at night, that if he was

20  there with any young ladies, that you would walk them out and

21  make sure that they would get to their car, right?

22  A     Among other things.

23  Q     Well, that's among the things that he was asking you to

24  do, and that certainly wasn't uncommon or unusual, was it?

25  A     No, sir.

1   Q   In fact, not only -- not only would you do it for

2   Tommy Anderson, you would do it for anybody that asked you

3   because your boss told you to, right?

4   A   No, sir.

5   Q   Did you do it for a number of people?

6   A   No, sir.

7   Q   So the only person that you walked young ladies to was

8   for Tommy Anderson?  That's what you're telling the Court?

9   A   No, sir.  What I'm telling you is -- is that

10   Tommy Anderson is the only person that paid me to do it.

11   Q   Okay.  So he gave you an extra tip, right?

12   A   Yes, sir.

13   Q   You were always looking for tips, though, down there,

14   weren't you?

15   A   Yes, sir.

16   Q   Okay.  Did you suggest getting tipped for a little extra

17   special service?

18   A   No, sir.

19   Q   And certainly, again, once again, a number of people

20   would do that just for extra attention, right?

21         MR. DAVIS:  Asked and answered.

22   A   No, sir.

23   Q   (By Mr. Rosenblum)  Okay.  Now with respect to the other

24   things that Tommy was asking you to do back in 2009, it was

25   just essentially, what, did they set up on a private table or

1  something and you were just to watch to make sure they got

2  good service?

3  A    No.  It wasn't -- I mean it depends.  If I'm working in

4  in the club, I'm working in the club.  If I'm working for

5  Tommy Anderson, I'm working for him.

6  Q    Well, I'm talking about one of the things you testified

7  to on Direct when you said in 2009 you were a bouncer and he

8  asked you to just take care of him.  I'm trying to learn what

9  that meant.  That's what you said to Mr. Davis.  That's what

10  you said to the FBI.  What did that mean?  We've established

11  you would walk out some girls to the car.  What else did it

12  mean?

13  A    As simple as that; look out for him.  In other words, you

14  have to -- You know, really the best person to ask, who that

15  is is Mr. Anderson --

16  Q    Well, sir, ---

17  A    -- what does it mean to look out for him because in my

18  opinion, while we was in the club, he wanted to make sure he

19  was good.  That's it.  His table, his -- where he sits and all

20  that was paid for because he had the money to pay for it.

21  Q    Well, you're the one on the witness stand.  Okay, sir?

22        And when you say that that was good, did you ever

23  have to break up an altercation involving Tommy Anderson while

24  you were working as a bouncer?

25  A    No, sir.

1  Q    Did he ever call you to the table and say, "Hey, Big, I

2  got a situation here; I need your help"?

3  A    No, sir.

4  Q    Did he ever -- Was there ever even a dispute that called

5  your attention over, that you had to calm somebody down

6  because of Tommy Anderson while he was in the club?

7  A    I believe so.  It was -- It was far back.  I believe so.

8  I believe he had had some kind of small/medium confrontation,

9  but it wasn't like he was so confrontational that he had

10 always had a problem where he was always -- No.  It was -- If

11 a situation arose, that's what it was.

12 Q    In fairness, he was pretty chill as far as a regular

13 customer, right?

14 A    In my opinion, yeah.

15 Q    Okay.  And that's what your job was as a bouncer, just to

16 watch out for everybody in the club, right?

17 A    Yes, sir.

18 Q    Now you said at some point in 2010 you went to work for

19 him personally, right?

20 A    Yes, sir.

21 Q    And as I recall your testimony, you couldn't tell the

22 Judge who approached who, right?

23 A    Yes, sir.

24 Q    But Tommy, being always nice to you, that wouldn't have

25 been unusual for you to approach him and say, "Hey, you got

1   some extra work for me," because you're always looking to

2   hustle an extra buck?  Fair enough?

3   A    I said I don't remember.

4   Q    I understand.  So you can't say who approached whom, but

5   it wouldn't be unusual for you to look for an opportunity to

6   hustle another dollar, right?

7   A    I said I don't know who approached who.

8   Q    I got that part.  My next question:  Given your

9   circumstance back in 2010, it wouldn't be unusual for you to

10  look for an opportunity to hustle up another dollar, right?

11  A    Yes, sir.

12  Q    And in that role, you asked him if you had any -- if he

13  can do anything for you?

14  A    No, sir.  I don't recall --

15  Q    Okay.

16  A    -- asking Mr. Anderson what did Mr. Anderson ask me.

17  Q    But in any event, you claim you started hanging out with

18  Mr. Anderson, and he introduced you as a bodyguard, right?

19  A    Yes, sir.

20  Q    Well, in fairness, we're going back to 2010, right?

21  Right?

22       That's when you're talking about these events, right?

23  A    Yes, sir.  Sometime in that time period.

24  Q    Okay.  And in 2010, you would have been approximately 41

25  years of age, correct?

1   A    Yes, sir.

2   Q    And Tommy Anderson and his friends would have been in

3   their early twenties, correct?

4   A    I don't know.  I never knew how old he was.

5   Q    Well, you can tell ---

6   A    I knew he was over 21.

7   Q    Other than being over 21 because you may have carded him

8   at one time, you can't say how old he was, but he appeared to

9   be a pretty young man, right?

10          THE WITNESS:  Your Honor, I don't ---

11          THE COURT:  You don't know how to answer it?

12          THE WITNESS:  No, because to me, he ---

13          THE COURT:  Could you rephrase it, please?

14          MR. ROSENBLUM:  I'll rephrase the question.

15  Q    (By Mr. Rosenblum)  Did Tommy Anderson appear

16  substantially younger than you in your opinion?

17  A    Yes.

18  Q    Okay.  And would it be fair to say that when he was

19  introducing you as his bodyguard, you weren't hanging out with

20  these guys just to socialize, right?

21  A    No, sir.  Now we had went out -- We went out before just

22  socially.  But when he called me and put me to work, he called

23  me and put me to work.

24  Q    Okay.  And when you would go out and socialize, that was

25  something you enjoyed, right?

1   A   No, not really.

2   Q   Well, were you getting paid?

3   A   Going out -- Going out and socializing or working?

4   Q   Going out and socializing.

5   A   Was it something I enjoyed?

6   Q   Yeah.

7   A   Of course, you enjoy going out and socializing, right.

8   That's why you go out.

9   Q   And you guys would go out and drink, and he'd buy your

10  drinks and things of that nature, correct?

11  A   Did he buy me drinks?  Yes.

12  Q   You never saw Tommy Anderson with a gun, did you?

13  A   No, sir, I haven't.

14  Q   Even when you were working -- quote/unquote -- "as his

15  bodyguard," you never saw him with a gun, right?

16  A   No, sir.  Just like I told the FBI, I have never seen

17  Tommy Anderson with a gun.

18  Q   You never -- You never carried a gun during these periods

19  of time, right?

20  A   No, sir.

21  Q   That wasn't -- That wasn't until you picked up your case

22  in 2014, right?  Or '13?

23  A   Right.

24  Q   After you were dealing with Thomas Anderson, correct?

25  A   Yes, sir.

1    Q    Now you told the FBI about -- And, incidentally, when you

2    were working as -- quote/unquote -- "a bodyguard" and you were

3    out with him, and I'll get to that incident that you talked

4    about where you were called, there was never anything you ever

5    had to do to stop any violence, right?

6    A    No, sir, not -- not to my knowledge.

7    Q    Well, you're the only person I can ask about that right

8    now because you're on the stand.  So as you're sitting here

9    searching your mind, as you were working for Mr. Anderson

10   as -- quote/unquote -- a "bodyguard," did you ever have to

11   break up any violence?

12   A    Sir, I can't say for certain because I really -- I really

13   -- I don't think so, but I think there might have been a minor

14   incident or two in the club where it was something, but --

15   Q    But you could be confused.

16   A    -- that happens all the time.

17   Q    Okay.

18   A    So as far as him having some type of personal contact,

19   that only happened the one time.

20   Q    You told the FBI and you told Mr. Davis about an incident

21   where you -- during this period of time where you were called

22   upon to break up some dispute or altercation by Mr. Anderson.

23   Do you remember that?

24   A    Yes, sir.

25   Q    And I think you told Mr. Davis that as you recall it,

1   Mr. Anderson was at Lucas Park when this call was made, right?

2   A    Yes, sir.  He was in Lucas Park and I was out in the

3   Loop.

4   Q    You were out in the Loop?  At the Loop in U. City?

5   A    Yes, sir.

6   Q    Okay.  So it would be wrong when you told the FBI that

7   actually Mr. Anderson called you and told you that the dispute

8   and the altercation was actually in University City and asked

9   you to travel to University City.  Did the -- Did the DEA

10  Agent get that wrong in his DEA report?

11  A    I don't know.  Would you repeat what you said at first

12  again?

13  Q    Do you recall when you relayed this story -- When you

14  relayed this particular story to the DEA and the FBI during

15  February of 2014, do you recall telling them on that occasion

16  that the way you recall it is that Mr. Anderson and his

17  associates were at a bar in University City?

18  A    No, sir.  No, sir.

19  Q    So that was ---

20  A    Yes, they got it wrong.  He was down at Lucas Park.

21  Q    They got it wrong, or you're remembering it differently

22  this time?

23  A    However you want to put it, sir.

24  Q    Well, which way is right?  Did they get it wrong or are

25  you changing the story?

1  A    There ain't -- There ain't no change to the story.  The

2  story goes like it goes.

3  Q    And in any event, what happened is essentially a big

4  nothing because you show up, and there's Tommy Anderson who

5  said, "There's nothing going on," right?

6  A    No.  He told me exactly what went on.

7  Q    And did you have to break up an altercation?

8  A    No, sir, I didn't.

9  Q    Did you see any injuries or damage to Mr. Anderson's

10  person?

11  A    I think -- I think he was -- his -- his nose was bleeding

12  or his lip was busted or something, but not -- something like

13  that.  It was some type of injury but it was minor.

14  Q    Well, why didn't you mention that to the FBI when you

15  gave them your debriefing in February?

16  A    I didn't see the purpose -- I didn't see the importance

17  of saying that he was injured to me.

18  Q    My question is:  Did this ---

19       MR. DAVIS:  Your Honor, if he's going to ask a

20  question, can I at least ask him to be instructed --

21       MR. ROSENBLUM:  I'll rephrase it.

22       MR. DAVIS:  -- to let him answer the question?

23       MR. ROSENBLUM:  I'll -- I'll slow down.

24       THE COURT:  Yeah.  You should let him -- Let him

25  finish his answer, Mr. Rosenblum, and then you can ask him the

1   next question.

2          MR. ROSENBLUM:  Okay.  No problem.

3   Q    (By Mr. Rosenblum)  My question to you, sir, is this:

4   Your testimony now is you think you may have seen some slight,

5   what, blood on his nose?  Is that it?

6   A    That's right, yes, sir.

7   Q    Okay.  Did you make that statement to the FBI?  To the

8   people you were talking to?  The DEA?  The FBI?

9   A    I don't recall.

10  Q    You don't recall?  If it's not in the report, can we

11  assume you didn't say it?

12  A    I guess we could assume that.

13  Q    Okay.  Then you tell the -- Then you go on about this

14  incident in San Jose, correct?

15  A    Excuse me?

16  Q    You go on about this incident where you were called to go

17  out to San Jose, California to meet this individual; an

18  individual, right?

19  A    Yes, sir.

20  Q    Now -- And I think what you said was the initial request

21  was that you come out here and basically scare somebody or

22  don't hurt them too badly, don't rough them up too badly.  Was

23  that the initial request?

24  A    Yes, sir.

25  Q    And so why did you feel you needed ---

1  A     That was the request, period, sir.

2  Q     That was the request, period.  Okay.  So even though

3  those were your marching orders, why did you feel it was

4  necessary to bring your friend, Mr. Lambert, with you?

5  A     Because he said I might need some help.  That's how he

6  felt.

7  Q     That you may need some help to -- just to gently toss

8  somebody?

9  A     Yes, sir.

10  Q     You didn't go out there with a gun, right?

11  A     No, sir.

12  Q     Did you ever show Tommy Anderson a gun that you carried?

13  A     No, sir.

14  Q     To your knowledge, would Tommy Anderson think that you

15  would ever carry any sort of a weapon?

16  A     No, sir.  He shouldn't have no reason to.

17  Q     Exactly.  Because you never told him you ever had a

18  weapon or anything that -- any sort of instrument that could

19  apply any sort of deadly force, right?

20  A     Correct.

21  Q     So as I understand then, the way this goes down in

22  San Jose, California is -- And I was trying to take notes when

23  you were telling the Court.  You arrive out there with

24  Conflict who may or may not -- who you refer to as your

25  brother but who's not your brother, correct?

1   A    Yes, sir.

2   Q    And then who -- who picks you up when you arrive in

3   San Jose?

4   A    I don't remember the guy's name.

5   Q    Was Tommy Anderson with him?

6   A    No, sir.

7   Q    And at some point you go to some resort area, and you

8   spend the night, right?

9   A    No, sir.  The first was like some little shady motel.

10  Q    Okay.

11  A    Then the next morning we went out to the resort then.

12  Q    Okay.  And then at some point you're requested to go meet

13  this individual, right?

14  A    Excuse me?

15  Q    At some point you're directed to a place to meet this

16  individual that you're supposed to talk to?

17  A    No, sir.  I wasn't there to talk to nobody.  I was

18  supposed to meet the individual, the guy I was supposed to

19  intimidate, put my hands on him, however you want to put it.

20  Q    Intimidate.  So how did you get to that location?

21  A    Rode with the guy in the Jeep.

22  Q    So it was just you or was it you and Conflict?

23  A    Me and Conflict.

24  Q    Okay.  So the three of you and the guy in the Jeep then

25  ride to a location that you described how?

1   A    As a motel.

2   Q    And at that point in time, and I'm looking at my notes, I

3   think you said you received a call from Tommy Anderson?  A

4   telephone call.

5   A    When did I receive a telephone call?

6   Q    Well, I thought you testified ---

7   A    When I was riding out to the ---

8   Q    When you were riding out to the place.

9   A    I can't -- I really can't remember if I had received a

10  phone call from Mr. Anderson or not.  That was a long time

11  ago.

12  Q    I understand it was a long time ago, but it wasn't a long

13  time ago when you testified on Direct Examination about 20

14  minutes ago when I believe you said that as you were riding,

15  you received a telephone call from Mr. Anderson saying, "He's

16  here."  Do you recall saying that?

17  A    No.

18       MR. DAVIS:  (Inaudible).

19       THE COURT:  Yeah.  I'm going to sustain the

20  objection.  The record is going to reflect whatever the

21  witness actually said.

22       MR. ROSENBLUM:  Okay.  No problem.

23       THE COURT:  So let's move on.

24  Q    (By Mr. Rosenblum)  So as your recollection is now, on

25  the way out there you did not receive a call from

1    Tommy Anderson?  I'm just trying -- Because my notes are

2    different than the police report.

3            MR. DAVIS:  The phone call was during the trip.

4    Q   (By Mr. Rosenblum)  When did you receive -- Did you ever

5    receive a phone call from Tommy Anderson directing you to go

6    to a place, sir?

7    A    I honestly don't remember.

8            THE WITNESS:  I mean if he wants me to try to draw a

9    scenario up, ---

10           THE COURT:  Just try to answer the question if you

11   can.  If you can't answer the question, ---

12   A    I do not remember -- I do not remember Tommy Anderson

13   calling me from the plane, after I got off the plane, on the

14   trip to the hotel.  I don't remember seeing Mr. Anderson until

15   the next morning at the hotel, the first hotel before I go to

16   the resort to assault the dude.

17   Q   (By Mr. Rosenblum)  Okay.  So the first time was that

18   morning before you go to the place to intimidate this person,

19   right?

20   A    Yes, sir.

21   Q    Now on the way there -- And that's maybe where I was

22   confused.  On the way to meet this person, the purpose of your

23   trip, did you receive a phone call from Tommy Anderson?

24   A    No, sir.

25   Q    Did you ever receive a phone call from Tommy Anderson

1   before you entered that apartment or hotel or whatever it is?

2   A     I don't recall, sir.

3   Q     And how did you know where to go?

4   A     I didn't know where to go.  The guy driving the Jeep knew

5   where to go because he's from, I guess, California, Central

6   California, Northern, Southern California.

7   Q     Okay.  So tell me:  As you arrive, when is the first time

8   that you see Tommy Anderson in connection ---

9   A     The next morning at the first hotel.

10  Q     At the first hotel, but now I'm past the first hotel.  I

11  want to get to the point where you were going to intimidate

12  this person.

13         MR. DAVIS:  (Inaudible).  The question is simple.

14  (Inaudible).

15         MR. ROSENBLUM:  Feel free.

16         MR. DAVIS:  The first night you stayed at a hotel

17  when the Jeep brought you there.

18         THE WITNESS:  Yes, sir.

19         MR. DAVIS:  The next morning you woke up, did you see

20  Tommy Anderson?

21         THE WITNESS:  Yes, sir.

22         MR. DAVIS:  Can you tell the Court how that happened?

23         THE WITNESS:  He pulled up.  He pulled up with ---

24         MR. DAVIS:  Pulled up to where?

25         THE WITNESS:  He pulled up to the hotel, and we got

1    out.  We got out.  I guess he pulled to the hotel, called us,

2    told us to come out.  We came out and went to the resort.

3         MR. DAVIS:  When you and Conflict walked out, did you

4    get in that Jeep?

5         THE WITNESS:  Yes, sir.

6         MR. DAVIS:  Who else was in the Jeep?

7         THE WITNESS:  Tommy Anderson and the other white guy.

8    I don't remember his name.

9         MR. DAVIS:  So he rode all the way with you to the

10   resort, Tommy.

11        THE WITNESS:  Yes, sir.

12        MR. DAVIS:  Okay.

13   Q    (By Mr. Rosenblum)  Did you walk into the resort -- into

14   the room with Tommy Anderson?

15   A    Yes, sir.  We walked to the registration counter to get

16   the room and then to the room.

17   Q    And you waited in the room?

18   A    Yes, sir.

19   Q    Now did Tommy Anderson carry to the room anything in his

20   hands?

21   A    No, sir, I don't remember.

22   Q    You don't remember?

23   A    I don't remember him having anything in his hands at that

24   time.

25   Q    So -- And just so I'm clear because I thought you said on

1  Direct Examination that you received a phone call from

2  Tommy Anderson stating, "I'm here," or, "He's here," did you

3  receive such a phone call?

4  A    No, sir.  I -- I said that he came in and told us that he

5  was here.  He was here to get us ready.  You know what I mean?

6  He came back in there like, "He's here."  No.  First, he came

7  in.  He said, "He's on his way!  He's on his way!  Get it

8  together!"  He told us to get it together so when he comes,

9  we'll be ready.  Then he went back out, and he came back and

10  said he was here; he was here.  So that's when we turned the

11  lights out.  Mr. Kienstra came in the room first and

12  Mr. Anderson was behind him.

13  Q    Now -- So he left and then came back in the room with

14  Mr. Kienstra is what you're saying.

15  A    Yes, sir.

16  Q    All right.  And that's when you followed your marching

17  orders which was to not hurt anybody too badly and sort of

18  intimidate him, right?

19  A    Right.

20  Q    And you, what, punched him one time through a shake, I

21  think you said, right?

22  A    Yes, sir.  I swung at him.  I swung and punched him

23  through the shake the first time, and I think Conflict might

24  have hit him.  I'm not for sure because I was watching

25  everything in real time, but I know he was up on the floor

1  like.

2  Q    Okay, slow down.  Now you say you think Conflict hit him.

3  Now you didn't mention any of that to the FBI when you spoke

4  in February, did you?

5  A    I don't recall.  I know --

6  Q    If it's not in the report, can we ---

7  A    -- every time I tell -- every time I tell it, I tell it

8  the same way.

9  Q    Well, if you didn't mention anything about Conflict maybe

10 hitting him, is it fair to say that he may not have hit him or

11 you may not have mentioned that to the FBI?

12 A    He may not have hit him.

13      MR. DAVIS:  I'm going to object to the compound

14 question, Your Honor.  I have no idea what that question is.

15      MR. ROSENBLUM:  Okay.  I'll withdraw it.

16      THE COURT:  Okay.

17 Q    (By Mr. Rosenblum)  Let me ask you this:  When you hit

18 him through the milk shake, did he need any medical attention?

19 A    No, sir.

20 Q    Was he bleeding?

21 A    I don't recall.

22 Q    Did he -- Did you open up any wounds?

23 A    I don't recall.  I don't believe.

24 Q    And he didn't ask to be taken for any medical attention,

25 right?

1   A    No, sir.

2   Q    I think on your Direct Examination you said at that point

3   in time you left with Mr. Anderson and he was carrying a

4   briefcase, right?

5   A    Yes, sir.  Because when he came back in with Kienstra,

6   that's when he had the briefcase.  Prior to that, he didn't

7   have one.

8   Q    And is it fair to say that you have no personal knowledge

9   as to what was in that briefcase?

10  A    That's very fair to say.  I don't know what was in there.

11  Q    Is it fair to say that you never told the FBI that

12  Mr. Anderson -- Strike that.

13        And Mr. Anderson never told you what was in that

14  briefcase.

15  A    No, sir, he didn't.

16  Q    He did not.  So why was it then -- And you're certain of

17  that today under oath?

18  A    Am I certain that Mister --

19  Q    Yeah.

20  A    -- Anderson never told me -- What's your question?

21  Q    That Mr. Anderson never told you what was in that

22  briefcase when he left the room.

23  A    That's correct.

24  Q    So my question then is:  Why would you have told the FBI

25  then that Mr. Anderson told you that -- Let me strike that.

1          Did Mr. Anderson ever tell you why you were asked to

2    intimidate Mr. Kienstra?

3    A     Excuse me.  Can you repeat that?

4    Q     Did Mr. Anderson tell you why he was asking you to

5    intimidate Mr. Kienstra?

6    A     No, sir, he didn't.

7    Q     So as far as you are -- As far as you're aware, as you're

8    testifying here today, you have no idea the purpose of this

9    intimidation?

10   A     No, sir, I had no idea at that time.  No, I didn't.  I

11   had no idea.

12   Q     And nor have you ever learned anything subsequent to give

13   you an idea of the purpose of this alleged intimidation,

14   right?

15   A     Repeat the question, please.

16   Q     Nor have you learned anything since that event of this

17   alleged intimidation, what the purpose of it was.

18   A     No, that's not true.  I was contacted by -- I was reached

19   out to by some guy named "TJ" to come down to the Social House

20   to meet with some guys for me to do some work.  And when I got

21   down there, the dudes down there, Steve Ballard and somebody

22   else, three -- three or four other white guys and they wanted

23   to talk to me.  So at that time I was wondering what they

24   wanted to talk to me about.  So then Mr. Ballard told me that

25   I helped Tommy Anderson rob Kienstra for $275,000.

1    Q     Okay.  Now, again, my question is:  Are you claiming that

2    Mr. Anderson ever told you what the purpose of this alleged

3    intimidation was?

4              MR. DAVIS:  Asked and answered repeatedly.

5              THE COURT:  Yeah; sustained.  Sustained.

6    Q     (By Mr. Rosenblum)  Did you tell the FBI that

7    Mr. Anderson told you that Kienstra owed him $90,000?

8    A     Excuse me?

9    Q     Why is it that you told the FBI that Mr. Anderson -- that

10   you claim that Mr. Anderson told you the purpose of this was

11   that Kienstra owed him, Anderson, $90,000?

12   A     I don't remember.  I don't -- I don't really remember

13   that.  I remember Mr. Anderson contacting me to go out there

14   to rough dude up.  I'm -- I'm ---

15   Q     You don't remember ---

16   A     He didn't tell nothing about no $90,000 at all.

17   Q     You don't remember telling the FBI that you claimed that

18   Anderson told you that Kienstra owed him $90,000?

19   A     I don't recall, sir.

20   Q     And I know you haven't seen any of these reports, but

21   would any of these reports refresh your recollection of what

22   you told the FBI?

23   A     It's possible.

24             MR. ROSENBLUM:  May I approach, Your Honor?

25             THE COURT:  Yes.

1     MR. DAVIS:  For evidentiary purposes, are you asking

2  that his memory be refreshed?

3     MR. ROSENBLUM:  Correct.

4     THE COURT:  Is that what that is?  I don't know what

5  it is.

6     (Inaudible)

7  A    This one right here in the yellow?  No, sir, I don't

8  remember saying that.

9  Q    (By Mr. Rosenblum)  So if they attribute that to you,

10  they would have gotten it wrong?

11  A    I don't remember saying that.

12  Q    Because, in fact, Mr. Anderson never told you any

13  particular reason is what you're claiming, right?

14  A    Right.

15  Q    Now fair enough that you talked about this meeting with

16  Mr. Ballard, and he approached you with some other white

17  dudes, white guys, and said do you want to come to work for

18  them, right?

19  A    No, sir.  He explained to me that I helped Tommy Anderson

20  rob a guy named Kyle Kienstra, who I didn't know at the time,

21  for $275,000.

22  Q    275,000 or 270 is what you told the FBI?  Do you remember

23  the number?

24  A    270 round about.

25  Q    Round about.  So you're just ---

1   A    $270,000 kept my attention.

2   Q    Okay.  So if you said 275 today, you may have misspoken?

3   A    I may have misspoken, yes, sir.

4   Q    And then at some point in time, as I understand it, you

5   actually then go to work for Mr. Kienstra, right?

6   A    Yes, sir.

7   Q    And Mr. Kienstra starts, being the opportunist that you

8   are, he starts paying you, right?

9   A    Yes, sir.

10  Q    And he starts paying you to beat up Tommy Anderson?

11  A    No.  He -- He started paying me for bodyguard work, too.

12  Q    Well, didn't he -- didn't you also tell the FBI that part

13  of your duties with Mr. Kienstra was to beat up Mr. Anderson?

14  A    No, sir.  I don't -- I don't recall that because I know

15  it wasn't about me beating up Mr. Anderson.  Mr. Kienstra

16  wanted me to stay out of the way.  In other words, let him get

17  to Tommy Anderson to hurt him or harm him, you know.  That's

18  all.

19  Q    Okay.  So -- Okay.  So being the opportunist that you

20  are, Mr. Kienstra was paying you that if Mr. Kienstra ever had

21  the opportunity to beat up Mr. Anderson, you were then

22  supposed to just stay out of the way, right?

23  A    Yes, sir.

24  Q    But in fairness, none of this was -- none of this -- none

25  of this ever took place.  It was a lot of talk, right?

1  A    Pretty much.

2  Q    Because you never had to look the other way when somebody

3  beat up Mr. Anderson, right?

4  A    Right.

5  Q    But in spite of never ever having to do that, you still

6  collected substantial money from Mr. Kienstra, right?

7  A    Right.

8  Q    And you continued to collect money from Mr. Kienstra for

9  how long?

10 A    A couple of years.

11 Q    How much money do you think you collected from

12 Mr. Kienstra all told?

13 A    I don't really -- I really -- I really don't know.

14 Q    Well, if you said you were getting approximately $900 or

15 so a month to the FBI, would it be fair to say that that was

16 about $900 a month times 24 months?

17 A    I didn't get money ever month, though.  That's the thing.

18 Q    So for a couple of years you received monthly money from

19 Mr. Kienstra, right?

20 A    Not quite, no.  I can't agree to that because

21 Mr. Kienstra really don't pay the -- pay his bills like he

22 should.  He says a lot of things he's going to do and don't do

23 them.

24 Q    So he -- You were -- He was supposed to pay you for two

25 years but he didn't make good on it sometimes, right?

1  A    Pretty much, yeah.

2  Q    Okay.  But you were still looking to get the money,

3  right?

4  A    Of course.

5  Q    And, of course, Mr. Kienstra then wasn't terribly upset

6  with you for this punch through the shake because he wound up

7  paying you, right?

8  A    Right.  I mean I -- I don't know.  I don't know his

9  feelings.  I just know that he hired me.

10  Q    And at any time during your employment with Mr. Kienstra

11  and the opportunity you seized on there, did you ever have to

12  do anything to Mr. Anderson?

13  A    No, sir.

14  Q    Did you ever have to present -- prevent any violence --

15  A    No, sir.

16  Q    -- coming to Mr. Anderson?  Pardon me?

17  A    No, sir.

18  Q    Essentially you just hung out with Mr. Kienstra from time

19  to time and got paid.

20  A    Well, no, sir.  No, sir.

21  Q    So you got paid for doing nothing?

22  A    Who are you asking me about?  Mr. Kienstra or

23  Mr. Anderson?

24  Q    Mr. Anderson -- Mr. Kienstra.

25  A    Okay.  What is your question?

1   Q     Well, if you didn't hang out with him and he was paying

2   you from time to time to prevent -- to -- to ---

3   A     He would give me money sometimes and like -- like an

4   advance on the job or an advance on doing something, like

5   that.  Like just because he didn't have nothing going on, he

6   would still throw me some money.  But, you know, he was always

7   trying to get me to help him trap Mr. Anderson which I would

8   never do because I'm never -- I wasn't -- I wasn't going to

9   never set him up doing like that.  You know what I'm saying?

10  It never was my intention.  You know what I'm saying?

11        But I was going to keep getting the money.  You know

12  what I'm saying?

13        I never would have let nothing happen to

14  Mr. Anderson, but at that time he was ---

15  Q     So your intention was to sort of play Mr. Kienstra sort

16  of to rip him off.

17  A     You can put it like that.

18  Q     Okay.  And incidentally, at the -- going back to San Jose

19  when you claim that Mr. Kienstra was on the ground saying,

20  "Don't kill me," and Mr. Anderson said, "That's exactly what's

21  going to happen," I mean that was never in the cards.  Nobody

22  was going to get hurt, seriously hurt, on that day, right?

23  A     As I told you before, Mr. Anderson stated that he didn't

24  want the guy hurt that bad.  He just wanted him punched a

25  couple of times, roughed up to get his attention.

1  Q    Now ---

2  A    Those were my instructions.

3  Q    So after seizing upon the opportunity -- And,

4  incidentally, Mr. Kienstra couldn't have been too upset with

5  you because he started paying you for two years, right?

6  A    Again, sir, for the third time, yes, sir.

7  Q    And lastly, after seizing upon the opportunity from

8  Mr. Kienstra, then you went ahead and not only -- and seized

9  on the opportunity from the FBI and you went on their payroll,

10  right?

11  A    Yes, sir.

12  Q    And what do you think the requirements -- your

13  requirements to stay on the FBI payroll are?

14  A    I don't know the requirements.  I haven't been told no

15  requirements and ---

16  Q    Are you continued -- Are you being paid by them as we

17  speak?

18  A    I haven't got no more money.  I stated the first time

19  when I got the first money.  That's all I got.

20  Q    A thousand dollars?

21  A    Yes, sir.

22  Q    And you got it at one time.

23  A    Yes, sir.

24  Q    And when did you get it?

25  A    Again, sir, ---

1  Q    When did you get it?

2  A    This morning.

3  Q    So you got a thousand dollars -- Wait a second.  So you

4  met with the FBI on the 14th of 2014.  You met with the FBI on

5  February 21st of 2014.  You stated you met with them to

6  provide information to them about Mr. Anderson and others

7  involved in this investigation, I think you said, 20 times or

8  so?  Is that fair?

9  A    No, sir.  You're very much mistaken.  I never said no

10 twenty times.  I said in between five and ten.

11 Q    You said in between five and ten?

12 A    Times that I -- that the FBI met with me.

13 Q    Okay.  And when was ---

14 A    Or are you talking about working for Mr. Anderson?

15 Q    No.  That's fine.

16 A    Because I'm confused.

17 Q    And when was the last time -- Okay.

18       THE WITNESS:  Your Honor, I'm very confused right

19 now.

20 Q    (By Mr. Rosenblum)  Let me ask this question.  I'll

21 accept your answer that you met with the FBI five to ten times

22 after those initial meetings.  When was the last time you met

23 with the FBI?

24 A    2:30.

25 Q    I'm sorry?

1    A     2:30.

2    Q     2:30 this afternoon?

3    A     PM.

4    Q     And that's ---

5    A     Today.

6    Q     And prior to 2:30 this afternoon, when was the last time

7    you met with the FBI?

8    A     This morning.

9    Q     And prior to this morning, when was the last time?

10           MR. DAVIS:  Your Honor, I'm going to object to the

11    relevance.

12           MR. ROSENBLUM:  Well, I'm trying to get to see when

13    he was done working and when he got paid.

14           MR. DAVIS:  He got paid this morning a thousand

15    dollars, paid this morning, and he's met with the FBI five to

16    ten times.

17           MR. ROSENBLUM:  Well, Mr. Davis isn't on the stand,

18    and I'm asking his witness, and I'm trying to ascertain when

19    his duties were done as opposed to when he got paid just

20    before he testified.

21           THE COURT:  Okay.  Why don't you ask him when --

22    whether his duties have ended with the FBI so we can move on.

23    Q     (By Mr. Rosenblum)  When did you think your duties with

24    the FBI ended?

25    A     I don't know.  I haven't discussed that.

1   Q    You haven't discussed it?

2   A    No.

3   Q    So you think you're still on the clock with the FBI as a

4   paid informant?

5   A    I mean it has no relevance to me.  I don't know whether

6   we're on or off.  I don't know.

7   Q    But the one thing -- the one thing we can be certain of

8   is before you came here and testified, you received a thousand

9   dollars from your Government, right?

10       MR. DAVIS:  Asked and answered.

11  A    That's what we can be certain of.

12       MR. ROSENBLUM:  All right.  I have nothing further.

13                    REDIRECT EXAMINATION

14  QUESTIONS BY MR. DAVIS:

15  Q    You recited to Mr. Rosenblum your previous convictions to

16  the best of your memory.

17  A    Yes, sir.

18  Q    Did Thomas Anderson, who asked you to go to California

19  and do that dirty work, know about your previous convictions?

20  A    Yes, sir.

21  Q    Did he know about that when he asked you to be his

22  bodyguard and accompany him to clubs around town?

23  A    Yes, sir.

24  Q    When you assaulted the man in the hotel room,

25  Mr. Rosenblum asked you:  You weren't there to kill anybody,

1   and that's true, correct?

2   A     Correct.

3   Q     Did you say anything to the man laying on the floor about

4   dying?

5   A     Did I personally?

6   Q     Yes.

7   A     No, sir.

8   Q     Who did?

9   A     Thomas Anderson.

10  Q     There's talk about a $90,000 debt that might have been

11  owed from Kienstra to Anderson or Anderson to Kienstra.

12  There's talk about $270,000-ish in that briefcase.  He's

13  paying you hundreds of dollars to be his bodyguard; 5000 to

14  fly to California.  How was Mr. Anderson employed?

15  A     Excuse me.  How was what?

16  Q     What did he do for his money?

17  A     Nothing.

18  Q     And Mr. Rosenblum made it a point that at the clubs, you

19  walked ladies to cars to make sure they were safe.  That was

20  part of your employment?

21  A     No, sir, that wasn't part of my employment.  That's part

22  of my courtesy as a gentleman.

23  Q     Okay.  But the difference between Mr. Anderson was he

24  paid you.  It wasn't just courtesy.

25  A     That's what I said, yes, sir.

1  Q    And your exact words were "among other things."

2  A    Yes, sir.

3  Q    Do those other things include going to California to beat

4  up someone?

5  A    Yes, sir.

6         MR. DAVIS:  I don't have anything further.

7         THE COURT:  Thank you, Mr. Hughes.  You are excused.

8         THE WITNESS:  Okay.

9         THE COURT:  Oh, wait.  Actually I have a question.  I

10  don't think I heard.  When was this trip to California?  What

11  year?

12         THE WITNESS:  I want to say either 2010 or '11.  I'm

13  not for sure.  I don't really recall; to my best knowledge.

14         THE COURT:  I'm sure somebody will give it to me.

15         MR. DAVIS:  Your Honor, under 612, I move for the

16  admission of the document (inaudible).

17         MR. ROSENBLUM:  I have no objection.

18         THE COURT:  It will be admitted.

19         MR. DAVIS:  That will be Government's Exhibit 3.

20         THE COURT:  Exhibit 3?  Okay.  Well, you entered 1 at

21  the first ---

22         MR. DAVIS:  I entered 1.  So 2's already marked for

23  (inaudible).  So that's 3.

24         THE COURT:  Okay.  This will be admitted as

25  Government's Exhibit 3.

1      Thank you, Mr. Hughes.  You may step down.  You are

2  excused.

3      MR. DAVIS:  Corey Nuspl.

4      THE COURT:  Mr. Davis, it's 5:00.  How much time do

5  you think this witness is going to take?

6      MR. DAVIS:  5:00 we're at?  Less than the Direct on

7  Mr. Hughes.

8      THE COURT:  Okay.

9      (The Witness Is Sworn.)

10                   DIRECT EXAMINATION

11  QUESTIONS BY MR. DAVIS:

12  Q    Mr. Nuspl, it's 5:00 on a Friday afternoon.  If I am

13  talking fast and you don't understand what I say, please feel

14  free to stop me and reask the question.  Okay?

15  A    Yes, sir.

16  Q    You are indicted with Tommy Anderson in the -- You're

17  aware that you're under indictment with Tommy Anderson.  Is

18  that true?

19  A    Yes, sir.

20  Q    You've agreed through your counsel, Joel Schwartz and

21  currently Patrick Kilgore, to cooperate with the Government in

22  that -- in that prosecution.  Is that correct?

23  A    Yes, sir.

24  Q    To that end, you and I, with counsel, have had

25  multiple -- a few conversations where it has been explained to

1  you that if you provide substantial assistance to the

2  Government, the Government will file a motion later on that

3  would allow the sentencing judge to give you a lesser sentence

4  than you might otherwise receive.  Is that your understanding?

5  A    Yes, sir.

6  Q    Has anyone predicted to you what that sentence is going

7  to be?

8  A    No, sir.

9  Q    In fact, what have I told you?

10  A    There is no prediction.

11  Q    Do you know Thomas Anderson?

12  A    Yes, sir.

13  Q    When do you remember meeting him?

14  A    Late 2010.

15  Q    When you met him, how long was it, if ever, that you

16  realized he was involved in a drug conspiracy?

17  A    Almost immediately.

18  Q    Did you become involved in it as well?

19  A    Yes, sir.

20  Q    I want to fast-forward to a portion where you and

21  Thomas Anderson had a conversation about a trip to San Jose,

22  California with two African-American gentlemen.  Do you ever

23  recall Tommy Anderson relating such a story to you?

24  A    Yes, sir, I do.

25  Q    Do you recall where you were?

1  A     It was in my truck on the way to the gym.

2  Q     To the gym to work out?

3  A     Yeah.

4  Q     Did you do that with Mr. Anderson on occasion?

5  A     Yes, a lot.

6  Q     What did Mr. Anderson tell you happened in California?

7  A     What Tommy told me -- Mr. Anderson told me was that they

8  had someone tell them that a guy named Kyle Kienstra was out

9  in California, wherever, and that he had money to purchase

10  marijuana.  And ---

11  Q     Did you know a man named "Kyle Kienstra" at that point?

12  A     I know of him through Tommy.

13  Q     Okay.  Were you -- Did you ever know Mr. Anderson and

14  Mr. Kienstra to jointly be involved in this drug conspiracy?

15  A     I was under the impression they were.

16  Q     Okay.  Okay.  Going back now, he tells you that he had

17  heard information that Kienstra was in California to make a

18  drug purchase.  What else did he say?

19  A     He said that someone told him he was out there with money

20  to make a purchase and that they were -- they went out there

21  to rob him.

22  Q     Who's "they"?

23  A     Him and a guy named "Big" and his brother, "Conflict."

24  Q     Did you -- When he told you -- When Tommy Anderson told

25  you this story, did you know "Big" and/or "Conflict"?

1  A    When he told me the story, no, but I met them shortly

2  after.

3  Q    Okay.  What did he say happened when they got to

4  California?  "They" meaning he, Big and Conflict.

5  A    He said that they had word he was in a hotel room, and I

6  guess they went up, knocked on the door, whatever have you,

7  and they walked in.  And Tommy's side of the story was that

8  they walked in, duct taped him in some fashion, and hung him

9  over a railing, and he was drooling on himself.  And they

10 asked him where the money was supposedly, and they got the

11 money and left was his story.

12 Q    In addition to -- Tommy Anderson, that's his relation of

13 what happened in California?

14 A    Yes.

15 Q    Okay.  Have you ever seen Tommy Anderson with a gun?

16 A    Yes.

17 Q    Have you ever seen it in his waistband?

18 A    Yes.

19 Q    How many times have you seen him with a firearm?

20 A    Just twice.

21 Q    Okay.  Have you ever seen -- When I say "firearm," I mean

22 handgun.  Okay?

23 A    Okay.

24 Q    Twice with a handgun?

25 A    Just once with a handgun.

1   Q     Okay.  What was the other weapon?

2   A     The other weapon was an assault rifle, and that was at

3   his apartment.

4   Q     Where was his apartment?

5   A     In Clayton.

6   Q     At the time that you saw him with the handgun in his

7   waistband and the assault rifle at his apartment, were you

8   aware that he was involved in a drug conspiracy?

9   A     Yes, sir.

10  Q     Were you, in fact, involved in the same conspiracy?

11  A     Yes, sir.

12  Q     When you agreed to cooperate with the Government, did you

13  express concerns to me about your safety?

14  A     Yes, sir.

15  Q     Against whom?

16  A     From Mr. Anderson and his associates.

17  Q     I'm sorry.  What did you say?

18  A     Mr. Anderson and anyone he's associated with.

19  Q     Can you explain to the Court why you had or have that

20  concern?

21  A     Just out of his personality and vengefulness.

22        MR. DAVIS:  Nothing further.

23                    CROSS EXAMINATION

24  QUESTIONS BY MR. ROSENBLUM:

25  Q     Mr. Anderson's, never threatened you, has he?

1   A    Yes, actually he has.

2   Q    When?

3   A    Through another person.  He said to tell Corey he's

4   coming for me.

5        THE COURT:  Could you keep your voice up, Mr. Nuspl,

6   please?

7        THE WITNESS:  Yes, ma'am.

8   Q    (By Mr. Rosenblum)  I mean you would agree with me that

9   anybody -- that when you decided to cooperate, there's always

10  a general concern about being hurt, right?

11  A    Yes.

12  Q    And you have a general concern because you've decided to

13  cooperate with the Government, correct?

14  A    Yes, and knowing Tommy.

15  Q    Okay.  And when you say, "knowing Tommy," has he ever

16  done any harm to you?

17  A    No, sir.

18  Q    Has he ever -- Now you said that you saw him one previous

19  occasion with a weapon?

20  A    Yes, sir.

21  Q    And when was that?

22  A    It was ---

23  Q    With a handgun?

24  A    Yes, sir.

25  Q    When was that?

1  A    In 2011.

2  Q    So you saw him in 2011 with a handgun, and this is when

3  you were ---

4  A    I -- I picked him up to go to the gym.

5  Q    Okay.  And did he carry the handgun into the gym?

6  A    He had it in his waistband.  And then when we pulled up

7  to the gym, he pulled it out of his waistband is when I seen

8  it, and he put it in a bag, his gym bag.

9  Q    And he put the -- he put -- You're telling the Court that

10 he put the weapon in his gym bag?

11 A    Yes.

12 Q    Did you ever see him use that weapon on anybody?

13 A    No, sir.

14 Q    Did you ever see him threaten anybody with that weapon?

15 A    No, sir.

16 Q    And at the time were you aware that Mr. Anderson was not

17 a prohibited person?  That he didn't have a -- he wasn't a

18 convicted felon?

19 A    I did not know.

20 Q    And when you said that he -- Can you give us a month in

21 2011?

22 A    I'd say towards the end of 2011.

23 Q    Okay.  Did you spend a lot of time with Mr. Anderson?

24 A    We'd work out, and I seen him socially a couple of times.

25 Q    And was that the only time you saw a handgun next to him?

1   A    That was the only time I seen him with a handgun.

2   Q    Okay.  And that was a handgun that he kept potentially in

3  his vehicle, correct?

4   A    Kept on him, I would say.

5   Q    And -- On that occasion.

6   A    Yes, sir.

7   Q    Well, on all the other occasions that you were with

8  Mr. Anderson, did you see a weapon on his person?

9   A    No, sir.

10   Q    And you said that you then -- On another occasion you saw

11  a rifle in his apartment?

12   A    Yes, sir.

13   Q    And incidentally, with respect to the handgun, you're not

14  telling the Court that he was involved in a specific drug

15  transaction that day at the gym, are you?

16   A    No, sir.

17   Q    So there was no -- And he wasn't around narcotics on that

18  particular day at the gym, was he?

19   A    No, sir.

20   Q    Or any large sums of money, correct?

21   A    No, sir.

22   Q    So it was just the two of you going to work out, right?

23   A    Yes.

24   Q    And you're telling the Court that on that particular

25  occasion, unrelated to any -- quote/unquote -- "conspiracy,"

1    there was no specific drug transaction at that time.

2    A    Not at that time.

3    Q    And you're not claiming that he needed it for protection

4    from a drug transaction at that time.

5    A    I would safely say that's probably the case.

6    Q    Pardon me?

7    A    I would safely say he probably was carrying it for his

8    protection.

9    Q    Now with respect to the weapon that you saw in his

10   apartment, was that also in 2011?

11   A    Yes, sir.

12   Q    And that was just -- Were there -- When you saw that

13   particular weapon, was there a drug transaction in process at

14   that time?

15   A    No, sir.

16   Q    You're not saying that to the Court.  Were there any

17   drugs around at that time?

18   A    No, sir.

19   Q    Were there any large sums of money at that time?

20   A    Not that I know of.

21   Q    So it was a weapon that he had in his home.

22   A    In his house under his bed.

23   Q    Did he ever threaten you with the weapon?

24   A    No, sir.

25   Q    Now when was the last time you've been in contact with

1    Mr. Anderson?  Direct contact.

2    A    Direct contact?  I haven't seen him in probably over --

3    over a year.

4    Q    Over a year?

5    A    Yes.

6    Q    Have you spoke with him in over a year?

7    A    No.  About a year I'd say since the last time I spoke to

8    him.

9    Q    And was that over the phone or in person?

10   A    Over the phone.

11   Q    And is that when you're telling the Court that he said

12   something threatening to you?

13   A    No.

14   Q    So he's never threatened you personally, has he?

15   A    He threatened recently in the past couple of months.  He

16   was at Ballpark Village and told a friend of mine that works

17   there's that, "Tell Corey I'm -- I'm coming for him."

18   Q    Assuming your friend's telling the truth, right?

19   A    Yes, sir.

20   Q    So my question again is:  Has Tommy Anderson ever

21   threatened you?

22           MR. DAVIS:  Asked and answered.

23   Q    (By Mr. Rosenblum)  Directly.  Directly --

24   A    No, sir.

25   Q    -- has he ever threatened you?  Pardon me?

1   A    No, sir.

2   Q    Okay.  And this incident some three months ago at

3   Ballpark Village came, what, "I'm coming for you"?

4   A    Yes.

5   Q    Did you go to the police?

6   A    No, sir.

7   Q    Were you cooperating with the Government at that time?

8   A    No, sir.

9   Q    Did you feel you needed to make any kind of report for

10  your safety at that time?

11  A    No, sir.

12          MR. ROSENBLUM:  I have nothing further.

13          MR. DAVIS:  Nor do I.  Thank you.

14          THE COURT:  You're excused, Mr. Nuspl.

15          THE WITNESS:  Thank you.

16          THE COURT:  Any more?

17          MR. DAVIS:  If it please the Court, and if

18  Mr. Rosenblum will stop me if I stray from what our previous

19  conversation was, I was going to call Agent Jenny with whom

20  the Court is familiar from two days ago concerning what could

21  be some voluminous testimony but a copy of which has been

22  provided to Mr. Rosenblum.  This is Exhibit No. 2 that I spoke

23  of earlier --

24          THE COURT:  Okay.

25          MR. DAVIS:  -- that I'll provide to the Court, if

1   counsel has no objection.  And counsel will allow me to

2   summarize what it is.

3        THE COURT:  Any objection, Mr. Rosenblum?

4        MR. ROSENBLUM:  No, Your Honor.

5        THE COURT:  Okay.

6        MR. DAVIS:  And, again, if I stray from that

7   stipulation, I invite the Court or counsel to stop me.

8        Your Honor, on November 13th of 2012, Government's

9   Exhibit No. 2, which is 50 pages long, that the Government

10  moves into admission before I forget, in Cause No.

11  4:12-MJ-1288 and 1289, Brandon Moles, the Case Agent on this

12  case, was sworn before Judge Adelman for two search warrants;

13  one at 4749 East Concord which is the residence of Mr. and

14  Mrs. Anderson; that's Tom Anderson, Sr., the mother and father

15  of the Defendant, as well as a search warrant for 67

16  Blackthorn Drive in St. Louis which is the residence of

17  Rachel Anderson and her boyfriend/fiance' who also lives there

18  and co-defendant Brian Hounsom.

19       The affidavit that was sworn to by the affiant

20  contains in it a relatively concise summary of wiretap calls

21  that were obtained from wiretaps on Mr. Anderson's phone and

22  Brian Lord's phone; Brian Lord being a third co-defendant in

23  this multi-defendant case.

24       Had Agent Jenny testified, I would have called -- and

25  the Court has tabs on its copy -- Paragraph 48 which is on

1    Page 14 wherein the affidavit to which Mister —— Agent Moles

2    was sworn is a summary of Call 14187 on August 15th of 2012 at

3    about 3:48 in the afternoon.  It is from Target Phone 1 used

4    by Brian Lord to Mr. Anderson.

5         During that conversation, Anderson states:  Anything

6    else been going on?  Anything like you hear about the heater

7    squad?

8         And Lord replies:  Yeah, absolutely.

9         Anderson:  What do you hear about them?

10        Lord:  Well, I mean I talked to ya.

11        Anderson asked:  Am I laughing at them or they

12   laughing at me?

13        Lord said:  You're going to get amped, about as amped

14   as I am.

15        And Anderson said:  Are they talking shit?

16        And Lord said:  Yeah.  I mean just call me.  Have you

17   talked to your parents in a while?

18        And Anderson replied:  Yeah, I did.  I talked to them

19   today.  Why?

20        And Lord says:  I mean there's just different things,

21   shit, you know.

22        And Anderson said:  Why?  Somebody called them or

23   something?

24        And Anderson responds:  Just hanging out there and

25   shit.

1         Anderson said:  Really?  Okay.  Here, I'm going to

2    call you right now.

3         And Lord advised:  I got to go to the office.

4         And Anderson asked:  Like the bad boys?

5         And Lord says:  No.  Like the fucking haters; like

6    fucking old man pimple face and shit.

7         And Anderson says:  What do you mean old man pimple

8    face?

9         THE COURT:  Mr. Davis?

10        MR. DAVIS:  Yes.

11        THE COURT:  What do you want me to do with this?  I

12   mean I can -- I can read it, but if you can maybe explain what

13   the tabs are for, I can always read it later and not keep

14   everybody here, especially if there's no objection to entering

15   this.  Maybe you can just explain it.

16        MR. DAVIS:  If there's no objection to entering this,

17   on the tabs you have which are Paragraphs 48, 51, 75, 91, 94,

18   96 and 99.

19        MR. ROSENBLUM:  Can you go through those again?

20   Paragraphs what?

21        MR. DAVIS:  48, --

22        MR. ROSENBLUM:  Yeah.

23        MR. DAVIS:  -- 51.

24        MR. ROSENBLUM:  51?

25        THE COURT:  51.

1          MR. DAVIS:  51.  75, Page 23; 91, Page 27; 94, Page

2     28; 96, Page 29; and 99 -- Paragraph 99, Page 30.

3          THE COURT:  And those are being offered for what

4     purpose?

5          MR. DAVIS:  If the Court reads the affidavit, it will

6     see that there is conversation, including that between

7     Mrs. Anderson herself and Mr. Anderson, the context of

8     which -- It's hard to explain without reading the nuts and

9     bolts of it.  He has asked Brian -- He has asked Brian Hounsom

10    to go -- to wire him $2000 because he is in LA and doesn't

11    have the money.  Weeks before that, Brian Lord had been taking

12    off at Lambert Airport with $35,000 in his suitcase, and the

13    presumption is that's why he didn't take the money with him to

14    LA because he knew he could be taken off by DEA at the

15    airport.  He asked it to be wired later.  The conversation

16    changes to make it $5000 to Brian Hounsom; "keep 500 for

17    yourself for doing it."

18          The evidence reflected in here from surveillance and

19    from the T-III calls is that Brian Hounsom then went to

20    Mr. and Mrs. Anderson's house on Concord to get the money.  In

21    fact, there's phone calls from Mr. Anderson saying:  Are they

22    still there?

23          And Mrs. Anderson says:  No.  They left already.

24          And he said:  I wanted to make sure who got in my

25    closet.

1    And she said:  What do you -- Mrs. Anderson:  What do

2  you think?  We're stupid?  We know where your clothes are.

3    Mr. Anderson, Jr. says:  Good, because when Brian

4  gets in there, my clothes shrink.  They always come back

5  shrunk.

6    Mrs. Anderson replies:  I'll make sure they're washed

7  in cold water and there will be no shrinkage.  We're all good.

8    Later on, there's conversation by Mrs. Anderson that

9  she has acquired silver, and apparently through the

10  conversation she is giving it to other co-conspirators as

11  payment for what is going on and whether or not that silver

12  can be cashed, and she expressed concerns that it's heating

13  up, and so she's backing off from her acquiring of silver.

14    There's also conversation in there about

15  Mr. Anderson's knowledge of money being counted in the house

16  and money being hidden in the house.  This is the same house,

17  Your Honor, where the money was found in the bathtub.

18    This is the home plan the defense counsel proffered.

19  In fact, Mr. and Mrs. Anderson are now targets of this

20  investigation, and the home plan simply isn't viable.

21    So with that, I'd move for the admission of 2.

22    THE COURT:  It's admitted.

23    Mr. Rosenblum, do you have anything you'd like to

24  proffer to the Court before I close the record?

25    MR. ROSENBLUM:  Can I have one moment?

1          THE COURT:  Oh, sure.

2          (Pause)

3          MR. ROSENBLUM:  Clearly, Mr. Davis is more adroit of

4     dissecting what all those words meant than I am other than

5     I've heard a lot about pimple face and things of that nature.

6          But to the extent that his parents are targets, at

7     this point they're not indicted.  And at this point -- And I'm

8     here representing Tommy.  I can proffer to the -- I can

9     proffer that they have both, his father who's retired, own a

10    home that's worth $200,000.  They owe 25,000 on it.  They have

11    owned that home for 30 years, longer than Tommy Anderson has

12    been alive.  So I would -- It would be hard pressed to suggest

13    that that home was purchased with the proceeds of any crime.

14         Mr. Anderson, Tom Anderson, Sr., is retired and is at

15    home every day.  They have already taken the opportunity to

16    install a separate phone line for any monitoring device that

17    would be needed, and so I think that's a valid home plan.

18         If the Court's not comfortable with that home plan

19    because of what Mr. Davis has just proffered, a -- we have a

20    substitute home plan which would be his mother's sister,

21    Debbie Hammond who's a 54-year-old woman that works for

22    American Orthodontists.  She owns a home on Meadowfield off

23    Tesson Ferry Road.  I could supply the Court with the exact

24    address.  She lives there with her fiance'.

25         Meadowfield is within walking distance of an entity

1   called "Exist Fitness" which Tommy Anderson has an opportunity

2   to work at that location, if admitted to bail by the Court,

3   and he could essentially live in that home, monitored by

4   electronic -- by a separate phone line.  He can be on an

5   electronic monitoring.  He can be bound to that home other

6   than working, if the Court would permit him to work.  And I

7   believe that should assuage any of the Court's concerns with

8   respect to the second prong which is any risk that

9   Mr. Anderson proposes or poses to the community.

10          That's in addition to securing the only asset that

11  his parents have which is their home of 30 years.

12          THE COURT:  Thank you.  I am going to -- I said thank

13  you.  I'm going to take the motion under submission.  I'll

14  issue an order the very early part of next week.  I'm going to

15  issue an order the very early part of next week.

16          MR. DAVIS:  Thank you, Judge.

17          THE COURT:  All right.  Thank you, all.

18          (Hearing adjourned at 5:22 PM.)

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL REPORTER

      I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

      Dated this 15th day of September, 2014.


      /s/ Deborah A. Kriegshauser
      _____
      DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
      FEDERAL OFFICIAL COURT REPORTER