UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) No. 4:14-CR-246-AGF-NAB | |
| | ) | |
| THOMAS GREGORY ANDERSON, JR., | ) | |
| COREY NUSPL, | ) | |
| BRIAN CHRISTOPHER HOUNSOM, | ) | |
| | ) | |
| Defendants. | ) | |


MOTION HEARING

BEFORE THE HONORABLE NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE

VOLUME 1
JUNE 23, 2015


**APPEARANCES:**

For Plaintiff        John T. Davis, AUSA
                     Stephen R. Casey, AUSA
                     Tiffany G. Becker, AUSA
                     **OFFICE OF U.S. ATTORNEY**

For Defendant        Arthur S. Margulis, Sr., Esq.
Thomas Gregory       William S. Margulis, Esq.
Anderson, Jr.        Justin K. Gelfand, Esq.
                     **CAPES, SOKOL, GOODMAN & SARACHAN, P.C.**

For Defendant        Patrick S. Kilgore, Esq.
Corey Nuspl          **PATRICK S. KILGORE**

For Defendant        James W. Schottel, Jr., Esq.
Brian Christopher    **SCHOTTEL AND ASSOCIATES, P.C.**
Hounsom

*REPORTED BY:        Gayle D. Madden, CSR, RDR, CRR*
                     *Official Court Reporter, U.S. District Court*
                     *111 South Tenth Street, Third Floor*
                     *St. Louis, MO  63102          (314) 244-7987*
                     (Produced by computer-aided mechanical stenography.)

## <u>INDEX</u>

*Witnesses:*

**<u>RACHEL ANDERSON</u>**
    Direct Examination by Mr. William Margulis . . . . Page   7
       Voir Dire Examination by Mr. Davis  . . . . . Page  10
    Direct Examination by Mr. William Margulis (cont'd)Page  14
    Cross-examination by Mr. Davis . . . . . . . . . Page  20

**<u>MARC JOHNSON</u>**
    Direct Examination by Mr. William Margulis . . . . Page  29
    Cross-examination by Mr. Davis . . . . . . . . . Page  73

1          (Proceedings commenced at 9:04 a.m.)

2          (The following proceedings were held in open court and

3    with the Defendants present.)

4          THE COURT:  Good morning.  This is the case of United

5    States of America versus Thomas Anderson, and the matters

6    before the Court today are the Government's motion for inquiry

7    into potential conflicts of interest as well as the

8    Defendant's motion to dismiss the indictment against the

9    Defendant.

10          At this time, I would like for counsel for the

11    Government to announce your presence.

12          MR. DAVIS:  John Davis appearing on behalf of the

13    United States, Your Honor.  Cocounsel is Tiffany Becker and

14    Steven Casey.

15          THE COURT:  All right.  And counsel for the

16    Defendant, please announce your presence.

17          MR. ARTHUR MARGULIS:  Good morning, Your Honor.

18    Arthur Margulis for the Defendant Anderson.  William Margulis

19    and Justin Gelfand as well.

20          THE COURT:  All right.  Thank you.  And I know that

21    we do have some other counsel here representing other

22    individuals who may be implicated in this.

23          At this time, what I'd like to do is start with the

24    initial motion that was filed, which was the motion for

25    inquiry into potential conflicts of interest.  Mr. Davis, how

4

1   do you wish to proceed?

2          MR. DAVIS:  Your Honor, about the only thing -- well,

3   I don't think there's anything the Government can add to its

4   written motion.  The Court is aware that on -- in late

5   February current counsel for Mr. Anderson met with members of

6   the Government, provided us with three issues -- two of them

7   being conflicts of interest, one of them being contact with

8   represented persons.  The Government spelled that out in its

9   motion for inquiry into those three issues with the idea that

10  if defense counsel saw fit to bring it to us, we saw fit to

11  bring it to the Court, to lay it out on the table.  It's

12  spelled out in the motion.  We have no evidence to present.

13  If the Court has questions about the written content of the

14  motion, we can certainly answer those.  Otherwise, the idea

15  was to bring it to the Court, determine if there were any

16  conflicts, if there were, what the remedy is.

17         THE COURT:  All right.  And, Mr. Margulis, in

18  response -- after the motion for inquiry was filed, you filed

19  a motion to dismiss the indictment based on these conflicts or

20  alleged conflicts, correct?

21         MR. ARTHUR MARGULIS:  Based on the alleged conflicts

22  particularly, Judge, but there are a couple of other issues

23  that will come up that will be the basis of that motion as

24  well.

25         THE COURT:  Okay.  With regard to the -- the

1    potential conflicts of interest -- and I just -- I want to

2    narrow down the issues here.  We have the -- first the claimed

3    conflict involving XXXXXXX XXXXXX and Thomas Anderson.  Next

4    it's the conflict regarding or potential conflict regarding

5    Corey Nuspl and Thomas Anderson.  Correct?

6           MR. ARTHUR MARGULIS:  It is correct, yes, Judge.

7           THE COURT:  And then there is the issue of the

8    contact with represented persons.

9           MR. ARTHUR MARGULIS:  Yes, Judge.

10          THE COURT:  Okay.

11          MR. ARTHUR MARGULIS:  That came up a little later and

12   evolved, and there will be some testimony on that as well.

13          THE COURT:  Okay.  Why don't we go ahead then with

14   you, that you plan to present evidence regarding your motion

15   that -- I guess starting with the *XXXXXX* case.  Is that

16   correct?

17          MR. ARTHUR MARGULIS:  Yes, Your Honor.  We'll start

18   with the -- with the conflict issue and move on from there.

19          THE COURT:  All right.  All right.  You may proceed

20   then.

21          MR. ARTHUR MARGULIS:  Thank you, Your Honor.

22          MR. DAVIS:  May we approach, Your Honor?

23          THE COURT:  Yes, yes, uh-huh.

24       (9:10 a.m. under seal bench conference excerpted.)

25       (The following proceedings were held in open court.)

6

1              THE COURT:  Okay.  We are back on the record in the

2       case of United States of America versus Thomas Anderson, Jr.,

3       and I have had a request that all of the witnesses in this

4       case be sequestered from the courtroom, and I'm going to grant

5       that request.  So I would ask that any witnesses now leave the

6       courtroom until it is time for them to testify.

7              All right.

8              Mr. Margulis, you may proceed.

9              MR. ARTHUR MARGULIS:  Thank you, Judge.  Mr. Margulis

10      will.

11             MR. WILLIAM MARGULIS:  Thank you, Your Honor.

12             THE COURT:  Okay.  Go ahead.  The other Mr. Margulis.

13             MR. WILLIAM MARGULIS:  Defense will call Rachel

14      Anderson.

15         (Witness sworn.)

16             MR. DAVIS:  May I move this TV screen?  I can't see

17      the witness.

18             THE COURT:  Sure.

19             MR. DAVIS:  May I not be held responsible?

20             THE COURT:  No.  We'll hold you responsible.  No.

21             Is it out of your way?

22             MR. DAVIS:  Thank you.

23             THE COURT:  All right.  You may proceed,

24      Mr. Margulis.

25             MR. WILLIAM MARGULIS:  Thank you, Your Honor.

Rachel Anderson Direct Examination                    Volume 1

7

1                    **RACHEL ANDERSON**,

2  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3  FOLLOWS:

4                    DIRECT EXAMINATION

5  BY MR. WILLIAM MARGULIS:

6  Q    Would you state your name for the Court, please?

7  A    It's Rachel Anderson.

8  Q    Okay.  Ms. Anderson, can you maybe pull the microphone or

9  talk a little closer to it just so everybody can hear you?

10 And, Ms. Anderson, are you the sister of Thomas Anderson?

11 A    Yes.

12 Q    And Tom -- and your brother, Tom Anderson, is currently

13 under indictment in this court in a drug conspiracy case; is

14 that correct?

15 A    Correct.

16 Q    Are you also familiar with a gentleman named Brian

17 Hounsom?

18 A    Yes.

19 Q    And is Brian Hounsom a Codefendant in that indictment?

20 A    Yes.

21 Q    And are you familiar with a gentleman named Marc Johnson?

22 A    Yes.

23 Q    And who is Marc Johnson?

24 A    Umm, an assistant of Rosenblum who Tommy was previously

25 represented by.

Rachel Anderson Direct Examination                    Volume 1

8

1   Q     Okay.  Mr. Johnson and the Rosenblum law firm represented

2   Thomas Anderson previously; is that correct?

3   A     Correct.

4   Q     Okay.  Before our law firm entered our appearance in

5   January of this year?

6   A     Correct.

7         MR. WILLIAM MARGULIS:  May I approach the witness,

8   Your Honor?

9         THE COURT:  Yes, you may.

10  Q    (By Mr. William Margulis) Ms. Anderson, I'm going to hand

11  you what I've marked as Defendant's Exhibits A and B for the

12  purposes of this hearing.  If you could take a look at those

13  for a minute.  Okay.  I've got to skip back to something real

14  quick before I get back to the exhibits I just handed you.

15  You mentioned that you're familiar with Brian Hounsom and that

16  he's also a Codefendant in this case.  How do you know

17  Mr. Hounsom?

18  A     He's my fiancé.

19  Q     Currently?

20  A     Currently.

21  Q     Okay.  Thank you.  The exhibits that I just handed you --

22  can you identify those for me, please?

23  A     These are our -- as in myself, Brian, my mom, and my

24  dad's -- phone records.

25  Q     Okay.  Those are -- are they -- they're AT&T --

Rachel Anderson Direct Examination                    Volume 1

9

```
 1   A     Uh-huh.

 2   Q     -- cell phone records?

 3   A     Correct.

 4   Q     And who's on that plan?

 5   A     My mom, my dad, myself, and Brian.

 6   Q     And Exhibit A -- what -- what's the billing period?

 7   A     It's August 29th of 2014 through September 28th of 2014.

 8   Q     And how about Exhibit B?  What's the billing period on

 9   Exhibit B?

10   A     September 29th, 2014, and October 28th, 2014.

11   Q     And how did you -- well, first of all, are those detailed

12   billing records?

13   A     Yes.

14   Q     And they list how many different phone numbers?  I mean

15   it covers -- you said it covers you, your mom, your dad, and

16   Brian Hounsom?

17   A     Correct.  And then there's also a number that's not used.

18   Q     Okay.  And how did you obtain those detailed billing

19   records?

20   A     Through my online AT&T account that I use to look up

21   things, make changes to the bill, just a general account

22   online.

23   Q     And then you forwarded those or you made copies and

24   provided those to us; is that correct?

25   A     Correct.
```

Rachel Anderson Direct Examination                    Volume 1

10

1   Q    And are the copies -- you originally saw them online; is

2   that right?

3   A    Yes.

4   Q    And are the copies that you have in front of you true and

5   accurate copies of what you looked up online and then provided

6   to us?

7   A    Yes.

8           MR. WILLIAM MARGULIS:  Your Honor, I would move for

9   the admission of Defendant's Exhibits A and B at this time.

10          THE COURT:  Is there any objection?

11          MR. DAVIS:  May I voir dire the witness?

12          THE COURT:  I'm sorry?

13          MR. DAVIS:  May I voir dire the witness?

14          THE COURT:  Yes.  And I would love to have a copy of

15  the exhibit, by the way.

16          MR. GELFAND:  I'll get a copy, Your Honor.

17          THE COURT:  Yeah.

18                    VOIR DIRE EXAMINATION

19  BY MR. DAVIS:

20  Q    Ms. Anderson, my name is John Davis.  Is this your phone

21  bill?

22  A    Yes.  Well, it's my -- my phone is on this bill, yes.

23  Q    Is your name on this bill?

24  A    No.  It's my mother.

25  Q    So the account is billed to who?

1    A    It's billed to Thomas and Laura Anderson.

2    Q    And what address?

3    A    4749 East Concord.

4    Q    Where do you live?

5    A    67 Blackthorn.

6    Q    It's a -- is this called a family plan?

7    A    Yes.

8    Q    You're a member; your phone number is a member of this

9    account held by your parents?

10   A    Yes, but I'm also an authorizer on the account to make

11   any changes or dispute anything that --

12   Q    Is that reflected anywhere on Exhibits A and B?  Are A

13   and B in front of you?

14   A    Yes.

15   Q    Is that reflected on there anywhere?  Isn't it true,

16   Ms. Anderson, that if I knew your phone number and I knew your

17   password to the AT&T account I could do the very same that

18   you're testifying you've done?

19   A    I actually have a second security password that --

20   Q    Okay.  If I had both passwords?

21   A    You could.

22   Q    This is not your account?

23   A    It is my family account.

24   Q    You're a member of your parents' account, correct?

25   A    I would say that we're all on one account.

Rachel Anderson Voir Dire Examination                Volume 1

12

1   Q    One minute, please, Your Honor.  In flipping through the

2   documents, how many numbers are on this account?

3   A    There is one, two, three, four, five.

4   Q    If you flip through the documents, numbers -- just the

5   last four digits -- 7483, 9989 -- those are numbers on the

6   account?

7   A    Yes.

8   Q    Is it true that 6314 is another one?

9   A    Yes.

10  Q    But on this bill, every one is subscribed to Laura

11  Anderson?

12  A    It's under "Laura Anderson," yes.

13  Q    And she is your mother?

14  A    Correct.

15  Q    To whom -- who lives on Concord, to whom this bill is

16  sent?

17  A    Yes.

18       MR. DAVIS:  Your Honor, I don't think this witness

19  can authenticate these exhibits.

20       THE COURT:  All right.  Okay.  Mr. Margulis.

21       MR. WILLIAM MARGULIS:  Your Honor, first of all, I

22  don't think the formal Rules of Evidence are applicable to

23  this type of hearing.  Second of all, the witness testified

24  that her number is on this account; she's part of this

25  account; she accessed these phone records online; she

1   photocopied it, photocopied the records, and provided them to

2   us; and they are true and accurate copies of what she looked

3   up online; and I think she certainly has authenticated the

4   records as far as this hearing is concerned.

5              THE COURT:  Mr. Davis.

6              MR. DAVIS:  I respectfully disagree.  If a family

7   anywhere in the United States wants to hand me one of their

8   phones and say, "Here's the password," that doesn't make me

9   the account holder.  As far as the Rules of Evidence not

10  applying in this court, I'll defer to the Court's discretion

11  on that.

12             THE COURT:  With regard to this particular situation,

13  I -- is there some rule that says that she has to be an

14  account holder in order to testify that her telephone number

15  appears?  I mean if there's testimony that she has a

16  particular telephone number and these -- I don't think you're

17  saying that these are not AT&T records.

18             MR. DAVIS:  Correct.

19             THE COURT:  You're just saying that she's not the

20  account holder.  I think that as far as authenticating the

21  AT&T records she has done so except that I don't know -- we

22  haven't gotten to the point where we're at what phone number

23  is hers, but if she testifies regarding her telephone number

24  and her access to this account, I think that the records have

25  been adequately authenticated as -- as records that she had

1    access to.  She's testified that she had the password and she

2    had access to it, and I'm finding that testimony credible.  So

3    I will allow her to testify regarding these records and the

4    exhibits to be admitted.

5              MR. DAVIS:  Thank you, Your Honor.

6              THE COURT:  Okay.

7              MR. WILLIAM MARGULIS:  Thank you, Your Honor.

8              Did you just -- I'm sorry.  Did you just admit the

9    exhibits?

10             THE COURT:  Yes.

11             MR. WILLIAM MARGULIS:  Okay.  May I approach the

12   witness?

13             THE COURT:  Yes.

14             MR. WILLIAM MARGULIS:  Thank you.  I need those back.

15             MR. GELFAND:  Your Honor, may I assist Mr. Margulis

16   with the ELMO?

17             THE COURT:  Yes.

18                       DIRECT EXAMINATION

19                         (continued)

20   BY MR. WILLIAM MARGULIS:

21   Q    Ms. Anderson, I'm going to ask you some specific

22   questions regarding Exhibit A and just have you identify some

23   phone numbers on here.  This is Exhibit A.  You see that?

24   A    Uh-huh.

25   Q    Okay.  And that's for the billing period, I think you

1   testified, August 29th of 2014 through September 28th of 2014?

2   A    Uh-huh.

3   Q    Okay.  I just want to ask you some questions about some

4   phone numbers that appear on the bill.  The -- you see those

5   phone numbers listed under "Service Summary" down there?

6   A    Yes.

7   Q    Okay.  Which of -- your number is one of those; is that

8   right?

9   A    Correct.

10  Q    And which one is that?

11  A    314-960-5434.

12  Q    And how about -- do you recognize the 960-7483 number?

13  A    Yes.

14  Q    And whose number is that?

15  A    Brian Hounsom.

16  Q    And just for the record, the other numbers on there --

17  how about 809-6314?  Whose number is that?

18  A    That's my father's.

19  Q    Okay.  How about 971-9989?

20  A    That's my mother's.

21  Q    How about that first one, 421-9896?

22  A    At one point, that was Tommy's phone number, but it's

23  actually cheaper to keep it on there than it is to pay the

24  cancellation fee.

25  Q    Okay.  Now, with respect to -- I'm going to put Exhibit B

1    up there, which is the billing period September 29th through

2    October 28th.  Are the phone -- phone numbers identical on

3    Exhibit B?

4    A    Yes.

5    Q    Okay.  And the way the phone bill is set up -- can you

6    explain how the phone bill is set up here as far as the

7    individual phone numbers?

8    A    It pretty much gets broken down by each number.  The call

9    history, as in the times of the calls, the dates of the calls,

10   the minute-to-minute, how long the person was on the phone,

11   and the text messages as well, when the text messages were

12   sent and received, and then it moves on to the next phone

13   number.

14   Q    Okay.  So if we go to page 26 of 48 on Exhibit A -- and

15   that's the phone number 960-7483; is that correct?

16   A    Correct.

17   Q    And you testified that that number belongs to who?

18   A    Brian Hounsom.

19   Q    And did you -- so under Brian Hounsom's phone number,

20   there's an itemized list of phone calls made and text messages

21   sent and received and phone calls made and received during

22   that time period; is that correct?

23   A    Correct.

24   Q    And did you look specifically at the numbers that were

25   listed?

1    A    Yes.

2    Q    And there's a number -- there's a lot of phone calls and

3    text messages between Mr. Hounsom's number and another number,

4    which is 314-753-2020; is that correct?

5    A    Correct.

6    Q    And the phone number 314-753-2020 -- do you recognize

7    that number?

8    A    I do.

9    Q    And how do you recognize that number?

10   A    Because it's Marc Johnson, who is Rosenblum's assistant.

11   Q    Okay.  And how do you know that's Marc Johnson's cell

12   phone number?

13   A    Because I also had communicated with him.

14   Q    With Mr. Johnson?

15   A    Yes.

16   Q    On the cell phone?

17   A    Yes.

18   Q    So you called -- you called his cell phone from your cell

19   phone?

20   A    It was mainly text messages, if anything.

21   Q    Okay.  Did you text Mr. Johnson on occasion?

22   A    Yes.

23   Q    And did he text you?

24   A    Yes.

25   Q    And likewise, I just wanted to ask you, with respect to

18

1    Defendant's Exhibit B, page 18 of 39, again, that's -- scroll

2    down.  That's -- that's the itemized phone calls and text

3    messages for the same -- for Mr. Hounsom's phone for the

4    billing period September 29th through October -- through the

5    end of October; is that right?

6    A     Yes.

7    Q     And you looked at those records; is that right?

8    A     Yes.

9    Q     And the number, again, 314-753-2020 appeared numerous

10   times in that detailed billing as well; is that correct?

11   A     Yes.

12   Q     And that's Mr. Johnson's phone number?

13   A     Yes.

14   Q     Ms. Anderson, just a couple other quick questions.  To

15   your knowledge, did the Rosenblum law firm ever represent

16   Brian Hounsom?

17   A     Umm, they did not represent him, but they would give him

18   legal advice and talk with him about this case.

19   Q     Mr. Hounsom was -- when he was indicted, he was

20   represented by whom?

21   A     Burton Shostak.

22   Q     And Mr. Hounsom currently has a different attorney, to

23   your knowledge?

24   A     Yes.

25   Q     And who is that?

1    A    James --

2    Q    James Schottel maybe?

3    A    Yes.

4    Q    Okay.  So, to your knowledge, at no time did the

5    Rosenblum law firm ever represent Brian Hounsom?

6    A    No.

7    Q    Did you -- did you personally ever meet with Marc Johnson

8    at his office?

9    A    Yes.

10   Q    And was Brian Hounsom -- did he participate in those

11   meetings?

12   A    Yes.

13   Q    And who was present during those meetings?

14   A    Umm, it was usually me, Brian, and Marc Johnson.

15   Q    And on how many occasions would you say that -- that you

16   personally were in a meeting with Marc Johnson and Brian

17   Hounsom at Marc Johnson's law office?

18   A    Umm, I would say probably around four times that I was

19   there.

20   Q    And that was -- what time period was that?  Do you know

21   approximately?

22   A    I would say between beginning of September and mid

23   November.

24        THE COURT:  Of what year, please?

25        THE WITNESS:  Oh, I'm sorry.  2014.

1  Q    (By Mr. William Margulis) Ms. Anderson, do you -- do you

2  know when the indictment was issued in this case?

3  A    I believe it was the middle of August of 2014.

4  Q    So your three or four meetings that you had with

5  Mr. Hounsom and Mr. Johnson in Mr. Johnson's office were after

6  the indictment in this case?

7  A    Correct.

8  Q    And during that time, Mr. Hounsom was represented by Burt

9  Shostak; is that correct?

10 A    Correct.

11 Q    And not the -- not anybody from the Rosenblum law firm;

12 is that correct?

13 A    Correct.

14      MR. WILLIAM MARGULIS:  Okay.  I don't have any

15 further questions.  Thank you, Ms. Anderson.

16      THE COURT:  Mr. Davis, you may cross-examine.

17                  CROSS-EXAMINATION

18 BY MR. DAVIS:

19 Q    Mr. Hounsom is here today, correct?

20 A    Correct.

21 Q    You testified you think -- your memory -- you had about

22 four meetings with Marc Johnson where you and Brian were

23 present, true?

24 A    Correct.

25 Q    Who else would have been present at those meetings?

Rachel Anderson Cross-examination                    Volume 1

21

1   A     It was Marc Johnson, Brian Hounsom, and myself.

2   Q     Did your mother or father ever participate in any of

3   those meetings?

4   A     Not when I was there.

5   Q     Do you recall a meeting late September or maybe early

6   October with Brian Hounsom, yourself, and Marc Johnson

7   regarding a cell phone that Tom Anderson had used in a jail

8   cell?

9   A     It was more mid Septemberish.

10  Q     Well, is it your memory that Mr. Anderson might have used

11  a cell phone inside his jail in Warren County on or about

12  September the 12th?

13  A     Umm, I did know that, yes.

14  Q     Okay.  So would the meeting have been after that?

15  A     There was -- the meeting was after that, that he told me

16  to --

17  Q     Who's "he"?

18  A     Marc Johnson.

19  Q     Okay.  What did Marc Johnson tell you?

20  A     He told me to look in Tommy's phone and call an 818

21  number.

22  Q     Why?

23  A     I don't know.  I didn't want to know.

24  Q     Okay.  So a man says, "I need you to look inside a

25  phone" --

Rachel Anderson Cross-examination                    Volume 1

22

1   A    Uh-huh.

2   Q    -- "get an 818 number," and do what with it?

3   A    He just said contact the person.

4   Q    Okay.  So if you were to contact someone at an 818 phone

5   number, what are you going to say?

6   A    I wasn't planning on doing that, so I didn't need to know

7   that information.

8   Q    Okay.  So what's your response then to Mr. Johnson when

9   he says to do this?

10  A    I just said, "Okay."  That's it.

11  Q    Where did that conversation take place?

12  A    In the law office of Rosenblum, Johnson's office.

13  Q    And who all was present for that conversation?

14  A    Brian, myself, and Marc Johnson.

15  Q    Okay.  Do you know what prompted Marc Johnson to ask you

16  to do such a thing?

17  A    Because I believe he had taken the cell phone in to Tommy

18  and they must have had a discussion and then --

19  Q    Why is it you believe that?

20  A    Because he said, "Off the record --"

21  Q    Who is -- I -- the pronouns --

22  A    Sorry, sorry.

23  Q    We've got to -- just so the record is clear --

24  A    I'm sorry.

25  Q    That's fine.  It happens all the time.

 1  A   Marc Johnson said that when he had spoke with Tommy that

 2  Tommy and him discussed something and that I was to call an

 3  818 number.

 4  Q   Okay.  And at that, you didn't respond, "What is it you

 5  discussed?  Who am I supposed to call?  What am I supposed to

 6  say when I get on the phone with this person?"

 7  A   Well, once he told me to buy --

 8  Q   "He"?

 9  A   I'm sorry.

10       THE COURT:  I'm going to -- at this point, I'm going

11  to step in because we are, at this point, talking about a

12  situation involving an attorney.  There isn't anyone here

13  representing that attorney's interests.  This is very -- we

14  have gone into so much hearsay that -- and I know that we have

15  this issue about the Rules of Evidence, but I think that she

16  is -- her -- she is hearsay upon hearsay at this point, and I

17  suppose I can take it for what it's worth, but I would like to

18  have something a little less hearsay here regarding this

19  situation.  I don't know what other witnesses will testify to

20  regarding this, but I just -- you know, we're at "He told me

21  that so-and-so told me."  I just think that the hearsay -- I'd

22  like to limit the hearsay here.

23       MR. DAVIS:  And there is the issue of Marc Johnson's

24  representation.

25       THE COURT:  Well, I mean there's no one here.  If

1   this is about something -- I mean I know that the issue here

2   is about unrep -- contact with unrepresented persons, correct?

3           MR. DAVIS:  One of them.

4           THE COURT:  Right.  We've got Mr. Anderson here.  I

5   don't know if he's going to testify or not, but he would be

6   the person who actually had the conversation with Marc

7   Johnson.  Marc Johnson, I believe, will be testifying.  So I'm

8   just -- with -- with regard to her conversations with -- with

9   Mr. Johnson, I don't have a problem because she was there

10  having that conversation.  My issue has to do with when we're

11  asking about what Marc Johnson said to Anderson, she was not

12  there, and I don't know how she knows these things, and I'm

13  just concerned about that amount of hearsay coming in.  So I'd

14  like to have more of her direct knowledge.

15          MR. DAVIS:  At this point, Your Honor, with that

16  understanding, the Government doesn't have anything further of

17  Ms. Anderson.

18          THE COURT:  Okay.  All right.

19          MR. DAVIS:  Thank you.

20          THE COURT:  Okay.

21          MR. WILLIAM MARGULIS:  Nothing further, Your Honor.

22          THE COURT:  All right.  You are excused.

23          THE WITNESS:  Thank you.

24          THE COURT:  You may call your next witness.

25          MR. WILLIAM MARGULIS:  I've just got to get our next

```
 1   witness.

 2              THE COURT:  Okay.

 3              All right.  Counsel, what's —

 4              MR. GELFAND:  Your Honor, can we approach at sidebar?

 5              THE COURT:  Yes.  Yes.  Come on up, please.

 6              MR. DAVIS:  May we approach, Judge?

 7              THE COURT:  Yes.  Does this need to be on the record?

 8              MR. DAVIS:  Yes.

 9              THE COURT:  Okay.  Hold on a second then.

10         (9:49 a.m. under seal bench conference excerpted.)

11         (The following proceedings were held in open court.)

12              THE COURT:  We are going to take — by that clock,

13   it's just 10:00.  That one's always wrong.  So we are going to

14   take a 10-minute recess.  If — depending on what happens

15   after you talk with your client, I would like to do some

16   inquiry about that on the record as well.

17              Okay.  All right.  So we're taking a 10-minute

18   recess.

19              MR. DAVIS:  Thank you, Judge.

20         (Court recessed from 10:01 a.m. until 10:16 a.m.)

21         (10:16 a.m. under seal bench conference excerpted.)

22         (The following proceedings were held in open court.)

23              THE COURT:  Come on up, Mr. Rosenblum.  With regard

24   to this, we're still going to have this in open court until we

25   get to the Defendant, correct?
```

1          MR. DAVIS:  Correct.

2          THE COURT:  Okay.  Mr. Rosenblum, will you please

3    just approach the podium?

4          MR. ROSENBLUM:  Yes, ma'am.  Good morning.

5          THE COURT:  Good morning.

6          MR. ROSENBLUM:  How are you?

7          THE COURT:  I'm fine.  This is the case of United

8    States of America versus Thomas Anderson.  Mr. Anderson is the

9    Defendant in a multidefendant case, and at one time, the

10   Rosenblum firm represented Mr. Anderson, correct?

11         MR. ROSENBLUM:  That's correct.

12         THE COURT:  The Court is conducting an inquiry into

13   conflicts of interest as well as entertaining a motion to

14   dismiss the indictment in this case.  The reason that I'm

15   requesting your presence is that there's a question as to

16   whether Mr. Anderson wishes to waive his attorney-client

17   privilege, and that's the privilege attaching to the time that

18   your firm was representing him.  Do you have any opinion or do

19   you have any concerns about Mr. Anderson waiving his

20   attorney-client privilege with regard to his representation by

21   the Rosenblum firm?

22         MR. ROSENBLUM:  Concerns for me or concerns for

23   Mr. Anderson?

24         THE COURT:  Either.

25         MR. ROSENBLUM:  Well, I'm happy to answer any of the

1    questions posed to me as long as Mr. Anderson is -- is advised

2    and makes an informed decision to waive not only the rights

3    for the attorney-client privilege but also the confidentiality

4    aspect that goes into the representation that would allow me

5    to talk about some of the other acts that I did on his behalf

6    in that representation.  After speaking with and getting an

7    advisory informal opinion from the bar, without Mr. Anderson

8    actually being advised of the possible ramifications, the

9    possible, for lack of a better expression, parade of horribles

10   that can -- that can wind up inuring to him, I would feel

11   uncomfortable answering -- well, I wouldn't answer any

12   questions unless I'm convinced that he has made a complete and

13   total waiver of his attorney-client privilege, that he's done

14   so after being informed not only by the Court but by counsel,

15   that he understands the ramifications and the repercussions,

16   and that if he's willing to do that, it doesn't alleviate my

17   concern for him, but that's certainly his choice.

18           THE COURT:  All right.  Okay.  Before we proceed

19   further, because I do have an inquiry with regard to

20   Mr. Anderson and his decision to waive, I am going to ask that

21   the Government leave the courtroom, and I am also -- because

22   this is a sensitive matter involving potential confidential

23   information and at this point he does still have the

24   attorney-client privilege, I am going to ask that the

25   courtroom be cleared for just this inquiry.

1          MR. ARTHUR MARGULIS:  Judge, may I inquire of

2    Mr. Rosenblum as to one question?

3          THE COURT:  Yes.

4          MR. ARTHUR MARGULIS:  Mr. Rosenblum, is it your

5    position that you nor anyone else in your firm will testify,

6    although we have you under subpoena, unless Mr. Anderson

7    waives his attorney-client privilege --

8          MR. ROSENBLUM:  Or otherwise --

9          MR. ARTHUR MARGULIS:  -- during the time that you

10   represented him?

11         MR. ROSENBLUM:  Or otherwise ordered to do so by the

12   Court.

13         THE COURT:  Unless the Court orders it.  Okay.

14         MR. ARTHUR MARGULIS:  Okay.

15         THE COURT:  I understand that.  All right.  All

16   right.

17         MR. ARTHUR MARGULIS:  Thank you.

18         THE COURT:  At this time, if we can just clear the

19   courtroom for this, for this period, and then we will reopen

20   proceedings.

21      (Under seal ex parte proceedings excerpted.)

22      (The following proceedings were held in open court.)

23         THE COURT:  Okay.  We are back on the record in open

24   court, and Mr. Margulis, you may call your next witness.

25         MR. WILLIAM MARGULIS:  Thank you, Your Honor.

29

1    Defendant would call Marc Johnson.

2                        **MARC JOHNSON,**

3    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

4    FOLLOWS:

5                        DIRECT EXAMINATION

6    BY MR. WILLIAM MARGULIS:

7    Q    Would you state your name for the Court, please?

8    A    Marc Johnson.

9    Q    And, Mr. Johnson, what is your occupation?

10   A    I'm an attorney.

11   Q    Are you licensed to practice law in the state of

12   Missouri?

13   A    Yes.

14   Q    And since what -- since what year?

15   A    2006, I believe.

16   Q    Okay.  Any other states besides Missouri?

17   A    No.

18   Q    And I assume you're also admitted to practice here in the

19   Eastern -- federal court in the Eastern District of Missouri;

20   is that correct?

21   A    I hope so, but, yes, I am.

22   Q    I hope we all are.

23        THE COURT:  Sure, sure, yeah.

24   Q    (By Mr. William Margulis) And how long -- do you recall

25   how long you've been admitted in the federal court here in the

30

1    Eastern District?

2    A    I think 2011.

3    Q    Any other federal courts you're admitted to?

4    A    Yes.

5    Q    Which ones?

6    A    Southern District of Illinois.  Western District of North

7    Carolina, I believe.  Western District of Missouri.  District

8    of Kansas and Southern District of California.  And I think

9    that covers it.

10   Q    You've got me beat by about two or three of them.  What's

11   your primary area of concentration in the law practice?

12   A    Criminal.

13   Q    And I assume you've handled lots of federal cases as

14   well?

15   A    Primarily federal, yes.

16   Q    And how many of those federal cases have been drug cases,

17   conspiracies, possession, you know, the whole gamut?

18   A    Certainly, several a year and probably more than that.

19   Q    And you've tried jury trials in federal court?

20   A    No.

21   Q    None of the cases you've been involved in have made it to

22   a jury trial?

23   A    That's correct.

24   Q    Okay.  But I assume you're pretty familiar with the

25   Federal Rules of Criminal Procedure just through your

31

1    practice?

2    A    I believe so.

3    Q    And the local court rules?

4    A    Yes.

5    Q    As well as the local customs and practices of the Court

6    here in the Eastern District of Missouri?

7    A    Yes.

8    Q    And where are you currently employed?

9    A    Rosenblum, Schwartz, Rogers & Glass.

10   Q    And how long have you been there?

11   A    2010.

12   Q    And what would you -- how would you describe your general

13   duties and responsibilities at the law firm?

14   A    Primarily, I interact with clients and process discovery

15   in federal criminal matters that we handle and relate that --

16   relay that information to Mr. Rosenblum.

17   Q    And who would you say at the -- I know there are several

18   attorneys at your firm.  Who would you say you work with

19   mostly at your law firm?  What other attorneys?

20   A    I work almost exclusively with Scott Rosenblum and Adam

21   Fein.

22   Q    Do you ever work with Joel Schwartz at all?

23   A    Sure, yes.  Not nearly -- it's not as frequent, though.

24   Q    And if you had to, you know, say -- if you had to point

25   to one person that was your, you know, boss or supervisor at

32

1    the firm, who would that be?

2    A    Scott.

3    Q    Okay.  Now, in the course of your employment with the

4    Rosenblum law firm, did you become involved in the

5    representation of Thomas Anderson, Jr.?

6    A    Yes, sir.

7    Q    And do you remember when you -- when you personally first

8    became involved, an approximate time period?

9    A    It would have been late August, early September of 2014,

10   and, well, let me -- let me step back.  We had -- there were

11   some asset forfeiture matters that I dealt with prior to that

12   for probably up to a year before that.

13   Q    Okay.  So the indictment was in mid August of 2014?

14   A    Correct.

15   Q    Correct?

16   A    Correct.

17   Q    And there were some other issues that you dealt with

18   approximately a year prior to that?

19   A    Correct.

20   Q    Okay.  Was that -- there was a -- some search warrants

21   executed, I think, maybe in -- are you familiar with search

22   warrants being executed --

23   A    Yes.

24   Q    -- in that case?

25   A    Yes, but I didn't -- I didn't see any of that until after

1    the indictment.

2    Q    Oh, okay.  So, oh, you're talking about asset

3    forfeitures, not search warrants?

4    A    Yes.  Sorry.  Yes.

5    Q    Okay.  Okay.  Do you have any idea when your law firm

6    first began representing Mr. Anderson?

7    A    Their -- on this case?

8    Q    Correct.

9    A    Well, I would think at least or summer of -- the summer

10   prior, so summer of 2013, I would think.

11   Q    Of 2013, but you personally -- is that right?  When

12   you -- did you become involved initially --

13   A    In the asset --

14   Q    -- when your firm represented Mr. Anderson?

15   A    In the asset forfeiture?

16   Q    Right.

17   A    Yes.  I filed -- I filed paperwork, but I never

18   personally met Mr. Anderson during the asset forfeiture

19   portion.

20   Q    Okay.  Do you recall when you filed that paperwork?

21   A    I don't.  It would have been sometime prior.  There would

22   be a record of it somewhere, but I don't know that offhand.

23   Q    I think we established that the indictment in this case,

24   I think, was around August 13th or 14th of 2014.  Does that

25   sound right?

1   A     That sounds right.

2   Q     And Mr. Anderson, I think, voluntarily surrendered

3   himself around August 24th or 25th of 2014.  Does that sound

4   right?

5   A     Sounds right.

6   Q     And he's been in custody since that time, to your

7   knowledge?

8   A     Yes.

9   Q     And to your knowledge, he's been at the Warren County

10  Jail in Warrenton, Missouri, that whole time?

11  A     Yes.

12  Q     Now, prior to the indictment because you mentioned that

13  you didn't -- you mentioned about -- that you hadn't met Tom

14  Anderson in person yet.  Did you meet him in person at any

15  time prior to the indictment?

16  A     I -- you know, I have a faint recollection of

17  Mr. Anderson sticking his head into my office and waving or

18  saying, "Nice to meet you," something like that, and then kind

19  of continuing on his way out the door.  I believe that was

20  Mr. Anderson.  I don't know when that was.  Obviously, it

21  would have been prior to his incarceration.

22  Q     Right.  Now, prior to -- you may have answered this

23  already, but prior to the indictment, do you have any

24  knowledge as to how long the federal investigation into

25  Mr. Anderson's activities had been ongoing?  I mean, you

35

1    mentioned the asset forfeiture.

2    A    Sure.  So I apologize.  Prior to the indictment.  So my

3    knowledge prior to seeing the documents, was I aware?  Is that

4    what you --

5    Q    Yeah, yeah.  I mean, in your experience in handling

6    federal cases, especially drug cases, I mean, a lot of these

7    cases, they -- they're investigated for months or sometimes

8    even years?

9    A    Sure.

10   Q    I mean, true in any federal case before the indictment is

11   actually returned, correct?

12   A    Yes.

13   Q    So I guess my question was -- is:  How long prior to the

14   indictment being issued in this case were you aware of the

15   investigation into Tom -- Tommy Anderson's activities, alleged

16   activities?

17   A    Well, I was aware that the Government was involved at

18   least to the extent of the asset forfeiture matters, and

19   beyond that, I didn't know the extent of the investigation or

20   what all was involved.

21   Q    Okay.  And you think that was sometime in 2013?

22   A    I believe so.

23   Q    Were you aware of -- I guess, at the time, were you aware

24   of a search warrant being executed at Mr. Anderson's parents'

25   house and maybe his sister's house in November of 2012?

1    A    Was I aware?

2    Q    At that time, in 2012.

3    A    No, I was not.

4    Q    But I think you mentioned you became aware of it later on

5    after you -- after the indictment and after you got involved

6    in the representation.

7    A    Sure.  I was aware of search warrants after the

8    indictment.

9    Q    Do you have any knowledge as to whether your firm was

10   representing Mr. Anderson at that time in November of 2012

11   when the search warrants were executed?

12   A    I do not.

13   Q    So it sounds like you -- prior to the indictment, other

14   than your little bit of work on the asset forfeiture -- that

15   you did not have a whole lot of involvement in his case

16   preindictment; is that accurate?

17   A    Yes.

18   Q    Now, in the course of representing Mr. Anderson, I assume

19   you've reviewed all the discovery and investigative reports,

20   and there were a lot of phone calls and things of that nature.

21   A    I was in the process of reviewing.  I had gotten through

22   a significant amount, yes.

23   Q    Okay.  And if -- you're -- without mentioning the name,

24   you're aware of somebody who was referenced numerous times as

25   CS1?

1   A    Yes.

2   Q    And, again, you're -- you're -- without mentioning his

3   name, you're aware of who that is?

4   A    I -- I believe so.  There were multiple CSs involved.

5   It's been awhile since I've looked at the exact numbers, but

6   I'm aware of -- of multiple CSs, yes.  I believe I know who

7   you're referencing.

8   Q    Okay.  Now, with respect to CS1, to your knowledge, did

9   your law firm represent CS1 at any time?

10  A    Yes.

11  Q    And do you know when your firm became involved in

12  representing CS1?

13  A    I don't know for sure.  I know it was -- I did not work

14  on that case.  I believe it would have been 2012 or prior,

15  though.

16  Q    With respect to CS1, I believe he was originally

17  represented by Travis Noble.  Does that ring a bell?

18  A    That sounds correct.  That sounds correct.

19  Q    Up through the time of his guilty plea?

20  A    Yes.

21  Q    Okay.  And then your firm, I believe, took over the

22  representation of CS1 after the plea but prior to sentencing?

23  A    Yes.

24  Q    Were you involved in the representation of CS1 at all --

25  you personally?

                                                                    38

 1    A    No.

 2    Q    Did you ever meet with CS1?

 3    A    I know CS1.  I mean I saw him in the office, yes.

 4    Q    Okay.  But you never personally had any meetings with

 5    CS1?

 6    A    Regarding his case?

 7    Q    Correct.

 8    A    No.

 9    Q    Do you have any knowledge as to your firm continuing his

10    sentencing for about a year in order to allow CS1 to proffer

11    and cooperate with the DEA and the federal government

12    regarding other investigations?

13    A    It was my vague understanding that that was going on,

14    yes.

15    Q    And that -- and that was -- your understanding the reason

16    the sentencing was continued multiple times was to allow CS1

17    to cooperate; is that correct?

18    A    Yes.

19    Q    And do you have any knowledge, any specific knowledge, as

20    to those proffers or meetings that CS1 had with the DEA or the

21    Government during that time period?

22    A    No.  I didn't participate in any of those.

23    Q    Okay.  Do you know who in your office specifically

24    represented CS1?

25    A    I believe Scott Rosenblum and Adam Fein.

Marc Johnson Direct Examination                    Volume 1

39

1   Q    Do you have any knowledge as to whether they attended any

2   proffers or meetings with -- with CS1 and the Government?

3   A    My thought would be that at least one of them would have

4   been at any such meeting, yes.

5   Q    Now, you did indicate that you did have a chance to

6   review some of the discovery and listen to some of the

7   evidence in the Thomas Anderson case before -- before he

8   switched law firms; is that correct?

9   A    Yes.

10  Q    And in your review of those materials, did you learn that

11  CS1 provided the DEA with a lot of information about Thomas

12  Anderson's alleged involvement in distributing marijuana?

13  A    I do not recall the exact nature of the discovery and the

14  reports that I read.  It would have been eight, 10 months ago,

15  but I know he was mentioned in the reports, yes.

16  Q    Have you -- you're aware that part of the reason we're

17  here for this hearing this morning is that the Government

18  filed a motion for inquiry into potential conflicts of

19  interest?

20  A    Yes.

21  Q    And that was filed, I think, on -- on or about March 27th

22  of this year?

23  A    Yes.

24  Q    Have you ever read or seen the motion?

25  A    I did read it.

Case: 4:14-cr-00246-AGF  Doc. #: 391  Filed: 07/08/15  Page: 40 of 78 PageID #: 1269
Marc Johnson Direct Examination                    Volume 1

40

1   Q    And there's a sentence in the Government's motion, on

2   page 2, that says CS1 -- well, CS1 was sentenced on

3   November 1st, 2012, and then it says that CS1's cooperation

4   and information was the genesis of the Anderson investigation

5   and CS1 was referenced in affidavits and documents to be used

6   in the investigation and prosecution of *United States versus*

7   *Thomas Anderson*.  Do you recall that sentence?

8   A    I don't, but I -- I don't recall it, but I'm not saying

9   it wasn't there.  I apologize.  I haven't read the motion

10  in --

11  Q    No.  That's okay.  That's why I reread it.  Do you -- do

12  you agree with that statement?

13  A    I don't know what the genesis of the Anderson

14  investigation was.  I didn't -- I wasn't part of the Anderson

15  investigation.

16  Q    Well, my question is:  Based upon your review of the

17  evidence and discovery in the Anderson case, would you agree

18  that CS1 provided a lot of information regarding

19  Mr. Anderson's alleged marijuana distribution activity?

20  A    I do not recall the exact nature of CS1's involvement.  I

21  haven't reviewed those reports in a considerable period of

22  time.

23  Q    Okay.  Thank you.  So you don't -- you don't have any

24  knowledge as to whether CS1's cooperation against Mr. Anderson

25  was an integral part of building a case against Mr. Anderson?

41

1    A    I don't.  I do not.

2    Q    I'm just trying to get some dates down.  So it -- it

3    looks like your law firm began representing CS1 on

4    November 15th, 2011, and then he was sentenced about a year

5    later, on November 1st, 2012.  Does that sound about right?

6    A    That seems plausible, yes.

7    Q    And then -- then your law firm -- I know you didn't have

8    any personal involvement, but your law firm -- did you -- I

9    just -- can you tell me again when you believe your law -- to

10   your knowledge -- your law firm began representing Thomas

11   Anderson in this case, in this investigation prior to

12   indictment?

13   A    I -- I cannot tell you when he first communicated with

14   anyone else in the firm, no.  I -- as I stated, I worked on

15   the asset forfeiture portion of this case.  I believe it was

16   around a year prior to the indictment.

17   Q    Okay.  And prior to that, you don't have any specific

18   knowledge as to how -- as to when your firm began representing

19   Mr. Anderson?

20   A    No, I don't.

21   Q    Now, are you also -- you reviewed the indictment in

22   Mr. Anderson's case, I assume, and looked at the names of the

23   Codefendants and everybody?

24   A    At some point, yes, yes.

25   Q    Okay.  And you're familiar with one of the -- are you

42

1    familiar with the name of Corey Nuspl or Nuspl, I think?

2    A    Yes.

3    Q    And was he -- he's a Codefendant in that indictment?

4    A    Yes.

5    Q    There's about 10 or 11, I think, total Codefendants?

6    A    That sounds correct.

7    Q    And that's pretty typical or pretty common in charging

8    these drug conspiracies, correct?

9    A    I would say so.

10   Q    Now, was -- Corey Nuspl was represented by Joel Schwartz

11   in your office prior to the indictment.  Do you have any

12   knowledge as to that?

13   A    I became aware of that after the fact, yes.

14   Q    Okay.  So I take it by your answer that prior to the

15   indictment in Thomas Anderson's and Corey Nuspl's case --

16   during that time, did you have any knowledge that your firm

17   was also representing Corey Nuspl?

18   A    No.

19   Q    When would you -- you said after the fact.  When would

20   you say you became aware of it?

21   A    Umm, I knew that there was a conflict hearing set at some

22   point in fairly close proximity to the surrenders, et cetera,

23   and at that point, it was my understanding that our office got

24   off of that case, and that's really the extent of what I knew.

25   Q    So you never dealt with -- you never met Corey Nuspl?

Marc Johnson Direct Examination                    Volume 1

43

1  A    Today was the first time I met him.

2  Q    Okay.  So do you have any idea when -- how long

3  Mr. Schwartz had been representing him?

4  A    I don't.

5  Q    Do you have any knowledge as to whether prior to

6  indictment Corey Nuspl cooperated with the Government and

7  proffered and provided information regarding Thomas Anderson?

8  A    I understood that he cooperated, but the nature and

9  extent of that cooperation, I have no knowledge of.

10  Q    To your knowledge, was he primarily represented by Joel

11  Schwartz in your office -- Corey Nuspl?

12  A    Correct.

13  Q    Corey Nuspl -- let me -- let me back up.  In

14  Mr. Anderson's case, when you were representing him, there

15  were a couple of detention hearings held; is that right?

16  A    Yes.

17  Q    There was one before the Magistrate Judge Mensah, I

18  believe, on August -- I think it was over two days,

19  August 27th and 29th of 2014.

20  A    That sounds correct.

21  Q    Okay.  And then there was a -- I think -- a motion to

22  revoke her detention order in front of Judge Fleissig, which I

23  think was held maybe in late November or early December of

24  last year; is that correct?

25  A    Yes, I believe that was in December sometime.

44

1    Q    Were you present at both -- the two-day detention hearing

2    in front of Judge Mensah back in August?

3    A    I believe I was present at the second day.  If I remember

4    correctly, I stopped in to watch part of it.

5    Q    So who -- who handled those hearings from your firm?

6    A    Mr. Rosenblum.

7    Q    Do you recall Corey Nuspl testifying at the detention

8    hearing?

9    A    You know, I don't recall.  I don't remember if I recall

10   him testifying in person, but I know I reviewed the transcript

11   after the fact, so I was aware he testified.  I'm not sure if

12   I saw him testify or not.

13   Q    When you reviewed the transcript, he was cross-examined

14   by -- by Mr. Rosenblum from your law firm?

15   A    That's correct.

16   Q    So I'm just directing this to you personally, your

17   personal knowledge, obviously, not anybody else in your firm,

18   but -- so at the point in 2013 which is when you seem to

19   become involved in Mr. Anderson's case, from that point

20   forward, you did not know that Mr. Schwartz was also

21   representing Mr. Nuspl?

22   A    No.

23   Q    And can you tell me again when you first became aware of

24   that?

25   A    I believe I -- when Mr. Schwartz -- that he represented

45

1    Mr. Nuspl?

2    Q    Correct.  When did you first become aware of that?

3    A    I believe it was -- I was made aware of a conflict

4    hearing that was set.

5    Q    And that was after -- that was postindictment, after the

6    indictment?

7    A    Yes.

8    Q    So was there a period of time where you believe your

9    office was representing Mr. Anderson, CS1, and Mr. Nuspl all

10   at the same time?

11   A    I don't -- I don't -- I don't have the information to

12   make that statement.  I'm sorry.  I'm not sure.  I'm not sure.

13   Q    Okay.  As far as -- I'm sure you're aware of the rules of

14   professional responsibility on conflicts of interest in

15   representing clients and former clients and things of that

16   nature.  I mean generally speaking.

17   A    I'm no expert.

18   Q    Yeah, I mean I wouldn't expect you to quote the statute

19   or the number, but my question is:  What policy or practices

20   does your law firm follow in order to check for conflicts of

21   interest?  When you obtain a new case or a new client or

22   prospective new client, is there a policy or general practice

23   that you guys follow?

24   A    I'm not aware.  That would be something that

25   Mr. Rosenblum or Mr. Schwartz would engage in.

Marc Johnson Direct Examination                    Volume 1

46

1    Q    Okay.  Well, I assume you bring in -- you bring in some

2    of your own clients, some of your own business, or do you --

3    A    Sure.  I try my best not to, but yes.

4    Q    Well, on the occasion that you do, I mean, is there a

5    procedure you follow to make sure that there's no conflict of

6    interest existing with any other attorneys and their clients

7    in your office?  I mean, do you run a conflict check on the

8    computer?

9    A    Sure.

10   Q    Do you send out a memo, or what do you do?

11   A    I wouldn't send out a memo, but we could ask one of the

12   assistants in the office to check to see if the name is in our

13   system, a name on an indictment or a codefendant or something

14   of that nature.

15   Q    But you testified that mainly that's Mr. Rosenblum or

16   Mr. Schwartz's job to make sure that -- that there's no

17   conflicts with other clients or other cases?

18   A    I'd say primarily based on my function in the office,

19   that would be correct simply because I work effectively on

20   Mr. Rosenblum's federal matters.

21   Q    Okay.  So it's not something that you're routinely

22   involved in on a day-to-day basis?

23   A    On a day-to-day basis, by the time the matters get to me,

24   they would already be clients and that process, I assume,

25   would have already been handled.

Marc Johnson Direct Examination                          Volume 1

47

1   Q     Mr. Johnson, you're familiar with -- I know you've

2   testified you're familiar with the indictment in

3   Mr. Anderson's case.

4   A     Yes.

5   Q     And, again, you testified that there were several

6   Codefendants involved.

7   A     Yes.

8   Q     And one of those is a guy named Brian Hounsom?

9   A     Yes.

10  Q     And Mr. Hounsom is the fiancé or boyfriend of Thomas

11  Anderson's sister, Rachel Anderson; is that correct?

12  A     That's my understanding, yes.

13  Q     And did your law firm ever represent Mr. Hounsom, to your

14  knowledge?

15  A     Well, asset forfeiture matters at the same time as

16  Mr. Anderson's were filed on behalf of Mr. Hounsom.

17  Q     Did you represent -- did your law firm represent

18  Mr. Hounsom in those asset forfeiture matters?

19  A     They -- before they proceeded beyond the -- just simply

20  the initial claim, the indictment came.  The continuances were

21  filed by the Government for that process, during the civil

22  asset forfeiture process.  The indictment came, and then we

23  got off of his case.

24  Q     Do you know what the approximate time period was that you

25  would have assisted Mr. Hounsom with the asset forfeiture?

1    A    It would have been in a very close proximity to

2    Mr. Anderson.  Documents were -- if I remember correctly, the

3    forms were FedExed to Mr. Hounsom and Mr. Anderson, and they

4    were filled out and notarized, or I should just say signed and

5    notarized by them, and I don't -- I don't recall where they

6    were sent, but I did not meet with either of them personally

7    at the outset of those signings of those filings.

8    Q    So you think your involvement with Mr. Hounsom was back

9    in 2013?

10   A    I believe so.

11   Q    Did you ever meet with him back -- I -- you just -- you

12   never met with him regarding the asset forfeiture?

13   A    I don't recall meeting with him then, no.

14   Q    At the time of the indictment in mid August of this -- of

15   last year, 2014, do you know who entered their appearance for

16   Mr. Hounsom?

17   A    Burt Shostak.

18   Q    And do you know who is currently representing

19   Mr. Hounsom?

20   A    I do not.

21   Q    It's not Mr. Shostak; is that correct?

22   A    No.  I believe he's off of the case now.

23   Q    He withdrew.  I believe somebody named James Schottel

24   maybe entered their appearance.

25   A    I'm not sure.

1   Q    Now, after Mr. Hounsom was indicted and Mr. Shostak

2   entered his appearance, do you recall ever having

3   conversations with Mr. Davis about the possibility of you

4   representing Mr. Hounsom?

5   A    Yes.

6   Q    And do you remember when -- when that was?

7   A    It would have been -- I would venture to say in the

8   September of 2014 vicinity.

9   Q    In September of 2014?

10  A    Yes.

11  Q    Do you recall what those conversations were?

12  A    With Mr. Davis?

13  Q    Correct.

14  A    Yes.  It was his position on would there be a conflict if

15  Mr. Hounsom retained my services.

16  Q    And at the time you inquired of Mr. Davis about possibly

17  representing Mr. Hounsom, your firm had -- was representing

18  Mr. Anderson; is that correct?

19  A    Yes.

20  Q    Did you not think that there -- when you -- when you

21  approached Mr. Davis about possibly representing Mr. Hounsom,

22  did you not think there would be any potential conflicts of

23  interests in your law firm also representing Mr. Hounsom in

24  the indictment at that time?

25  A    Yes.  I alerted Mr. Hounsom to that.

1   Q    And it was Mr. Davis' opinion that -- that he didn't see

2   how you could represent Mr. Hounsom with -- without getting

3   into the conflict of interest issues; is that right?

4   A    That's correct.

5   Q    Now, how many -- I mean, I assume you must have had

6   conversations with Mr. Hounsom about representing him?

7   A    That's correct.

8   Q    Or otherwise you wouldn't have inquired of Mr. Davis

9   about representing him?

10  A    Yes.

11  Q    And I mean, when did you -- when do you recall you

12  started having conversations with Mr. Hounsom about possibly

13  representing him?

14  A    Mr. Hounsom was requesting that I represent him.  It

15  could have -- potentially, it could have been prior to the

16  indictment up until a certain period of time after the

17  indictment once it became aware that he was too intricately

18  involved with Mr. Anderson to make that work.

19  Q    So he approached you about representing him?

20  A    That's correct.

21  Q    Do you recall approximately how many conversations you

22  had with him about the potential of you representing him as

23  well?

24  A    He asked me numerous times.  He was persistent.

25  Q    Was that by telephone, in person?

1    A    Both.

2    Q    Both.  Did you ever have a discussion with Mr. Hounsom

3    about what you thought you could do for him or -- as far as

4    his case was concerned?

5    A    No.

6    Q    And at the time that Mr. Hounsom was inquiring of you

7    about representing him, he was represented by Mr. Shostak at

8    that time; is that correct?

9    A    Certainly, some of the conversations or some of the

10   requests that he made to me would have come during the time of

11   his representation, yes.

12           MR. WILLIAM MARGULIS:  May I approach the witness,

13   Your Honor?

14           THE COURT:  Yes.

15   Q    (By Mr. William Margulis) Mr. Johnson, this is what we've

16   marked Defendant's Exhibit I.  Can you just take a look at

17   that real quick?  Have you had an opportunity to review that?

18   A    Yes.

19   Q    Exhibit I -- can you tell us what that is?

20   A    This was a -- an email from me to Mr. Davis back in early

21   September of 2014 and his response to me.

22   Q    Okay.  And what's the date on that?

23   A    Excuse me.  An email from him and then my response to

24   him.  I apologize.

25   Q    That's okay.  What was the -- what's the date?  Is there

Marc Johnson - Direct Examination                       Volume 1

52

1    a date on there?

2    A    He emailed me September 9, and I responded the same day.

3              MR. WILLIAM MARGULIS:  Okay.  And is that -- may I

4    approach the witness, Your Honor?

5              THE COURT:  Yes.

6              MR. WILLIAM MARGULIS:  Thanks.  Is this thing on?

7    Your Honor, I would offer Defendant's Exhibit I.

8              THE COURT:  Is there any objection?

9              MR. DAVIS:  No objection, Your Honor.

10             THE COURT:  Defendant's Exhibit I will be admitted

11   into evidence.

12             MR. WILLIAM MARGULIS:  Thank you.

13   Q    (By Mr. William Margulis) Mr. Johnson, I really just

14   wanted to -- we were talking about conversations about

15   representing Brian Hounsom, and I just wanted to put a time

16   frame on there.  What's the date on this email exchange again?

17   A    September 9.

18   Q    Okay.  And then the indictment was, again, in mid August?

19   A    Yes.

20   Q    Right.  So at that -- at the time of these conversations,

21   it was postindictment, and Mr. Hounsom was represented by

22   Mr. Shostak at that time; is that correct?

23   A    Yes.

24   Q    Okay.  So at least some of your conversations with

25   Mr. Hounsom about possibly representing him would have

1    occurred after the indictment and after the time that

2    Mr. Shostak started representing him; is that correct?

3    A    Yes.  I already said that.  Yes.

4    Q    Okay.  Now, at some point during -- during your

5    representation of Tom Anderson, to your knowledge, did Rachel

6    Anderson and -- and her parents ever become subjects or

7    targets of the investigation, to your knowledge?

8    A    Did Rachel or his parents become targets?

9    Q    Right.  Or the Andersons.  Or subjects.

10   A    Sure.  I believe at a -- the detention hearing, the

11   initial detention hearing, the Government made a statement

12   along those lines.

13   Q    Did they in fact receive grand jury subpoenas?

14   A    I don't recall.

15   Q    Okay.  Did you ever -- do you recall ever having a

16   conversation with Rachel Anderson about the possibility of you

17   representing Rachel Anderson and her parents in the

18   investigation?

19   A    I don't recall that.

20   Q    Now, with respect to Mr. Hounsom, he was represented by

21   Mr. Shostak at the time of the indictment up until recently;

22   is that correct?

23   A    That's my understanding, yes.

24   Q    Now, after Mr. Hounsom retained Mr. Shostak to represent

25   him, other than the times that Mr. Hounsom contacted you about

54

1    possibly representing him, did you at any time have any

2    contact with Mr. Hounsom that to your knowledge Mr. Shostak

3    was not aware of?

4    A    Yes.  I don't believe Mr. Shostak was aware that

5    Mr. Hounsom had reached out to me on multiple occasions.

6    Q    Okay.  When you say he reached out to you on multiple

7    occasions, was that for the purposes of representing him?

8    A    And to relay communications from Mr. Anderson.

9    Q    Okay.  And you don't think Mr. Shostak had any knowledge

10   of -- that Brian was doing that?

11   A    He didn't have -- he would not have had knowledge from

12   me.  I do not know --

13   Q    Right.

14   A    I didn't know if he had knowledge from Mr. Rosenblum or

15   anyone else.

16   Q    Okay.  And you don't know whether Mr. Hounsom informed --

17   A    Correct.

18   Q    -- Mr. Shostak either, right?

19   A    Correct.

20   Q    Okay.  But you personally never informed Mr. Shostak?

21   A    I did not.

22   Q    And getting back, of course, to the rules of professional

23   responsibility that we talked about before, you are aware of

24   the rules regarding communications with persons represented by

25   counsel; is that correct?

1    A    Yes.

2    Q    Okay.  And at any time, did you ever have any

3    unauthorized contact with Mr. Hounsom while he was represented

4    by Mr. Shostak?

5    A    Yes.

6    Q    And what would that have consisted of?

7    A    Mr. Hounsom requesting that I represent him in the case

8    and Mr. Hounsom relaying messages from Tommy Anderson, Rachel

9    Anderson, and their parents to me.

10   Q    Okay.  And, I mean, do you have any idea how many times

11   he contacted you?

12   A    Incessantly.

13   Q    Numerous, you would say?

14   A    Yes.

15   Q    Was it daily?

16   A    It certainly would not be abnormal for it to be several

17   times a week.

18   Q    Okay.  In March or April of this year, were you contacted

19   by or did you have a conversation with Mr. Davis from the

20   United States Attorney's Office regarding contact with

21   Mr. Hounsom?

22   A    That sounds accurate.

23   Q    Was that a call that you initiated, or did he call you,

24   if you remember?

25   A    I believe I would have -- I believe I would have

1    initiated that.

2    Q    And do you recall what the purpose of that telephone call

3    was?

4         MR. DAVIS:  Counsel, may I inquire what date?  I'm

5    sorry.

6         MR. WILLIAM MARGULIS:  Oh, I don't know the exact

7    date.  I said March or April of this year.

8         MR. DAVIS:  Okay.  Thank you.

9         MR. WILLIAM MARGULIS:  I think it's in your motion,

10   but --

11        MR. DAVIS:  That's the one we're talking about?

12        MR. WILLIAM MARGULIS:  Right, right.

13   A    It would have been regarding the motion filed by the

14   Government.

15   Q    (By Mr. William Margulis) Okay.  But what was your -- do

16   you recall what your specific conversation with Mr. Davis was

17   during that?

18   A    I don't recall the specific conversation.

19   Q    Okay.  Was that telephone call, conversation, about your

20   contact with Mr. Hounsom?

21   A    It could have been.

22   Q    Do you recall representing to Mr. Davis in that telephone

23   call that your contact with Hounsom was limited to instances

24   in which Hounsom repeatedly reached out to you about the case

25   and that you told Hounsom he could not -- you could not

Marc Johnson Direct Examination                    Volume 1

57

1  discuss the matter with him because he was represented -- a

2  represented party?

3  A   I would have -- I -- what I've told Mr. Hounsom was that

4  "I cannot have substantive conversations with you about this

5  case.  I can do my best to answer generic questions."

6  Q   Well, my question -- I was asking you about the statement

7  that you made to Mr. Davis in the telephone call that we just

8  talked about.

9  A   I would have relayed something similar to what I just

10 said to Mr. Davis.

11 Q   Okay.  Well, what I asked was:  Did you represent to

12 Mr. Davis in that telephone call that your contact with

13 Hounsom was limited to instances in which Hounsom repeatedly

14 reached out to you about the case and you told Hounsom you

15 could not discuss the matter with Hounsom because Hounsom was

16 a represented party?  Is that what you represented to

17 Mr. Davis in that telephone call?

18 A   I do not recall that.

19 Q   Okay.

20 A   I believe I informed Mr. Davis that I've had

21 communication with him.

22 Q   Now -- but your testimony is you had several

23 conversations with Mr. Hounsom while you were representing

24 Mr. Anderson; is that correct?

25 A   Yes.

1    Q    And to your knowledge, Mr. Shostak was not aware of those

2    conversations; is that right?

3    A    I did not inform Mr. Shostak of the conversations.  The

4    conversations generally consisted of communications being sent

5    to our office by Mr. Anderson and of requests for me to

6    represent Mr. Hounsom.

7    Q    Did you ever obtain Mr. Shostak's consent to speak with

8    his client?

9    A    No, I did not.

10   Q    Mr. Hounsom reached out to you several times, you've

11   testified?

12   A    Yes.

13   Q    By phone, by telephone?

14   A    Yes.

15   Q    By text messaging?

16   A    Yes.

17   Q    By email?

18   A    I don't recall email, but it's possible.

19   Q    In those conversations, did you inform Mr. Hounsom that

20   you could not talk to him about his case?

21   A    I informed him that I could not speak with him about any

22   details regarding his case, yes.

23   Q    Did you ever initiate any telephone calls or text

24   messages with Mr. Hounsom?

25   A    Only in a response to something that he had sought

1  regarding Mr. Anderson.

2  Q    Did you ever contact Mr. Shostak to let him know that his

3  client was repeatedly reaching out to you?

4  A    No.

5  Q    Is your cell phone number 314-753-2020?

6  A    Yes.

7  Q    Do you recognize the number 314-960-7483?

8  A    No.

9  Q    Do you not recognize that as Brian Hounsom's telephone

10 number?

11 A    I do not.

12 Q    Would it surprise you to learn that between August 29th,

13 2014, and September 28th, 2014, that you and Mr. Hounsom

14 exchanged approximately 62 text messages?

15 A    No.

16 Q    28 of those were initiated by you.  Would that surprise

17 you?

18 A    Nope.

19 Q    And is it your testimony that all of those text messaging

20 back and forth were situations where Mr. Hounsom was reaching

21 out to you about possibly representing him?

22 A    Were all of those about that?

23 Q    Right.

24 A    No.  The majority were questions or issues coming from

25 his family, from Tommy Anderson, from his girlfriend or

60

1    fiancée, and from their parents, asking when I was going to go

2    visit Tommy.

3    Q    You guys exchanged text messages and phone calls on

4    Saturdays and Sundays and weekends; is that correct?

5    A    Yes.  My clients tend to do that, and their associates

6    apparently do as well.

7    Q    You don't have a -- well, let me back up.  Now, on -- on

8    September 12th of 2014, which is a Friday morning, there's

9    three phone calls between you and Mr. Hounsom between 8:28 and

10   9:07 a.m.  Do you recall those phone calls?

11   A    No.

12   Q    The second call lasted four minutes.  You don't recall

13   those phone calls?

14   A    I -- I don't.

15   Q    Do you have any specific recollection as to the nature of

16   those phone calls?

17   A    I do not.

18   Q    Did you ever meet with Brian Hounsom in your office?

19   A    Yes.

20   Q    On how many occasions?

21   A    I do not know.

22   Q    Was Rachel Anderson ever present for those meetings?

23   A    Rachel Anderson was present in our office.  I don't know

24   with whom she would have come.  I don't recall.

25   Q    Do you know how long those meetings with Mr. Hounsom

Marc Johnson Direct Examination                          Volume 1

61

1   lasted in your office?

2   A    No.

3   Q    What was the purpose of those meetings?

4   A    Well, which meetings?

5   Q    Well, the meetings that you had with Mr. Hounsom in your

6   office.

7   A    After the indictment?

8   Q    After the indictment.  Did you ever meet with him in your

9   office after the indictment?

10  A    Yes.

11  Q    Approximately how many times?

12  A    I don't know.

13  Q    What was discussed in those meetings?

14  A    Mr. Anderson and his desire for us to represent him.

15  Q    Do you have any idea how long those meetings were?

16  A    They would have been brief.

17  Q    And was Rachel present for any of those meetings that you

18  recall?

19  A    It -- it's certainly possible.  I don't recall one way or

20  the other.

21  Q    Was Mr. Shostak, to your knowledge, aware that you were

22  meeting with Mr. Hounsom in your office on those occasions?

23  A    To my knowledge, no.

24  Q    Did you ever obtain his consent to meet with Mr. Hounsom?

25  A    No.

1  Q    Did you ever personally inform Mr. Shostak that you were

2  meeting him within your office?

3  A    No, I did not personally inform him.

4  Q    Did you ever -- do you recall any meetings with

5  Mr. Hounsom in your office after September 9th of 2012?

6  A    I don't recall.

7  Q    You don't recall the specific dates that you met with him

8  in your office?

9  A    I don't recall if he was there or if he was what specific

10  dates they would have been.

11  Q    Thomas Anderson was housed -- has been housed at the

12  Warren County Jail since he was detained in mid August or late

13  August of 2014?

14  A    Yes.

15  Q    And did you go visit Mr. Anderson at the Warren County

16  Jail?

17  A    Yes.

18  Q    Do you recall how many times approximately you have

19  visited Mr. Johnson at -- I'm sorry -- Mr. Anderson at the

20  Warren County Jail?

21  A    Umm, I would -- I would think 10 plus.

22  Q    You've visited -- have visited other clients at the

23  Warren County Jail?

24  A    Have I?

25  Q    Yes.

63

1   A    Yes.

2   Q    And you've been to the Warren County Jail numerous times,

3   I assume?

4   A    Yes.

5   Q    On the occasions that you visited Mr. Anderson at the

6   Warren County Jail regarding his case, did you go by yourself

7   or with other members of your firm?

8   A    Usually, I would go by myself.  Mr. Rosenblum would have

9   been there once or twice.

10  Q    Between August 25th and September 12th, do you have any

11  idea how many times you visited Mr. Anderson during that

12  two-and-a-half-week period?

13  A    No, I don't.

14  Q    On September 12th of 2014, was your wife at a local

15  hospital having a baby?

16  A    Yes.

17  Q    Which hospital was that?

18  A    Missouri Baptist.  She was not having the baby yet, but

19  she was at the hospital.

20  Q    Okay.  And on the morning of September 12th, 2014, did

21  you have occasion to meet with Brian Hounsom in the hospital

22  parking lot?

23  A    I don't remember the day, but I did meet with him.

24  Q    You did meet with him in the hospital parking lot?

25  A    Yes.

1  Q    You don't recall if it was that morning?

2  A    I don't.

3  Q    What was the purpose of your meeting with Mr. Hounsom in

4  the hospital parking lot?

5  A    He was giving me a cell phone.

6  Q    Mr. Anderson's cell phone?

7  A    I believe it was, yes, but I don't know for sure.

8  Q    The three phone calls that I asked you about between you

9  and Mr. Hounsom the morning of September 12th, 2014 -- is it

10 still your testimony that you don't recall the purpose of

11 those phone calls or the nature of those phone calls?

12 A    I'm sorry.  Can you say that again?

13 Q    On the morning of September 12th, which was a Friday

14 morning, there were three phone calls between you and

15 Mr. Hounsom.

16 A    If that was --

17 Q    And my question is:  Is it still your testimony that you

18 don't recall the purpose of those phone calls or the nature of

19 the conversation?

20 A    If that was the day that I met with Mr. Hounsom, it would

21 have probably been to arrange where we were meeting.

22 Q    And the purpose of that meeting was for Mr. Hounsom to

23 give you Thomas Anderson's cell phone; is that right?

24 A    It was to give me a cell phone; that's correct.

25 Q    You don't know whose cell phone it was?

1   A    I believe it was Mr. Anderson's cell phone, but I don't

2   recall, but I believe it was.

3   Q    Did -- to your knowledge, did Mr. Shostak have any

4   knowledge that you were meeting Mr. Hounsom on the hospital

5   parking lot that morning?

6   A    No.

7   Q    What did you do with that cell phone?  What did you do

8   with the cell phone that Mr. Hounsom gave you?

9   A    I took it from him.

10  Q    And what did you do with it after you took it?

11  A    I took it with me to Warren County.

12  Q    To the jail?

13  A    Yes.

14  Q    Okay.  Did you take the cell phone into the jail and give

15  it to Tom Anderson during your meeting with him that day?

16  A    Yes.

17        MR. WILLIAM MARGULIS:  Your Honor, may I approach the

18  witness?

19        THE COURT:  Yes, you may.

20  Q    (By Mr. William Margulis) I'm going to hand you what's

21  marked Defendant's Exhibit P, as in Paul.  Flip to the second

22  page.  You might be able to read it better.  Can you read what

23  Exhibit P says?

24  A    I can.

25  Q    Can you read it out loud to the Court, please?

Marc Johnson Direct Examination                          Volume 1

66

1   A    Sure.  "No cell phones.  No cameras.  No food or drinks."

2   Do you want me to continue?

3   Q    Sure.

4   A    "Use of cell phones and cameras and contact with inmates

5   is against federal law, and you can be charged.  Your visit

6   will also be cut short.  Thank you."

7   Q    Mr. Johnson, you testified that you've been to the Warren

8   County Jail several times; is that correct?

9   A    Many times.

10  Q    Okay.  And you're -- I mean that's on the -- on the door

11  when you go into the jail, is it not?

12  A    I don't know when that was posted.

13  Q    You don't recall ever seeing that sign on any of your

14  visits at the jail?

15  A    I've seen it.  I don't know when it was posted, though.

16  Q    You don't know if it was posted there on September 12th?

17  A    I do not.

18  Q    And you recall visiting with Tom Anderson on that day; is

19  that correct?

20  A    If -- I recall going out with a phone after it was given

21  to me by Mr. Hounsom.  If it was that day, then yes.

22       MR. WILLIAM MARGULIS:  May I approach the witness,

23  Your Honor?

24       THE COURT:  Yes.

25  Q    (By Mr. William Margulis) Mr. -- before I do that,

1  Mr. Johnson, as you've said, you've been to the jail many

2  times; is that right?  Warren County Jail?

3  A    Many times.

4  Q    To visit clients?

5  A    Many times.

6  Q    And it's customary at the Warren County Jail upon arrival

7  that the deputies there take your bar card and driver's

8  license and they photocopy it and hand it back to you; is that

9  correct?

10 A    Absolutely.

11        MR. WILLIAM MARGULIS:  Okay.  May I approach the

12 witness, Your Honor?

13        THE COURT:  Yes.

14 Q   (By Mr. William Margulis) I'm going to hand you what's

15 marked Defendant's Exhibit H.  Can you identify that, please?

16 A    My ID and bar card.

17 Q    And is there a time and date on there?

18 A    Yes.  It says 12:08 on 9-12 of '14.

19        MR. WILLIAM MARGULIS:  Okay.  Would you -- would --

20 Your Honor, I would move to introduce Defendant's Exhibit P,

21 which -- and H at this time.

22        MR. DAVIS:  No objection.

23        THE COURT:  Exhibits P and H will be introduced into

24 evidence.

25 Q   (By Mr. William Margulis) Mr. Johnson, upon reviewing

68

1    this exhibit, would you agree that Friday, September 12th, at

2    12:08 p.m. is the approximate time you entered the Warren

3    County Jail?

4    A    Yes.

5    Q    And is that the day that you brought Mr. Anderson's cell

6    phone or -- I'm sorry -- the cell phone into the jail?

7    A    I believe so, yes.

8    Q    When you went into the jail that day, did you go into the

9    visitation room with Mr. Anderson?

10   A    Yes.

11   Q    And did you close the door to that visitation room for

12   privacy?

13   A    Someone did.

14   Q    And once you close the door, there's no windows or

15   anything of that nature; is that correct?

16   A    That's correct.

17   Q    At the time that you met with Mr. Anderson in the

18   visitation room on September 12th, were you aware of any video

19   surveillance cameras in the visitation room?

20   A    No.

21   Q    What did you do with the cell phone in the visitation

22   room?

23   A    Gave it to Mr. Anderson.

24   Q    And what was the purpose of giving that cell phone to

25   Mr. Anderson at that time?

Marc Johnson Direct Examination                    Volume 1

69

1    A    Mr. Hounsom had informed me that Mr. Anderson owed

2    Mr. Rosenblum money and needed a phone number out of that

3    phone to communicate with that person or to relay it back to

4    Mr. Hounsom so that that person could get money to our office.

5    Q    And that was the purpose of you bringing the cell phone

6    into the jail at that time?

7    A    Yes.

8    Q    And to your knowledge, did Mr. Anderson use that cell

9    phone to make any telephone calls?

10   A    Mr. Anderson was not supposed to use the cell phone in

11   the jail.  I didn't even know if the cell phone worked.  I'm

12   not sure.  He put the phone up to his ear.  I'm not sure if he

13   spoke with anyone or not.

14   Q    Do you recall if he took any photographs with his phone

15   at that time?

16   A    I have no knowledge of photographs.

17        MR. WILLIAM MARGULIS:  May I approach the witness,

18   Your Honor?

19        THE COURT:  Yes.

20   Q    (By Mr. William Margulis) I'm going to hand you what I've

21   marked Defendant's Exhibits F and G.  Can you identify those

22   for the Court, please?

23   A    Appears to be Mr. Anderson.

24   Q    Can you read the date and time on the -- it's kind of

25   small.  Can you read that?

Case: 4:14-cr-00246-AGF   Doc. #:  391   Filed: 07/08/15   Page: 70 of 78 PageID #: 1299
Marc Johnson Direct Examination                    Volume 1

70

1    A    September 12, 2014.

2    Q    Can you read the time?

3    A    12:17.

4    Q    Is that while you were in the visitation room with

5    Mr. Anderson?

6    A    Yes.

7    Q    Do you have any recollection of Mr. Anderson taking those

8    two, I guess, what everybody calls selfies?

9    A    Absolutely not.

10   Q    You were present with him in the visitation room at that

11   time, were you not?

12   A    Yes, I was.

13   Q    But you don't have any -- you don't have any recollection

14   of him taking those -- that picture of himself?

15   A    No.

16   Q    Do you know what phone number he called?

17   A    I have no idea.

18   Q    How long was the visit?  Do you recall?

19   A    I don't.

20        MR. WILLIAM MARGULIS:  Your Honor, I would move to

21   admit Exhibits F and G.

22        THE COURT:  Is there any objection?

23        MR. DAVIS:  No objection, Your Honor.

24        THE COURT:  Exhibits F and G will be admitted into

25   evidence.

Marc Johnson Direct Examination                    Volume 1

71

1   Q    (By Mr. William Margulis) When you left the jail that

2   day, did you -- what'd you do with the cell phone?

3   A    I took it with me against his objection.

4   Q    When you brought that cell phone into the jail, were you

5   aware that is a violation of federal law, specifically,

6   18 U.S.C. § 1791?

7   A    No.

8   Q    Were you aware that's also a violation of Revised

9   Statutes of -- Statutes of Missouri § 221.111?

10  A    No.

11  Q    You weren't --

12  A    I'm not --

13  Q    You had no --

14  A    I'm not refuting that they are violations, that it was a

15  violation, no.

16  Q    Did you think it was legal to bring the cell phone in for

17  Mr. Anderson's use during the attorney-client visitation?

18  A    I've allowed clients to use cell phones to get phone

19  numbers and things out of them before.

20  Q    And you --

21  A    That's what was my understanding of what was going to

22  happen.

23  Q    You had no knowledge just the act of bringing the phone

24  into the jail is a violation of federal law?

25  A    No.

Marc Johnson Direct Examination                          Volume 1

72

1   Q     Or state law?

2   A     No.

3   Q     Do you have any knowledge of Mr. Anderson using the

4   telephone to dial a number that began with 818?

5   A     No.

6   Q     What did you do with the phone after the visit, after you

7   left the jail?

8   A     I took it back to my office.

9   Q     And what happened to it?  Do you know?

10  A     I left it at the front desk.

11  Q     Do you know -- do you have any knowledge as to who

12  retrieved the phone from your office?

13  A     No.

14  Q     Or when it was retrieved?

15  A     No.

16  Q     Do you recall if -- after September 12th, 2014 -- if you

17  had a conversation with Rachel Anderson in which you asked her

18  to buy two burner phones and to contact an 818 number to get

19  money for your legal fees?

20  A     No.

21  Q     You did not have that conversation, or you don't recall?

22  A     I don't recall that conversation.

23  Q     Mr. Johnson, do you have any recollection of any plea

24  offers being made in Mr. Anderson's case while your law firm

25  was still representing him?  By the Government.

1    A    We were in the midst of attempting to negotiate a deal.

2    There were hang-ups on if cooperation would be allowed at all

3    and, if so, under what terms.  The two sides were a fair

4    distance apart in terms of what they viewed as acceptable

5    terms of any cooperation.

6    Q    Okay.

7    A    I don't recall -- I don't think anything got to a -- I

8    just don't recall if a formal offer was ever presented.

9         MR. WILLIAM MARGULIS:  Thank you, Mr. Johnson.  I

10   don't have any further questions.

11        THE COURT:  Mr. Davis or --

12        MR. WILLIAM MARGULIS:  You need any of this stuff?

13        MR. DAVIS:  No.

14                    CROSS-EXAMINATION

15   BY MR. DAVIS:

16   Q    Mr. Johnson, insomuch that the Government has filed only

17   a motion for inquiry in this matter, has not called you as a

18   witness in that matter, let me ask you this.  Is there

19   anything you would like to submit, testify to the record to

20   clarify anything that was asked of you on direct?

21   A    Yes.

22   Q    Please.

23   A    The communications with Mr. Shostak -- unfortunately, the

24   information that was being relayed to me was that Mr. Hounsom

25   was not satisfied with Mr. Shostak's representation for

1    various reasons.  Mr. Shostak is a personal friend of people

2    in our office, and no one wanted to hurt Mr. Shostak's

3    feelings based on the things that Mr. Hounsom was saying.

4    Mr. Hounsom was incessant in his attempts to get me to

5    represent him.  Mr. Hounsom relayed information from Tommy

6    Anderson and Tommy Anderson's family to me, wanting additional

7    visits, Tommy Anderson's mother offering me additional money

8    on the side to drive out and visit with her son more

9    frequently, all of which I turned down.  I visited

10   Mr. Anderson as frequently as I could.

11        It was my understanding when the phone went out there

12   that there was a number that was required.  I do not remember

13   if the phone was locked or why it could not be accessed or if

14   it was just an unknown number to Mr. Hounsom.  I do not know.

15   But Mr. Anderson was supposed to locate a number in order to

16   contact an individual who owed him money who would then turn

17   that, those funds, over to our office to finish paying the

18   bill that was owed to Mr. Rosenblum.

19        I'm not involved in any way, shape, or form in the fee

20   structure.  I get no percentage of any fee that's brought in

21   by Mr. Rosenblum's client, and I think anyone who's familiar

22   with Mr. Rosenblum would agree with that.

23        The phone was absolutely not to be used in the jail.  I

24   was quite upset that Mr. Anderson attempted to do that and

25   did, and it appears he certainly used it to the extent to take

 1   a photograph.  I did not know about that photograph.

 2       Mr. Anderson told me that for us to defeat this case we

 3   would have to be gangster together and be G together and I

 4   would have to leave the phone with him in order for him to

 5   keep it and continue to communicate with other individuals.  I

 6   laughed at that suggestion.  I took the phone from him, left,

 7   and left the phone at the front desk of my office, and that's

 8   the last time I ever saw it.

 9   Q   And for the sake of completeness, again, only to the

10   motions -- the Government's motion for inquiry, is there

11   anything else that you feel necessary the Court should be

12   aware of in the issue of completeness?

13   A   Well, from my perspective, I had no involvement with

14   Mr. Nuspl or CS1, I believe, so I can't speak any further on

15   that, and that's really all I have to say, Mr. Davis.

16   Q   And there -- is it a true statement that you and I have

17   not prepared for what I'm going to -- making the air quotes --

18   call cross-examination at this point, correct?

19   A   No, not in any way.

20           MR. DAVIS:  Okay.  I have nothing further.

21           Thank you, Judge.

22           THE COURT:  Anything further, Mr. Margulis?

23           MR. WILLIAM MARGULIS:  No, Your Honor.  Thank you.

24           THE COURT:  You may step down.  You're excused,

25   Mr. Johnson.

76

1           THE COURT:  Unfortunately, I have to take a recess

2     for the day.  I have another obligation this afternoon.  We

3     will continue tomorrow with this hearing, and I suggest we get

4     started at 9:00 tomorrow unless anyone has any objection to

5     that.  Okay.

6           MR. DAVIS:  What if there's a conflict with counsel?

7     Not that the Court doesn't take precedence.  I'm supposed to

8     teach a CLE at the Cole County Bar Association tomorrow.

9           THE COURT:  Okay.  What time?

10           MR. DAVIS:  It starts at 10:30, ends at noon.

11     Obviously, there's drive time to Jeff City.

12           THE COURT:  Right.  Can't you find someone else?

13           MR. DAVIS:  Rich Callahan comes to mind.

14           THE COURT:  Can one of -- can your cocounsel -- well,

15     you guys were in -- I'm sorry.  They were planning you might

16     have to testify, correct, in this case?

17           MR. DAVIS:  I believe so, yes.

18           THE COURT:  Okay.  Because I was thinking, perhaps,

19     your cocounsel could --

20           MR. DAVIS:  Pardon?

21           THE COURT:  -- handle some portion of this.

22           MR. DAVIS:  Correct.

23           THE COURT:  Are you -- I mean I mentioned this last

24     week when we talked about the scheduling of it, that this was

25     going -- would likely have to be continued to tomorrow.  I'd

1   like to get this done really.

2          MR. DAVIS:  I will accommodate the Court before I

3   accommodate any other commitments.

4          THE COURT:  Okay.  All right.  I apologize for that,

5   but I did mention it last week.

6          MR. DAVIS:  No need to apologize, Your Honor.  So do

7   I.

8          THE COURT:  And I would like to get this completed.

9   I think we need to.

10          MR. DAVIS:  So would the Government.

11          THE COURT:  Yes.  Okay.

12          MR. DAVIS:  Thank you.

13          THE COURT:  So we'll start tomorrow morning at 9:00.

14          MR. DAVIS:  Very well.

15          THE COURT:  All right.  Thank you.

16       (Court adjourned at 11:58 a.m.)

17

18

19

20

21

22

23

24

25

CERTIFICATE


        I, Gayle D. Madden, Registered Diplomate Reporter and

Certified Realtime Reporter, hereby certify that I am a duly

appointed Official Court Reporter of the United States

District Court for the Eastern District of Missouri.

        I further certify that the foregoing is a true and

accurate transcript of the proceedings held in the

above-entitled case and that said transcript is a true and

correct transcription of my stenographic notes.

        I further certify that this transcript contains pages

1 through 77 inclusive.

        Dated at St. Louis, Missouri, this 4th day of July,

2015.


                        _____

                        /s/ Gayle D. Madden

                        GAYLE D. MADDEN, CSR, RDR, CRR

                        Official Court Reporter