**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-CR-246 AGF NAB |
| | ) | |
| THOMAS GREGORY ANDERSON, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).  Defendant Thomas Gregory Anderson, Jr. is charged in a multi-defendant indictment with conspiracy to distribute and possess with intent to distribute one thousand kilograms of marijuana and conspiracy to launder the proceeds of drug trafficking in violation of 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1956(h). [Doc. #2.]  On March 27, 2015, the Government filed a Motion for Inquiry into Potential Conflicts of Interest. [Doc. #303.]  On April 9, 2015, Defendant filed a Motion to Dismiss for Irreparable Denial of Defendant's Constitutional Right to Effective Assistance of Counsel. [Doc. #315.]  The Government filed its Response on April 28, 2015 and Defendant filed his Reply on May 15, 2015. [Doc. #328, Doc. #344.]  On June 23 and 24, 2015, the undersigned held an evidentiary hearing.  Defendant was represented by Attorneys Arthur S. Margulis, Sr., William S. Margulis, and Justin K. Gelfand of Capes, Sokol, Goodman & Sarachan, P.C. (Capes Sokol).  The Government was represented by Assistant United States Attorneys John T. Davis, Stephen R. Casey, and Tiffany G. Becker.  Following the hearing, the

parties submitted post-hearing briefs. [Doc. #405, Doc. #411.]   On August 24, 2015, the undersigned heard oral arguments.  The undersigned will make the following findings of fact and conclusions of law with regard to the Government's motion for inquiry and Defendant's motion to dismiss based upon the parties' briefs, oral arguments, and evidence adduced at the evidentiary hearing.   For the reasons set forth below, the undersigned recommends that Defendant's Motion to Dismiss for Irreparable Denial of Defendant's Constitutional Right to Effective Assistance of Counsel be denied.

## FINDINGS OF FACT

From the end of 2012 through January of 2015, Anderson was represented by the law firm of Rosenblum, Schwartz, Rogers & Glass, P.C. (RSRG).  Attorney N. Scott Rosenblum represented Anderson, with assistance from Attorneys Adam D. Fein and Marc Johnson.  On August 13, 2014, Anderson was indicted.  In mid-January 2015, Capes Sokol began representing Anderson and RSRG withdrew.  Capes Sokol brought to the Government's attention potential conflicts of interest based on RSRG's prior representation of CS #1, the confidential informant whose cooperation led to Anderson's indictment, and Corey Nuspl, Anderson's co-defendant. RSRG Attorneys Scott Rosenblum and Adam Fein represented CS #1 from November of 2011 through January of 2013 and RSRG Attorney Joel J. Schwartz represented Nuspl from the summer of 2014 until shortly after indictment.

The Government filed a motion for inquiry into the potential conflicts and Capes Sokol filed a motion to dismiss the indictment based on ineffective assistance of counsel.  At the evidentiary hearing, the undersigned held a colloquy with Anderson and found that he knowingly and intelligently waived his attorney-client privilege and interest in confidential communications with RSRG for the purposes of the motion to dismiss.  The undersigned then heard testimony

from RSRG Attorneys Scott Rosenblum, Adam Fein, Marc Johnson, and Joel Schwartz, as well as AUSA John Davis.  The undersigned will make the following findings of fact with regard to RSRG's representation of Anderson before and after his indictment.

## I.     Pre-indictment Representation

CS #1 was indicted in April of 2011.  Following his plea of guilty in November of 2011, he retained RSRG to coordinate his cooperation with the Government and obtain a more lenient sentence.  RSRG Attorneys Scott Rosenblum and Adam Fein represented him.  From January of 2012 through January of 2013, CS #1 cooperated with the DEA and provided information that formed the genesis of the investigation leading to indictment in this case.  CS #1 provided information about Anderson at fourteen meetings with the DEA.  In November of 2012, CS #1 was sentenced with the benefit of a 5K1.1 motion by the Government[1] based at least in part on his cooperation against Anderson.  Rosenblum represented CS #1 at sentencing and Fein may have also been present.  Fein filed multiple motions to continue CS #1's surrender date for service of sentence so that he could continue cooperating with the DEA.  CS #1 ultimately surrendered in January of 2013, following his last contact with the DEA.

The sentencing judge as well as the undersigned conducted an in camera review of the Government's 5K1.1 motion and the transcript of CS #1's sentencing.  Both are very general in nature.  Anderson is not named. Jeannette Graviss, the AUSA on CS #1's case, was never present at any interview where CS #1 discussed Anderson.  Rosenblum testified that CS #1 was incredibly secretive about his cooperation with the DEA and wanted to do it "off the grid."

---

[1] When the Government files a 5K1.1 motion stating that a defendant has provided "substantial assistance," the sentencing court may depart from the applicable sentencing guidelines and, in certain circumstances, sentence the defendant below the statutorily required mandatory minimum sentence. U.S.S.G. § 5K1.1; 18 U.S.C. § 3553(e).

(Evidentiary Hearing Tr. Vol. II p. 24.)  No one at RSRG had any knowledge at the time that CS #1 was cooperating against Anderson.

With information from CS #1, AUSAs John Davis and Stephen Casey began investigating an extensive marijuana conspiracy.  DEA Special Agent Brandon Moles was the lead agent on the investigation.  The investigation was ultimately divided into two indictments.  AUSA Davis became the lead attorney in this case, while AUSA Casey became the lead attorney on a second, related indictment involving Kyle Kienstra (4:14-cr-250 CDP).

In November of 2012, shortly after CS #1 was sentenced, agents executed search warrants on Anderson's parents' home and the home of Anderson's sister Rachel and her fiancé Brian Christopher Hounsom, who was later indicted along with Anderson.  Shortly thereafter, RSRG Attorney Scott Rosenblum began communicating with AUSA Davis regarding Anderson and a potential indictment.  Rosenblum testified that RSRG began representing Anderson after CS #1 was sentenced in November of 2012 but before CS #1 surrendered for service of sentence in January of 2013.

On February 19, 2014, agents approached co-defendant Corey Nuspl who consented to a search of his home and indicated a willingness to cooperate.  At some point thereafter, RSRG Attorney Joel Schwartz contacted AUSA Davis to set up a proffer interview with Nuspl.  The interview took place on July 15, 2014 at AUSA Davis' office.  Agent Brandon Moles was present, along with two other agents.  Agent Moles had also participated in meetings with CS #1 where CS #1 discussed Anderson.

By the time of the proffer interview, AUSA Davis had had multiple conversations with RSRG Attorney Scott Rosenblum regarding Anderson.  He was "well aware" that Scott Rosenblum and Joel Schwartz were partners at the same firm. (Evidentiary Hearing Tr. Vol. II p.

4

190.)  AUSA Davis testified that Schwartz was "begging" him not to indict Nuspl, arguing he was "low-hanging fruit." (*Id.* at 189.)  According to AUSA Davis, at that time, the investigation had not yet been divided into the two indictments and he was still "juggling" 30 potential co-defendants with "no idea" who he was going to indict. (*Id.* at 189-90.)  Nuspl provided information about Anderson.  Schwartz guessed the proffer lasted "significantly less" than "several hours." (*Id.* at 158.)

Agent Brandon Moles testified before the Grand Jury regarding information both Nuspl and CS #1 had provided.  On August 13, 2014, Anderson and Nuspl were indicted, along with nine other co-defendants, including Brian Hounsom.  AUSA Davis contacted RSRG Attorney Scott Rosenblum to let him know that Anderson had been indicted.  Some time after Anderson was indicted and Rosenblum had received discovery, Rosenblum learned that CS #1 was RSRG's former client and contacted AUSA Davis to confirm his identity.  AUSA Davis did not know the identity of CS #1 but was able to confirm with Agent Moles.

## II.    Post-indictment Representation

A week after the indictment, on August 20, 2014, RSRG Attorneys Scott Rosenblum, Adam Fein, and Marc Johnson entered on behalf of Anderson and RSRG Attorney Joel Schwartz entered on behalf of co-defendant Corey Nuspl.  Because Anderson was out of the country at the time, RSRG Attorneys Rosenblum and Fein arranged for him to self-surrender on August 25, 2014.  United States Magistrate Judge Shirley Padmore Mensah held an initial appearance where Fein was present.  The same day, RSRG Attorney Joel Schwartz represented Nuspl at an arraignment before the undersigned.

On the morning of August 27, 2014, the undersigned held an arraignment for Anderson. AUSA Davis represented the Government.  RSRG Attorney Adam Fein represented Anderson

and requested additional time to file pretrial motions.  The undersigned granted the request in the interest of justice and set a pretrial motion deadline of September 25, 2014.

Later that morning, Judge Mensah held a detention hearing for Anderson.  AUSA Davis represented the Government and RSRG Attorney Scott Rosenblum represented Anderson.  The sole witness was DEA Agent Alexander Jenny, who was standing in for Agent Moles.  Agent Jenny testified as to fears informants for the Government had for their safety, the many firearms and large sum of currency found at Anderson's parents' home, and a 2011 incident where Anderson sent his bodyguard, Mitchell Hughes, to San Jose, California to rough up Kyle Kienstra.  On cross-examination, Rosenblum established that most of Agent Jenny's testimony was hearsay from other investigators.  Judge Mensah continued the detention hearing to August 29, 2014 to hear testimony from other witnesses, indicating she was primarily concerned about the danger Anderson posed to the community.

On August 29, 2014, Judge Mensah held a second detention hearing, beginning at approximately 4:00 p.m.  As with the first hearing, AUSA Davis represented the Government and Rosenblum represented Anderson.  The Government called two witnesses: Hughes and Nuspl.  Hughes essentially confirmed Agent Jenny's testimony.  At approximately 5:00 p.m., the Government called Nuspl.  AUSA Davis established that Nuspl was cooperating with the possibility of gaining a sentencing benefit.  Nuspl testified that he had concerns for his safety from Anderson, that Anderson had threatened him through another individual, and that he had seen Anderson with firearms on two occasions.  On cross-examination, Rosenblum brought out that Anderson had never directly threatened Nuspl, that Nuspl had never felt the need to report any concern for his safety, and that Nuspl had seen the firearms in 2011 and had not seen them in

the context of a drug transaction, or near drugs or large sums of currency.  The proceedings concluded at 5:22 p.m.

On September 2, 2014, Judge Mensah ordered Anderson be detained. [Doc. 74.]  Judge Mensah found by clear and convincing evidence that:

> Defendant's release would present a danger and threat to potential witnesses in the case.  The evidence presented included credible, unrebutted testimony by a paid informant that, on at least one occasion, Defendant hired the informant to fly to California to assault and intimidate an associate; credible unrebutted testimony by a co-defendant that he fears for his safety based on his own observations of Defendant with firearms, his knowledge of Defendant's 'vengefulness' and an indirect threat Defendant made to this co-defendant; evidence presented by the government that Defendant's parents, with whom he initially proposed to reside pending trial, were involved in his activities and are also targets of the ongoing government investigation.

[Doc. 74 p. 2.]

RSRG Attorney Adam Fein filed a motion to revoke Judge Mensah's detention order. [Doc. 195.]  United States District Judge Audrey G. Fleissig held a hearing on the motion where Nuspl again testified, along with another co-defendant, Brian Lee Lord.  Anderson was represented by RSRG Attorneys Rosenblum and Fein.  Lord testified as to Anderson's general involvement in the drug conspiracy, an occasion in 2012 when Anderson asked him to transport firearms to Boston for $5,000, and a 2011 incident when Anderson threatened an individual in a nightclub by flashing his firearm.  Nuspl's testimony was short.  He testified that Anderson's sister Rachel sent a group text containing Nuspl's earlier testimony that he was cooperating and had concerns for his safety.  On cross-examination, Rosenblum suggested Rachel was clearing the record because Nuspl had said *Anderson* was cooperating and that he was not afraid of Anderson.  Following Nuspl's testimony, Fein proffered testimony to that effect from Rachel who invoked her Fifth Amendment right against self-incrimination.  Judge Fleissig indicated she

would not give much weight to proffered testimony from a witness invoking her Fifth Amendment rights.

Fein argued that Anderson had no history of violence, that the incidents discussed were from years ago, that Anderson lawfully possessed his firearms and no longer had access to them, and that Nuspl's testimony about the text and indirect threat were too attenuated and minor to support an order of detention.   AUSA Davis emphasized that Anderson faced a ten-year mandatory minimum, which carries a presumption of detention.  He further argued that that there was plenty of evidence that Anderson was hot tempered, had threatened people, and possessed firearms in connection with his drug business.

Judge Fleissig did not revoke Judge Mensah's order. [Doc. 249.]   In fact, she went beyond Judge Mensah in finding that Anderson was a flight risk because he had few non-criminal ties to the Eastern District of Missouri, had lived in multiple countries, had recently crossed the U.S.-Mexico border undetected, and was facing a significant sentence.   Judge Fleissig further found that Anderson was a danger to the community.  She determined that there was probable cause to believe he was the leader of an extensive drug conspiracy, corroborated in part by intercepted calls, a conspiracy that was on-going when he hired Hughes and had him assault Kienstra.   Judge Fleissig also found that Anderson owned multiple firearms, had threatened an individual with one in 2011, and had offered to pay Lord to transport his firearms to another state in 2012.  Acknowledging the lack of temporal proximity, Judge Fleissig found Nuspl's testimony significant:

> While it is true that the events related in the above paragraph occurred a few years ago, there is evidence from the prior hearing that, recently, Defendant indirectly threatened a co-Defendant who has cooperated. Even more recently, after the detention hearing Defendant's sister sent a text message to at least six individuals in which she attached a few selected pages from the transcript of the hearing before Judge Mensah, which pages specifically identify an individual as

8

cooperating with the Government. The Court finds especially disturbing that the transcript of that hearing was filed under seal.

[Doc. 249 p. 7.]

On September 4, 2014, RSRG Attorney Joel Schwartz moved to withdraw as counsel for Nuspl and Attorney Patrick S. Kilgore, a solo practitioner, formally entered on Nuspl's behalf. As a result, the undersigned vacated a conflicts hearing previously set for September 5, 2014.

Although the docket sheet reflects that Attorney Kilgore entered and RSRG Attorney Schwartz withdrew on September 4, 2014, Kilgore began representing Nuspl before then.  At some point following indictment, "probably days" before the first detention hearing, when it became clear that the conflict was unwaivable, RSRG Attorneys Schwartz and Rosenblum had a conversation where Rosenblum instructed Schwartz to withdraw. (Evidentiary Hearing Tr. Vol. II p. 36.)  Schwartz testified that he effectively withdrew at that point but did not formally withdraw until after Kilgore agreed to represent Nuspl.  Schwartz recalled that Nuspl retained Kilgore shortly after indictment.  AUSA Davis recalled that after the first detention hearing, when it became clear Nuspl would have to testify, he told Schwartz and/or Rosenblum that RSRG could not continue to represent both defendants.  At least by the time of the second detention hearing on August 29, 2014, Kilgore was representing Nuspl and Schwartz had no further involvement in the case.

RSRG Attorney Marc Johnson was in regular contact with co-defendant Brian Hounsom, Anderson's sister's fiancé, who relayed messages from Anderson's family and repeatedly requested that Johnson represent him.[2]  On the morning of September 12, 2014, Johnson

---

[2] Hounsom was initially represented by Attorney Burton H. Shostak and is now represented by Attorney James W. Schottel, Jr.  In a September 9, 2014 email to Johnson, AUSA Davis advised that it would be a conflict for him to represent Hounsom. (Ex. I.)  Johnson maintains that he never advised Hounsom regarding this case.  Rosenblum testified that he was aware of contact

obtained Anderson's cell phone from Hounsom and brought it to Anderson in the Warren County Jail in Warrenton, Missouri.  Johnson testified that Hounsom had informed him that Anderson needed a number out of the phone so that he could pay RSRG.  Rosenblum testified that Anderson was paid in full at the time.  Johnson arrived at the jail at 12:08 p.m. (Ex. H.)  Johnson testified that he was not sure that the phone in fact worked and did not know why Hounsom could not relay the number himself.  Johnson recalled Anderson putting the phone to his ear.  Johnson testified that Anderson was absolutely not supposed to use the phone and that he was quite upset when Anderson attempted to use it.  At some point, Anderson took two "selfies" that are timestamped 12:17 p.m. that day. (Exs. F & G.)  Johnson had no recollection of Anderson taking the selfies.  Anderson wanted Johnson to leave the cell phone with him, but Johnson took it back to his office and left it at the front desk.

On September 24, 2014, the Government filed a motion for a complex case finding pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii). [Doc. 150.]  In support of the motion, the Government stated that the case involved a complex long-term conspiracy, eleven defendants, voluminous discovery, and several arguably suppressible events, and that in light of the foregoing, it would be unreasonable for defense counsel to effectively prepare within the time limits established by the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*  On September 25, 2014, RSRG Attorney Adam Fein filed a first motion for additional time on behalf of Anderson, citing the Government's motion. [Doc. 155.]

On September 26, 2014, the undersigned entered an order making a complex case finding for the reasons set forth in the Government's motion and setting a status conference for October

between Johnson and Hounsom but was not aware of any unauthorized contact and had instructed Johnson not to discuss specifics of the case or give specific legal advice.  According to Rosenblum, Hounsom and Anderson's family were often "camped out" in RSRG's lobby. (Evidentiary Hearing Tr. Vol. II p. 69.)

9, 2014 to determine scheduling. [Doc. 157.]  At the status conference, AUSAs Davis and Casey represented the Government and RSRG Attorney Fein represented Anderson.  Following the status conference, the undersigned entered an order setting the pretrial motion deadline for December 1, 2014 and setting evidentiary hearings on February 2 and 3, 2015.

RSRG attempted to negotiate terms of cooperation for Anderson.  On November 26, 2014, AUSA Davis sent an email to RSRG Attorneys Rosenblum, Fein, and Johnson setting forth the Government's position with respect to any proffer and potential 5K1.1 motion or 3553 filing which would theoretically allow Anderson to be sentenced below the ten-year mandatory minimum. (Ex. J.)  The email states that, "anything and everything Anderson says can and will be used against him later if he were to proceed to trial or any other contested matter including, but not limited to, sentencing hearings, appeals or PCR matters, whether involving himself or others." (*Id*.)  Moreover, to potentially earn a benefit, the Government expected a "complete and honest recitation of his knowledge of, and involvement in, the conspiracy," including the roles of co-defendants and Anderson's parents and sister. (*Id*.)  Anderson wanted specific guidelines for any proffer and did not want to proffer about his case.  The Government's proposed proffer terms were rejected.

On December 1, 2014, RSRG Attorney Marc Johnson filed a second motion for additional time on behalf of Anderson, citing the complex case finding and Johnson's workload. [Doc. 207.]  On December 3, 2014, the undersigned entered an order continuing the pretrial motion deadline to January 15, 2015 for the reasons set forth in the motion.  On January 15, 2015, a day after entering his appearance, Capes Sokol Attorney William Margulis filed a motion for additional time on behalf of Anderson.  Anderson later filed the instant motion to dismiss the indictment.

11

**DISCUSSION**

Anderson contends that RSRG labored under conflicts of interest that denied him his right to effective assistance of counsel both before and after he was indicted.  He maintains that the only appropriate remedy is dismissal of the indictment.  The Government counters that there is no pre-indictment right to effective assistance of counsel and that any conflicts did not adversely affect RSRG's post-indictment representation of Anderson.  The Government further argues that dismissal is an extreme and inappropriate remedy.  The undersigned will address in turn Anderson's right to effective assistance before indictment, Anderson's right to effective assistance after the indictment, and whether dismissal is appropriate in this case.  For the reasons set forth below, the undersigned recommends that Anderson's motion to dismiss be denied.

**I.      Pre-indictment Right to Effective Assistance of Counsel**

Anderson has repeatedly argued that the existence of a constitutional right to effective assistance of counsel during pre-indictment plea bargaining is a question of first impression following the Supreme Court's decisions in *Frye* and *Lafler*.[3]  Anderson emphasizes that it is now a common practice in federal court for counsel to negotiate a plea before indictment. Indeed, the Sentencing Guidelines regime has encouraged and upped the ante for pre-indictment bargaining. *See United States v. Moody*, 206 F.3d 609, 616-18 (6th Cir. 2000) (Wiseman, J., concurring) (citing David N. Yellen, *Two Cheers for A Tale of Three Cities*, 66 S. Cal. L. Rev. 567, 569-70 (1992)); Wayne R. LaFave et al., *Plea bargaining and the federal sentencing guidelines*, 5 Crim. Proc. § 21.1(h) (3d ed.); Pamela R. Metzger, *Beyond the Bright Line: A Contemporary Right-to-Counsel Doctrine*, 97 Nw. U. L. Rev. 1635, 1663-71 (2003).  "In practical terms, drug conspiracy cases have become a race to the courthouse. When a conspiracy

---

[3] *Missouri v. Frye*, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012); *Lafler v. Cooper*, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012)

is exposed by an arrest or execution of search warrants, soon-to-be defendants know that the first one to 'belly up' and tell what he knows receives the best deal. The pressure is to bargain and bargain early, even if an indictment has not been filed." *Moody*, 206 F.3d at 617 (Wiseman, J., concurring).

*United States v. Moody*, 206 F.3d 609 (6th Cir. 2000) illustrates the perils of ineffective counsel during pre-indictment plea bargaining.  Moody was cooperating with the government in a drug conspiracy investigation. *Id.* at 611-12.  The government offered him a plea involving one kilogram of cocaine and a maximum sentence of five years. *Id.*  Moody's attorney contacted the government a month later and rejected the plea offer without inquiring into the nature of Moody's cooperation. *Id.*  As it turned out, by the time the government offered him the plea, Moody had confessed to more than 24 times the amount of cocaine necessary to fall within a five-year sentence. *Id.*  Following discovery, Moody's attorney advised him to plead guilty. *Id.* Two of his co-defendants had also pled guilty. *Id.*  Moody pled and was ultimately sentenced to ten years. *Id.*  The Sixth Circuit acknowledged "that but for … ineffective assistance, Moody would not have rejected the government's first offer of a plea agreement; and that Moody had suffered prejudice by his subsequent exposure to a substantially higher sentence." *Id.* at 612.

Nevertheless, as the Sixth Circuit reluctantly acknowledged in *Moody*, there is no constitutional right to effective assistance of counsel during pre-indictment plea bargaining.  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI.  "Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 1103, 67 L. Ed. 2d 220 (1981).  Thus, the right to conflict-free, effective

13

assistance of counsel is "derivative" of the right to counsel. *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003).  The right to counsel attaches at "critical stages" of a criminal proceeding. *Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009).  Critical stages include some pretrial proceedings, such as post-indictment interrogations, post-indictment identifications, and post-indictment plea negotiations. *See Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964) (post-indictment interrogations); *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967) (post-indictment lineups); *Missouri v. Frye*, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012) (post-indictment plea negotiations).

Contrary to Anderson's contention that this is an open question of law, the Supreme Court has repeatedly imposed a bright-line rule that the Sixth Amendment right to counsel "does not attach until the initiation of adversary judicial proceedings," "'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *United States v. Gouveia,* 467 U.S. 180, 188, 104 S. Ct. 2292, 81 L. Ed. 2d 146 (1984) (quoting *Kirby v. Illinois,* 406 U.S. 682, 688-89, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972)); *see also Moran v. Burbine,* 475 U.S. 412, 428-31, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986).  "The rule is not 'mere formalism,' but a recognition of the point at which 'the government has committed itself to prosecute,' 'the adverse positions of government and defendant have solidified,' and the accused 'finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.'" *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 198, 128 S. Ct. 2578, 2583, 171 L. Ed. 2d 366 (2008) (citing *Kirby*, 406 U.S. at 689).

In *United States v. Morriss*, the Eighth Circuit declined to "abandon the bright-line rule the [Supreme] Court unambiguously reaffirmed in *Rothgery* requiring appearance before a judicial officer and adopt a more flexible approach based upon a case-by-case examination of the

14

prosecutors' and/or investigators' actions." 531 F.3d 591, 594 (8th Cir. 2008).  No circuit court of appeals has ruled otherwise.  The undersigned could find only three decisions declaring a right to effective assistance of counsel during pre-indictment plea bargaining. *United States v. Wilson*, 719 F. Supp. 2d 1260 (D. Or. 2010); *United States v. Busse*, 814 F. Supp. 760, 763-64 (E.D. Wis. 1993); *Chrisco v. Shafran*, 507 F. Supp. 1312, 1319 (D. Del. 1981).  Those decisions have either been overruled by or are inconsistent with Supreme Court precedent. *See, e.g., United States v. Tableman*, No. CRIM. 99-22-B, 1999 WL 1995192, at *1 (D. Me. Sept. 3, 1999) (recognizing overruling of *Chrisco v. Shafran*).

Anderson argues that the Supreme Court's decisions in *Frye* and *Lafler* are game changers.  In *Frye* and *Lafler*, the Supreme Court held that the Sixth Amendment right to effective assistance of counsel applies to pretrial plea bargaining, not merely to counsel's performance at trial.  In so holding, the Court recognized that, "In today's criminal justice system … the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." *Frye*, 132 S. Ct. at 1407.  Anderson argues that *Frye* and *Lafler* left open the possibility of a right to effective assistance of counsel during pre-indictment plea bargaining.  The undersigned disagrees.  *Frye* and *Lafler* were decided in the context of post-indictment plea bargaining and nothing in those decisions suggests they overruled Supreme Court precedent.  The Sixth Circuit has persuasively rejected Anderson's argument:

> Recognizing this difficulty, Kennedy argues that *Missouri v. Frye,* ⸺ U.S. ⸺, 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012), and *Lafler v. Cooper,* ⸺ U.S. ⸺, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012), reopen the question of when the right to counsel attaches in plea negotiations. To be sure, *Frye* and *Lafler* recognize that plea negotiations are central to the American system of criminal justice. *See Frye,* 132 S.Ct. at 1405–08; *Lafler,* 132 S.Ct. at 1385–86. And together the decisions make clear that the right to counsel applies in postindictment plea negotiations even if the negotiations have no effect on the fairness of a conviction. *See Lafler,* 132 S.Ct. at 1385–88 (rejecting arguments that the Sixth Amendment is designed

only to guarantee a fair trial and reliable conviction); *see also id.* at 1391–95 (Scalia, J., dissenting); *Frye,* 132 S.Ct. at 1412 (Scalia, J., dissenting). But in neither case did the Supreme Court consider the question of whether the right to counsel attached in preindictment plea negotiations.

If anything, *Frye* and *Lafler* accept the rule that the right to counsel does not attach until the initiation of adversary judicial proceedings. Neither decision expressly abrogates or questions the rule. It would be highly unusual for the Supreme Court to discard or sharply limit a longstanding rule without comment, especially when the rule supposedly abrogated comes from the text of the Sixth Amendment. *See Shalala v. Ill. Council on Long Term Care, Inc.,* 529 U.S. 1, 18, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000). Additionally, the dissenting justices did not read the majority opinions as creating a new right to counsel in preindictment plea negotiations. *See Lafler,* 132 S.Ct. at 1392 (Scalia, J., dissenting) ("Today's opinions deal with only two aspects of counsel's plea-bargaining inadequacy...."). And finally, recognizing that the Sixth Amendment guarantees a right to counsel at "all critical stages of [a] criminal proceeding [ ]," *Frye* explained that those critical stages include "arraignments, *postindictment* interrogations, *postindictment* lineups, and the entry of a guilty plea." *Frye,* 132 S.Ct. at 1405 (internal quotations omitted) (emphasis added). Had the Supreme Court erased the line between preindictment and postindictment proceedings for plea negotiations, it surely would have said so given its careful attention to the distinction for interrogations and lineups.

*Kennedy v. United States*, 756 F.3d 492, 493-94 (6th Cir. 2014).

The undersigned does not doubt that the existence and quality of pre-indictment counsel is important.  "Most federal criminal cases are resolved through plea negotiations and a suspect-defendant's best chance of obtaining a reduced sentence occurs prior to indictment. Depriving a suspect-defendant of the effective assistance of counsel at pre-indictment plea negotiation … may be more damaging than a denial of effective assistance at trial itself." *United States v. Wilson*, 719 F. Supp.2d at 1268.  Attorneys who are inexperienced or otherwise impaired may leave their client behind in the "race to the courthouse." *Moody*, 206 F.3d at 617 (Wiseman, J., concurring).

In *Moody*, the Sixth Circuit lamented that its hands were tied by Supreme Court and circuit precedent:

> We do not favor this bright line approach because it requires that we disregard the cold reality that faces a suspect in pre-indictment plea negotiations. There is no question in our minds that at formal plea negotiations, where a specific sentence is offered to an offender for a specific offense, the adverse positions of the government and the suspect have solidified. Indeed, it seems a triumph of the letter over the spirit of the law to hold that Moody had no right to counsel in his decision to accept or deny the offered plea bargain only because the government had not yet filed formal charges. We are faced with the ponderable realization that this is an occasion when justice must of necessity yield to the rule of law, and therefore we must REVERSE the district court's order and reinstate the original sentence.

206 F.3d at 615-16.  Judge Wisemen, concurring, shared the majority's frustration:

> The Sixth Amendment right to counsel historically has evolved to meet the challenges presented by a changing legal paradigm. *See Ash*, 413 U.S. at 310, 93 S.Ct. 2568 (noting that the extension of the Sixth Amendment right to counsel resulted from "changing patterns of criminal procedure and investigation that have tended to generate pretrial events that might appropriately be considered to be parts of the trial itself"). The criminal justice system has and is changing so that defendants now face critical stages of their prosecutions prior to indictment. The Sixth Amendment's underlying purpose is to protect defendants in critical stages of their prosecution. Thus, the Sixth Amendment should guarantee the right to counsel during preindictment plea negotiations. Precedent, however, prevents me from endorsing this position which logic demands.
>
> I would urge the Supreme Court to reconsider its bright line test for attachment of the Sixth Amendment right to counsel enunciated in *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), and *United States v. Gouveia,* 467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984).

*Id.* at 618.  The undersigned is similarly concerned with the formalist distinction as to when a defendant has come up against the "expert adversary" of the state, *United States v. Ash,* 413 U.S. 300, 310, 93 S. Ct. 2568, 37 L. Ed. 2d 619 (1973), and is therefore entitled to counsel.  However, as the law currently stands, the constitutional right to effective assistance of counsel does not attach pre-indictment.

17

## II.    Post-indictment Right to Effective Assistance of Counsel

As a threshold matter, it is unclear what standard applies to Anderson's post-indictment ineffective assistance of counsel claims. Anderson's position is that RSRG remained conflicted, even after they withdrew from representing Nuspl, because of their ongoing responsibilities to Nuspl and CS #1 as former clients. It is unsettled whether the more lenient standard set forth in *Cuyler v. Sullivan*[4] or the more stringent standard set forth in *Strickland v. Washington*[5] applies to a claim not involving concurrent representation. *Mickens v. Taylor*, 535 U.S. 162, 176, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002) ("In resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation. Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question."); *Morelos v. United States*, 709 F.3d 1246, 1252 (8th Cir. 2013) ("[W]e have expressly refrained from deciding whether the lowered burden in establishing prejudice applies to actual conflicts of interest which did not arise out of multiple representation."). Because there was at least a small period after indictment during which RSRG represented both Anderson and Nuspl, the undersigned will apply the *Cuyler v. Sullivan* standard. The undersigned finds that, even under that more lenient standard, Anderson's post-indictment ineffective assistance of counsel claims fail.

"In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350. "[U]ntil a defendant shows that his counsel actively represented conflicting

---

[4] The *Cuyler v. Sullivan* standard, discussed infra, presumes prejudice if a defendant can show that counsel's performance was adversely affected. 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).

[5] The *Strickland v. Washington* standard requires that a defendant show prejudice. 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.*   "[T]he *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Mickens*, 535 U.S. at 172 n.5.

"*Sullivan* provides that we presume prejudice when a conflict of interest arising from multiple representation adversely affected counsel's representation. The presumption arises because when joint representation of conflicting interests has an adverse effect on counsel's performance, it is difficult to measure the precise harm arising from counsel's errors." *Plunk v. Hobbs*, 766 F.3d 760, 764 (8th Cir. 2014) (internal quotations omitted) *cert. denied*, 135 S. Ct. 981, 190 L. Ed. 2d 863 (2015).  However, "there is no *per se* rule that a defendant who is advised by the same attorney as a co-defendant is deprived of his right to effective assistance of counsel under the Sixth Amendment." *Id.*  And "a mere theoretical division of loyalties" is insufficient to show ineffectiveness. *Mickens*, 535 U.S. at 171.  "To prove a conflict produced an adverse effect, a defendant must identify a plausible alternative defense strategy or tactic that defense counsel might have pursued, show that the alternative strategy was objectively reasonable under the facts of the case, and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." *Morelos*, 709 F.3d at 1252 (internal quotations omitted).

A jurisdiction's ethical rules are useful "guides" in assessing whether counsel has been ineffective. *Strickland*, 466 U.S. at 688; *Missouri v. Frye*, 132 S. Ct. 1399, 1408, 182 L. Ed. 2d 379 (2012).  But they are "only guides." *Strickland*, 466 U.S. at 688.  "The purpose of the *Sullivan* rule is not to enforce the Canons of Legal Ethics." *Plunk*, 766 F.3d at 764 (internal quotations omitted).

Anderson argues the following adverse effects: (1) RSRG failed to contest the complex case finding and moved for extensions of time, waiving Anderson's right to a speedy trial, when Anderson had an interest in proceeding to trial to limit the impact of cooperation but Nuspl had an interest in delaying trial so he could earn a sentencing benefit; (2) Anderson was detained after Rosenblum represented him at detention hearings where he failed to attack Nuspl's credibility based on his criminal history; (3) Anderson is now the last man standing with a plea offer of ten years, while his co-defendants have cooperated and received benefits, including Nuspl who will likely receive a sentencing benefit.  The undersigned will address each point in turn.

## A.      Waiver of Right to a Speedy Trial

Anderson contends that, as a result of the conflict involving Nuspl, RSRG failed to represent his interests by failing to contest the complex case finding and filing motions for extension of time, waiving his right to a speedy trial.  Anderson argues that it was in his interest to proceed to trial as quickly as possible so as to limit the impact of cooperation, while it was in Nuspl's interest to delay trial so that he could earn a sentencing benefit.  To establish RSRG was ineffective in the foregoing respect, Anderson must show that contesting the complex case finding and asserting Anderson's right to a speedy trial was a plausible alternative strategy, that the strategy was objectively reasonable under the facts of this case, and that RSRG's failure to pursue that strategy was linked to the actual conflict. *Morelos*, 709 F.3d at 1252.

In a drug conspiracy case involving eleven co-defendants and voluminous discovery, where RSRG represented the alleged leader of the conspiracy, it is highly questionable whether attempting to proceed to trial within the time limits established by the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, would have been a reasonable or plausible strategy.  Indeed, RSRG might

20

have exposed itself to claims of ineffectiveness by failing to request extensions of time.  The Government stated in its motion for a complex case finding that, while the Government was prepared to proceed to trial within the speedy trial timeline, it recognized that "in light of the number of defendants, and the nature of the conspiracy and substantive charges, and the aforementioned voluminous discovery, it is unreasonable to expect the defense to have adequate preparation for pretrial proceedings or for the trial itself within the time limits established by the Speedy Trial Act" and that "[a]dditional time would likely assist defendants and defense counsel in fully reviewing discovery, preparing for evidentiary hearings and trial and/or completing plea negotiations with the Government." [Doc. 150 p. 1-2.]  The undersigned relied upon those reasons, among others, in making a complex case finding.

While applying the *Strickland* standard, *United States v. Morrow*, No. 04CR355-01 (CKK), 2015 WL 1955462 (D.D.C. Apr. 30, 2015) is instructive.  Morrow argued that his counsel was ineffective for failing to raise a violation of his speedy trial rights, namely, that the trial court's complex case designation was improper because it "allowed the government to bolster its case against Morrow by giving the government time to negotiate with codefendants who testified against Morrow." *Id.* at *6.  The court reasoned that counsel had not been ineffective in failing to object to the complex case designation:

> Even assuming *arguendo* that Morrow's counsel did commit an error by not advising of him of his statutory Speedy Trial rights, and that his counsel misrepresented that she had explained his rights to her client and that her client had consented to the designation of the case as complex, Morrow was not prejudiced by this error. The Court tolled the time under the Speedy Trial Act pursuant to 18 U.S.C. §§ 3161(h)(8)(A), (B)(i), (B)(ii) & B(iv) (2004). None of those provisions require the consent of the defendant. Rather, a party or the Court may move for tolling under these provisions, but the Court applying the appropriate legal standard must determine whether such a continuance is permissible. Accordingly, even if Morrow's counsel had objected to the tolling of the time prior to the entry of the Court's findings, it is not reasonably likely that

21

> this objection would have dissuaded the Court from finding that the case was complex and that all parties needed additional time to prepare given that this was a case involving several codefendants alleged to have been involved in a conspiracy that included the armed robbery of six different banks.

*Id*.  The court emphasized that, "While one reason for granting the continuance was to give the prosecution time to prepare because of the complex nature of the case … the continuance also specifically was granted to give the defense time to effectively prepare their case and to avoid a miscarriage of justice." *Id*.

Even assuming that contesting the complex case finding and asserting Anderson's speedy trial rights was a plausible, reasonable alternative strategy, there is no indication in the record that RSRG's failure to do so was linked to some loyalty to their former client, Nuspl.  Neither Fein, who represented Anderson at his arraignment and filed the first motion for extension, nor Johnson, who filed the second motion, had any involvement with RSRG's prior representation of Nuspl in this case.  The undersigned finds that Anderson has suffered no adverse effect with respect to the complex case finding and motions for extension of time.

## B.     Anderson's Detention

Anderson argues that Rosenblum did not effectively attack Nuspl's credibility because he did not question Nuspl about his criminal history at the second detention hearing.  Anderson emphasizes that Rosenblum was faced with the quintessential ethical dilemma driving rules against conflicts based on prior representation: to protect RSRG's former client Nuspl by not disclosing privileged information *or* to zealously advocate for his current client Anderson by doing everything in his power, including using privileged information, to attack Nuspl's credibility.  The undersigned acknowledges the ethical dilemma inherent in Rosenblum cross-examining a cooperating co-defendant who days earlier had been an RSRG client.  By the time he cross-examined Nuspl at the second detention hearing, Rosenblum knew Nuspl was a former

22

RSRG client and Nuspl was *still* an RSRG client on paper.  There is little doubt that Rosenblum violated Missouri Rules of Professional Conduct 4-1.7, 4-1.9, and 4-1.10 governing conflicts of interest[6] and therefore this court's ethical rules.  *See* E.D.Mo. Local Rule 12.02 (adopting the Missouri Rules of Professional Conduct except as otherwise provided in E.D.Mo. Rules of Disciplinary Enforcement).  Rosenblum testified that, before the second detention hearing, he advised Anderson of the conflict and Anderson said he did not want to lose Rosenblum. Rosenblum further testified that it was his impression from Schwartz that Nuspl had no problem with RSRG continuing to represent Anderson.  However, RSRG never obtained a written waiver of the conflict from either Anderson or Nuspl, nor did they discuss a Rule 44 hearing.[7]

But the ethical rules are prophylactic.  An ethical violation does not necessarily mean that the kind of adverse effect demanded by *Cuyler* has come to pass. *See Strickland*, 466 U.S. at 688; *Plunk*, 766 F.3d at 764; *Beasley*, 27 F. Supp. 3d at 816-17.  With regard to prior representation of a prosecution witness, the Eighth Circuit has held:

---

[6] Rule 4-1.7, *Conflict of Interest: Current Clients*, provides that a lawyer shall not represent a client where "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to … a former client" unless "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation" and "each affected client gives informed consent, confirmed in writing." Rule 4-1.9, *Duties to Former Clients*, provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."  Rule 4-1.10, *Imputation of Conflicts of Interest: General Rule*, provides that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 4-1.7 or 4-1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm."

[7] Rosenblum recalled that AUSA Davis made a reference to the conflict on the record at the second detention hearing.  AUSA Davis vaguely recalled raising the conflict with a court but could not recall if it was at one of the detention hearings or at the arraignment.  There is no mention of a conflict in the transcripts of the arraignment or detention hearings.

> The mere fact that a trial lawyer had previously represented a prosecution witness does not entitle a defendant to relief. *Simmons,* 915 F.2d at 378. The defendant must show that this successive representation had some actual and demonstrable adverse effect on the case, not merely an abstract or theoretical one. *Id.* An example may be where counsel's cross-examination of a former client is impeded for fear of misusing confidential information. *Agosto,* 675 F.2d at 971.

*United States v. Flynn*, 87 F.3d 996, 1001 (8th Cir. 1996).  "In determining whether a conflict of interest exists, substantial weight is given to defense counsel's representations." *Id.*  Anderson must show that cross-examining Nuspl on his criminal history to attack his credibility was a plausible alternative strategy, that the strategy was objectively reasonable under the facts of this case, and that Rosenblum's failure to pursue that strategy was linked to the actual conflict. *Morelos*, 709 F.3d at 1252.

In evaluating traditional ineffective assistance of counsel claims under *Strickland*, the Eighth Circuit has cautioned against second guessing cross-examination strategy.  "The cross-examination of a witness is a delicate task; what works for one lawyer may not be successful for another. Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997).  "In hindsight, there are a few, if any, cross-examinations that could not be improved upon. If that were the standard of constitutional effectiveness, few would be the counsel whose performance would past muster." *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996).  Courts will not credit theories of cross-examination prejudice that are "merely speculative," such as "generally averring if [counsel] had pursued additional lines of questioning with each of the government's witnesses, it was possible those witnesses would have responded in such a way as to lessen their credibility" or asserting that "the jury would have discredited the

testimony of [a witness] had it learned he had been granted absolute immunity instead of a less advantageous plea deal." *Morelos*, 709 F.3d at 1250.

Most claims of ineffective cross-examination involve trial counsel who presumably have had time to vet witnesses and consider strategy.  In this case, Rosenblum found out that Nuspl would be testifying the day before the second detention hearing.  He received some discovery the day of the hearing, but he did not have a copy of Nuspl's criminal history.  These circumstances cast serious doubt on whether it would have been plausible for Rosenblum to cross-examine Nuspl on his criminal history at the second detention hearing.

Assuming that cross-examining Nuspl on his criminal history was a plausible, reasonable alternative strategy, there is no indication in the record that Rosenblum failed to do so out of loyalty to RSRG's former client Nuspl.  The fact that Rosenblum knew Nuspl was a former RSRG client when he cross-examined him is relevant for the purposes of the ethical rules, but the *Cuyler* inquiry requires more—it requires "some actual and demonstrable adverse effect" linked to a conflict. *Flynn*, 87 F.3d at 1001.  Rosenblum testified that he met Nuspl for the first time at the second detention hearing and that until then, he had had no idea the nature of Schwartz's contact with Nuspl.  Rosenblum further testified that until around the time of the second detention hearing, he was not aware of the July 15, 2014 proffer interview where Schwartz represented Nuspl.  For his part, Schwartz testified that he did not know who Anderson was when he began representing Nuspl and that he had not actually seen Anderson in person until the evidentiary hearing.  Schwartz was not present at any of the detention hearings.  Thus, while Rosenblum knew Nuspl was a former RSRG client, it appears that was all he knew. Beyond instructing Schwartz to withdraw, there is no evidence that Rosenblum had any

knowledge of or involvement in Nuspl's representation that might have adversely affected his representation of Anderson.

At the second detention hearing, AUSA Davis and Rosenblum both focused their efforts on Hughes. Nuspl's testimony began at 5:00 p.m. and could not have lasted more than fifteen or twenty minutes. The timing certainly would have put pressure on Rosenblum to be quick. Rosenblum testified that his cross-examination was focused on "the remoteness in time of [Nuspl] seeing a gun in a gym bag and how it was not related to drug dealing or large sums of money or things of that nature, specifically that it was just so remote in time in 2011 that it shouldn't have anything to do with a danger to the community in 2014." (Evidentiary Hearing Tr. Vol. II p. 60-61.) His cross-examination also brought out that Anderson had never directly threatened Nuspl and that Nuspl had never felt the need to report any concern for his safety. Rosenblum did not harp on Nuspl's cooperation because he felt the Government had already established it. At the hearing before Judge Fleissig, RSRG attempted to undermine Nuspl's testimony regarding Rachel's text by cross-examining Nuspl on Rachel's side of the story and proffering her testimony.

The proposition that Rosenblum's cross-examination was adversely affected by his loyalties to Nuspl because he chose to pursue one line of cross-examination as opposed to another is too theoretical to establish ineffective assistance. *Mickens*, 535 U.S. at 171; *Flynn*, 87 F.3d at 1001. Rosenblum testified that he handled the second detention hearing just as he would any other. Transcripts from all three detention hearings suggest that Rosenblum and Fein engaged in zealous representation in an uphill battle to gain release for Anderson, the alleged leader of an extensive drug conspiracy. While it is true that Rosenblum could have obtained and brought out Nuspl's criminal history at the hearing before Judge Fleissig, it is unclear whether

26

that strategy would have impacted how Judge Fleissig viewed his testimony about the indirect threat and the text. Moreover, such a strategy certainly would not have impacted her ultimate decision. Judge Fleissig found no shortage of reasons to sustain Judge Mensah's detention order, including her finding that Anderson was a flight risk. With no evidence to show Rosenblum was otherwise "soft" on Nuspl, speculation as to an alternative strategy he could have adopted does not establish ineffective assistance of counsel. The undersigned finds that Rosenblum's cross-examination of Nuspl was not adversely affected by RSRG's prior representation of Nuspl.

### C.    Last Man Standing

Anderson contends that he did not have the opportunity to proffer and potentially earn a sentencing benefit because RSRG did not effectively advise him. Anderson primarily argues that RSRG itself had a conflict in advising Anderson to reject proffer terms that would have required him to proffer against Johnson as a result of the cell phone incident. Anderson also argues that RSRG could not effectively advise him whether to accept a plea because, if he proceeded to trial, RSRG would again be faced with the ethical dilemma of cross-examining Nuspl, as well as CS #1. The Government counters that RSRG effectively represented Anderson's interests in plea negotiations and that it has always been opposed to any sentence less than the ten-year mandatory minimum.

Anderson cannot show that RSRG failed to pursue a plausible, reasonable alternative strategy with regard to plea negotiations, and certainly not that any such failure was linked to a conflict. *Morelos*, 709 F.3d at 1252. With the advice of RSRG, Anderson wisely declined to participate in the no-holds-barred proffer proposed by the Government and, despite RSRG's best efforts, no alternative terms were ever on the table. The record here demonstrates that the Government was never willing to accept more favorable proffer terms or anything less than the

27

ten-year mandatory minimum.  AUSA Davis testified that, in all the Government's negotiations

with Anderson in this case, he has always made clear that the Government would not go below

the ten-year mandatory minimum.   Rosenblum testified that AUSA Davis told him, with or

without cooperation, there was no way Anderson was receiving less than ten years.  The Eighth

Circuit's decision in *Plunk v. Hobbs* is on point:

> A conflict of interest may adversely affect counsel's representation when it
> prevents an attorney from exploring potential plea opportunities, but only when a
> lesser charge or a favorable sentencing recommendation would be acceptable to
> the prosecution. If the prosecutor would not have been receptive to a more
> favorable plea bargain, then there is no basis to conclude that any conflict of
> interest harmed the lawyer's advocacy.

766 F.3d at 765 (internal quotations omitted).  The undersigned further notes this is far from the

situation in *Frye* and *Lafler* where counsel failed to communicate a plea offer, or *Padilla*[8] where

counsel failed to advise a defendant he could be deported.

Even assuming that RSRG Attorney Johnson committed a crime by bringing the cell

phone to Anderson,[9] there is no indication that his misconduct played any role in RSRG's plea

negotiations.  AUSA Davis testified that the Government would not have been interested in that

information.  His November 26, 2014 email made clear that, in order to potentially earn a

sentencing benefit, Anderson would be expected to "testify up," in other words, provide

---

[8] *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).  In *Padilla*, the
Supreme Court found that counsel was ineffective in failing to advise the defendant that his plea
of guilty made him subject to automatic deportation.

[9] There was signage in the jail banning cell phones and cameras. (Ex. P.)  Under Missouri law,
"[a] person commits the offense of possession of unlawful items in a prison or jail if such person
knowingly delivers, attempts to deliver, possesses, deposits, or conceals in or about the premises
of any correctional center … or any city, county, or private jail [a]ny article or item of personal
property which a prisoner is prohibited by law, by rule made pursuant to section 221.060, or by
regulation of the department of corrections from receiving or possessing." Mo. Rev. Stat. §
221.111.  An individual who, "in violation of a statute or a rule or order issued under a statute,
provides to an inmate of a prison a prohibited object, or attempts to do so," violates federal law.
18 U.S.C. § 1791(a)(1).  A "prohibited object" includes "a phone or other device used by a user
of commercial mobile service … in connection with such service." 18 U.S.C. § 1791(d)(1)(F).

information about bigger fish than himself. (Ex. J.)  Attorney misconduct alone does not render counsel ineffective. *Strickland*, 466 U.S. at 688; *Plunk*, 766 F.3d at 764; *Beasley*, 27 F. Supp. 3d at 816-17.  The undersigned finds that RSRG's plea negotiations were not adversely affected by conflicts of interest or Johnson's misconduct.

## III.    Dismissal of the Indictment

Anderson moves to dismiss the indictment based on the denial of his Sixth Amendment right to effective assistance of counsel and corresponding government misconduct.  The due process clause of the Fifth Amendment provides, "no person shall … be deprived of life, liberty, or property without due process of the law." U.S. Const. amend. V.  Pursuant to the due process clause and its supervisory power, a district court may dismiss an indictment when the government has committed "outrageous" misconduct. *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991) (citing *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 1643, 36 L. Ed. 2d 366 (1973)).  "The level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." *United States v. Pardue*, 983 F.2d 843, 847 (8th Cir. 1993) (internal quotations omitted).  Dismissal on due process grounds "is reserved for conduct that falls within that narrow band of the most intolerable government conduct." *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003) (internal quotations omitted).

Anderson argues that the Government committed misconduct by: (1) disclosing sealed pleadings, namely, the motion for inquiry and addendum, to Rosenblum before the evidentiary hearing; (2) extending a plea offer requiring waiver of the claims set forth in Anderson's motion to dismiss; and (3) taking no action with regard to RSRG's simultaneous representation of Anderson and Nuspl.  The undersigned will address each point in turn.

### A.      Disclosure of Sealed Documents

The Government's motion for inquiry and Anderson's addendum to it were filed under seal. [Doc. 303, Doc. 314.]   The documents contained the identity of CS #1 along with allegations of unethical and criminal conduct on the part of RSRG attorneys.   Rosenblum received copies of both documents before the evidentiary hearing.   Anderson argues that, in disclosing sealed documents to a material witness, the Government deprived him of a fair hearing.   The undersigned finds that the Government did not commit misconduct.   It was reasonable for the Government to investigate an alleged conflict by disclosing the same and for the RSRG attorneys to receive notice of alleged ethical and criminal misconduct. *See* E.D.Mo. Rule of Disciplinary Enforcement VI (requiring notice before attorney is sanctioned for misconduct).   Moreover, while the documents were filed under seal, there was no sealing order in place and, to the knowledge of undersigned, no rule requiring that they be filed under seal. Finally, the certificate of service shows that the motion for inquiry was served on Rosenblum, but Anderson failed to object until post-hearing briefing.

### B.      Plea Offer Requiring Waiver of Claims

On May 15, 2015, AUSA Davis sent an email to Capes Sokol extending a plea offer of ten years, the statutory mandatory minimum.   The offer was set to expire before the evidentiary hearing.   The email stated that "[t]he plea agreement will also contain a detailed appellate waiver of matters you wish to contest in your motion to dismiss including ineffective assistance of counsel." [Doc. 405-1.]   Capes Sokol responded that such waivers are unethical and violate Department of Justice policy.   Denying any wrongdoing, AUSA Jim Delworth replied that the Government would extend the deadline to "a week after these issues have been adjudicated." [Doc. 405-5.]   Anderson argues that the Government's unethical inclusion of the waiver in its

plea offer underscores the Government's misconduct in this case.  The Government counters that such waivers are permitted, Anderson has had the opportunity to fully litigate his claims, and the traditional concerns motivating ethical prohibitions on waivers of ineffective assistance of counsel are not present here since Anderson has new counsel to advise him.

As a threshold matter, the undersigned notes that Anderson had knowledge of this issue at the time of the evidentiary hearing and should have raised it at that time.  However, the emails are self-explanatory and the Government does not dispute their veracity, so the undersigned will address the issue.  Waivers of collateral claims are enforceable, unless they go to claims that a sentence was illegal or imposed in violation of the plea agreement, or that the decision to enter into a plea agreement was not knowing or voluntary, including as a result of ineffective assistance of counsel. *DeRoo v. United States*, 223 F.3d 919, 923 (8th Cir. 2000); *Watson v. United States*, 682 F.3d 740, 743-44 (8th Cir. 2012).  But enforceable does not mean ethical or advisable.   Anderson cites the following opinion of the of the Missouri Supreme Court's Advisory Committee finding it unethical for prosecutors to seek waivers of ineffective assistance of counsel and prosecutorial misconduct:

> We have been asked whether it is permissible for defense counsel in a criminal case to advise the defendant regarding waiver of the right to seek post-conviction relief under Rule 24.035, including claims of ineffective assistance by defense counsel. We understand that some prosecuting attorneys have expressed intent to require such a waiver as part of a plea agreement.
>
> It is not permissible for defense counsel to advise the defendant regarding waiver of claims of ineffective assistance of counsel by defense counsel. Providing such advice would violate Rule 4-1.7(a)(2) because there is a significant risk that the representation of the client would be materially limited by the personal interest of defense counsel. Defense counsel is not a party to the post-conviction relief proceeding but defense counsel certainly has a personal interest related to the potential for a claim that defense counsel provided ineffective assistance to the defendant. It is not reasonable to believe that defense counsel will be able to provide competent and diligent representation to the defendant regarding the

31

effectiveness of defense counsel's representation of the defendant. Therefore, under Rule 4-1.7(b)(1), this conflict is not waivable.

We have also been asked whether it is permissible for a prosecuting attorney to require waiver of all rights under Rule 24.035 when entering into a plea agreement. We believe that it is inconsistent with the prosecutor's duties as a minister of justice and the duty to refrain from conduct prejudicial to the administration of justice for a prosecutor to seek a waiver of post-conviction rights based on ineffective assistance of counsel or prosecutorial misconduct. See, Rules 4-3.8 and 8.4(d).

We note that at least three other states have issued opinions consistent with our view.

We do not believe the Rules of Professional Conduct prohibit a defense counsel and prosecutor from entering into a plea agreement that involves waiver of other post-conviction rights, unless such a waiver violates the Constitution or other laws. Analysis of whether it would violate the Constitution or other laws is beyond the scope of this opinion.

Advisory Committee of the Supreme Court of Missouri, Formal Opinion 126, *Waiver of Post-Conviction Relief* (May 19, 2009). Anderson also cites a recent Department of Justice policy memorandum that states: "While the Department is confident that a waiver of a claim of ineffective assistance of counsel is both legal and ethical," "[f]ederal prosecutors should no longer seek in plea agreements to have a defendant waive claims of ineffective assistance of counsel whether those claims are made on collateral attack or … direct appeal." Deputy Attorney General James M. Cole, Memorandum for All Federal Prosecutors, *Department Policy on Waivers of Claims of Ineffective Assistance of Counsel* (October 14, 2014).

It seems clear that neither the Advisory Committee nor the DOJ contemplated the unique situation presented by this case where Anderson has had the opportunity to fully litigate his ineffectiveness and prosecutorial misconduct claims with new counsel, who could ethically

advise him on waiver of those claims.[10]   Nevertheless, the Advisory Committee issued a broad prohibition on prosecutors seeking such waivers and AUSA Davis' plea offer could reasonably be interpreted to violate that prohibition.  The DOJ policy likewise suggests a broad directive not to seek ineffectiveness waivers, though it is not binding as to Anderson. *United States v. Lee*, 274 F.3d 485, 492-93 (8th Cir. 2001).  A recent review of the boilerplate plea agreement from this district shows that prosecutors exclude ineffectiveness and prosecutorial misconduct claims from waivers of collateral claims. Appendix H, Susan R. Klein, Aleza S. Remis, Donna Lee Elm, *Waiving the Criminal Justice System: An Empirical and Constitutional Analysis*, 52 Am. Crim. L. Rev. 73 (2015).  While the waiver sought by AUSA Davis is undoubtedly enforceable and ethical insofar as Capes Sokol could competently advise Anderson on it, Davis may have run afoul of the Missouri Rules of Professional Conduct and therefore this court's ethical rules in seeking the waiver. *See* E.D.Mo. Local Rule 12.02 (adopting the Missouri Rules of Professional Conduct except as otherwise provided in E.D.Mo. Rules of Disciplinary Enforcement).  However, even assuming that AUSA Davis violated the Missouri Rules of Professional Conduct, the undersigned finds that the violation does not rise to the level of "outrageous" government

---

[10] The undersigned notes, however, that at the time of the initial offer, Anderson had <u>not</u> had the opportunity to fully litigate his claims.  Absent the extension, this case presents some of the traditional concerns regarding ineffectiveness and procedural misconduct waivers.  While Capes Sokol could have advised Anderson with the benefit of some discovery, they did not know how the RSRG attorneys or AUSA Davis would testify and therefore did not know the true veracity of Anderson's ineffectiveness and procedural misconduct claims. *See* Susan R. Klein, Aleza S. Remis, Donna Lee Elm, *Waiving the Criminal Justice System: An Empirical and Constitutional Analysis*, 52 Am. Crim. L. Rev. 73, 93 (2015) ("A defendant cannot accurately predict what claims she is waiving. Aside from ethical concerns, this definitional fact that a defendant cannot know what evidence she is not yet aware of makes waiving collateral attacks problematic."); *see also id.* at 94 ("[P]rosecutors have vested interests in protecting their reputations and jobs, as well as avoiding bar complaints, when they ask defendants to waive claims of prosecutorial misconduct.")

conduct that "shocks the conscience" and justifies dismissal of the indictment. *King*, 351 F.3d at 867; *Pardue*, 983 F.2d at 847; *Restrepo*, 930 F.2d at 712.

###### C.     No Action on RSRG's Concurrent Representation

There is no dispute that all parties, including the Government, took action shortly after Anderson was indicted by having Schwartz withdraw as Nuspl's attorney.  Anderson argues, however, that the Government committed misconduct by breaching its duty to take action with regard to RSRG's concurrent pre-indictment representation of Nuspl and Anderson.  The undersigned agrees that, at least by the time of the July 15, 2014 proffer interview, it should have been apparent to AUSA Davis that Nuspl and Anderson could not be represented by the same firm.  Schwartz recalled AUSA Davis raising the conflict at that time but AUSA Davis had no specific memory of it.  Regardless of whether AUSA Davis believed Rosenblum and Schwartz to be technically "representing" Anderson and Nuspl, he had been communicating with Rosenblum about Anderson since the end of 2012 and was sitting across from Schwartz and Nuspl at a proffer interview.  Moreover, AUSA Davis may not have known who he would indict, but there is little doubt that he intended to indict Anderson at that point and he was certainly considering indicting Nuspl.  And yet, AUSA Davis allowed Nuspl to sit across from him, knowing him to be represented by the same firm as Anderson, and cooperate against Anderson.  As Schwartz and Rosenblum testified, the Government is often in the best position to evaluate whether there is a conflict of interest.  That was certainly true in this case.  Nevertheless, Anderson has not cited and the undersigned has not found any authority for (1) a pre-indictment duty to inform the court of a potential conflict of interest and (2) that a breach of any such duty warrants dismissal of the indictment. *United States v. Beasley*, 27 F. Supp. 3d 793, 807 (E.D. Mich. 2014); *cf. United States v. Levy*, 577 F.2d 200 (3d Cir. 1978) (dismissing indictment in case involving conflict

known to government agents where co-defendant was represented by same attorney as defendant, was secretly serving as an informant, and disclosed defendant's defense strategy and therefore dismissal was only appropriate remedy).

## IV.    Conclusion

This case presents some troubling ethical issues.  AUSA Davis could have instructed Nuspl to obtain new counsel at the proffer interview a month before indictment.  RSRG Attorney Rosenblum could have withdrawn from the case or requested a formal hearing once he realized he would be cross-examining a cooperating co-defendant and former RSRG client. Nevertheless, there is nothing in the record before the undersigned that warrants dismissal of the indictment.  For the foregoing reasons, the undersigned recommends that Anderson's motion to dismiss be denied.

**ACCORDINGLY,**

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Dismiss for Irreparable Denial of Defendant's Constitutional Right to Effective Assistance of Counsel [Doc. #315] should be **DENIED.**

The parties are advised that they have fourteen (14) days in which to filed written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1).  Failure to timely file objections may result in a waiver of the right to appeal questions of fact.

Dated this 28th day of September, 2015.


_____/s/ Nannette A. Baker_____
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE