1                  UNITED STATES DISTRICT COURT FOR THE
     EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION, ST. LOUIS
2

3    UNITED STATES OF AMERICA,        )
                                      )
4                    Plaintiff,       )
                                      )
5    v.                               )    No. 4:14CR246-AGF
                                      )
6    THOMAS GREGORY ANDERSON, JR.     )
                                      )
7                    Defendant.       )

8

9                      PRETRIAL CONFERENCE

10                          VOLUME 1

11         BEFORE THE HONORABLE AUDREY G. FLEISSIG
                 UNITED STATES DISTRICT JUDGE
12

13                        JULY 20, 2017

14   APPEARANCES:

15   For Plaintiff:       John T Davis
                          Stephen R. Casey
16                        Sirena Wissler
                          OFFICE OF U.S. ATTORNEY
17                        111 S. Tenth St.
                          St. Louis, MO 63102
18
     For Defendant:       William S. Margulis
19                        Justin K. Gelfand
                          CAPES AND SOKOL
20                        7701 Forsyth Blvd., 12th Floor
                          Clayton, MO 63105
21
     REPORTED BY:         PATTI DUNN WECKE, RMR, CRR, CMRS
22                        Official Court Reporter
                          United States District Court
23                        111 S. Tenth Street
                          St. Louis, MO 63102
24                        314-244-7984

25     PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

1

2              (THE FOLLOWING PROCEEDINGS WERE HAD ON JULY 20,

3    2017, AT APPROXIMATELY 12:40 P.M. IN OPEN COURT, WITH

4    DEFENDANT PRESENT:)

5              THE COURT:  Good afternoon we are here in the

6    matter of United States v. Thomas Gregory Anderson, Jr.  It

7    is case number 4:14CR246-AGF.  The United States is

8    represented by Assistant United States Attorneys Stephen

9    Casey, John Davis, and Sirena Wissler.  And Mr. Anderson is

10   present and represented by his attorneys Mr.

11   William Margulis and Mr. Justin Gelfand.  And this matter

12   is scheduled before the Court today for a final pretrial

13   conference in connection with the jury trial that is

14   scheduled to proceed in this matter on Monday morning.  Are

15   the parties ready to proceed.

16             MR. CASEY:  Yes, Judge.

17             MR. GELFAND:  Yes, Your Honor.

18             THE COURT:  I'm aware that there are quite a few

19   motions and other matters that have been filed.  We will be

20   taking those up.  We're kind of going to go through

21   housekeeping type matters first, and then we will get to

22   the motions in limine, and then we will also make a record

23   of any further plea offers that have been made or are not

24   available at this time.

25             Is there anything else that we need to take up

1    that isn't on the housekeeping, motion in limine, Frye

2    hearing list before we get started?

3            MR. MARGULIS:  Your Honor, we had a few items

4    that we can take up.  I was thinking after we did the

5    motions in limine, but whatever the Court wants to do.  It

6    was just some discovery issues that we, I think, have

7    resolved all the discovery issues with the Government as of

8    now.  We just want to make a formal record of a few of

9    those items at some point.

10           THE COURT:  If you want to just do that right

11   now, you are welcome to, would that be easier?

12           MR. MARGULIS:  As the Court knows, there's been a

13   lot of discovery issues in this case, and as I said I think

14   they've all been resolved, but we just wanted to put some

15   of these formally on the record just to make sure that

16   we're all on the same page.

17           Some of the conversations we've had with the

18   Government, throughout the -- some of the plea agreements

19   of other codefendants and others that we have reviewed, and

20   some of the other reports and discovery items that we've

21   reviewed in this case have consistently made references to

22   other agencies being involved in the investigation, such as

23   the IRS criminal investigation division, the Secret Service

24   and even I think some of the plea agreements referenced the

25   Postal Inspectors being involved in the investigation.  And

1    we have requested any documents, reports, discovery from

2    any of those agencies that have been referenced and we have

3    been assured by the Government that they have done their

4    due diligence and have not come across any reports from the

5    Secret Service, or any of those other agencies.  And I know

6    that Secret Service agents that will come up in the motions

7    in limine, because there is a disputed motion that revolves

8    around an issue with the Secret Service's involvement in

9    this case.  But I just wanted to note on the record that we

10   have requested reports from any of those other agencies,

11   and have been assured that there are not any.  So, I just

12   wanted to put that on the record.  I assume that's still

13   the case.

14            MR. CASEY:  Yes, it is.

15            MR. DAVIS:  John Davis on behalf of the United

16   States, Your Honor.  I've been asked repeatedly by defense

17   counsel if there are Secret Service or IRS records/reports.

18   I have looked repeatedly and I have answered in the

19   negative every time.  I'm not aware of any secret service

20   or IRS reports.  Are those agencies referred to as Mr.

21   Margulis suggests?  Yes.  And DEA sometimes need manpower

22   from secret service, sometimes from IRS, and so it is a mix

23   of agents involved, but they did not write any reports.

24            THE COURT:  And I think the other agency noted

25   was Postal, is that the same with respect to Postal?

1          MR. DAVIS:  Yes.

2          THE COURT:  Anything further, Mr. Margulis, with

3    respect to discovery?

4          MR. MARGULIS:  Yes, Your Honor, there's about

5    three or four more issues I just want to make a record of

6    at this point.  We've also been provided with precision

7    location information warrants Title IIIs on some phone

8    numbers in this case, and I think at one point we requested

9    if there were any of those items related to, and I think we

10   weren't sure if it was an area code that was 408 or 480.  I

11   think Mr. Davis is the one that we corresponded with.  So,

12   I just wanted to put on the record that I think -- and he

13   did send us an email responding that I believe there were

14   no such items as far as he is aware of pertaining to a

15   number with that area code.

16         MR. DAVIS:  I got an email from defense counsel

17   asking and I can't remember if it was area code 408 or 480,

18   but I looked regardless using the number they provided.  I

19   found one with the number transposed.  If they asked for

20   480, I found 408 and there was no such order.  It is at

21   this point infamous phone that was smuggled into the jail

22   and there was no PLI or GPS on that phone.  That is to say

23   if it was actually just a typo, the 408 versus the 480.

24         THE COURT:  I'm just trying to understand,

25   Mr. Margulis, are you asking whether that was any PLI order

1    on the phone that was taken into the jail and given to the

2    defendant to use?

3            MR. MARGULIS:  Right.  We're on the same page as

4    far as which phone and that is correct.  That's what we

5    were asking, and I think it has been confirmed there is

6    not.

7            MR. DAVIS:  Your Honor, I could proffer to the

8    Court from listening to jail calls, Mr. Anderson is

9    convinced when that phone left the jail, counsel,

10   Mr. Johnson, brought it to me.  That did not happen nor was

11   there a GPS on it that they can later find out and track

12   it.

13           THE COURT:  So, talking about the telephone that

14   was brought in at Mr. Anderson's request and given to him

15   to use, that he then used and gave back to counsel, the

16   question is whether there was any PLI or GPS order on that

17   phone?

18           MR. MARGULIS:  That's correct, Your Honor.

19           THE COURT:  Is that what you have requested and

20   Mr. Davis have you checked to determine whether there was

21   any PLI or GPS on that phone?

22           MR. DAVIS:  I have and there was not.

23           THE COURT:  Anything further with respect to

24   that phone?

25           MR. MARGULIS:  No, Your Honor.  That covers that.

1           THE COURT:  All right.  What's your next matter.

2           MR. MARGULIS:  The next issue is that we

3    requested as well from the Government, to try to determine

4    if there were any self-sight simulator-type devices also

5    known as String Ray's Trigger Fish, and a variety of other

6    names, that were involved in this investigation regarding

7    Mr. Anderson or related investigations to this case, and we

8    again have been assured by the Government that there was

9    not.  So, I wanted to put that on the record as well.

10          MR. DAVIS:  There were no Trigger Fish on any

11   phone associated with Thomas Anderson or any other name

12   that device goes by.

13          MR. MARGULIS:  Does that include all phones

14   associated with the investigation or just Mr. Anderson's

15   phone?

16          MR. DAVIS:  The request was for Mr. Anderson's

17   phone, to which they would have standing.  There's no such

18   device used on an Anderson phone.

19          THE COURT:  Is that the request that you made,

20   Mr. Margulis?

21          MR. MARGULIS:  I believe that was the request

22   that we made specifically with regard to Mr. Anderson's

23   phone.

24          THE COURT:  So you have received an answer to the

25   request that you made?

1          MR. MARGULIS:  Yes.

2          THE COURT:  What is your next matter?

3          MR. MARGULIS:  As part of Jencks material we

4   wanted to inquire as to whether there were any text

5   messages, emails that pertain to Mr. Anderson or the

6   investigation between Agent Moles or any other cooperating

7   witnesses that would be relevant to Mr. Anderson's defense

8   possibly?

9          MR. DAVIS:  No.

10          THE COURT:  All right.  What's next?  I assume

11   we're not going to go down twenty things that you have

12   requested to determine whether the Government has provided

13   those are not?

14          MR. MARGULIS:  We're not, Your Honor.  I have

15   about one more item.  Mr. Davis, I think we requested if

16   there were any statements from a guy named Paul Holland and

17   I think you determined that there were not.

18          MR. DAVIS:  Again my answer was no.

19          THE COURT:  And who was this person again?  Paul

20   Holland?

21          MR. MARGULIS:  Yes.

22          THE COURT:  Okay.  And the request was with

23   respect to any statements made by Paul Holland?

24          MR. MARGULIS:  Right, in possession of the

25   Government.

1          THE COURT:  And let me ask you, Mr. Margulis, do

2   you have some reason to believe that any of these items

3   exist and that there's something different than what you

4   are -- than what is being represented to you, because if so

5   I want to hear it now.

6          MR. MARGULIS:  No, Your Honor.

7          THE COURT:  We will not play this "I have it, but

8   I'm not telling you and I'm going to wait."

9          MR. MARGULIS:  I don't have any of these items to

10  answer your question.  I'm simply making a record that I

11  requested these items.

12         THE COURT:  And I just want to make sure that as

13  you stand here today, defense counsel has no knowledge that

14  these items do in fact exist, that you in fact have no

15  knowledge contrary to what is being stated by the

16  Government, because if so I want to know it now.

17         MR. MARGULIS:  Out of all the items I have raised

18  this afternoon before the Court, as an officer of the

19  court, I will represent to the Court that I have no

20  knowledge of any of these items existing.

21         THE COURT:  Good, thank you.

22         MR. MARGULIS:  And I do not have any possession

23  of any of these items either.  I believe that's it, Your

24  Honor   There are a couple issues that I know are related

25  to Agent Jenne in the 2E regulations and the agents that

1   will probably be--

2            THE COURT:  When we talk about the witnesses we

3   can talk about any other little whiskers and subissues that

4   may exist.

5            MR. MARGULIS:  Thank you and thanks for your

6   patience.

7            THE COURT:  Good.  Now, let me just ask, we will

8   of course get back to doing a -- making a Frye record

9   later, but let me just ask, are the parties engaged in any

10  settlement discussions at this time?  Is there any prospect

11  that we are not going forward to trial on Monday?

12           MR. MARGULIS:  The answer is, no, Your Honor.

13  There is no prospect that we are not going to proceed to

14  trial on Monday.

15           THE COURT:  All right.  So, I know we had some

16  preliminary discussions about this previously, but now that

17  you all have done a little bit more to get ready for trial,

18  what is your best estimate of how long this case will take

19  to try?

20           MR. CASEY:  I'll speak to that.  We plotted out

21  the witnesses that we have and we believe that will end

22  approximately 10 days.  I think the date is Thursday,

23  August 3rd on our calendar.

24           THE COURT:  And that's doing both parties cases?

25           MR. CASEY:  No, that's the Government's case,

1    Judge.

2              THE COURT:  The Government's case is going to

3    take 10 days?

4              MR. CASEY:  We have quite a number of witnesses,

5    yes, ma'am.

6              THE COURT:  Oh, my.  That's the first I've heard

7    10 days.  I thought we were at like seven days previously.

8              MR. DAVIS:  It was originally my estimation it

9    was seven days.  Since then at least two witnesses have

10   been added, a Noelle Trudeau from Boston and Nickolos

11   Grasso from here in St. Louis.  There's extensive travel

12   plans from around the country, northern California,

13   Phoenix, and as this Court is well aware, choreography is

14   hard to guesstimate, but with the addition of those

15   witnesses and my prep of those witnesses recently, I think

16   there's witnesses that may take an entire day.

17             THE COURT:  Now, the prescreening that was done

18   by the clerk's office, was that just for two weeks?

19             THE CLERK:  I'll have to check with Chris.  I

20   think maybe two and a half weeks.

21             THE COURT:  How long does the defendant

22   anticipate for its case?

23             MR. MARGULIS:  No more than one to two days, Your

24   Honor.

25             THE COURT:  Well, hopefully, as I advised you all

1   by email quite some weeks ago, it was my intent unless

2   somebody had some problem with it to go ahead and prescreen

3   jurors, just with respect to the time period since we're

4   talking about, you know, late July and August when lots of

5   people are taking vacation.  At that time, I thought we

6   were talking about less than two weeks.  I am hopeful that

7   I told the clerk's office to screen for a little bit more

8   than that, but if I did not, and we will check on it, it's

9   possible that our jurors were only screened for two weeks.

10  The prescreen was through August 9, so I think we're

11  okay.

12          MR. MARGULIS:  But you're not encouraging us to

13  go there.

14          THE COURT:  No, I am discouraging from going that

15  long, but we prescreened through August 9.  So, we should

16  be okay on the folks that we have pulled in.  All right.

17  So, right now, best guess, we're probably talking 11 to 12

18  days by the time we submit the case to them, and give the

19  jurors time for deliberations, right?

20          MR. CASEY:  Yes, Judge.

21          MR. MARGULIS:  Right.

22          THE COURT:  So, I would anticipate telling the

23  jurors we anticipate that the trial will last approximately

24  two and a half, but no more than three weeks.  Is that a

25  fair estimate to give them?

1          MR. CASEY:  Absolutely Judge.

2          MR. MARGULIS:  Yes.

3          THE COURT:  Great.  Okay.  And normally what I

4    like to do is get you all here at 8:30, bring the jurors in

5    at 9:00 put in a nice long trial day.  I generally try to

6    give them an hour and a half for lunch the first day or two

7    so that they can find their way around.  I just want to

8    warn you, I think I have 17 criminal cases on my docket,

9    August 7th, so I still have a lot of pleas to get in.  I

10   will likely be doing other criminal matters over every

11   lunch hour.  So, we are probably going to need a little bit

12   longer than an hour for lunch most days.

13          And then I would plan to end at 5:00 with the

14   jurors, maybe a little bit before five, let the jurors get

15   out before rush hour.  If we're moving along at a good clip

16   and we're moving along more quickly than you all

17   anticipate, then what I would like to do is start letting

18   the jurors leave at 4:00 or 4:30 so that we can attend to

19   any other matters that we need to at the end of the day,

20   start working on jury instructions, things of that sort,

21   but that will be a function of how quickly we are moving

22   along as we go along.

23          Looking at those time frames, are there any

24   particular needs that we need to make -- that we need to

25   accommodate for any of you?  Are there any particular times

1    when you need to break a little bit early or come a little

2    late, or somebody, you know, have any medication or other

3    needs that we need to factor into our daily time schedule?

4          MR. MARGULIS:  Not on behalf of the defense that

5    I'm aware of at this time, Your Honor.

6          MR. CASEY:  Nothing on behalf of the Government,

7    Judge.

8          THE COURT:  So, I'm assuming that at this point

9    all the motions in limine have been filed?

10          MR. MARGULIS:  Correct.

11          MR. CASEY:  Yes, ma'am.

12          THE COURT:  I know that there's been a further

13    filing with respect to the expert witnesses.  I had also

14    entered an order with respect to 404(b) evidence, and I am

15    aware of the issue that exists in the motions in limine

16    with respect to the 2008 address, but I just wanted to make

17    sure that I did not see any filing of 404(b) by the

18    Government; is there anything that the Government is

19    seeking to introduce in its case in chief that it believes

20    come in under 404(b)?

21          MR. CASEY:  No, Judge, just for the record,

22    beyond what we've filed.

23          THE COURT:  I realize we have a question with

24    respect to the 2008 address.  So, a couple of things that

25    I'm going to need from you, and it's possible that you all

1   filed it and that I just missed it, but I do need a summary

2   of the case to read to the jurors in voir dire, and usually

3   we try to keep it short and sweet and generic and so we are

4   basically saying, you know, what the case is about, what

5   the defendant has been charged with and normally we end

6   with the defendant has pleaded not guilty.        So, if I

7   could get you all to work on that, please, and provide that

8   to me by about 3:00 on Friday, that would be great.  If for

9   any reason you are unable to agree on that, that's why I

10  want it by 3:00, so that I can draft my own, and if we are

11  -- if you are unable to agree then I will draft it myself,

12  and then I will present it to you to review on Monday

13  morning before we get started.

14          Now, it is my hope that we would be rereading

15  that same summary in the introductory jury instructions as

16  opposed to reading the entire indictment; is that

17  acceptable to everyone?

18          MR. CASEY:  Yes, Your Honor.

19          THE COURT:  All right.  Good.  The other thing

20  that I need is I need to get from you not only a list of

21  any witnesses that you anticipate may be called at trial,

22  but a list of names that may figure prominently in the

23  trial.  So, we want to make sure that if somebody's name is

24  going to start coming up in any substantive way during the

25  trial, we need to list those folks because we want to

1    provide all of those names in voir dire, and hopefully we

2    will get the jurors to focus on that.  And it won't be like

3    one of my jury trials when we read that whole list and

4    selected our jury and got going and after opening statement

5    one of our jurors said, you know, I think I know that guy

6    that they just talked about in opening statement.

7              So, that's what we're trying to avoid is having

8    names come up and jurors go, oh, you know, that's my

9    cousin, that's my neighbor, that's my close friend.  So I

10   need you all to prepare that list for me and file it by the

11   end of the day on Friday as well, or certainly no later

12   than first thing Monday morning, so that we can read that

13   entire list to the jurors in voir dire.  I will state to

14   them that I'm going to read to them a list of names of

15   people who may be witnesses or whose names may be mentioned

16   during the course of the trial, so that they won't be

17   going, oh, well, I heard that name and I didn't hear that

18   person called as a witness.  Okay?

19             MR. CASEY:  Sure Judge.

20             MR. MARGULIS:  Sure.

21             THE COURT:  The other thing with respect to voir

22   dire is I do read that instruction, the point 10

23   instruction, the instruction to use at voir dire under the

24   Eighth Circuit regarding the use of cell phones, the

25   Internet, things of that sort.  And I have had a trial

1    where two people raised their hands and told me they could

2    not abide by an instruction not to get on their phones, not

3    to get on the computer and the Internet and talk about the

4    trial or do research about the trial.  So, I do read that.

5    I know it is very lengthy, but I think that it is worth

6    reading.

7                 So, basically what I will do, and you all can sit

8    down as we go through this stuff right now, this kind of

9    housekeeping stuff, you don't have to stand there.  So I

10   will bring the jurors in.  I will tell them what the matter

11   is before the Court, read the cause number.  I will

12   introduce myself and the Court personnel, and generally

13   what we will do with respect to voir dire is we will put

14   all of the jurors out in the benches.  We will have given

15   you the list, the information on the jury sheets by that

16   time.  If everything is going according to plan, then Sara

17   will try to prepare for you a list of the jurors, the

18   prospective jurors with their names in the boxes.  Every

19   once in a while, we just don't get the list in time and

20   it's not possible to do that, but this is how the jurors

21   will be seated when we seat them, so that juror No. one

22   will be sitting where Sara is now sitting, and then we will

23   put the jurors in these two rows of benches, the left and

24   the middle section of the benches.  So, if either of the

25   parties have people here who are observing voir dire, I'm

1   going to ask that you ask them to sit in the section that

2   is to the right, just until we get the voir dire process

3   completed and seat the jurors.  After that time, anyone who

4   is observing is welcome to sit wherever they would like,

5   but we're likely going to fill up most of the those benches

6   while we conduct the voir dire.

7           We have requested 45 jurors.  I think that that

8   should be enough in light of the prescreening that has been

9   done, because I would have normally expected most of our

10  jurors who had issues, would have issues with respect to

11  the length of time for the trial.  That's not to say that

12  one or two of them won't come in and say, oh, I didn't

13  realize that August the 9th really meant till August the

14  9th.  I'm sure we will still have one or two of those.

15          So, we are going to start with about 45.  We will

16  give you the lists.  They will be seated all in back.  We

17  will call them up and seat them one at a time and that is

18  just a courtesy to you, to give you a little bit more time

19  to look over those lists and to give you an opportunity, if

20  you so desire, to kind of eyeball each juror.  Whereas if

21  they are all sitting there, you don't have as much of an

22  opportunity for that.

23          And after they are seated I will tell them a

24  little bit about voir dire and the process of it.  I will

25  tell them that on rare occasions somebody is being asked a

1    question that is so personal that they don't want to do it

2    in front of everyone else, and tell them they will have the

3    opportunity to come up there, and encourage them, tell them

4    we are not trying to embarrass them, but that we need these

5    answers and emphasize how important it is to answer fully

6    and truthfully, and err on the side of providing an answer.

7            Then we will administer the oath and I will do

8    that introductory instruction about the use of cell phones

9    and the Internet, and then I will tell them that they have

10   been called in this case.  I will read them the summary,

11   ask them if anyone knows of that incident or the charge.  I

12   will introduce one of the attorneys for the Government and

13   one of the attorneys for the defendant, and then I will ask

14   you to stand and introduce the other people at counsel

15   table with you, and so who would you like me to introduce

16   on behalf of the Government?

17           MR. DAVIS:  Myself, please.

18           THE COURT:  And?

19           MR. GELFAND:  Me, Your Honor.

20           THE COURT:  And I will -- understand I will list

21   all of your names.  I will list each of your names and your

22   law firm as well to make sure that they don't have any

23   conflicts with any of the individuals or the law firm.

24           So I will ask you to introduce yourself and also

25   people at counsel table, and I will ask them if they, or to

1    their knowledge any of their family members, know any of

2    them, know clients or anyone having dealings with the law

3    firms.  I will read the list of the names of witnesses and

4    other names that they are likely to hear during the course

5    of the trial.  I will ask them if any of them know one

6    another, and follow up if they do to make sure that they

7    will be in a position to exercise independent judgment.

8              I will tell them how long the case is expected to

9    last, which as I said, two and a half but no more than

10   three weeks.  And let them know the general time frames

11   that we will be using each day, tell them that they will

12   have the opportunity for a fifteen minute break in the

13   morning and in the afternoon, so that they generally don't

14   have to sit more than an hour and a half or two hours at

15   any one time, see if there is anyone that has any problem

16   with that schedule, see if there is anyone who has medical

17   or other needs that we need to accommodate.

18             I will then ask them about their prior jury

19   service.  I generally start in the front row of the jury

20   box and work my way through and then do it row by row

21   asking them whether they have ever been selected as a

22   juror, whether the case finished or not, where, when, was

23   it civil or criminal, did they reach a verdict without

24   telling me their verdict, and were they the foreperson and

25   was there anything about that experience that they would

1  have trouble setting aside.

2          I will ask them if they have ever served as a

3  grand juror in either federal or state court, and if so how

4  long, was it state or federal, was there anything about

5  that service that might interfere with their ability to

6  come to a fair decision in this case.

7          I will ask about their prior criminal records,

8  whether they or any close friends or relatives have ever

9  been arrested for or charged with a crime, or placed on

10  probation in state or federal court, where the punishment

11  was one year or more, and if so what was the crime, did

12  they feel that they or that person was treated fairly, is

13  there anything about that situation that would affect their

14  ability to listen to the evidence or come to a fair

15  decision.

16          I will ask whether any of them or their close

17  friends or relatives have ever been the victim of a crime,

18  and if so whether there was anything about that incident

19  that would prevent them from being completely fair and

20  impartial.  I will advise them of the presumption of

21  innocence, ask if there is anyone that does not understand

22  that a charge is not evidence and simply because a person

23  has been charged is no indication of guilt.

24          I will advise them that in a criminal trial the

25  defendant is presumed innocent unless proved guilty beyond

1  a reasonable doubt, that the presumption remains with the

2  defendant until found guilty by a jury, that the obligation

3  is always on the Government to prove the defendant's guilt,

4  and there is no obligation for a defendant to prove his

5  innocence, and ask if there is anyone on the panel who

6  disagrees with those principles, and is there anyone that

7  would have any problems applying the standard of proof

8  beyond a reasonable doubt, and the converse, would any find

9  the defendant not guilty even if convinced of his guilt

10  beyond a reasonable doubt solely because you felt sympathy

11  for him or her.

12            I will go into the burden of proof, describe to

13  them how that burden of proof is different in a criminal

14  case than a civil case, and explain that the Government is

15  required to prove the case beyond a reasonable doubt, and

16  see if anyone has any problem understanding that that is a

17  different burden than in a civil case, and if anyone

18  disagrees with that principle.  I will advise them of the

19  defendant's right to remain silent, see if there is anyone

20  who does not understand that Mr. Anderson has an absolute

21  right not to testify, ask if there is anyone who is more

22  likely to believe that he's guilty if he does not testify.

23            I will advise them that if the defendant does not

24  testify, that they may not discuss that in their

25  deliberations, and see if there is anyone who has any

1    problem with that.

2         I will advise them that it is their job to decide

3    the case based on the evidence, applying the law as it is

4    given to them, that they are the judge of the facts while I

5    am the judge of the law, that they have a duty to follow

6    the law as it is given to them and see if there is anyone

7    who would not be willing to follow all the instructions

8    that I give them.  And ask if there is anyone who would not

9    be able to decide the case based solely on the evidence

10   that is presented to them here in the courtroom.

11        And I will tell them that we are going to pick 12

12   jurors and we need to discuss how many alternates.  So, how

13   many alternates would you like in light of this?

14        MR. GELFAND:  Two sounds reasonable, Your

15   Honor.

16        THE COURT:  Are you sure two is enough?

17        MR. CASEY:  Three, to be safe.

18        THE COURT:  Why don't we go with three just in

19   case.  And obviously since you all don't have any strong

20   feelings beyond two, if we have an unexpected number of

21   strikes for cause, we can always back that down to two, but

22   right now assuming we have the folks to work with to

23   exercise strikes, let's go with three.  I will tell you

24   that it is now my practice to keep the alternates here

25   until the verdict is reached, and so we will sit them in a

1   room and tell them to bring a book, and not discuss the

2   matter with them or we can send them down to the jury

3   assembly room because there are folks down there kind of

4   watching, and we will keep them here until the verdict has

5   been returned, so that if for some reason some juror needs

6   to be excused or removed, we'll have an alternate to bring

7   in and have them begin their deliberations anew.

8           So, right now I'm going to go with three and I'll

9   just tell them we're going to pick three and that their

10  verdict must be unanimous, find out if anyone has any

11  problem with that or feel that they would be unwilling to

12  try and reach a unanimous verdict, and then I would ask

13  them if any of them has -- if any of them has any problems

14  or issues that I have not asked about, or any experiences

15  that they feel might prevent them from being completely

16  fair and impartial.  Then I would plan to turn the case

17  over to counsel for voir dire.  Now, I know that you have

18  each filed some voir dire questions, and if there are any

19  of those voir dire questions, first of all, if you have

20  problems with any of the voir dire questions that opposing

21  counsel has filed, let's make sure we talk about that

22  today, and if you do not have problems with them, but there

23  are questions on your list that you would like to propose

24  that I ask instead of you ask, let me know that as well and

25  I will certainly be willing to take a look at that.

1    Mr. Casey, did you have something?

2              MR. CASEY:  No, Judge, I was just going to

3    respond to that.  I've reviewed defense filed voir dire and

4    seems pretty straight forward to me.

5              MR. GELFAND:  Likewise, Your Honor.  We have

6    reviewed the Government's proposed voir dire and have no

7    objection to any of its questions.

8              THE COURT:  All right.  Great.  So, like I said,

9    if you look over your voir dire in light of what I've told

10   you that I normally ask in a criminal case, if there are

11   particular questions on your list, I don't remember having

12   any real problem with any of those questions as I went

13   through them.  If there are any questions that you would

14   like to suggest that I ask instead of you, just let me

15   know.  You can just, you know, file something brief or you

16   can send me an email with counsel copied.

17             MR. CASEY:  The Court is not going to  -- is

18   going to leave the proposed voir dire that we filed to each

19   of us and we are limited to those questions?

20             THE COURT:  No, no, you are not limited to those

21   questions.  Some of the questions on your voir dire are

22   questions that I will have already asked them.  So, I

23   wasn't otherwise planning to ask the questions on your list

24   unless you wanted me too.  It's my practice to do kind of

25   some standard basic questions, and then otherwise leave the

1    voir dire to counsel so long as I haven't had past

2    experiences with you, where you haven't behaved.  So, since

3    I have not had past experiences with you where you have not

4    behaved during voir dire, I would like to let you all

5    conduct a portion of the voir dire as well.

6          And, you know, think about, you know, in light of

7    all the questions I will have already asked, should be

8    aiming at 20 to 30 minutes for whatever additional voir

9    dire you want to ask.  And I realize that, you know, it's

10   impossible for us to anticipate whether we're going to have

11   a couple of those folks that you know, just read you a

12   small novel every time you answer a question or not.  We'll

13   just have to see how that goes.

14         So then I would plan to turn the voir dire over

15   to each of you with the Government going first, and the

16   defendant going second because the Government has the

17   burden of proof.  And you when conducting your voir dire

18   you need to stay in the general area of the podium.  You

19   can't sidle up to the jurors, and that doesn't mean you

20   have to have one hand on the podium at all times, just stay

21   in that general area.

22         As you all know I'm sure, we have line of sight

23   problems in this courtroom.  We did do mock ups, we really

24   did before we built this building and I don't know how we

25   ended up with line of sight problems, but we do have them.

1    And so if at any time you are having problems seeing the

2    witness, you just get up and move.  So, just get up and

3    move to one of those seats over there or move to a seat at

4    the center table.  You go to where you need to go, if

5    you're having any trouble seeing.  You don't have to ask my

6    permission, just do it, unless you feel like asking for

7    permission, you can do whatever you want.

8              In terms of the voir dire as well, the process is

9    ask the questions to the group as a whole, and follow up to

10   the extent that they indicate that they have answers.  I

11   don't want you all going down the jury box, going through

12   45 people and asking individual questions, and, you know

13   sidling up to Ms. Smith and saying, so tell me what

14   magazines you get.  We're not going to do that.  So, you

15   ask to the group as a whole, you follow up.  On the other

16   hand, I don't expect anyone to take a bump on a log.  There

17   are always some jurors who don't respond to anything, and

18   if you want to follow up with those jurors who have not

19   responded to anything, you are welcome to do that.  You are

20   welcome to ask those individual jurors and just say, you

21   know, Juror No. 12, I know that you've been here listening

22   carefully, but I just want to make sure, you know, you can

23   ask one or two of the questions or something more generic,

24   you know, just to make sure that they can hear, they can

25   speak, that they are not going to say well, you need to

1   understand that I don't believe in the jury process, so,

2   I'm refusing to answer any questions that you ask.  You

3   know what I'm saying.  That is up to you, or if you would

4   prefer that I do that follow-up questioning, after we have

5   gotten through the voir dire, just ask to approach, let me

6   know that you would like me to do that and then I will do

7   some follow up with those jurors who have said absolutely

8   nothing as we have gone through, just to make sure that,

9   you know, they are willing to be part of the process.

10              MR. MARGULIS:  Can I ask a quick question?

11   Mr. Gelfand is conducting the voir dire for us.  Are we

12   permitted to follow up with individual questions based on

13   what you cover with them?

14              THE COURT:  Absolutely.  Everybody is permitted

15   to follow up, so to the extent I ask questions, I generally

16   try to follow up with them as we go, but you may not be

17   content with my follow up.  And so if you would like to do

18   additional follow up with them and sometimes I just miss

19   following up with someone, you are welcome to.  You are

20   welcome to follow up with respect to responses that

21   individual jurors have provided to the Government's

22   questions and vice versa.

23              So if the Government has some more follow up for

24   individuals after the defendant has conducted voir dire,

25   you will be able to do that as well.

1          So that's about it in terms of the voir dire

2     questioning itself, and then we would recess to pick our

3     jury.  My hope is by then we would be at the lunch hour and

4     we would actually let them go for lunch and then bring them

5     back after, but we'll just have to see how that goes, but

6     let's try and aim for that.  Let's try and aim to get going

7     as close to 9:00 as we possibly can, which is why I want

8     you here at 8:30 to resolve anything else that we need to

9     go over, and then let's try and get those jurors out, the

10    voir dire questioning completed by the lunch hour.

11         Then we will first take up strikes for cause.

12    I'm going to ask both sides to give me all of your strikes

13    for cause, because often there's a tremendous amount of

14    overlap and so, then we will take up all strikes for cause,

15    I will give you my rulings on any strikes for cause and

16    then we will proceed with respect to the peremptory strikes

17    and we've got six and ten.  So, the Government is going to

18    get six peremptory strikes.  They will exercise theirs

19    first, give those strikes to the defendant.  The defendant

20    will then exercise his ten peremptory strikes.  We will

21    exercise those strikes from the first 28 jurors who have

22    not been excused for cause.

23         So, if among the first 28 we have excused four

24    for cause, you will exercise your peremptory strikes from

25    jurors one through 32, the remaining jurors one through 32,

1  so you don't have to be worried about juror number 48 down

2  there.  And then we will exercise, if we are going to have

3  three alternates, then you will get two strikes each for

4  those alternates and then so we will be looking at three

5  plus four, we'll be looking at seven, and if we don't have

6  enough jurors left to do that, we'll back it down to two

7  alternates, and then you will do one each.  So, the

8  Government will exercise peremptories, give it to the

9  defendant, then the defendant will exercise peremptories

10  from the next four jurors, and that will leave us our two

11  alternates.  Does anybody have any questions about the

12  process?

13          MR. CASEY:  No, Your Honor.

14          MR. MARGULIS:  No, Your Honor.

15          THE COURT:  Opening statements, tell me how long

16  you'd like and then I'll tell you how long you're going to

17  get.

18          MR. CASEY:  You can just tell me how long I

19  get.

20          THE COURT:  Tell me how long you'd like.

21          MR. MARGULIS:  Judge, we've agreed on everything

22  up to this point, we'll see if it continues.

23          MR. CASEY:  Twenty minutes.

24          MR. MARGULIS:  That's more than enough for me.  I

25  was going to say 10 or 15.

1          THE COURT:  I'll give you each 20 minutes for

2    your opening.  That's great.  I thought you were going to

3    tell me much more than that.  So, 20 sounds great.

4    Sometimes I get the three-day trial and they want an hour

5    in opening.

6          MR. MARGULIS:  Just generally speaking on my

7    opening and closings what's your rule as far as our being

8    confined to the podium?

9          THE COURT:  You are allowed to move around a

10   little, but like I said, you don't have to keep one hand on

11   the podium, you just need to kind of stay in that little

12   well area.  So, you are allowed to walk around.  Does

13   anybody need any further assistance, questions, anything

14   with respect to use of the ELMO?

15         MR. GELFAND:  No, Your Honor.

16         MR. CASEY:  No.

17         THE COURT:  Now, let me just remind you of

18   something that attorneys either they don't know, they don't

19   remember, or don't ever use.  You do have the ability to

20   the extent someone has marked something on the screen, to

21   ask us to save it for you.  We can save it, we can print

22   it, we can mark it with a new exhibit label.

23         So, just remember because, you know, people have

24   fallen into the bad habit of saying, okay, put an X where

25   that was, and then as soon as the witness is gone, poof, it

1    disappears and, you know, normally that stuff is not

2    pertinent for an appeal, but you never know.  So, just

3    think about it, if it's something you know you are going to

4    use with another witness or where, you know, that witness's

5    markup on that exhibit may be important, and something you

6    want to preserve for appeal, know that we can save that for

7    you, but you need to let us know that and it does take a

8    couple minutes.  We need to king of stop the system, save

9    it, and then we will print it for you.  We won't

10   necessarily have it available for you at that moment, but

11   we will give it to you.  We can then put an additional, you

12   know, we can make it Exhibit 12A.  We can mark it with a

13   new number for you, so that you can use it with other

14   witnesses.

15          So, that's about it for the voir dire and any

16   questions about that process, and then we will bring the

17   jurors back in and we will seat them.  I generally bring

18   them all back up so that those who were not selected can

19   actually watch the jurors take the oath and so that I can

20   thank those who were not selected and make sure they

21   understand that their time was not wasted.  And that's

22   about it.

23          Then the introductory instructions that I would

24   plan to read to them.  I use the Eighth Circuit

25   instructions.  I read 101, nature of the case; 103, the

1    evidence; 105, the credibility of witnesses.

2         I read a modified version of 106A on no

3    transcripts and note taking.  I do advise them that they

4    can have no transcripts, but I kind of have my own note

5    taking instruction.  I do allow the jurors to take notes.

6    I do that in every trial both criminal and civil, but I

7    have modified the Eighth Circuit instruction, and I wish I

8    remember where I got it from, but I don't remember that

9    anymore.  But basically what I am adding to that are just

10   some cautionary instructions that they should not allow

11   their note taking to keep them from paying attention to the

12   witnesses and looking at the witnesses and the evidence,

13   that notes are just to prompt their own memory, and that

14   they must recall the evidence and that notes are sometimes

15   incorrect, and that they must remember the evidence

16   themselves and they cannot cede that responsibility to

17   someone else who was taking notes.

18         So, that's the additional language that I've got

19   in there.  If anybody would want to take a look at my note

20   taking instruction, I have highlighted the additional stuff

21   I've added to the Eighth Circuit instruction.  I'm happy to

22   let you see what it is if any of you would like to see it.

23         MR. CASEY:  I trust you, Judge.

24         THE COURT:  Then I talk about bench conferences,

25   107, bench conferences, 108, conduct of the jury, 109,

1   outline of the trial.  I would then read any stipulations

2   of fact if you all have any.  Do you all have any

3   stipulations of fact that you would like to use in

4   connection with the trial?

5          MR. CASEY:  There's none from the Government.

6   There was some discussion.  We filed a 902 disclosure as

7   the Court saw.  We do anticipate introducing certain

8   self-authenticating business Government records,

9   specifically a certificate of nonfiling that has been

10  sealed and signed by the IRS as well as other records.

11  There was some discussion regarding stipulations to that.

12  We believe that no stipulation is necessary and those

13  documents are self-authenticating and those documents can

14  be used as admissible hearsay.

15         THE COURT:  We will get to the 902 issues.  I

16  just wanted to make sure there weren't any background facts

17  or other things of that nature that you all might want to

18  stipulate.

19         MR. CASEY:  Other than that, the Government has

20  no stipulation.

21         MR. GELFAND:  As of now that's correct, Your

22  Honor.  We will entertain discussions to the extent the

23  Government wishes to.

24         THE COURT:  All right.  So, at this moment in

25  time, does the defendant anticipate giving an opening?  I'm

 1   not trying to bind you at this time, but you anticipate

 2   giving an opening following the Government's opening?

 3           MR. MARGULIS:  Yes, Your Honor.

 4           THE COURT:  And then we'll go with the

 5   Government's case and then we'll go with the defendant's

 6   case thereafter.  And can you tell me has a decision been

 7   made by the defendant at this time whether he is going to

 8   testify?

 9           MR. GELFAND:  Your Honor, we have certainly had

10   discussions with our client, but I think it would be

11   premature.  He hasn't made any final decision yet.  To the

12   extent the Court would like to know if that changes through

13   trial we are happy to let the Court know.

14           THE COURT:  Well, one of the things that we will

15   need to discuss here today, if there is the possibility

16   that he will testify, we need to discuss whether defendant

17   has any prior criminal convictions, so that we can make

18   sure that we understand how those prior criminal

19   convictions may or may not be used in any

20   cross-examination.  So, does Mr. Anderson have prior

21   criminal convictions?

22           MR. MARGULIS:  We're not aware of any, Your

23   Honor.

24           THE COURT:  Are you all aware of any prior

25   criminal convictions of Mr. Anderson?

1          MR. CASEY:  Not of a felony, Judge.

2          THE COURT:  So, right now were Mr. Anderson to

3    testify, is there anything that you would be using in the

4    608, 609 realm, are there any other nonfelony convictions

5    that bear on truthfulness that you would be seeking to use

6    in cross-examination?

7          MR. CASEY:  I don't believe so, Judge, not that

8    we are aware of.

9          THE COURT:  All right.  Good.  Then obviously at

10   the appropriate time we will make a record if Mr. Anderson

11   -- well, regardless, we will make a record with respect to

12   any decision that Mr. Anderson makes with respect to

13   testifying when we get to the defendant's case in chief.

14   And so I think that that is about it in terms of just the

15   order of the trial and how we're going to proceed.

16          Obviously I want to keep bench conferences to a

17   minimum.  We don't want to be running up here all of the

18   time.  I don't need to have lengthy narrative objections

19   under the rules of evidence.  I try to keep myself pretty

20   current about the rules of evidence, so let's try to keep

21   those objections as short as possible to make your record,

22   and highlight the nature of the objection.  I will call you

23   all up here if you need to.  Obviously if there is

24   something that requires you all to come up for a bench

25   conference, you are welcome to do so and as you know the

1   little mike is right over here.

2           Has the Government disclosed to the defendant

3   their exhibit list?

4           MR. CASEY:  Informally we provided to them

5   earlier today what I call my working exhibit list.  They

6   went through the physical evidence, other exhibits, papers,

7   documents and so forth.  It's not in kind of a fileable

8   format in the sense that each exhibit is marked with the

9   number, but lists the universe of the exhibits.

10          THE COURT:  And you are going to put that list

11  together like pretty soon, because I want to see one,

12  too.

13          MR. CASEY:  Absolutely, Judge.  I was planning on

14  filing but I wanted to get them something that they can

15  look at.

16          THE COURT:  So, you know, I will want at the

17  start of trial the exhibit list as well as the witness list

18  of the Government's witnesses.  I would like the Government

19  to disclose to the defendant at the close of each day, who

20  you anticipate calling the next day so that they can get

21  properly prepared.  So, you know, let the Government know

22  who your first witnesses are going to be and then at the

23  end of each day let them know who you anticipate calling

24  the next day

25          MR. CASEY:  Just for the record, Judge, I gave

1  them our first three and I anticipate when I file the

2  exhibit list will be filing in general order, travel

3  arrangements and things outstanding.

4          THE COURT:  Great.  All right.  So, the next

5  thing I've got on my list here is to talk about the

6  exhibits, and to get into any business records and the use

7  of exhibits.  Working backwards chronologically, I don't

8  just send all the exhibits back to the jury when they go to

9  deliberate.  When we send the jury out I will ask you all

10  to put together in a nice pile all exhibits that have been

11  admitted into evidence.  And put them together for opposing

12  counsel to review and make sure that they agree.  That

13  would be the first thing that I will ask you to do when the

14  jury goes out.  We will keep those exhibits here and if and

15  when the jury asks for exhibits then they can have them.

16          You are free to tell the jurors in your closing

17  that, you know, if there are certain exhibits that you want

18  them to look at, tell them to ask for them.  You are free

19  to tell them that.  You may use your exhibits in opening

20  statements if you both agree to it.  So, if you want to use

21  an exhibit in opening, please show it to opposing counsel.

22  If opposing counsel agrees, then that is okay with me.

23          So, let's now move to the business records and I

24  know that the defendant has filed a motion in limine with

25  respect to certain financial records, but what I'm talking

1    about is essentially the -- not relevance but rather the

2    authenticity and hearsay objections that the federal rules

3    themselves provide a certificate to avoid the need to call

4    records custodians.  So, is the defendant requesting that

5    the Government call records custodians with respect to any

6    of the matters that it has done 901 stipulations for?

7             MR. GELFAND:  Your Honor, with -- my

8    understanding is there's basically three possible

9    categories and the Government can correct me if I'm wrong,

10   with respect to the first two, which are financial records

11   and Southwest Airline records, notwithstanding any other

12   objections as the Court has noted under 403 or relevance,

13   we have notified the Government that we stipulate to the

14   authenticity and nonhearsay nature of those exhibits.  With

15   respect to quote/unquote certificates of nonfiling, and I

16   think there is only one such certificate involving Internal

17   Revenue Service records, we informed the Government that we

18   discussed that with our client and we do not stipulate to

19   any such certificate of nonfiling.  We believe that the

20   confrontation clause requires a full live witness.

21             THE COURT:  I don't know that that's true.  I'll

22   take it look at it, but that's not my recollection.  I

23   believe on nonfiling, but do you have any case law to

24   support your proposition that the confrontation clause

25   requires that?

1          MR. GELFAND:  We do, Your Honor.  As I stand here

2    right now, I literally have a manila folder at the office

3    with that printed out.  I'd be happy to provide that to the

4    Court in whatever format the Court would prefer.

5          THE COURT:  I'm not aware that that to date has

6    been memorialized in any of the parties motions, but

7    there's been a lot so maybe I missed it.

8          MR. GELFAND:  It has not, Your Honor.

9          THE COURT:  So what I would like you to do -- is

10   that something that you all can put together and case

11   authority that you have for me by the end of the day

12   tomorrow?

13         MR. GELFAND:  Yes, Your Honor.

14         THE COURT:  And can the Government do that as

15   well?

16         MR. CASEY:  Absolutely.

17         THE COURT:  Because then I would be in a position

18   on Monday to let you know, because I assume you need to

19   know sooner rather than later whether you are going to need

20   a witness.

21         MR. CASEY:  Yes, and getting an IRS witness is a

22   difficult process, so the sooner I can work through that

23   process the better.

24         THE COURT:  Well, I will try -- if you all -- if

25   you've already got yours collected -- you have any case

1    authority to support your proposition?

2              MR. GELFAND:  Can I have a moment, Judge?

3              THE COURT:  Yes, what I was going to suggest, is

4    if you can try and get that to me by 2:00 tomorrow, I'll

5    try to take a look at it and get you a ruling by the end of

6    the day.

7              MR. GELFAND:  We'll be happy to do that.

8              THE COURT:  I can't promise you that I will, but

9    I will make an effort to get a ruling by the end of the

10   day.

11             MR. GELFAND:  Thank you.

12             THE COURT:  Well, we'll see.  Certainly the rules

13   of evidence would not prohibit it, so I'm quite certain

14   that the rules of evidence do not prohibit it, and so the

15   question is whether you have case law that suggests that

16   the confrontation clause requires that.

17             MR. GELFAND:  Yes, Your Honor, and the case law,

18   just so the Court is advised, deals -- we have certain

19   cases that we have pulled that are specific to an alleged

20   lack of tax returns filed with the Internal Revenue Service

21   and so in our view it is about as directly on point as you

22   can get.

23             THE COURT:  Well, I like on point.  On point is

24   good.  Thank you.  Does that take -- does that address all

25   of the exhibit stipulation issues?

1            MR. CASEY:  Beyond defense Exhibit A.

2            THE COURT:  Right.  And that's the subject of a

3   motion in limine and we will get to that.  But to the

4   extent that the Government is trying to avoid records

5   custodians and has provided the certificates under the

6   rules of evidence, does that address all of those issues?

7            MR. CASEY:  Yes, Judge.

8            THE COURT:  Great, thanks.  Okay.  Do we have --

9   and this is a stupid question, I know we have audio tapes

10  or video tapes in the case that the parties will be a

11  planning to use.

12           MR. CASEY:  Yes, Judge, we have Title III wire

13  intercepts that we plan on playing.  I want to say we're --

14  I know we're going to play them next Thursday, well, if the

15  witnesses go as they go, our estimate is they will be next

16  Thursday.  Obviously we will liaise with the Court's tech

17  people to make sure that's as seamless as possible, so not

18  to waste any time.  And I believe your other question,

19  Judge, was video?

20           THE COURT:  Yes.

21           MR. CASEY:  We have currently identified, as I

22  said, in our large universe, two potential videos, very

23  short surveillance type videos to play and again we will

24  liaise with the Court's tech people to make sure that's as

25  seamless as possible.

1            THE COURT:  So, getting back to talking about

2    both of them, are you planning to play those through the

3    Court's equipment?

4            MR. CASEY:  Yes, Judge, I would anticipate we

5    would.

6            THE COURT:  So, let's make sure that you do that

7    well in advance to make sure that there aren't going to be

8    any problems with that.  By the way, speaking of the

9    Court's equipment, right now we've only got the one monitor

10   in here and that's because we don't want that second

11   monitor in here while we're doing voir dire and everybody

12   is walking back and forth.  After we select the jury, we

13   will bring the second monitor, the smaller monitor in that

14   will go on the other side of the jury box, but are either

15   of you planning to display exhibits through your own

16   laptop?

17           MR. CASEY:  No, Judge, my anticipation is we're

18   going do it the old fashion way and use paper documents.

19           MR. GELFAND:  Likewise, Your Honor.

20           THE COURT:  So, to the extent you have audio and

21   video tapes, have transcripts been prepared with respect to

22   any of those?

23           MR. CASEY:  No, Judge, we did not prepare

24   transcripts.  We believe the calls are understandable and

25   audible and no transcripts are necessary, and I believe in

1    my jury instructions that I filed with the Court, I think

2    there was an instruction related to transcripts, so that

3    was out of abundance of caution filed a while ago.

4              THE COURT:  All right.  And do we have any

5    depositions or other documents or evidence from other

6    cases?

7              MR. CASEY:  No, Judge.

8              THE COURT:  Apart from the civil forfeiture.

9              MR. GELFAND:  That's all I was going to say,

10   apart from that, no, Your Honor.

11             THE COURT:  Generally folks, just in terms of

12   some more housekeeping stuff, generally I prefer that you

13   do not call witnesses by their first name.  I think that we

14   ought to use surnames.  Obviously, if we have problems

15   because we have multiple people with the same last name,

16   you know, try to accommodate that in a professional way.  I

17   think it's just common courtesy that ought to apply in the

18   courtroom.

19             Obviously, if you want to call your client by his

20   first name you are free to do that.  You may do whatever

21   you want.  Obviously, you cannot refer to opposing counsel

22   or opposing witnesses by their first name.

23             I know that the Government has filed its proposed

24   jury instructions and I know that we're going to be at this

25   for a while, but I want to get those instructions finalized

1    as soon as possible, so I will be asking the defendant to

2    provide me with any objections to the Government's proposed

3    jury instructions probably, you know, Wednesday or Thursday

4    of that first week of trial.  And then I'm going to keep at

5    it day by day so that we can narrow any objections.  I need

6    to know what the defendant's objections might be so that I

7    can begin to look at them, give you all a chance to work

8    out any objections that you have, so that by the time we

9    are at the close of the case, we have very little to do

10   then to finalize our jury instructions.

11           If you don't do that, the alternative is to keep

12   you here the night, you know, the night before you're going

13   to close until we get them done, and I don't think that you

14   all want to do that.  I don't mind staying here until

15   10:00, but I can tell you that the air conditioning goes

16   off, and I assume there are things that you would rather be

17   doing the night before your closing than staying here

18   working on jury instructions.

19           So, let's work very hard as we go along to get

20   those instructions and your objections narrowly defined,

21   hopefully resolved, but if not, to identify those for me so

22   that I can give you my rulings and we can get those

23   instructions finalized.  I need you all to provide to me

24   any instruction, proposed instructions you have either by

25   email to Sara or on a disk in Word.  I want to receive any

1  proposed instructions from you on the first day of trial.

2  If we get those from you on the first day of trial, and you

3  work hard as we go along, we will take responsibility for

4  producing the final set of instructions.  If not, if I'm

5  not getting the level of cooperation that I need from you

6  as we go along, then you are the ones that are going to

7  have to put together those final instructions, and again I

8  assume you have better uses of your time in the last couple

9  days of trial than trying to, you know, see if we have

10  gotten all the commas fixed in the instructions.  Okay?

11        MR. GELFAND:  Can I clarify one quick question?

12  We do anticipate proposing a couple of defense instructions

13  without regard to whether there are any objections to the

14  Government's instructions.  Does the Court want us to file

15  those and to provide basically a disk in Word or email in

16  Word or how does the Court, just as a housekeeping matter,

17  want us to present those?

18        THE COURT:  We want to get a copy in Word,

19  whether that be by email or on disk so that we can put

20  together the start of a working document.

21        MR. GELFAND:  So, we will bring that on Monday

22  morning.

23        THE COURT:  That would be fine and then you can

24  file it as well, but what you do in CM/ECF is a PDF, so

25  what we want to receive from you in addition to whatever

1  you file, is a copy that we can put in Word and begin to

2  edit and work with one another.  We will use that as our

3  working document to start finalizing our instructions from

4  that.

5            MR. GELFAND:  Thank you.

6            THE COURT:  And in terms of the final

7  instructions to the jurors, if you all have worked with us

8  and we are in a position to create that final set of

9  instructions, then we will display them on the screen to

10  the jurors as I read them, and we will also send a copy of

11  the final instructions, send copies of the final

12  instructions back to the jurors as well.

13            One set will be marked with a tab that has the

14  verdict forms for the foreperson to use.  It is my practice

15  to read all instructions, other than the final instruction

16  before you do your closing.  So, they will have received

17  all of those instructions from me.  Then you will do your

18  closing.  Then I will read the final instruction because I

19  want the last word, but the only down side to that is that

20  it is that final instruction that has the verdict form in

21  it, but we will have agreed on that before we get to that

22  place obviously, or I would have ruled on it.  There's not

23  that much to talk about in that last one.  You can use that

24  final instruction in your closing, so you don't have to say

25  I anticipate that the Judge may advise you.  You can say,

1    this is the next instruction you are going to hear.  This

2    is the verdict that the Judge is going to give you in a

3    moment, and use it as you will in your closing.

4              So that's about all that I've got on my

5    housekeeping list.  Anybody have any questions about any of

6    that?

7              MR. CASEY:  No, Judge.

8              THE COURT:  So, why don't we take about a

9    ten-minute break here and just to give everybody a little

10   break here.  So, let's take about a ten-minute break and

11   then come back here and we will start marching through the

12   motions in limine.  I will try to give you as many rulings

13   as I possibly can today.  Anything that I cannot rule on

14   today I will try to get you a ruling on no later than the

15   end of the day on Friday so you can make whatever

16   adjustments you may need.

17             (A SHORT RECESS WAS TAKEN, AFTER WHICH THE

18   FOLLOWING PROCEEDINGS WERE HAD:)

19             THE COURT:  So, anything we need to take up

20   before we do the motions in limine?

21             MR. CASEY:  I don't believe so, Judge.

22             MR. GELFAND:  No, Your Honor.

23             THE COURT:  So, I'm just planning to march down

24   these in the order in which they were filed, if that works

25   for everybody, unless someone -- I didn't see that they

1      were building on each other so that we needed to take them

2      in any particular order.

3              So, the first motion that I have I think is 938,

4      the motion to quash that was filed by the Government.  This

5      is docket 938, Government's motion to quash subpoenas or in

6      the alternative to modify the subpoena of Alex Jenne.

7              MR. CASEY:  Yes, Judge.  I can speak to that, if

8      that's okay.  I'm not going to belabor what I've already

9      written to the motion.  The motion speaks for itself.  I

10     will just as response to some things that the defendant has

11     filed, you know, the motion I'd like to think is clear.  We

12     make comment related to relevance.  Our comment is related

13     to the cumulative nature and harassing nature and the

14     potentially harassing nature.

15             To that end we have additional evidence since

16     obtained, since filing the motion, related to a jail call

17     from Thomas Anderson, Jr. to his father where he discusses

18     the need for having Mr. Jenne appear that we believe helps

19     support our motion that this subpoena is now motivated by a

20     desire for relevant evidence that Mr. Jenne can add, is

21     motivated by kind of a outside -- just nonsense view of

22     that Mr. Jenne is lying and it's in the defendant's own

23     words.  So, we would like to play that for the Court, at

24     least a snippet of it if the Court is amenable to that.

25     And we have it ready to go.

1          THE COURT:  All right.

2          (RECORDING PLAYED.)

3          MR. CASEY:  Judge, if I may, and the Court is

4    welcome to listen to the tape later on, just for the

5    interest of time, later on Mr. Anderson makes mention of

6    the fact that Mr. Jenne is on a GPS and a Title III and

7    that's why he doesn't want to come, and that there's a

8    whole new level of corruption, and he's going to get on the

9    stand and it's going to crumble and fall apart, and the

10   call goes on and on and on.  If I can just address my

11   motion, it's my understanding that Mr. Jenne didn't

12   conduct -- was part of an investigative team.

13          His knowledge of the investigation is not unique

14   as far as I know, as far as we know.  There's nothing new

15   or different.  He wasn't in a room by himself with

16   Mr. Anderson, or was the only one to find a specific piece

17   of evidence.  He was part of an investigative team.  When

18   Mr. Moles left to do language immersion school and go to

19   Argentina, Mr. Jenne became the point of contact for our

20   office in handling the investigation that had basically

21   been indicted and it was a matter of rounding up the

22   defendants and bringing them in.  Mr. Jenne then, I believe

23   in September of 2014, he informs me that he went to the DEA

24   academy and he was off the case.

25          Mr. Jenne is here today.  I addressed what I

1   believe to be serious medical concerns in the motion.  Mr.

2   Jenne is here if the Court would like to hear from him

3   first hand, probably the most appropriate place would be at

4   sidebar because of the sensitive nature.  The Court can

5   do -- he can make a record.  He's here.  He is available

6   for deposition.  We've tried to work with defendant's

7   counsel to make sure that they get the evidence they need

8   from him, and our argument is twofold, because Mr. Jenne

9   has this serious medical situation going on that affects

10  the health and well-being of his wife, and the care of his

11  children.  Our question and our ask of the Court is simply

12  to make Mr. Anderson carry his burden that Mr. Jenne is

13  material and necessary to his defense to a fair trial as

14  the law requires.  That's what we are asking, and that they

15  articulate to the Court the unique evidence that Mr. Jenne

16  can bring to the table that no one else can.  Otherwise we

17  suggest that it's cumulative -- this subpoena is cumulative

18  at best, harassing at worse.

19           MR. DAVIS:  Your Honor, May I supplement?

20           THE COURT:  Sure.

21           MR. DAVIS:  I'm the one that found the call in

22  the system that records the calls from St. Louis County

23  jail, has its own timing system and you can access it from

24  your desktop actually.  I then sent an email to Mr. Casey

25  explaining what the content of this call was, and that it

1    exposed Mr. Anderson's true reasons for Mr. Jenne's

2    appearance.  However, it's apparent as I sit here now, that

3    the timing on the website that St. Louis County uses and

4    the timing on a copy of the download is different.  So,

5    what the Court just heard basically the Government missed

6    its time marks, but I can relate to this Court and

7    certainly as Mr. Casey said, the Court can listen to this

8    entire tape, I think it's 12 or 13 minutes long, it's not

9    that long, where Mr. Anderson, defendant Anderson says to

10   Senior Anderson, that we, they, meaning the Government, we

11   know that Alexander Jenne falsified GPS documents and even

12   Title III documents and it's quite apparent that he's

13   referring back to a letter he wrote to the Court, that I

14   believe was addressed to the Magistrate Judge Baker, that

15   hinted to the fact that he believes the Government went to

16   a FISA Court and got a GPS order.

17           It's my belief from putting things together that

18   he thinks it's on that phone that Marc Johnson smuggled

19   into the jail, and that as soon as that is exposed we're

20   all going to learn this gotcha moment that Mr. Johnson

21   brought the phone to me.  And as an officer of the Court I

22   can relate to this Court that that did not happen.  I

23   didn't learn about that phone until defense counsel told

24   me, months, maybe even years -- year, and so it appears

25   from Mr. Anderson's conversation that we didn't catch

1   because these numbers didn't transpose as I thought they

2   would, is he wants there to be a big gotcha moment with

3   this agent, that quite honestly, Your Honor, does not

4   exist.

5             THE COURT:  I'm confused.  I don't know what

6   you're telling me in terms of the difference of the timing

7   of things.  I don't understand the significance of any of

8   that.

9             MR. DAVIS:  What I emailed Mr. Casey was, listen

10  to, and I'm making this up, between the one-minute mark and

11  the two-minute mark, and I had it downloaded onto my

12  computer to send to him.  What we open up now is my

13  download and that's from -- I don't know anything about

14  software, but it's different than what I listened to

15  originally.

16            THE COURT:  So you are saying there are different

17  parts of the tape that we should be listening to than what

18  we have just heard.  Okay.  I didn't quite understand.

19            MR. DAVIS:  Yes.  Wherein the defendant plainly

20  says they are going to expose Mr. Jenne as a liar, even

21  says, dad, I'll tell you what the Government's thinking.

22  Mr. Jenne has come to them and said, look, I'll go along

23  with your lies, but if I have to get in front of the

24  District Court, I'm not going to do it anymore, and I'm

25  going to tell the truth, and, dad, they know that, and

1    that's why they don't want Jenne there.  And then you hear

2    the conversation about how adamant he is that he is going

3    to be here and this gotcha moment coming that doesn't

4    exist.

5         THE COURT:  Let me hear from the defendant.  Have

6    you all given this tape to the defendant?

7         MR. CASEY:  Yesterday, yes.

8         MR. GELFAND:  Your Honor, we just received a copy

9    of this tape yesterday evening by email from Mr. Casey.

10   Both Mr. Margulis and I have listened to it.  We think it's

11   totally irrelevant with all due respect, to the issue

12   before the Court.  And the reason why, Your Honor, is

13   because the tape is a recorded jail-call conversation

14   between Mr. Anderson and Mr. Anderson's father.  And with

15   all due respect to everyone involved and their opinions,

16   whatever was stated or candidly inferred from that tape, is

17   not why Mr. Margulis and I putting on a zealous defense for

18   Mr. Anderson, in our judgment believe that Mr. Jenne has

19   relevant and proper testimony to offer in Mr. Anderson's

20   defense.

21        THE COURT:  And what is the subject of that

22   testimony?

23        MR. GELFAND:  Would we be able to provide that to

24   the Court in ex parte so as not to prejudice Mr. Anderson?

25        THE COURT:  You can.

1          MR. CASEY:  I apologize for interrupting.  The

2   only issue is Mr. Jenne is here.  We produced him.  He's

3   here till Saturday and then his surgery is scheduled to

4   take place on Monday.  If the Court is going to modify the

5   subpoena to allow him to appear for deposition, he's here,

6   he's ready to go, we can schedule this tomorrow.

7          THE COURT:  Let me tell you all one thing.  I am

8   not going to require that Mr. Jenne's deposition be taken,

9   okay, because I don't think it's appropriate to require the

10  Government, I mean the defendant to basically layout the

11  questioning that it proposes to do of any witness well

12  before the Government has put on its case, which is what we

13  would be doing here.  And I understand that sometimes that

14  happens with material witnesses, but that's so that they

15  can like leave the country.

16          So, the question in my mind is twofold:  One, as

17  with any subpoena, that the defendant may have to make a

18  showing that the testimony is relevant and material to the

19  case, especially whereas here they have basically

20  subpoenaed every single agent to come and testify at the

21  trial.  And I don't know how we're going to do that in one

22  day, but I'll leave that to the defendant to figure out.

23  And so I really do want to hear from the defendant because

24  right now you're anticipating that your case is going to

25  take a day and I don't really understand how you are going

1    to put on ten Government witnesses in a day.

2            MR. GELFAND:  I can be clear, Your Honor.  Many

3    of them we subpoenaed as, not including Special Agent

4    Jenne, but we subpoenaed as potential rebuttal witnesses,

5    based on their direct interviews of Government cooperating

6    witnesses who will be testifying at trial.

7            So, as the Court is aware, if these witnesses

8    testify in a way that does not invite such testimony, we

9    have no intention of calling these people at all.

10           THE COURT:  Can we identify which on that list

11   you are intending to subpoena as rebuttal witnesses, just

12   in case you need them because that might help us narrow the

13   focus of what we are discussing here.

14           MR. GELFAND:  Yes, Your Honor.  DEA Special

15   Agent, I apologize if I'm not giving the correct

16   designation.

17           THE COURT:  Just give me last names.

18           MR. GELFAND:  Lannom, Wilson, and candidly the

19   other three the Government is calling in its case in chief,

20   which for the record are Feagans, Krieg and Mr. Moles.

21           THE COURT:  Okay.

22           MR. GELFAND:  The other witnesses --

23           THE COURT:  The others that you are intending to

24   call in your case are?

25           MR. GELFAND:  Special Agent Jenne to the extent

1    that we can get him served, subject to another issue that

2    the Court has to take up, Secret Service Special Agent,

3    Bryce Husak, or former Secret Service Special Agent Husak,

4    And again depending on the other -  the Court's ruling on

5    the other issue, Secret Service Special Agent Stephen

6    Jenkins, and I don't anticipate we would have to recall any

7    of the law enforcement agents the Government calls, but

8    obviously that could depend on the Court's rulings.

9         THE COURT:  We will make that determination when

10   we determine whether a witness is excused or not excused.

11        MR. GELFAND:  Yes, Your Honor.  So, I am

12   expressly, just for the record, not including those

13   individuals that the Government is calling.

14        THE COURT:  So, the three Government witnesses

15   that you are anticipating calling for your case in chief,

16   and I realize that may depend upon other rulings, are

17   Jenne, Husak and Jenkins?

18        MR. GELFAND:  Yes, Your Honor, and potentially

19   Special Agent Moles.  But that's a different issue and he's

20   going to be here as the case agent at trial anyway.

21        THE COURT:  Does that help narrow things a little

22   bit for you?  I understand that doesn't address the issue

23   of Jenne and we'll get back to Jenne.

24        MR. CASEY:  With respect to law enforcement

25   witnesses, he can call all he wants.  The only serious

1    issue he has expressed to us is Jenne, and that's why we

2    brought it to the Court's attention.  With respect to the

3    rest of the witnesses, we just felt that they needed to

4    carry their burden to show that these weren't cumulative.

5    With law enforcement, the worse case scenario is they sit

6    and wait and then they go back to work.  It's Mr. Jenne

7    that poses a very real problem.

8            THE COURT:  Now, I'm sorry.  You all filed a lot

9    of stuff.  Did I recall correctly that the surgery that is

10   being done is with respect to his wife?

11           MR. CASEY:  That's correct.  My understanding,

12   and Special Agent Jenne can articulate this better than I

13   can, his wife is undergoing serious pulmonary invasive

14   surgery on Monday.  Her recovery time according to her

15   doctor, is going to be a few weeks to a month.  While she

16   is recovering she will be medicated, on bed rest, will not

17   be able to drive, move.  Mr. Jenne, from my understanding

18   from him is going to have to take care of her and they also

19   have four children under the age of eleven, five, eight,

20   eight and eleven.  He recently moved to Corpus Christi.

21   Was restationed to Corpus Christi, so that his wife could

22   get medical attention that she needed, from his previous

23   station office.  They don't know anyone or have family

24   there and for him, even if they said you are going to be

25   here on X day, to fly from Corpus Christi to St. Louis is

1   going to take some time to get here and get back and what

2   does his wife and children do while he's gone.  It's a

3   serious concern.  We tried to work out some alternatives

4   with defense counsel.  They insisted that Mr. Jenne be here

5   and so we said, okay, we'll take it to the Court.

6          THE COURT:  Why is it that the defendant is

7   unwilling to do this by video conference?  We do have

8   witnesses testify by video conference these days all the

9   time.

10         MR. GELFAND:  I understand, Your Honor, and I

11  have conducted direct and cross-exminations by video

12  conference in courtrooms as well.  What I can represent

13  without jeopardizing attorney-client privilege is that we

14  had a very real conversation about that option with our

15  client.  We discussed the pros and the cons.  We explained

16  that, at least in my experience, when this happens, the

17  witness is -- it's a two-way live video feed.  The witness

18  is sworn in in an appropriate environment, but we also

19  explained that accurately, candidly what the jury is seeing

20  is on a television monitor.

21         THE COURT:  A really big one.

22         MR. GELFAND:  I understand that, Your Honor.  But

23  that's no denying this, and this was our client's concern

24  is that it is just a different effect on the jury than live

25  witness testimony.  What I would like to add, Your Honor,

1    just so the Court understands, is that when this was

2    brought to, well before any involvement by the Court, to

3    the attention of Mr. Margulis and me, at the Government's

4    request we speak extensively with the DEA agency counsel,

5    or whatever the formal title is, about this situation.  We

6    tried to get a better understanding of what the situation

7    was.  We represented to the DEA counsel and to the

8    prosecutors in this case that we would be willing, provided

9    that the Court would agree on it, and I candidly assume the

10   Court would, to even call Agent Jenne out of order so as to

11   ensure that Agent Jenne was only having to be in St. Louis

12   for one trial day so that he can get on the stand.  That --

13   to the extent that during, especially with the Government's

14   estimate of how long their case was going to be, that

15   during the first week of trial -- we wouldn't anticipate

16   this to be the case candidly -- but to the extent that we

17   were to ever decide, you know, that we were actually not to

18   call Special Agent Jenne, we would immediately inform the

19   Government of that so that this isn't hanging over

20   someone's head.  And we thought that we basically did, and

21   are still willing to do everything possible to preserve our

22   client's constitutional rights, but at the same time we're

23   not unsympathetic to the burden, but limiting the burden to

24   Mr. Jenne to be physically in St. Louis for one trial day,

25   you know, fly him in in the morning, if that's possible,

1    and fly out in the evening, or whatever it may be.  We're

2    not suggesting that that doesn't present a burden on this

3    witness, but I think it's abundantly reasonable to

4    basically say we'll limit it to that, but still protect

5    Mr. Anderson's right to call him in his case in chief.

6              THE COURT:  Well, we'll see.  I'm going to give

7    you the opportunity to advise me ex parte why you believe

8    you need his testimony.  I may need to communicate portions

9    of that to the Government, so that I can test the veracity

10   of what I am being told in terms of the need, and then my

11   guess is that one of three things is going to happen.  I'm

12   either going to tell you that you have not met your burden

13   to establish the need for this witness, or I will tell you

14   that you have established the need for the witness to be

15   here live, or I will tell you that there isn't enough of a

16   showing for the witness to be here live, and you have a

17   choice between not calling him or having him testify by

18   video conference.  All right?

19             MR. GELFAND:  Yes, Your Honor.

20             THE COURT:  I'm going to excuse the defense side

21   from the courtroom.  Are the witness rooms open?  I'm

22   sorry, the Government.  Before we do that, Mr. Jenne, maybe

23   I can hear from you for just a moment, sir.

24             THE COURT:  Mr. Jenne, I'm not unsympathetic to

25   your situation, but is there some reason why given adequate

1  notice as to the timing that you could not arrange for a

2  nurse and day care to be there with your wife for one day?

3  MR. JENNE:  Your Honor, we've been in Corpus

4  Christi since November this past year, of 2016, not long

5  enough to where we've met people that, whether it be a

6  babysitter for an evening, or a caretaker for even a couple

7  hours, that we would feel comfortable leaving our kids with

8  their being four children, the oldest one being a special

9  needs child as well.  All of our family, I should say our

10  closest family is here in St. Louis.  My wife has gone

11  through a similar procedure before moving to Corpus Christi

12  and seeing her recovery from that procedure which was less

13  invasive, every indication from talking to the doctors and

14  what we've been told about this procedure, is that it's

15  going to be a more extensive recovery.

16  So, the doctors explained that limiting any

17  possible movement, more so bed rest for her, because in the

18  event that she was to move, try and do something whether it

19  be caring for the kids, making them a meal, doing something

20  for herself could have adverse affect on the actual

21  procedure.  This is an issue that she's -- impedes her

22  daily quality of life, and as Mr. Casey and the Government

23  have mentioned before, required us to ultimately relocate

24  from the previous office to where we are now.  So, getting

25  back to your question, there is not a family member, a

1   friend or a caretaker that we have found for something that

2   we would feel comfortable leaving the children with.

3              THE COURT:  I understand, but you could get a

4   nurse to look after your wife that day.  I assume that a

5   registered nurse would be as qualified to deal with your

6   wife's medical needs as you are.

7              MR. JENNE:  Your Honor, I'm not familiar with the

8   options down there in the way of nursing.  Again, it's not

9   only a matter of caring for my wife but for four children.

10             THE COURT:  I understand.  I'm just taking it one

11  at a time.  Is there some reason why you cannot obtain the

12  nurse to care for your wife for one day?

13             MR. JENNE:  Your Honor, again, I'm not familiar

14  with the resources down there.  I've expressed to

15  respective DEA personnel and personnel from the U.S.

16  Attorneys office that this is not an issue of testifying

17  whatsoever, I've communicated with them, again being here

18  on vacation more or less on a daily basis communicating

19  with them to let them know, again, this is not an issue

20  having to do with testifying.  It's the well-being of my

21  wife and my children.

22             THE COURT:  I understand that.  All right.  And

23  do you have family member that could go down to Corpus

24  Christi for a day or two?

25             MR. JENNE:  Your Honor, most of the family that

1    we have here is currently working, or working full time, so

2    I'm not -- I'm not aware of them being in a position to be

3    able to do that.

4              THE COURT:  Okay.  Well, people take off of work

5    all the time.  I realize that this is not an ideal

6    situation, I'm just trying to figure out other than work is

7    there some restriction on the ability of your family

8    members here in St. Louis to travel?

9              MR. JENNE:  I don't know whether it would be

10   financial or whatever the case might be.

11             THE COURT:  But nobody has any physical

12   impediment to traveling, your family members here aren't

13   incapable of traveling?

14             MR. JENNE:  No, Your Honor.

15             THE COURT:  All right.  Thank you.

16             THE COURT:  Are you okay with Mr. Anderson's

17   parents staying in here?  I'm not sure I understand why

18   they should be in here.

19             MR. GELFAND:  They should be excluded.

20             UNKNOWN SPEAKER:  I can leave.

21             THE COURT:  You are presenting this to me ex

22   parte, I didn't know why you wanted outside people here.

23             MR. GELFAND:  Sure, that's fair.

24             (COURTROOM CLEARED AND EX PARTE PORTION OF THE

25   PROCEEDINGS WERE HAD.  PUBLIC PROCEEDINGS THEN CONTINUED AS

1   FOLLOWS:)

2          THE COURT:  Mr. Davis and Mr. Casey, I have a

3   couple of questions that I want to ask you.  A search

4   warrant was conducted with respect to Mr. Hounsom's house

5   at some point?

6          MR. CASEY:  That's correct.

7          THE COURT:  The DEA-6 revealed that certain items

8   were seized from that house that may have included currency

9   and perhaps one or more firearms?

10          MR. CASEY:  From Mr. Hounsom's house, no, Judge;

11   from Mr. Anderson's parents' house.

12          THE COURT:  Do you all have some evidence that

13   there was something -- that a search warrant was conducted,

14   from Mr. Hounsom's house?

15          MR. DAVIS:  Judge, we could be mistaken, but

16   Mr. Hounsom was living with Rachael Anderson in what would

17   have been the Anderson's, this Anderson's grandparents

18   house on Blackthorn, that's the search warrant.

19          MR. MARGULIS:  That's the one.

20          MR. DAVIS:  As I am standing here right now, I

21   don't recall if there were firearms seized and what else?

22   Did the Court say, currency?

23          THE COURT:  Currency and perhaps a firearm

24   seized.

25          MR. MARGULIS:  There was definitely currency,

1    because we reviewed that this morning.

2              THE COURT:  Can you tell me?

3              MR. MARGULIS:  Firearms, I'm not a hundred

4    percent sure.

5              MR. DAVIS:  From my memory, what I can add to

6    this, Your Honor, is that I simply don't remember.  I know

7    there's a piece of evidence that we intend to introduce at

8    trial, but it's a receipt that came from that residence,

9    but I can certainly find out.

10             MR. CASEY:  I don't believe any of the firearms

11   came from Blackthorn.

12             THE COURT:  What about currency?  Was currency

13   seized from Blackthorn?

14             MR. CASEY:  I thought both pieces of currency

15   came from Concord evidence.  We can get that straightened

16   out, Your Honor.  It's clearly a factual matter based on a

17   DEA-6 from  the search, but we did just review the exhibits

18   this morning at a conference room, and we're both --

19   our recollection is that there was definitely some currency

20   seized from the residence.  There was some paperwork I know

21   that Mr. Davis is referring to that was seized.  I'm not --

22   Mr. Gelfand seems to recall there was one firearm seized

23   from that residence, I'm not sure about that, but as I

24   said, I think all we have to do is look at the DEA-6.

25             THE COURT:  You all will have to get back to me

1   and let me know that.  And is the Government intending to

2   adduce evidence with respect to Mr. Anderson's whereabouts

3   post-indictment and prearrest, and whether he was or was

4   not at the place that his attorney was representing he was

5   at?

6         MR. DAVIS:  Put simply, no.  I don't see any

7   relevance in that for the Government to produce such a

8   thing.  Out of an abundance of caution, I know there is

9   affidavits perhaps or something of that nature, and we have

10  certainly belabored this with counsel back and forth about

11  whether he was in the country or out of the country, but in

12  the end it was irrelevant to us.

13        THE COURT:  What I want to know is whether the

14  Government is planning to offer in its case where

15  Mr. Anderson was post-indictment and prearrest?

16        MR. DAVIS:  No.

17        THE COURT:  And is the Government seeking to

18  introduce evidence of what was seized from Mr. Anderson's

19  parents' house?

20        MR. DAVIS:  Some of it, yes, money, guns.

21        THE COURT:  And is the Government taking the

22  position that Mr. Anderson lived at that house at the time?

23        MR. DAVIS:  Yes.

24        MR. CASEY:  No.

25        THE COURT:  You are taking the position that he

1    lived at the house at the time?

2              MR. DAVIS:  At the time of the search warrant,

3    no, that was not our position.  That was his parents' house

4    and he was there at the time of the search warrant, but not

5    residing there.

6              THE COURT:  And it's the Government's position

7    that Mr. Anderson actually lived somewhere else at that

8    time and you are not contesting that?

9              MR. DAVIS:  I don't know the answer to that

10   question, to tell you the truth.  He seemed to be rather

11   nomadic to me, but it certainly isn't a point we are going

12   to try to make at trial, whether he was or wasn't living

13   there.

14             THE COURT:  Okay.  But you can't really say at

15   this moment what your evidence is going to be with respect

16   to whether Mr. Anderson did or did not live there at the

17   time?

18             MR. DAVIS:  I don't think there's direct evidence

19   that we can show that he was living there or not, but there

20   will certainly be evidence that he had frequent access to

21   that house.

22             THE COURT:  All right.  So, this is what we are

23   going to do.  Right now it is my belief that any testimony

24   by Mr. Jenne is at best marginal in terms of relevance.

25   But I cannot say how certain items will unfold.  I cannot

1    say for instance what the Government's testimony is going

2    to be with respect to where Mr. Anderson lived at the time

3    of the search warrant.  The Government is certainly seeking

4    to introduce that evidence.

5           And Mr. Jenne, you are going to need to make

6    arrangements, and you are going to need to make two sets of

7    arrangements, and I am going to request the Government to

8    make arrangements for Mr. Jenne to be able to testify by

9    video conference in this matter.

10          It is certainly possible based upon what the

11   defendants may present to me and based upon the

12   Government's case in this matter, that I may be convinced

13   that Mr. Jenne needs to be here live, and if so, I want you

14   all to work with one another to arrange that date and

15   Mr. Jenne you will need to check the airline schedules and,

16   honestly, Mr. Jenne, I am sorry.  I am very sympathetic to

17   your situation, but honestly I took care of my mother's

18   medical needs for many, many years, and I have to believe

19   that if in St. Louis there are a multitude of nursing

20   services that will send people out to your house to provide

21   nursing services here in St. Louis, that they exist in

22   Corpus Christi, too.

23          And I suggest that you talk to the doctors who

24   are going to be dealing with this surgery, and ask them who

25   can provide those services, those nursing services for your

1  wife.  I want you to check the airline schedules and try to

2  work out -- I want you all to work out with one another a

3  date and time for Mr. Jenne's testimony, that I assume

4  later after the surgery, rather than earlier is better, but

5  we're not talking about putting him on during the

6  Government's case in chief, so we are at best talking about

7  a week after the surgery has taken place.

8           So try to arrange that date, look at the airline

9  schedules, and do your best to set up a date and time that

10  will provide the least possible time commitment here in

11  St. Louis.  At the moment you should assume that that

12  testimony is going to be by video conference, but that is

13  not a final ruling, and I want the parties to be in a

14  position to go either way, by video conferencing or by live

15  testimony.  And Mr. Jenne, I am sorry.  I realize that you

16  have just moved to Corpus Christi, but the other thing is

17  you have gone to an office where other people are, and I

18  assume that some of them have been living there for a

19  while, and so I strongly suggest that you send an email to

20  the people who are in your office, and let them know your

21  predicament, and I have to believe that some of those

22  people, if you are not able to arrange for one of your

23  family members to go down there to care for the children,

24  that one of our coworkers will be in a position to help you

25  find someone to care for your children that day.  All

1    right?

2              MR. DAVIS:  Crystal clear.

3              THE COURT:  Anything else with respect to that

4    motion?

5              MR. CASEY:  No, Judge.

6              MR. GELFAND:  No, Your Honor.

7              THE COURT:  Does that take care of the defendant

8    on that motion?

9              MR. MARGULIS:  Yes, Your Honor.

10             THE COURT:  All right.  Now, you understand if

11   you really want Mr. Jenne live, you are going to have to

12   come back at me based upon the testimony we have heard with

13   some level of specificity and tell me why you need him,

14   because I haven't heard it yet.

15             MR. GELFAND:  We understand, Your Honor.

16             THE COURT:  Please understand, I am not trying to

17   deprive Mr. Anderson of a fair trial.  I want everyone here

18   to have a fair trial, but you don't necessarily get

19   something just because you want it.  Sometimes you got to

20   need it and I haven't heard that yet.  All right?

21             MR. GELFAND:  We understand, Your Honor.

22             THE COURT:  Okay.  So, that is that motion and

23   hopefully we will get through some of the others more

24   quickly.  Is there anything else with respect to 938 that

25   we need to know?  Know which witnesses are on just going to

1    be there in case someone testifies, you know,

2    inconsistently, right?

3           MR. CASEY:  Yeah, I mean, I guess to the extent

4    that they've been served.

5           THE COURT:  Okay.  The next motion in limine that

6    I have here is 945 with respect to references to

7    punishment.  And it is my understanding, if I'm

8    understanding this correctly, that the defendant agrees

9    that they are not going to attempt to be offering any

10   evidence of Mr. Anderson's punishment or trying to make

11   arguments that Mr. Anderson's life is on the line, and that

12   the only testimony that you do not want to be precluded

13   from offering is with respect to cooperating witnesses who

14   have received some benefit with respect to their

15   sentencing.  It is the defendant's position that you should

16   not be precluded from exploring that; is that a fair

17   summary?

18          MR. GELFAND:  Precisely, Your Honor.

19          THE COURT:  Does the Government have any problem

20   with that?

21          MR. CASEY:  No.

22          THE COURT:  So 945 is going to be denied as moot,

23   based upon the parties' agreements that the defendant is

24   not seeking to offer any evidence with respect to

25   Mr. Anderson's punishment, directly or indirectly, and the

1   Government's understanding that that does not preclude the

2   defendant from cross-examining cooperating witnesses with

3   respect to benefits that they are receiving for their

4   testimony, which might involve, you know, something like a

5   mandatory minimum, that they are going to be relieved from,

6   correct?

7          MR. GELFAND:  Correct.

8          THE COURT:  Good.  Next one is 946 and this is

9   the Hounsom forfeiture affidavit.  And this is the Hounsom

10  affidavit with respect to forfeiture, yes?

11         MR. CASEY:  Yes, Judge.

12         THE COURT:  And this has been marked as

13  Defendant's Exhibit A; is that correct?

14         MR. CASEY:  I don't mean --

15         THE COURT:  Just so we all know what we are

16  talking about.  All right.  And so I have reviewed and I

17  think there are a couple of different pleadings that relate

18  to that, we have got 946 and then we had --

19         MR. CASEY:  Can I run it down for the Court?

20         THE COURT:  Yes.

21         MR. CASEY:  We had my preliminary motion in

22  limine, you had the defense response and a defense motion

23  in limine.

24         THE COURT:  That's what I'm trying to get the

25  number.

1          MR. CASEY:  The preliminary admission and my

2     response to that.

3          THE COURT:  So, the Government's affirmative

4     motion was 946 and then we had the defendant's affirmative

5     motion in limine on this matter, which is 954 and then I

6     believe we had responses to each that were perhaps filed

7     today.

8          MR. CASEY:  Response from the defense was filed I

9     think Tuesday.  My response technically is today.  It was

10    late last night.

11         THE COURT:  So the operative motions are 946 and

12    954 and then both sides have responded to the others'

13    motions.

14         MR. CASEY:  Correct.

15         MR. GELFAND:  Yes, Your Honor.

16         THE COURT:  So I have reviewed all of those, and

17    so is there anything that either party wishes to add in

18    argument, in response to that?

19         MR. CASEY:  No, out of respect to the Court's

20    time, the Government leaves it at that.

21         THE COURT:  I don't know who is arguing that,

22    Mr. Gelfand, and tell me Mr. Gelfand why you believe -- I

23    understand that one of the grounds that you are asserting

24    is that it is an affidavit that is in the court file and as

25    a court record it is admissible.

1          MR. GELFAND:  Yes, Your Honor, at the very

2     least.

3          THE COURT:  And I'm refusing it on that basis.

4     The mere fact that somebody files an affidavit in state

5     court, does not mean that that affidavit may be used in

6     evidence as a self-authenticating document.  Otherwise

7     every affidavit that somebody filed in support of a summary

8     judgment motion, the parties could submit that in lieu of

9     live testimony, so, no.

10         MR. GELFAND:  Your Honor, to clarify, and I

11    appreciate that, but our intention was -- and I apologize

12    if we were unclear in our pleadings.  The affidavit

13    argument, the argument that it's a certified Court

14    document, was solely intended to get past the 902 hurdle,

15    not intended to suggest that it's independently admissible,

16    knowing that we still have to get past the hearsay

17    exception.

18         THE COURT:  That's just authenticity argument and

19    that is not the gravity of the Government's objection.

20         MR. GELFAND:  We agree, Your Honor.

21         THE COURT:  All right.  So your next argument is

22    it is a statement in a document that reflects an interest

23    in property.

24         MR. GELFAND:  Yes, Your Honor, Rule 803(15)

25    expressly states that a statement contained in a document

1    that purports to establish or affect an interest in

2    property, if the matter stated was relevant to the

3    document's purpose, is an exception to the rule against

4    hearsay regardless of whether the witness is available.

5    And a claim in a forfeiture case in which the declarant,

6    Mr. Hounsom, expressly states he is the true and bona fide

7    owner of said property and that no other person is the

8    owner, clearly in our view falls within the scope of Rule

9    803(15) as a hearsay exception.

10          THE COURT:  Mr. Casey, do you want to respond on

11   that ground?

12          MR. CASEY:  I laid it out in my motion, Judge.

13   You said you reviewed it.  I would just direct the Court's

14   attention to the actual text of the rule.  The advisory

15   notes certainly contradict the defense argument and the

16   case that they cite in support upon further inspection

17   really has to do with a judgment from a Court that recites

18   certain facts that deals with disposal of property.  It's

19   not an affidavit filed by somebody saying I own it.

20          THE COURT:  Yeah, and I'm not convinced by the

21   803(15) argument either.  As I read the advisory committee

22   notes, we are basically talking about things like deeds and

23   things that affect interests in property and not someone

24   just executing an affidavit saying that I have an interest

25   in property, that that is my property.  I do not think that

1    the advisory committee notes support the proposition of the

2    defendant, and I realize that we're not just talking about

3    dispositive documents like deeds, but I do not believe that

4    803(15) was intended to encompass a document like that,

5    because -- and just looking at Federal Practice and

6    Procedure Section 7056, the 2017 edition, we are talking

7    about documents that are purported to affect interest in

8    property that are executed that would normally guarantee

9    the trustworthiness of the recital and relevant facts.  And

10   I just don't think that this is what was intended under

11   803(15).  We're talking about things like -- well, I just

12   think if you look at the advisory committee notes as

13   supported by 30(c) Federal Practice and Procedure, Section

14   7056, that this does not fall within 803(15).

15              Now, your third basis, if I'm understanding it

16   correctly, is that it's a statement against interest.

17              MR. GELFAND:  Yes, Your Honor.

18              THE COURT:  And tell me why you think it's a

19   statement against interest.

20              MR. GELFAND:  The Government has taken the

21   position from the moment that these items were seized to

22   its case in chief at trial, that these, this U.S. currency,

23   these firearms, basically what was the subject of

24   Mr. Hounsom's claim filed with the Court, were evidence of

25   a federal crime, which was the basis that they were seized

1   in the first place, obviously.  Mr. Hounsom under oath in

2   an affidavit represents to a federal court, I am the owner

3   of this and I'm the only owner of this, essentially

4   admitting that he owned items that are allegedly

5   incriminating.  It's clearly a statement against his penal

6   interest which falls within the hearsay exception under I

7   believe that's 804(b)(3).

8            MR. CASEY:  Judge, he didn't admit that I own

9   this money and it's drug money.  He just said, I own this

10  money, and if I'm mistaken, let me check the time line, I

11  believe the civil forfeiture action was filed before the

12  indictment.  So, he filed an affidavit before he was ever

13  indicted and formally accused of being in a drug conspiracy

14  and such that he wouldn't necessarily think that at the

15  time he filed that verification that he was admitting that

16  the drug money was his.

17           The second point, if I may, Judge, just to skip

18  ahead is the second prong of that particular rule which

19  talks about, if you are going to use it for penal, it's

20  contrary to penal interest, it has to be and the rule is

21  quoted in the --

22           THE COURT:  Trustworthiness.

23           MR. CASEY:  Trustworthiness, escorted by

24  corroborating circumstances that clearly indicate it's

25  trustworthiness.  I think the fact that Mr. Anderson

1    subsequently claimed it, admitted that it was his and the

2    other circumstances surrounding the seizure, including

3    Title III intercepts certainly casts doubt onto the

4    trustworthiness of that particular affidavit.

5            And, Judge, I'm not going to stand here and say I

6    know the law on this topic because I don't, but it strikes

7    me as against common sense that Mr. Hounsom asserts the

8    Fifth Amendment right on something that he stood in this

9    Court and pled guilty to and now he's going to reassert

10   that Fifth Amendment right and makes him unavailable to

11   testify.  I don't think that quite washes.

12           MR. GELFAND:  Your Honor, with respect to

13   trustworthiness, what the Government is essentially asking

14   this Court to do is make a factual determination that

15   Mr. Hounsom was not telling the truth, because we believe

16   that it is a factual question for the jury's consideration

17   at trial whether Mr. Anderson or somebody else owned this

18   property.  We believe that what does go to trustworthiness

19   and what the spirit of the rule is because ultimately the

20   question is whether it passes the threshold where a jury

21   can reasonably consider it, is that this was filed by an

22   attorney, Mr. Hounsom's attorney, Mr. Rosenblum.  It was

23   under oath and notarized, it was filed in a federal court

24   using language as clear and blunt as true and bona fide

25   owner, and no other person is the owner, and it was filed

1    to protect an interest in property in a civil interim

2    forfeiture proceeding.

3          We think the fact that this was filed before

4    Mr. Hounsom was indicted flows to our side, if you will,

5    because that's even more against his penal interest.  This

6    was filed after it was seized in a federal search warrant

7    by federal agents, and we think that it's fair and

8    appropriate for us to be able to present this to the jury

9    for its factual determination, as to whether the Government

10   has proven beyond a reasonable doubt that this should even

11   be considered against Mr. Anderson, this being the

12   currency.

13          THE COURT:  How is it that Mr. Hounsom has a

14   Fifth Amendment right that he can assert in this matter,

15   when he has already spoken and waived his right with

16   respect to that matter?

17          MR. GELFAND:  I think he has a Fifth Amendment --

18   well, first of all he has a Fifth Amendment privilege

19   because the Government is now claiming in its pleading that

20   he perjured himself in this, so he would have a Fifth

21   Amendment privilege with respect to the crime of perjury.

22          THE COURT:  No, they are not claiming that he

23   perjured himself.  They are claiming that the rules require

24   that there be corroborating circumstances that clearly

25   indicate the trustworthiness which would be your burden.

1   And the question is, do you have such corroborating

2   circumstances that clearly indicate the trustworthiness

3   that is different than we're saying that Mr. Hounsom

4   perjured himself?

5           MR. GELFAND:  Yes, Your Honor.  What I was basing

6   that on, was the Government called this a perjurious

7   document in its pleading, and so I was responding to that.

8   I believe that the corroborating evidence of

9   trustworthiness are, A, that this was filed by the

10  attorney.

11          THE COURT:  I understand.  Don't walk through all

12  of the facts that it was filed in federal court for me.

13          MR. GELFAND:  And so, I do believe that this

14  becomes an appropriate jury question, and I believe that he

15  does have a Fifth Amendment privilege as to any other crime

16  that he could be charged with in connection with this by

17  any state or federal authority.  Furthermore --

18          THE COURT:  But doesn't that kind of get you in a

19  catch 22 here, that the reason he's entitled to invoke his

20  Fifth Amendment rights is to protect himself because he

21  committed perjury, then how does that provide corroborating

22  circumstances that fairly indicate the trustworthiness of a

23  document?  The Government would not be in a position to

24  cross-examine Mr. Hounsom with respect to that document.

25          MR. GELFAND:  Our position is not that

1    Mr. Hounsom, A, committed perjury or that one has to be

2    guilty of an offense to assert a Fifth Amendment privilege.

3    The law is clear that you don't.  It just has to be

4    something that could tend to incriminate you if used

5    against you.

6              THE COURT:  I'm going to have to walk back

7    through the time line of when all of this happened, so I

8    will give you my ruling on this on a later date, okay?

9              So I don't buy the first two grounds that you

10   have offered, the question of whether it is admissible as a

11   statement against interest and whether the defendant --

12   whether Mr. Hounsom is properly unavailable as a witness.

13   That is the issue that I am concerned with.  And if you all

14   have anything further that you want for submit to me in

15   terms of case law on those issues, I suggest you do it

16   promptly.

17             MR. GELFAND:  Thank you.

18             THE COURT:  So the next one I have is the motion

19   in limine, number 947 with respect to evidence not

20   produced.  And may this be denied as moot?

21             MR. GELFAND:  Yes, Your Honor.  I just wanted to

22   note, for the record, I don't believe there's any dispute.

23   We had sent to the Government, but they had not received as

24   of the date this was filed, additional discovery in

25   particular FAA certified records.

1          MR. CASEY:  Can I speak to that for a second?

2    The point, just to move this along, the point of the motion

3    is to make sure that they don't show up in the middle of

4    trial and say, oh, we're going to use this with this next

5    witness.  It's just a measure to avoid that.  We've got the

6    FAA records.  Anything else they want to give us up to and

7    including the start of trial Monday morning is fine.  I

8    just want to, you know, I think the point of trial is to

9    avoid surprises with discovery rules and that's all this is

10   motion is supposed to do.

11         THE COURT:  So, I assume at this moment, you are

12   not aware of any other documents you need to use in your

13   case that you have not disclosed to the Government?

14         MR. GELFAND:  Correct, Your Honor.

15         THE COURT:  So, as of this moment 947 will be

16   denied as moot, on the basis that the Government -- the

17   defendant has disclosed what it plans to use and is not

18   intending to use things that it should have and did not

19   disclose.

20         MR. CASEY:  Yes.

21         MR. GELFAND:  Yes.

22         MR. CASEY:  Judge, I hate to go backwards, but

23   when you are deciding -- and we don't need to talk about it

24   because the pleadings speak for themselves, but when you

25   are deciding with respect to the Hounsom verification, it

1    gets into the second part of the motion in limine file

2    regarding the use of Mr. Anderson's suppressed statements

3    to, in rebuttal, to the use of the document, not only if

4    Mr. Anderson testifies, but any other defense witness  or

5    the scope to be determined by the Court.  So, I just want

6    to make sure that's on the record.

7            THE COURT:  Do you have any case law to suggest

8    to me that by offering this document the defendant has

9    opened himself up to the use of statements that have been

10   suppressed?

11           MR. CASEY:  Judge, that case law and the

12   explanation is in the papers that I filed with the Court.

13           THE COURT:  I don't remember seeing that.  I will

14   go back and look at it.  I remember seeing case law to the

15   effect that if the defendant were to testify and testify

16   inconsistently with that statement, that the Government

17   could use that evidence.

18           MR. CASEY:  Correct.

19           THE COURT:  Now, the question is, if the

20   defendant puts on some other witnesses, this would be

21   putting on a document in lieu of that witness, if the

22   defendant puts on some other witnesses to testify to

23   something inconsistent with Mr. Anderson's suppressed

24   statements.  Do you have some case law suggesting to me

25   that the exclusionary rule would permit you to offer the

1    excluded statements?

2            MR. CASEY:  Judge, my interpretation of the case

3    law cited, it's a logical extension.  I think the cases go

4    to the idea that you cannot use suppressed statements as a

5    sword.  It's there to protect as a shield, and it would be

6    unfair if they get to use this affidavit to cast doubt on

7    the ownership of this particular currency when -- and the

8    Government's hands are essentially tied in terms of

9    response, and if that extends to the defendant which it

10   certainly does, I think we can all agree the case law

11   certainly says that, then it seems to me and by the

12   analysis --

13           THE COURT:  But the defendant has actually cited

14   case law suggesting that the extension that you are

15   suggesting is inappropriate.

16           MR. CASEY:  I have not reviewed the defendant's

17   case law, so I can't comment on that one way or the

18   other.

19           MS. WISSLER:  Judge, I'm sorry, I hate to

20   interrupt but I would just interject that Rule 806 of the

21   Rules of Criminal Procedure, I'm sorry, the Rules of

22   Evidence, permit the Government to effectively

23   cross-examine an unavailable hearsay declarant as if that

24   person were testifying live.  In the Government's view if

25   Mr. Hounsom were here and testified live that, yes, in

1    fact, he did sign verification claiming that that money

2    were his, the Government would be entitled to cross-examine

3    him with the fact that another person had made a claim for

4    that same money.

5           How mechanically we do that, if the Court's

6    inclined to allow the verification into evidence, I'm not

7    sure, but it's certainly clear that the rules of evidence

8    allow the Government to cross-examine an unavailable

9    hearsay declarant as if he were here.  So, the rules

10   clearly provide for the Government to have the opportunity

11   to do that to avoid the precise kind of unfairness that

12   Mr. Casey has identified.  In other words, they are not

13   entitled to just put on a piece of paper that we can't

14   cross-examine, and not allow the Government to do what we

15   are allowed under the rules which would be cross-examine

16   him as if he were here.  So, if under no other rule or law

17   Rule 806 allows for the Government to cross-examine

18   effectively that document by admitting evidence that

19   someone else has made a claim for that same money.

20          MR. GELFAND:  Your Honor, with respect to the 806

21   argument, they are not really seeking to cross-examine the

22   declarant, Mr. Hounsom, by statements Mr. Anderson

23   allegedly made that the Court has suppressed.  So, I don't

24   think that that properly analyzes the issue.  The Court is

25   obviously aware with the case law we cited, this argument

1  has been made historically by the Government exactly as

2  Mr. Casey articulated, kind of it should extend and has

3  been flat out consistently rejected because of the

4  constitutional magnitude of suppression.  And so we don't

5  think that the admissibility of defense Exhibit A somehow

6  invites evidence that has already been suppressed on

7  constitutional grounds.  We do as the Court noted, readily

8  concede that if Mr. Anderson were to testify, for example,

9  that he didn't say that or testify about the substantive

10  topic inconsistently, then that would open the door based

11  on the current state of case law.

12        THE COURT:  I'll get back to you all on that, but

13  right now my understanding of the case law does not permit

14  the kind of extension that you are suggesting, Mr. Casey.

15  I know that you had a very long string cite of cases, if

16  I'm recalling this one correctly, and if you think one of

17  those cases goes to the particular issue as whether the

18  extension as you are suggesting is appropriate, then please

19  highlight that for me, because I'm not going to read

20  through every one of those string cites that you cited.

21  I'll take a look at the 806 issue and consider that as well

22  when I am looking at the statement against interests.

23        So, the next one that I have and just to take the

24  them out of order, just to finish up the Government's

25  motions, is the motion in limine with respect to

1    Agent James Taschner that was filed today, No. 961.

2              MR. CASEY:  Yeah, Judge, that was filed ex parte

3    under seal.

4              THE COURT:  I'm sorry.  I'm so sorry.

5              MR. CASEY:  That's okay.  The Court can review

6    the motion and decide.

7              THE COURT:  I apologize, if I should not have

8    mentioned it.

9              MR. CASEY:  It's fine, Judge.

10             MR. GELFAND:  It is news to us, Your Honor.

11             THE COURT:  Sorry, I am terribly sorry.

12             MR. CASEY:  It's okay, Judge.

13             THE COURT:  The next one I have is 948 filed by

14   the defendant with respect to the Government's proposed

15   expert testimony, and I did file an order requesting some

16   further supplementation by the Government, which has been

17   filed, I have reviewed that.  Anything further from the

18   defendant.

19             MR. GELFAND:  Your Honor, nothing further to add

20   as to our original arguments we addressed on our pleadings.

21   We would note that to the extent Agent Moles in particular

22   is permitted to testify as an expert witness,

23   notwithstanding our objections, we would like some

24   direction from the Court as to the scope of permitted

25   testimony about quote/unquote translating code words in

1   wiretaps.

2           MS. WISSLER:  Your Honor, as of right now we have

3   no intention of asking Agent Moles to do that.

4           THE COURT:  So am I understanding the Government

5   is not going to have anyone provide expert testimony with

6   respect to translating code words?

7           MS. WISSLER:  No, that doesn't mean that we're

8   not going to ask one of the participants --

9           THE COURT:  No, I mean an expert to testify as

10  opposed to a fact witness.

11          MS. WISSLER:  Correct.  We'll have Agent Moles

12  testify the fact that narcotic traffickers generally speak

13  in code, but we are not going to ask him to interpret a

14  specific call that was intercepted during the course of

15  this investigation.

16          THE COURT:  Does that take care of you,

17  Mr. Gelfand?

18          MR. GELFAND:  It does take care of the issue that

19  we were concerned about.

20          THE COURT:  So, with the Government's

21  supplementation, I am denying the defendant's motion.  I

22  think that it is proper and appropriate and has been

23  approved many, many times by the courts to permit

24  Government agents to testify in general about narcotics

25  trafficking, methods used, methods of concealment, methods

1    of transportation.  I believe that these are matters that a

2    jury is not going to be familiar with, and if so their

3    familiarity is based on TV, may not be correct, and so I

4    believe that this is expert testimony that will assist the

5    jury.  And I also believe that Agent Moles and the other

6    agents who have been identified in the supplemental report

7    filed by the Government have, based upon their training and

8    experience developed the personal knowledge to provide that

9    testimony.  And I further note the fact that some of that

10   knowledge, some of that opinion may be based on hearsay is

11   not a basis to exclude the testimony of an expert witness.

12   And if I recall correctly there was a Supreme Court case to

13   that effect within the last few years in which the Supreme

14   Court in dealing with the confrontation clause specifically

15   recognized that expert witnesses might be relying to some

16   extent upon hearsay testimony, and so I believe, and I

17   don't know it's probably from about three or four years

18   ago, part of the series of confrontation clause cases that

19   followed in the years after Crawford.  And so on that basis

20   I am going to deny the defendant's motion and unless there

21   is any particular area in addition to code words that the

22   defendant is concerned about, then I am denying the motion.

23   Is there any other particular area?

24            MR. GELFAND:  No, Your Honor I did want to

25   clarify though, if I may, the initial expert notice

1    included a very broad reference to cooperating witnesses

2    and the Court addressed that in its order in  the

3    supplemental expert disclosure by the Government, included

4    no such reference to any such witness.  I just wanted to

5    make sure that we are on the same page, if that means that

6    no -- other than these law enforcement officers that the

7    Court has already ruled on, no other witness will be

8    offering expert testimony including cooperators.

9              THE COURT:  Am I correct that, based upon what

10   has been filed, that the Government may well be putting on

11   cooperating witnesses who are going to testify about, based

12   upon the facts, their understanding and belief about what

13   was going on, and what things meant, and how they were

14   transporting things, in other words explanation rooted in

15   fact as opposed to expert opinion.

16             MR. CASEY:  Correct.

17             THE COURT:  So 948 based upon the limitation that

18   has been offered by the Government with respect to code

19   words is denied.  And then the next one is the defendant's

20   motion in limine 949 to exclude evidence of the 2008

21   arrest, and I have reviewed the parties pleadings with

22   respect to that.  Does anyone wish to offer further

23   argument?

24             MR. CASEY:  No, Judge.

25             MR. GELFAND:  No, Your Honor, we addressed it in

1    our pleadings.

2            THE COURT:  949 is denied.  It is my belief based

3    upon the timing of the arrest, and what is alleged in the

4    indictment that the 2008 arrest is being offered not by way

5    of 404(B) evidence, but in fact is part and parcel of the

6    evidence that is at issue in this case.  The mere fact that

7    the investigation itself may have begun at a later date and

8    time does not mean that the investigation did not turn up

9    evidence going back to 2008, and the indictment indeed

10   alleges that.

11           MR. MARGULIS:  Your Honor, the only thing I would

12   ask on that issue to the extent that any exists, if there's

13   any discovery with regards to that arrest, because we are

14   not aware of any, we've never seen any such as police

15   reports or evidence that our client was in fact arrested.

16           THE COURT:  Let me just ask first, is the

17   Government intending to offer evidence of the 2008 arrest?

18           MS. WISSLER:  No, Your Honor, the Government does

19   not intend to call any person who was a participant in that

20   arrest.  For example, we don't intend to call either of the

21   law enforcement officers who were involved in that traffic

22   stop.  However we do intend to elicit evidence from at

23   least one if not more individual indicating that

24   Mr. Anderson had spoken about that 2008 arrest, and that

25   following that 2008 arrest, he began to change his behavior

1    in response to it.

2              THE COURT:  All right.

3              THE COURT:  Does that do you, Mr. Margulis?

4              MR. MARGULIS:  I guess it does, Your Honor.

5              THE COURT:  So, let's go ahead and take another

6    ten-minute break here, and I'm sorry folks I realize that

7    you all started at 12:30 here, but we started at 8:30, so

8    we've been going all day.  So, we are going to take a

9    ten-minute break here.  We're getting close to the end.

10             MR. CASEY:  Judge, if I may, I can take one right

11   off your docket.  It's the dog sniff one.  We don't plan on

12   introducing any evidence of a dog sniffer.

13             THE COURT:  I saw that you responded that you

14   weren't going to do that.  I think we will run through the

15   other ones pretty quickly.

16             Let's go ahead and take a ten minute break

17   because Patti has been at this since 8:30 this morning.

18             (A SHORT RECESS WAS TAKEN, AFTER WHICH THE

19   FOLLOWING PROCEEDINGS WERE HAD:)

20             THE COURT:  Let me just ask you:  Do you all have

21   any reports of that 2008 arrest, is there like a DEA-6 of

22   the 2008 arrest?

23             MR. DAVIS:  I think I have reports from the

24   Highway Patrol Trooper, it was a state arrest.

25             THE COURT:  If you have them, would you go ahead

1    and give them to the defendant.  I realize that you are not

2    offering them in your case in chief directly, but it is

3    being offered indirectly, and since it's very difficult to

4    know exactly how its going to come out, I think that those

5    reports should be turned over to the defendant.

6              MR. DAVIS:  Sure.

7              THE COURT:  Especially since you are arguing it's

8    not 404(b), it's part of the case.

9              MR. CASEY:  Sure, okay.

10             THE COURT:  Okay.  And then the next one we have

11   is 950 which is the motion in limine to exclude evidence of

12   dog sniffing of currency, and if I understand the

13   Government's response, the Government is not seeking to

14   offer any such evidence and that can be denied as moot,

15   right?

16             MR. CASEY:  Correct.

17             THE COURT:  And the next one I have is the

18   defendant's motion in limine to exclude evidence of

19   expenditure of legal items.  We're talking about the

20   financial disclosures, is that right, No. 951, talking

21   about expenditures and things of that sort?

22             MR. GELFAND:  Yes, Your Honor.  We would be happy

23   to address any questions or we would also be happy to rest

24   on our pleadings to save some time.

25             THE COURT:  I have reviewed it both the pleading

1   and the response.  Mr. Casey, do you want do offer anything

2   else?

3           MR. CASEY:  No, Judge.

4           THE COURT:  No. 951 is denied.  I believe that

5   the case law clearly recognizes the ability of the

6   Government to offer by way of circumstantial evidence,

7   unexplained wealth or just large expenditures, things of

8   that sort, the purchase of luxury items or just purchase of

9   a lot of items, whether they be luxury or not, as

10  circumstantial evidence that the defendant was engaged in

11  some form of unlawful activity that has the tendency to

12  generate a lot of money.  And so 951 is denied and

13  obviously the Government is going to have to lay the proper

14  foundation for any documents as it offers it, so we can get

15  into those foundational issues later.  I assume that the

16  bulk of that is already covered by the affidavits that will

17  be entered, but, you know, there may be some other

18  foundational arguments that you all have and you will

19  certainly be free to make them.  I do not agree and reject

20  the defendant's argument that the Government must somehow

21  present evidence that the defendant himself made that

22  purchase, and indeed I'm not even sure how somebody in this

23  day and age would prove that, since, you know, people get

24  online and purchase things on Amazon and have them

25  delivered to their house.  And so the defendant will be

1    free to cross-examine witnesses that are talking about

2    that, to establish that they didn't actually see

3    Mr. Anderson purchase that.

4            But that goes to the weight of the evidence and

5    not its admissibility and so 951 is denied.

6            No. 952 is the motion, defendant's motion to

7    exclude evidence of the defendant's pretrial detention.

8    And it is my understanding that the Government has

9    responded it does not intend to offer any such evidence,

10   and to the extent there is anything that arose from jail,

11   that the parties would work with one another to establish a

12   mechanism for dealing with it that does not identify that

13   that conversation was made by the defendant from jail,

14   correct?

15           MR. CASEY:  Correct.

16           MR. GELFAND:  Yes, and my understanding is that

17   would only be on cross-examination from the defense's case,

18   from the Government's pleading as well unless I was

19   mistaken.

20           THE COURT:  I lost you.

21           MR. GELFAND:  My understanding was that the

22   Government does not intend to introduce quote/unquote jail

23   tapes regardless of any measures taken in its case in

24   chief.

25           MR. CASEY:  As of right now we have no intention

1    of introducing any jail call made by Mr. Anderson.

2            THE COURT:  Okay.  But I understand that

3    certainly things could come up if in trial, certainly if

4    Mr. Anderson were to testify, I assume that could all

5    change very quickly.

6            MR. GELFAND:  Of course, Your Honor.  Thank

7    you.

8            THE COURT:  All right.  Okay and then 953 was the

9    defendant's motion in limine to sequester witnesses and it

10   appeared to me that that could be denied as moot as well.

11   I understand that the Government -- that that is agreeable

12   that all witnesses will be excluded except for, of course,

13   Mr. Anderson and the case agent.  And is there any question

14   about the ability of the case agent to actually prepare

15   witnesses for trial with the understanding that he will not

16   be relating to those witnesses what the testimony has been?

17           MR. GELFAND:  No objection to that at all.

18           THE COURT:  So 953 is also denied as moot.  And

19   then I've got 954, we already covered.  And I will get you

20   a ruling on that, and then we have 955 proposed voir dire,

21   but I think that's not an issue that I need to address.

22   I'm sorry I wrote it down and I don't know if I just wrote

23   it down because it was a filing or if there was something

24   we needed to address.

25           MR. GELFAND:  No, we just filed it.

1          THE COURT:  Okay.  So, and the only question that

2     I had when I was looking at the proposed voir dire, and I

3     need to go back in and look at it, but perhaps you all can

4     look at it as well, in paragraphs 47 and 48 is the wording

5     that with respect to informants that that is something that

6     you can and should consider.  I would like to look at the

7     wording of the Eighth Circuit instruction, and I don't know

8     that it goes so far as saying you should consider, and if

9     it does not, I'd like you to back that off a little bit,

10    and if it does say "should" then I'm perfectly fine with

11    it.

12         MR. GELFAND:  Absolutely, Your Honor.

13         THE COURT:  But you know what I'm talking about,

14    because the may is certainly absolutely correct, and I know

15    that the Government has offered limiting instructions to be

16    used at trial with respect to the cooperating witnesses as

17    well, it's just the word "should" may go a step too far.

18         MR. GELFAND:  We'll make sure whatever we ask is

19    consistent with the instruction.

20         THE COURT:  Great.  Thank you.  And then 956 I

21    have the motion in limine to exclude evidence of the

22    firearm and the currency seized from the parents'

23    residence.

24         MR. GELFAND:  If I may, Your Honor.  The primary

25    fundamental issue before the Court in this motion is that

1  the particular items that are the subject of the motion

2  were items located by two secret service agents, Mr. Husak

3  and Mr. Jenkins, whom the Government has represented will

4  not be testifying in its case in chief.  And we believe

5  that this is not chain of custody type objections, which we

6  readily concede go to the weight and not the admissibility

7  of evidence, but that the initial foundation from the

8  seizing agent to basically say this is what I found, and

9  here is where I found it, has to actually come from that

10  individual.  What we understand from the DEA-6's, and if

11  we're mistaken we're certainly happy to be corrected, is

12  that with respect to this evidence Special Agent Moles in

13  an unrelated capacity has testified he was basically in the

14  kitchen of the residence with Mr. Anderson.

15          THE COURT:  That's my understanding as well from

16  the motion, the pretrial motions that were filed.  That's

17  what I understand.

18          MR. GELFAND:  So as a logical extension of that

19  our understanding is that while he was in the kitchen these

20  two former secret service agents or maybe they still work

21  for the secret service, but not locally, basically found

22  items that the Government seeks to introduce into evidence,

23  as we understand it through Special Agent Moles.

24          And we think that raises two issues.  One, a

25  threshold authentication objection that we wanted to raise

```
 1    before trial in the form of a motion in limine, and two, it

 2    raises a confrontation clause issue to the extent that

 3    Special Agent Moles would basically say this other person

 4    told me that this was in the basement, this was in the

 5    door.  We think that's clearly testimonial under the

 6    language set out in Crawford and its progeny, and we would

 7    rest on the pleadings.  But to the extent that the

 8    Government is not calling these secret service agents,

 9    which we are surprised about in light of this, we don't

10    think that this evidence is admissible.

11            THE COURT:  All right.  Mr. Casey?

12            MR. CASEY:  I don't have anything to add, Judge.

13    It's all in my response.  I believe there's photos from the

14    event that we intend to introduce into evidence.  The

15    document that, what was seized that day will be used at

16    trial.  This strikes me as a chain of custody

17    authentication argument regarding the seizure of items

18    during the course of the search warrant where the case

19    agent was present, and if the secret service agent told

20    him, hey, I've got something down here and then Agent Moles

21    goes and investigates that, then that to me is a classic

22    example of subsequent steps of the investigation that Agent

23    Moles then pursued.  So, I would just rest on the

24    pleadings, Your Honor.

25            THE COURT:  And I got to tell you, Mr. Casey, I
```

1    got a real problem with this, okay?  And maybe I am reading

2    a little bit too much into this based upon the knowledge

3    that I have of this case, having had so many dealings with

4    this case, but my understanding is that somebody had

5    advised agents that something could be found in the house

6    and that the defendant Anderson was keeping certain money

7    in the house at a certain place that was near some Jacuzzi

8    or something like that.  Am I making this up?  And that a

9    search warrant was obtained and they go down and that's one

10   of the places where they go and they looked, and based upon

11   my recollection of the testimony that I read at the

12   pretrial stage, Agent Moles was upstairs with the

13   defendant, with Mr. Anderson at that time in the kitchen,

14   and that at some point he goes down there, but the items

15   were already found by some other agent, and if you were

16   trying to offer evidence that that item was found in that

17   place --

18             MR. CASEY:  Within the Jacuzzi.

19             THE COURT:  -- You are going to have to lay the

20   foundation for Agent Moles to have personal knowledge of

21   that.  Now, I don't know enough about the facts about how

22   everything transpired here to know whether he's going to be

23   able to lay that foundation or not, but if what he's going

24   to say is this money was found and it was taken out and

25   they took pictures of it, and it was taken out and it was

1   put on the table, and I didn't take the pictures so I can't

2   tell you for sure that that's where they found it because I

3   wasn't there, and I didn't see it, and that it was then put

4   on the table and I went down and I saw it down there on the

5   table.  I think he can testify that after some other people

6   came and did things, that there was money that was located,

7   but unless Agent Moles has firsthand knowledge of what was

8   found where, I don't know the mere fact that some other

9   agent told him that that's where it was is sufficient.

10        Now, I understand that this kind of stuff comes

11  in at trial all the time, but usually there is not an

12  objection to it, and the parties aren't really contesting

13  that that item was in fact found and seized in the house,

14  but we do have that objection here and the mere fact that

15  defense attorneys often don't object on that basis doesn't

16  mean that it's not a good objection.  And you're welcome to

17  put Agent Moles on and see if he can lay the foundation,

18  but if he cannot I would suggest to you that you'd better

19  figure out if those secret service agents are available to

20  testify and get them here.

21        MR. CASEY:  Okay, Judge.

22        THE COURT:  All right.  So, right now I can't

23  tell you, I am reserving that motion until we hear the

24  testimony because I don't know enough about these facts to

25  know whether Agent Moles is going to be able to lay the

1    foundation that you need or not.

2              MR. CASEY:  Understood.

3              THE COURT:  So, you should know I'm putting you

4    on notice that I have some concerns about this, and that he

5    may not be able to lay the foundation that I think is

6    necessary.  I agree with you that the confrontation clause

7    does not require you to put every single person in the

8    chain of custody here, but I agree with the defendant that

9    we are not talking about a chain of custody issue here,

10   we're talking about what was found and where.  And if Agent

11   Moles' sole basis of knowledge is that I went down and I

12   saw it after it was found and somebody told me that they

13   found it in the house as opposed to they brought it with

14   them and they put it out there, then I'm not sure that we

15   have the proper foundation for firsthand testimony to

16   establish that it is what it purports to be, namely, money

17   that was found in the house at that place.

18             MR. CASEY:  Okay, Judge.

19             THE COURT:  So.  We shall see.  I think that is

20   all of the motions in limine that I have now.  I do think

21   that there are a couple other quick matters that we need to

22   address.  And one of them is with respect to Agent Moles

23   who will be testifying as both a fact witness and an expert

24   witness.  I want to know what if any provisions the

25   Government is planning to make to alleviate any possible

1   confusion by the jury with respect to Agent Moles' expert

2   testimony versus his fact testimony.

3          MS. WISSLER:  I think it's fairly easy to

4   compartmentalize that and we've done this numerous times.

5   I know it's not the practice of this Court to ask the

6   Government or any party to essentially move someone in as

7   an expert.  I don't think it's appropriate.  I think that's

8   a disfavored practice and not my practice to do that, so I

9   don't intend to specifically move for his designation as an

10  expert.  However I do think that it will be fairly easy to

11  compartmentalize his testimony and make sure that

12  differentiate between when he is testifying about this

13  investigation in particular as opposed to investigations

14  generally that he has participated in throughout the course

15  of his training or experience.  And I think in that way we

16  can differentiate for the jury whether he's talking about

17  this group of people specifically, or people engaged in

18  this type of activity more generally.

19          THE COURT:  All right.

20          MR. GELFAND:  Can I confer with my client for

21  thirty seconds to make sure he understand the issue?

22          THE COURT:  Sure.

23          MR. GELFAND:  Thank you, Your Honor.

24          THE COURT:  Any problems with that?

25          MR. GELFAND:  No, Your Honor, as I understand it,

1    the proposal or suggestion is to compartmentalize the

2    testimony, but not to give any sort of limiting instruction

3    to highlight any particular aspect of the testimony which

4    we would concur with.

5            THE COURT:  Right.  Good.  If you all have

6    anymore particularized questions about how the Government

7    is planning to do this compartmentalization, you know, talk

8    to Ms. Wissler about it, and then if there are any issues

9    you all can present that to me.  But I will assume any

10   further questions the defendant has will be resolved from

11   further questioning of the prosecutor, and if there's an

12   issue you all will bring that to me.

13           MR. GELFAND:  Thank you, Your Honor.

14           THE COURT:  And does the defendant want a

15   limiting instruction with respect to the codefendants' plea

16   agreements?  In other words, the Government has provided

17   limiting instructions saying that the fact that a defendant

18   has pled should not be used as evidence of the defendant's

19   guilt, and the Government has proffered those instructions.

20   The question is, does the defendant want me to give those

21   instructions during trial?

22           MR. GELFAND:  One minute with our client.

23           THE COURT:  You don't have to tell me at this

24   moment, but do tell me before any cooperating witness

25   testifies because I do need to know whether you want me to

1    be reading such a limiting instruction or not.

2              MR. GELFAND:  I anticipate the answer is going to

3    be no, but we'll let you know.

4              THE COURT:  Is the Government seeking to

5    introduce the plea agreements themselves, or just to have

6    the witness testify that they did in fact enter into a

7    plea?

8              MS. WISSLER:  Judge, I think what we will

9    probably do is show them to the individual cooperators,

10   have them indicate that they recognize them and say, yeah,

11   that's a true and correct copy.  Whether we'll actually

12   move them in or not, I don't know, and moreover even if we

13   did, we would not suggest they should be provided to the

14   jury under any circumstances.

15             THE COURT:  Is that okay with the defendant?

16             MR. GELFAND:  Yes, Your Honor.

17             THE COURT:  Good.  And then do we have any issue

18   with respect to authenticity of the wiretap recordings?

19   Are the parties stipulating to the authenticity of the

20   wiretap recordings?  Because if there was a real problem

21   with that I would have expected it to be raised in the

22   pretrial motions.

23             MR. GELFAND:  No, we do not object to the

24   authenticity.

25             THE COURT:  But I understand you may want to

1    argue about what something means or what was said.

2            MR. GELFAND:  Yes, Your Honor.

3            THE COURT:  All right.  Good.  And the last one

4    is has -- does the defendant wish the forfeiture issues to

5    be decided by Judge or jury?

6            MR. GELFAND:  Candidly it's not something we have

7    discussed yet with our client, we will do that

8    immediately.

9            THE COURT:  Okay.  But understand this is

10   something we need to be able to tell the jury about when

11   they come.

12           MR. GELFAND:  I understand.

13           THE COURT:  And so I need to know whether we are

14   going to be taking them in two phases and presenting

15   additional evidence to them, or whether, you know, because

16   they need to know that forfeiture is an issue if it is

17   going to be decided by the jury.

18           MR. GELFAND:  We understand, Your Honor.

19           THE COURT:  All right.  Can you let me know by

20   end of tomorrow whether you are seeking to have any

21   forfeiture issues decided by the jury or by me?

22           MR. GELFAND:  Yes, Your Honor.

23           THE COURT:  All right.  Good.  So anything else

24   that we need to take up?

25           MR. MARGULIS:  Your Honor, I thought we just

1   needed to make a record on the plea offer.

2          THE COURT:  Right.  We will do that, but I meant

3   any other trial related issues.  Any other trial related

4   issues?

5          MR. MARGULIS:  I don't think so.

6          THE COURT:  All right.  I just want to remind you

7   all that we need your proposed jury instructions to be sent

8   to us.  If you have anything further that you want to

9   present to me on the issue or two that I have reserved,

10  make sure that you get it to me.  The Government is going

11  to be turning over any documents that it has with respect

12  to the 2008 arrest.  And I think there was something else

13  but I'm not remembering what.

14         MR. CASEY:  Here is what I have, decide on the

15  summary of the case and get that to you by three tomorrow.

16         THE COURT:  Right.  So, a summary of the case and

17  you're going to get that to me by 3:00 tomorrow, if you

18  can.

19         MR. CASEY:  And a list of prominent names to be

20  filed by the Court or provided to the Court by close of

21  business tomorrow, exhibit list, witness list, send

22  instructions to Sara by email, the Kansas stop, discovery

23  to defendant.  You're going to take or I guess accept a

24  certificate of, I'm sorry -- the confrontation clause issue

25  with respect to the certificate of noncompliance from the

1    IRS, that you said you expected that additional briefing by

2    tomorrow, if I have my notes correct, and then defense

3    wants to file defense instructions or objections.  They

4    have to do that at some point, but if I'm not misstating,

5    the Court would like that done sooner rather than later

6    That's my list, Judge.

7              THE COURT:  Anybody have anything else on the

8    list?  And I have, of course, taken under submission the

9    Exhibit A, so if you have something else you want to

10   highlight to me, get it to me quickly.

11             MR. GELFAND:  Yes, I don't know if I heard that,

12   so I apologize if I misheard it, but the issue on the

13   admissibility on the IRS lack of records issue?

14             THE COURT:  I think that's what the certificate

15   of noncompliance, I think you are talking about the same

16   thing.

17             MR. GELFAND:  Perfect.  And something else I

18   would just note for the record, Mr. Davis just handed to us

19   the Kansas arrest records.  So, we now have that.

20             THE COURT:  Great.  Thank you so much.  All

21   right.  So, I think that takes care of everything.  That

22   takes care of everything that I have on my list, and so I

23   think the last matter that we need to explore is what, if

24   any, offer and I know that we have some pleadings that

25   talked about offers way back when that were presented to

1    the defendant, and whether he wished to, whether he

2    rejected or accepted those offers and whether there is any

3    current offer on the table.  All right.

4            MR. DAVIS:  Mr. Margulis and I spoke two or three

5    days ago maybe on the phone and I think Mr. Gelfand was on

6    the phone also, and the Government through me suggested

7    perhaps going back to the ten year offer that was

8    previously withdrawn by the last time we were in this

9    situation, but I indicated that I would have to talk to

10   supervisors for that to happen, and I have not done that

11   yet.  As a matter of fact, I sort of got the impression

12   that it was going to be moot any way.

13           So, the offer as it stands right now is 13 years,

14   converted to months, whatever that is.  I'll leave it at

15   that.

16           MR. MARGULIS:  That's correct, Your Honor.  That

17   was the most recent offer Mr. Davis and I, and I do believe

18   my cocounsel Mr. Gelfand was on the phone as well.  I

19   believe that phone call took place on Monday.  It was our

20   understanding, we just had discussion about bumping it down

21   to ten including the time that he has served.  Mr. Davis

22   made it clear that he did not have authorization for that.

23   It was just a discussion that we had.  And Mr. Gelfand and

24   I did meet with our client at St. Louis County Jail in

25   Clayton extensively on Monday afternoon and evening to

1    discuss that issue amongst others.  And Mr. Anderson has

2    rejected the original 13-year offer and has also rejected

3    or indicated that he had no in interest in a 10-year

4    possibility that Government counsel and Mr. Gelfand and I

5    had discussed as well on Monday, and that's where we stand

6    now and we're ready to proceed to trial on Monday.

7              THE COURT:  And just to clarify, the 10-year

8    offer that you talked about, going back to my understanding

9    of what the 10-year offer was at that time was that it was

10   a 10-year offer with an express reservation that

11   Mr. Anderson would still be free to raise issues related to

12   the conflict of interest motions that had been asserted at

13   the pretrial phase as well, and so when you're talking

14   about the 10-year offer that he rejected, I'm trying to

15   understand whether that was a piece of it as well, or

16   whether we were talking about a different 10-year offer.

17             MR. DAVIS:  In all honestly, Your Honor, when I

18   was speaking to defense counsel on the phone Monday, the

19   waiver of appeal didn't even factor into the conversation.

20   It was a pretty casual conversation.  That was the original

21   offer that the Court's referring to last time we were in

22   this situation.  I can't say that that's the offer at this

23   point, but at this point is also sounds like it's moot.

24             THE COURT:  Well, that's what I want to

25   understand.  One of the reasons we hold these hearings is

1    to make sure that it is not unclear what was on the table

2    and rejected.  So, Mr. Margulis, when you were suggesting

3    the possibility of bumping it down to 10 years and that

4    your client in any event rejected that, were you assuming

5    that that 10 years did or did not preserve the defendant's

6    ability to appeal the denial of the motions to dismiss that

7    he previously filed?

8            MR. MARGULIS:  Your Honor, I was assuming that it

9    did not because Mr. Davis and I did not discuss that.

10            THE COURT:  So you were just talking about a

11    10-year offer that to the extent the operation of law might

12    waive those issues, that those issues might in fact be

13    waived by an operation of law?

14            MR. MARGULIS:  Correct.  At one time the offer

15    did include that, but we did not discuss that issue in the

16    most recent conversation.

17            THE COURT:  So, if I'm understanding correctly,

18    you have discussed with your client a 10-year plea offer

19    even though none has been made by the Government, you have

20    discussed with him whether you all wished to make

21    essentially a counteroffer to the Government for a ten-year

22    sentence as part of a plea, and that your client has

23    rejected that, and does not wish to make such a

24    counteroffer to the Government; is that correct?

25            MR. MARGULIS:  That is correct, Your Honor.

1          THE COURT:  And so at this moment there is no

2     offer or counteroffer on the table; am I correct?

3          MR. DAVIS:  Correct.

4          MR. MARGULIS:  Correct, Your Honor.

5          THE COURT:  And, so, Mr. Anderson, I'm going to

6     ask you to step forward here, please.

7          (COMPLIES.)

8          THE COURT:  And Mr. Anderson, you understand

9     --have you heard what's just been said here with respect to

10    the various plea offers?

11         THE DEFENDANT:  Yes, ma'am, I have.

12         THE COURT:  Was it your understanding that

13    several days ago that the prosecutors made an offer to you

14    for you to enter a plea of guilty with a deal that would

15    provide for a 13-year sentence?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Were you talking about that being a

18    (c)(1)(C) plea or a joint recommendation?

19         MR. DAVIS:  We never got a far.

20         MR. MARGULIS:  That's correct, never got that

21    far, Your Honor.

22         THE COURT:  You understand, Mr. Anderson, there

23    are two different ways that the parties may be talking

24    about a 13-year deal and one way they can be talking about

25    that is that the defendant enters into a plea and that both

1    of the attorneys, both of the parties enter a joint

2    recommendation for a 13-year sentence, but that's not

3    binding on me as a Judge.  And the other way that that

4    result can potentially be achieved is a more certain one

5    which involves what we call (c)(1)(C) plea, 11(c)(1)(C)

6    under rule 11(c)(1)(C) which then means it's a binding plea

7    offer such that the parties would enter into a plea that

8    you would in fact receive a 13-year sentence and if I was

9    not inclined to go along with that after I receive

10   sentencing documents, the parties would be free to back out

11   of the agreement and you would be free to withdraw your

12   guilty plea.

13           So, one is binding and the other is a

14   recommendation.  And all I would like you to do is spend a

15   minute talking to your attorney to see if whether it was

16   done as a binding plea as opposed to a recommendation would

17   make a difference to you.  In other words, if you were to

18   say, oh, well, if it was binding it would make a

19   difference, but if it's just a joint recommendation then I

20   am not interested.  I just don't want us to be laboring

21   under any misconception here, and that's not to suggest

22   that the Government would be willing to go with a (c)(1)(C)

23   plea, but we need to make sure that we're all talking about

24   the same thing.

25           THE DEFENDANT:  Yes, Ma'am.

1      MR. MARGULIS:  Your Honor, based on our

2  discussions with Mr. Anderson, we actually took a little

3  longer because I think we discussed all possibilities and

4  everything that we talked about with the Government, and

5  it's our understanding that Mr. Anderson is not interested

6  in any plea deal at this time of any kind.

7      THE COURT:  All right.  And so, Mr. Anderson,

8  that's all I want to spend a minute talking to you about,

9  so that I can make sure you understand the offers that were

10 made to you and that you are making your decision that you

11 -- whether you do or do not want to pursue any of those

12 possible plea deals, okay?

13     THE DEFENDANT:  Yes, ma'am.

14     THE COURT:  Do you understand that based upon

15 conversations between your attorney and the prosecutors

16 that an offer was made for you to plead to a deal that

17 would involve a 13-year sentence?

18     THE DEFENDANT:  Yes, I understand.

19     THE COURT:  The parties didn't get into the

20 detail of whether that would be a joint recommendation or a

21 (c)(1)(C) binding plea on me that would permit you to

22 withdraw your plea if I weren't willing to go along with

23 that 13-year sentence.  And regardless of whether it is

24 binding or just a recommendation, do you have any interest

25 in accepting such a plea?

1           THE DEFENDANT:  No, ma'am, I do not.

2           THE COURT:  And have you had a full opportunity

3    to discuss this matter with your attorney, sir?

4           THE DEFENDANT:  Yes, ma'am, I've discussed this

5    with my attorneys and thank you for the additional time to

6    talk to them about it.

7           THE COURT:  All right.  And to the extent you

8    have any questions about the offer being made, do you feel

9    like those have been answered for you?

10          THE DEFENDANT:  Yes, I feel that my attorneys

11   have adequately explained everything to me.

12          THE COURT:  And your attorney, I'm understanding

13   correctly, also explored with you the possibility of a

14   10-year deal, that I have kind of reframed as whether you

15   wished to explore with the prosecutors entering into a plea

16   that instead of a 13-year deal would instead be a 10-year

17   deal; do you understand that?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  Do you have any desire to explore the

20   possibility of entering into a plea that would involve a

21   10-year sentence for you, sir?

22          THE DEFENDANT:  No, ma'am, I do not.

23          THE COURT:  Regardless of what the details of

24   that were?

25          THE DEFENDANT:  Yes, ma'am.

1          THE COURT:  Regardless of whether it's a joint

2    recommendation or binding agreement or does or doesn't

3    preserve your right to appeal the motions that were

4    previously denied, you have no desire to pursue a 10-year

5    deal?

6          THE DEFENDANT:  No, ma'am.

7          THE COURT:  Any questions about that, sir?

8          THE DEFENDANT:  No, ma'am.

9          THE COURT:  Have you had a full opportunity to

10   discuss that decision with your attorney, sir?

11         THE DEFENDANT:  Yes, ma'am, I have.

12         THE COURT:  And you understand that we want you

13   to receive and be able to digest the advice and information

14   that is provided to you by your attorneys, but you

15   understand the decision whether to go to trial or accept a

16   plea or pursue a plea deal is solely yours?

17         THE DEFENDANT:  Yes, ma'am, I understand.

18         THE COURT:  It's not your parents', it's not your

19   lawyers', it's not anybody's decision but yours; do you

20   understand that?

21         THE DEFENDANT:  Yes, ma'am.

22         THE COURT:  Do you feel that you have had an

23   opportunity to receive all of the information that you need

24   to make a knowing and intelligent decision about whether

25   you should pursue one of the pleas that has been discussed

1    here or proceed to trial?

2              THE DEFENDANT:  Yes, ma'am, I do.

3              THE COURT:  All right.  Thank you.  Now, you

4    understand and probably does not -- is not pertinent under

5    these circumstances, but you understand that a defendant

6    always has a right to enter into an open plea to charges

7    that are asserted against them.  In other words, to plead

8    to the charges without any form of plea agreement, leaving

9    issues related to sentencing for the Court; you understand

10   a defendant always has that right?

11             THE DEFENDANT:  Yes, ma'am, I understand.

12             THE COURT:  Now, in other cases that may be a

13   more attractive option, because in most cases we are not

14   dealing with cases that carry a mandatory minimum.  And if

15   I am understanding correctly, the Count One that's been

16   asserted here, carries a 10-year mandatory minimum

17   sentence; is that correct?

18             MR. DAVIS:  Yes, Your Honor.

19             THE COURT:  And, you know, so pursuing an open

20   plea might not be a very attractive option for you in light

21   of the discussion we have already had, but I wanted to make

22   sure that you understand that there is a way for a

23   defendant to plead guilty to charges that doesn't have you

24   entering into a stipulation of facts or agreeing to any

25   particular facts; do you understand that, sir?

```
 1            THE DEFENDANT:  I do understand that, ma'am and

 2    may I clarify something?  I just would like to say that

 3    just based off of my recollection at this time, I would

 4    just like to inform you that my first offer was 17 years,

 5    then I was offered 14 years and then I fired my old

 6    attorneys and I was offered 10 years with what I was

 7    understanding was an appellate issue and then we had that

 8    hearing.  Then I was offered the 10-years with the

 9    appellate issue preserved, as far as prosecutorial

10    misconduct and ineffective assistance of counsel.  I just

11    would like the Court to know at no time was I ever offered

12    an amended charge under 10 years.

13            THE COURT:  Right.  I understand that and I'm not

14    understanding that anybody has talked about any offer that

15    would go below 10 years.

16            THE DEFENDANT:  Yes, ma'am.

17            THE COURT:  Now, if you are trying to make such a

18    counteroffer to the prosecutors, that would be up to you to

19    do at this point.  I can't make the prosecutors offer you

20    any particular deal, and while the parties certainly have

21    the capacity to allow someone to plead to an amended charge

22    that could get below the mandatory minimum, if that's what

23    you are looking for, sir, that has not been offered by the

24    Government to my knowledge, and it would be up to you to

25    make such a counteroffer to the prosecutors, if that's what
```

1    you want to pursue; do you understand that?

2              THE DEFENDANT:  Yes, ma'am, I understand.  And I

3    just want to inform the Court because I don't want you

4    think that I was, you know, up to something, but I was

5    actually trying to put together something in my layman

6    terms, you know, just to throw a counteroffer possibly out

7    because I didn't even know if it would be received.  But I

8    just wanted the Court to be aware that I have been in my

9    own mind, because my lawyers have been busy working on my

10   case, I have been trying to maybe figure out some type of

11   common ground.  But just so the Court is aware, it would

12   have to require an amended charge, but like I said, that

13   was all hypothetical thinking.

14             THE COURT:  All I can tell you, sir, is if you

15   believe that you wish to plead guilty and you wish to plead

16   guilty to an amended charge that would alleviate the

17   mandatory minimum, at this point in time it would be your

18   job to make such a proposal to the Government.  I am -- the

19   Government has not made such a proposal to you.  So, if you

20   are thinking that that's something that might be of

21   interest to you, I suggest that you try to clarify your

22   thinking on that point as quickly as you can, because

23   sometimes things can happen the days before trial that

24   don't happen anymore once the trial starts, you understand?

25             THE DEFENDANT:  Yes, ma'am, I do.

1          THE COURT:  And so if in fact you would like to

2    make any such proposal to the Government, the onus will be

3    on you and your attorney to craft what it is that you would

4    be willing to plead to and make that proposal to the

5    Government.  They would not be required to accept it, but

6    they would let you know whether they were accepting or

7    rejecting that.

8          MR. MARGULIS:  Your Honor, we have had over the

9    last couple years, if my recollection is correct, I would

10   call extremely very very informal conversations with the

11   Government about the possibility of less than 10 years, and

12   my recollection has always been that the Government is not

13   interested in that.

14         MR. DAVIS:  They were so informal, they were in

15   the lobby of the courthouse kind of informal, but Your

16   Honor, I've talked to co-counsel here, and, of course,

17   Mr. Anderson is speaking in layterms understandably so, if

18   he is interested in pleading to a nonmandatory minimum

19   sentence and virtually turning a trial into a sentencing

20   hearing, the Government would be amenable to that.  If he's

21   talking an 11(c) kind of plea, to a, and I'm picking a

22   number, eight years, the Government is not interested in

23   that.

24         THE COURT:  Okay.  So we're going to complicate

25   things for you here, Mr. Anderson.  But, you know, honestly

 1    folks, this is one of the reasons that we hold these

 2    hearings now, is to one, make sure that you fully

 3    understand the offers that have been made, and two, that we

 4    make sure you understand what the possibilities might be

 5    should you wish to pursue them.  And so you have just heard

 6    from the prosecutor that that is a possibility, it may not

 7    be in the form that you are envisioning it, but if there is

 8    some form of plea that you would like to pursue that would

 9    alleviate the mandatory minimum, but not necessarily

10    guarantee you any particular sentence, that's one, or to a

11    plea that alleviates you from the mandatory minimum but

12    does guarantee you some sentence less than 10 years.  Those

13    would be two different options.

14         I think what I have just heard from the

15    prosecutor suggests that option one is a possibility which

16    would then leave both parties free to present evidence at

17    sentencing with respect to the drug quantities, and then

18    sentencing issues would be determined by me, and I would

19    make determinations based upon the guidelines, and the

20    Section 3553 sentencing factors, what I thought the

21    appropriate sentence would be, if we took that option

22    number one; does that make sense to you?

23         THE DEFENDANT:  It makes perfect sense, ma'am,

24    and thank you for more accurately clarifying it for me.

25    I'm doing my best to understand.  As you can imagine my

1    nerves have been -- I've been staying up really late at

2    night and getting up really early.  So, I want to apologize

3    if any of my words have been unclear.

4              THE COURT:  No, don't apologize.  It's a good

5    thing that you raised this because, you know, these are

6    complicated matters, and especially when we're dealing with

7    cases that carry mandatory minimums and from what I am

8    hearing there is at least the possibility of a creative

9    option that might be amenable to both parties, and maybe

10   yes, maybe no.

11             MR. DAVIS:  Your Honor, I was talking to Mr.

12   Gelfand, and if it's amenable to the Court perhaps all

13   counsel could get together in a witness room, and spend

14   fifteen minutes talking instead of the whispering and be

15   able to come to the Court and to Mr. Anderson, obviously,

16   with a more concrete idea of a meeting of the minds.

17             THE COURT:  Absolutely, absolutely, and

18   understand folks it's okay with me either way, okay?  You

19   know the decision whether to enter into a plea or not enter

20   into a plea is yours to make.  The decision whether the

21   terms that are being proposed are acceptable to the

22   Government is for the Government to make.  I have no stake

23   in this.  If you wish to go to trial, then we'll go to

24   trial and I'll try to give you the most fair trial that I

25   possibly can.  But if in fact there is ground here for you

1     all to reach an agreement that doesn't give everybody

2     everything they want, but does give everyone a sufficiently

3     acceptable approach that eliminates some of the risks of

4     trial for both parties, then I want you to be able to

5     pursue that.  It doesn't matter to me how much work we've

6     done till now to get here, that's irrelevant.  That's my

7     job.  So, why don't you all go and talk, and we'll give

8     Patti another little break here and you let me know when

9     you are ready.  You know, if it's one of those matters

10    where you've got something fertile, and you need to talk

11    about it and explore it some more tomorrow, then that's

12    what we'll do, and if we need to make another Frye hearing

13    prior to trial, then that's what we will do as well.

14              THE DEFENDANT:  Thank you so much, Your Honor.

15              MR. CASEY:  Just one quick thing before we break

16    here, when I ran down my list, I think I left one thing off

17    and it was the video feed in Corpus Christi.  I believe you

18    said we should do that -- I will just do that.

19              THE COURT:  With respect to Agent Jenne, and I

20    apologize if I'm not getting his name right, I want the

21    parties to both be prepared to go full bore in two

22    different ways.  One, I want you to talk about a date when

23    you would present his testimony by video conference, and I

24    also want Mr. Jenne to make all of the arrangements that

25    may be necessary for him to come and testify live, in which

1    case I want you all to cooperate with one another with

2    respect to the date when that would occur, and Mr. Jenne

3    may need to check some travel, may need to talk to family,

4    other people as well, and so I want both options fully

5    ready to go, so that I will be in the position to make the

6    determination as to the appropriate manner in which to go

7    forward after we have let some of the direct testimony come

8    out in the matter.

9         MR. CASEY:  Will do, Judge.

10        THE COURT:  So, I will be back in chambers.  Just

11   let me know when you are ready.

12        (A SHORT RECESS WAS TAKEN, AFTER WHICH THE

13   FOLLOWING PROCEEDINGS WERE HAD:)

14        THE COURT:  All right.

15        MR. DAVIS:  Judge, we have what is about the most

16   tentative offer/deal plan, whatever you want to call it

17   that I've ever seen that -- well, I don't want to represent

18   to the Court what Mr. Anderson wants to do with the

19   suggestions.

20        MR. GELFAND:  Mr. Anderson -- Mr. Margulis and I

21   had an opportunity to speak to Mr. Anderson in the holding

22   cell area, whatever you want to call it, and Mr. Anderson

23   has requested this evening to think over the serious life

24   decision, talk it through more with us and possibly have an

25   opportunity to speak to his parents.  We've discussed that

1    with the Government.  The Government, regardless of

2    Mr. Anderson, also has to kind of run it up their chain

3    within the U.S. Attorneys Office.  What we would propose --

4    my understanding is Mr. Davis cleared this with the

5    Marshals' service -- is that Mr. Anderson be brought back

6    here to the courthouse tomorrow morning, so that if we do

7    in fact reach a deal we can, obviously the Court can hold a

8    change of plea hearing before we have the jurors come, and

9    we have also represented to the Government that if for

10   whatever reason they don't get authority or our client

11   doesn't wish to enter a plea, we will represent that to

12   them and to the Court as soon as possible.

13        THE COURT:  So, essentially what's going to

14   happen tomorrow is that you're going to finish your

15   discussions and either tell me that you have some type of

16   plea deal that we're going to try to finalize tomorrow, or

17   we'll have a further Frye hearing with respect to any offer

18   or counteroffer that was made?

19        MR. DAVIS:  Given this late hour, the Marshals

20   have indicated they think they could have Mr. Anderson here

21   at 9:00, not in court at 9:00, but physically in the

22   building at 9:00.  I obviously don't know what the Court's

23   docket is, if you want to set a time for an appearance.

24        THE COURT:  I'm fairly booked tomorrow.  I was

25   supposed to leave to go to a doctor's appointment.  I have

1    something at -- I have a 9:30 plea and that's the one

2    related to whether we have a trial right after the Anderson

3    trial.  No, that's a different one.  So, I have a 9:30

4    plea, I have something in chambers at 10:00.  I was

5    supposed to leave at 10:30 for a doctor's appointment, but

6    if you all tell me by 10:30 that there is a reason for me

7    to stay here, I'll cancel it, okay?  So, why don't -- if

8    Mr. Anderson will be back here in the building at 9:00, why

9    don't you all see if you're in a position to tell me where

10   you are at 9:30.  And if it's just a no-go, then what we'll

11   do is we'll set a time certain to do that Frye hearing, and

12   if it looks like we are going to try and work something out

13   tomorrow, then we will be in a position to evaluate how

14   much time you all need for that, and then we can set a time

15   for that as well.  Does that make sense?

16            MR. DAVIS:  Yes, ma'am.

17            THE COURT:  So, hopefully by 9:30 you all can let

18   me know what the status is.  I will be in court taking a

19   plea in another case, and, you know, just come in and I

20   will hear from you before I take that plea.

21            MR. DAVIS:  Very well.

22            MR. MARGULIS:  Sounds good, Your Honor.

23            THE COURT:  Anything else we need to address

24   tonight folks?

25            MR. DAVIS:  I don't believe so, Your Honor.

 1            THE COURT:  We'll be adjourned.  Thank you all

 2   for staying so late tonight.

 3            THE COURT:  Mr. Anderson, you understand where we

 4   are and what's happening now?

 5            THE DEFENDANT:  Yes, ma'am.  Thank you so much

 6   for your time.  I apologize.

 7            THE COURT:  No reason to apologize.

 8            (COURT ADJOURNED AT APPROXIMATELY 5:45.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              REPORTER'S CERTIFICATE

2

3          I, Patti Dunn Wecke, Registered Merit Reporter,

4    hereby certify that I am a duly appointed official court

5    reporter of the United States District Court for the

6    Eastern District of Missouri.

7          I further certify that the foregoing is a true

8    and accurate transcript of the proceedings held in the

9    entitled cause, and a true and correct transcription of my

10   stenographic notes.

11         I further certify that this transcript,

12   containing pages 1 - 128 inclusive, was delivered

13   electronically and that this reporter takes no

14   responsibility for missing or altered pages of this

15   transcript when same transcript is copied by any party

16   other than this reporter.

17         Dated at St. Louis, Missouri, this 28th day of

18   March, 2018.

19                       /s/Patti Dunn Wecke, RMR, CRR, CMRS
                              Official Reporter
20

21

22

23

24

25